IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re: Application Pursuant to     )
28 U.S.C. 1782 of     )
     )
FARHAD AZIMA     )     Case No.: 22-20707-MC-MARTINEZ
     )
     Petitioner,     )
v.     )
     )
INSIGHT ANALYSIS AND RESEARCH,     )
LLC, and SDC-GADOT LLC,     )
     )
     Respondents,     )
     )
_____)

## AMIT FORLIT'S SUPPLEMENT TO DE # 31:

AMIT FORLIT, by and through the undersigned attorneys (who continue to represent AMIT FORLIT on the basis of the original Notice of Limited Appearance), hereby files this Supplement to his filed Response in Opposition to Petitioner's Supplemental Application for Discovery under 28 U.S.C. § 1782, and his Motion to Dismiss for Want of Jurisdiction (DE # 31), upon proffer of the following[1]:

1. On July 20, 2022, SDC-GADOT, LLC produced Amit Forlit as its Rule 30(b)(6) designated representative to testify about the areas/matters of inquiry identified in the Petitioner's April 7, 2022 Notice of Deposition directed to SDC-GADOT, LLC. **This was done pursuant to the express agreement between counsel for the Petitioner, and counsel for Respondents INSIGHT**

---

[1] By filing this Supplement to DE # 31 (which was previously filed pursuant to Court Order), AMIT FORLIT does not assent to personal jurisdiction or subject matter jurisdiction of this Court, but rather continues to maintain that a want of subject matter jurisdiction and personal jurisdiction require denial of the relief sought by Petitioner as to AMIT FORLIT and dismissal of these proceedings as to AMIT FORLIT.

**ANALYSIS AND RESEARCH, LLC and SDC-GADOT, LLC[2].** Per said agreement, the Rule 30(b)(6) deposition of SDC-GADOT, LLC was to proceed as to the following agreed areas of inquiry:

    a. "The investigation of Mr. Azima, related hacking, and preparation of investigation reports.", and

    b. "The subsequent cover-up and scheme to submit false evidence to the UK Court."

2. Per the agreement of the parties, this deposition was scheduled to be conducted at a location in Tel Aviv, Israel.

3. The deposition of SDC-GADOT, LLC began at 11:09 a.m. local time (in Tel Aviv, Israel, where it was being conducted) on July 20, 2022, and it ended at 6:49 p.m. (with breaks for lunch, and short breaks as necessary to accommodate the witness and counsel for the parties).

4. Per the agreement of the parties, the deposition of INSIGHT ANALYSIS AND RESEARCH, LLC was scheduled, and conducted the following day. It began at 11:07 a.m. and concluded at 5:05 p.m. As with the day before, Amit Forlit was present as the designated representative of INSIGHT ANALYSIS AND RESEARCH, LLC, and by agreement of the parties he was presented to testify regarding the following agreed areas of inquiry:

    a. "The investigation of Mr. Azima, related hacking, and preparation of investigation reports.", and

    b. "The subsequent cover-up and scheme to submit false evidence to the UK Court."

5. Of note, the majority of questions asked during the July 20, 2022 and July 21, 2022 depositions were far outside of the designated areas of inquiry, ***and instead went to issues which were personal to Amit Forlit***, or which were related to the activities of other companies (such as Gadot Israel).

6. Consistently during the two (2) days of depositions, Amit Forlit testified unequivocally that a) no investigation of the Petitioner was ever performed by Amit Forlit, SDC-GADOT, LLC, Gadot Israel,

---

[2] See EX 1 filed herewith.

or INSIGHT ANALYSIS AND RESEARCH, LLC, b) as a matter of policy, Amit Forlit and the entities with which he is affiliated do not conduct any security research or surveillance of American Citizens or persons located in the United States, and c) the "sworn" statements made by Stuart Page, upon which the Petitioner has based these proceedings, are patently false and were obtained by the Petitioner through coercion[3].

7.  As reflected in the deposition transcripts (which will be filed separately with the Court), the deponent answered nearly all questions asked of him, including those which were entirely outside of the scope of the Rule 30(b)(6) areas of inquiry which had been agreed upon by the parties.

8.  For purposes of example, the following questions (and responses) were provided during the two (2) days of depositions which had no relation whatsoever to the agreed upon areas of inquiry:

>   Q.  And for example where did the CitiBank records get mailed to?
>
>   A.  As far as CitiBank is concerned mostly they would send a debit card but the rest of the documents were usually sent via the application the app.
>
>   Q.  And did they send those did they send the debit cards to New York or to Miami?
>
>   A.  No they sent it to Israel I had a fraud event with my card so I canceled the card and they sent me a new card which they sent to Israel.
>
>   Q.  And the fraud on the card was for a debit card?
>
>   A.  Yes.
>
>   Q.  Who actually used those debit cards during the life of this account at CitiBank?
>
>   A.  I did.

---

[3] At the end of the July 20, 2022 deposition, counsel for the Petitioner asked:

>   Q:  "Well Stuart Page was yourself boss and he paid you millions of dollars and he said you and your team authored every one of these project updates about Project Beech is that accurate?"

In response, Amit Forlit testified:

>   A:  "Stuart Page told me before he gave his affidavit that he tried to commit suicide twice because **they pressured him and forced him to cooperate** what I know is that we sent reports to Stuart Page at his request the reports were left open **and that we did not investigate Farhad Azima**."

Q.  Did anyone else use those cards?

A.  With the exception of the fraud case.

Q.  Yes?

A.  Nobody else.

Q.   So all the purchases then that would be indicated in the bank statements for Citi that were made on the debit card would have been your personal charges; correct?

A.   These are not personal expenses these are company expenses.

Q.   And so when you purchased a Porsche in Pennsylvania was that a business expense or a personal expense?

THE INTERPRETER:  When you acquired a what.

MR. BEHRE:  A Porsche the car.

THE WITNESS:  I never bought a Porsche in Pennsylvania.

Q.  Have you ever resided in the state of Florida?

A.  Only as a tourist I never resided there.

Q.  Have you ever resided in the United States?

A.  No.

Q.  Have you ever purchased a vacation home in the United States?

A.  No.

Q.  Have you ever attempted to purchase a vacation home in the United States?

A.  No.

Q.  Did you ever form an LLC to purchase a vacation home in the United States?

A.  No.  I bought once a caravan an RV.

Q.  Did you ever form an LLC with your wife in an effort to buy a vacation home in the United States?
A.  I set up an LLC with my wife in order to buy a caravan not not a vacation home an RV.

Q.   What was the last part sorry?

A.   Recreational vehicle an RV.

Q.   And when was that?

A.   I believe it was in 2012 and then when we maybe 20 or maybe 2014 he adds and when we divorced in 20 the end of 2017 beginning of 2018 as part of the divorce arrangement I transferred to her the ownership of the RV.

Q.   And while you owned the RV where was it stored when it was not being used?

A.   It was in use about one month or one month and a half per year and we would store it in the place that we would we would be arriving at.

Q.   And what state was that?

A.   I believe we visited something like 30 states like all over the place.

Q.   Was it ever stored in the state of Florida?

A.   I don't believe so.

Q.   Where?

A.   Because we were more on the west.

Q.   And where from what state were the license plates obtained from?

A.   I don't I honestly don't remember.

Q.   In what state did you purchase the RV?

A.   New Jersey.

Q.   Now you indicate in the third paragraph of this affidavit dated May 12, 2022, that SDC-Gadot LLC has not conducted business in the state of Florida. Do you see that?

A.   Yes.

Q.   Is that an accurate statement?

A.   I believe it is.

Q.   And when you say you it the company has not conducted business in the state of Florida what do you mean?

A.   That we did not do any business in the state of Florida.

A.   We did not carry out any investigation and we did not conduct any business activity.

Q.   Okay.  Now, in paragraph three as well you say the last time you were in the United States was 2019 what were you doing in the U.S. in 2019 (Not translated.)

A.   I was on a trip in the Yosemite National Park went up to Canada I was with my partner.

Q.   You indicate in paragraph six that you are an investigator and you were hired by Stuart Page to quote run intelligence gathering services end quote. Do you see that?

A.   I'm looking -- looking for it.  Yes I see it.

Q.   Are you considered a private investigator?

A.   Among other things yes.

Q.   Are you registered as a private investigator here in Israel?

A.   I'm registered and I have a firm certificate.

Q.   Are you do you have a license to be a private investigator?

A.   There are two levels I'm I have a private investigator's license and I have a license to run an investigating firm I don't actually use them here in Israel but I have those documents from the justice department or Ministry.  I don't think I've even renewed those licenses.

Q.   Has your license ever been suspended or revoked by the government of Israel?

A.   Yes.

A.   Yes I don't even recall why they suspend ed it but then they reinstated.

Q.   And do you recall what year it was suspended?

A.   2005 or six.

Q.   And did it relate to your involvement in smuggling someone out of the State of Israel who was wanted by the Israeli government?

A.   I was accused of that there was a trial I was not found I was not convicted and so my license was restored.

Q.   So that was the reason your license was suspended?

A.   I think so but I don't recall exactly.

…

MR. BARET:  Excuse me how does that relate to SDC-Gadot which is the purpose of this deposition.

MR. BEHRE:  He's claiming he's an investigator and I'm probing about his license.

MR. BARET:  This is not this wasn't for SDC this affidavit was provided to the court as an objection to deposing personally it wasn't.

**MR. BEHRE:  It doesn't matter it's the same case.**

MR. BARET:  No it's not I mean there is objection to his deposition which the court has not ruled yet we objected for his deposition and since you came from Washington I'm I'm sitting quietly and I'm trying not to interfere but it turns out that you are deposing Amit Forlit as Amit Forlit which we objected to this deposition and the court hasn't ruled yet and we here for the purposes of investigating or taking deposition of a representative of SDC-Gadot Florida.

MR. BEHRE:  Correct.

MR. BARET:  Now it happens to be Amit Forlit but the court has not ruled as to our objection to depose him personally and it turns out that this deposition turns to be taking a deposition in his personal capacity which we are objecting so.

MR. BEHRE:  In the affidavit paragraph five he specifically references SDC-Gadot LLC in paragraph six he says I am an investigator.

MR. BARET:  This is this affidavit was provided in our objection to depose him personally it wasn't we never objected to deposition of SDC-Gadot we're not objecting to SDC-Gadot as a Florida corporation.   He happens to be a representative of that corporation and I request that your questioning will be related to SDC-Gadot and not to Amit personally as the court hasn't ruled yet as to your right to depose him personally the court will.

MR. BEHRE:  Okay I hear your objection.

…

Q.   Did any of the payments that SDC-Gadot received relate to Gadot's use of subcontractors who were located in the United States?

A.   Not that I can recall.

Q.  Did you have any subcontractors in the United States?

A.  Not subcontractors I had vendors that I paid not subcontractors.

Q.  And did you have vendors located in the United States?

A.  I had vendors in the United States but they are not connected to the case related to Stuart Page.

…

**Q.   And part of the objective of your work was to prevent those who you thought was harming RAK from doing harm; right?**

**A.   So from the investigation concentrated or focused on the criminal activities carried out by Khater Massaad** both business in business and in politics such as for example assisting Hezbollah or violating the sanctions on Iran and he and his use of various infrastructure structures belonging to RAK the state in order to commit these illegal activities criminal activities among other things we provided protection and our work included protecting creating protocols in order to protect the entire environment the boss was very, very concerned and he he refused to talk on on the telephone because he was so concerned.

Q.  And SDC-Gadot received payments that were at least in part for the preparation of those reports; correct?

A.  So SDC-Gadot received payment for the whole Beech case and that included the security protocols and reports.

Q.  And it also included payments for the work that was reflected in those reports; right?

A.  Yes.

…

Q.  Okay.  How did you first meet Stuart Page?

A.  I believe it was in 2008 or 2007.

A.  I went to London and I was requested to do some job for him.

Q.  Requested by who?

A.   A mutual acquaintance for whom I was working at the time.

Q.   And who was that mutual acquaintance?

A.   How is this connected to this case.

Q.   It's directly related Stuart Page paid Stuart Page paid you $2.6 million into the U.S. account and I want to know how it is you first came in contact with Stuart Page?

A.   I met him through a mutual acquaintance I believe it was Mr. Rafi Pridan.

…

Q.   When were you first hired for Project Beech?

A.   I believe it was 2015.

Q.   So you worked with Stuart Page for approximately seven years before this project; right?

A.   Not consistently but between 2008 and 2015 on and off.

Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?

A.   **I was working only Khater Massaad as the subject of my investigation** and it went only under Project Beech.

Q.   Was there ever a time when that investigation was also called Project Oak?

A.   No Project Oak is something else.

Q.   Okay.  You testified earlier that you did not have a retainer agreement with Stuart Page; is that correct?

A.   To the best of my recollection there was no retainer agreement occasionally when we had problems with funds transferring with Hong Kong we would make some arrangements that would pacify the banks but to the best of my recollection there was no organized orderly retainer agreement with him.

Q.   What was the purpose for which you were hired?

A.   You mean on the Beech Project?

Q.   Yes.

A.   As I specified earlier there were concerns and suspicions on the part of the boss that Khater Massaad was causing damage to the state including assistance given to political opponents including felonies that would embarrass the boss very seriously vis-a-vis the United States in terms of the violations of the sanctions against Iran.

Q.   Did your investigation involve at all Karam Al Sadaq?  (spelling)

A.   The correct name is Karam Al Sadeq Karam Al Sadeq I also speak Arabic when we launched our investigation Karam was already arrested by the authorities of RAK.

A.   And we did get feedback from concerning him from the investigation he had already been investigated by RAK among other things concerning offshore companies that he had.

Q.   The allegations against Al Sadeq were similar to the allegations against Massaad right they were related?

A.   Not not exactly Massaad.

A.   To the best of my recollection Sadeq assisted in creating the infrastructure for Massaad's activity but the the initiator was Massaad.

Q.   Were you present for any of the interrogations of Al Sadaq.

A.   No and I've never been to Ras Al Khaimah.

…

Q.   Now you testified earlier that you were involved in private investigation correct?

A.   Yes.

Q.   And you don't provide IT services do you?

A.   I provide security envelope for computers not necessarily IT what you call IT. We've for example developed a telephone that can't be tapped into and all kinds of technological developments.

Q.   But with regard to Project Beech you 4   didn't provide any IT security other than the open-ended e-mail system where you put the reports right (Not translated.)

A.   I did provide in Project Beech I actually did provide consults services regarding communication security.

Q.  But that was a very small part of what you did for Project Beech; right?

A.  It was part I can't define it as big or small.

…

Q.  And if you look on on the same page that's page 52, on February 6 and February 13 just about a week apart there were two transfers one for 49,000 and one for 50,000 to Fusion GPS. Do you see that?

A.  Yes.

Q.  (Not translated.)

Q.  And Fusion GPS is an investigative firm; is that correct?

A.  Yes but there's no connection whatsoever to Stuart Page or Project Beech.

Q.  And Fusion GPS was a subcontractor to SDC-Gadot; correct?

A.   No they did not do any work for SDC-Gadot but they it was payment for something else.

Q.   And did the payments to Fusion GPS relate to anything you were doing for Stuart Page?

A.  Under no circumstances not at all.

…

Q.   There's a $47,000 payment on February 22 a wire to an Olam hamachshavim who is that (Spelling)?

THE INTERPRETER:  Are did I get that right Olam machshavim (Spelling).

THE WITNESS:  It's a vendor who supplied me with equipment again it has nothing to do with Stuart Page.

BY MR. BEHRE:

Q.  So it's your testimony that Olam sold you equipment?

A.  Yeah it's a computer store Olam HA machshavim.

THE INTERPRETER:  That means computer world in Hebrew so yes I guess it must have been for equipment.

…

Q.   Directing your attention go to 54 that's the SDC-Gadot statement for March 2018 there is a there's a wire on March first for $30,000 to Aviram Hawk which is Aviram Azari's company

A.   Yes that's correct.

Q.   And Mr. Azari recently pled guilty in Federal Court in New York to hacking didn't he?

A.   Yes he confessed to seven separate incidents of computer hacking in New York.

Q.   And the document in which he pled guilty references an Israeli company but they don't name that company was that company yours?

A.   No.

Q.   How do you know that?

**A.   Because I've never commissioned hacking** have never paid for hacking.

Q.   You're aware that Mr. Azari is cooperating with federal law enforcement officials in the U.S.; correct?

A.   I wish him all the best.

Q.   Have you been contacted by those prosecutors about this case?

…

Q.   What work did Azari do for you if it wasn't hacking?

A.   For me he never did any work.

Q.   Yet he was paid $55,000 on March first and March 12, 2018?

A.   He did work for Gadot and that work included economic investigations financial investigations.

**Q.   And by financial investigations does that mean obtaining confidential banking and financial records about individuals who were being investigated?**

**A.   The investigations that Azari did for me had nothing to do with Project Beech or anything to do with Stuart at all.   And I asked him that any investigations he did to me for me be done in accordance with the law.**

**Q.   Why did you find it necessary to tell him to act lawfully?**

**A.  I say that to every one of my subcontractors.**

…

Q.   If you look on the same page that's page 54 there are two entries on March 15th 2018 were where you received wires and one of them the first one is from Florida a p telecom Inc. Do you see that?  It's a $1,000 that came in from a Florida entity; correct?

**A.  This is -- this is a different customer it has nothing to do with page or any of this case and I can add that the investigation in this particular instance was in South America** and has nothing to do with what's going on.

**Q.  In your affidavit that you submitted in this case in Florida, you indicated that you didn't transact business in Florida and yet we have a transaction where you received $100,000 from a Florida company what business did you transact with this Florida company?**

**A.  I did not transact any business in Florida as I said earlier and this payment is for work that was done in South America.**

…

**Q.   Well, if you look on March 23 on page 55 you received $350,000 from overseas consulting limited LLP; correct?**

**A.   There's no connection whatsoever between these wires and Stuart Page and I I can't answer beyond saying that this has nothing to do with Project Beech Farhad Azima or Stuart Page.**

Q.   So in the month of March 2018 you received $650,000 from Florida companies; correct?

A.  **This work was not executed in Florida the customer is not a U.S. citizen**. And apparently part of the payment for this work was transferred through an American through American companies.

Q.  So my question is you went to all of this trouble to open the SDC-Gadot LLC account with CitiBank and yet you appear to be moving money just about as fast as you get it out to the Israeli entity. Why?

**A.   Most of the work was carried out by Gadot Israel.  And as I explained before these accounts in the United States were opened merely for convenience's sake which had proved itself over time.  As I can see now in July there's a lot of activity that is not connected to page at all to Stuart Page.**

…

Q.   Okay.  What about Ezekiel Golan Intellectual Pro there are several wires to that entity on December 12th and 13th totaling $65,000. Ezekiel Golan intellectual pro?

A.   It is not connected connected in any way whatsoever to Stuart Page or to the Beech Project.

Q.   What services did @Ezekiel Golan intellectual provide?

A.   I am prevented from answering that this is not connected and it is under privilege.

Q.   Under privilege because you were acting at the direction of a lawyer (Not translated.)

A.   No because of my agreement with Ezekiel Golan that commands a privilege.

Q.   Well, I don't knowing that's a valid basis not to answer?

…

Q.   And then in July 2019 there's a trip to Vegas you stayed at the?

A.   (In English.)  July.

Q.   July 2019 you went to the practiced a store and spent $535 the Montclaire store and spent 2175?

A.   I want a belt.

Q.   You won a?

A.   I can bring it tomorrow.

Q.   Okay.  I'll try it on.

Q.   And you saw the Beetles on Broadway and you ate at Joel Robishon?

A.   Joel Robishon.

Q.   Right?

A.   Kin.

…

9.  In addition to regularly going beyond the scope of the agreed upon Rule 30(b)(6) areas

of inquiry, counsel for the Petitioner resorted to threats of sanctions hearings before the

Court if his overly broad questions were not answered on the spot by the witness:

> Q.   Now if you want to if you want to say that's not something we can reach you can say it but it's then you've instructed him not to answer right
>
> MR. BARET:  I'm instructing him not to talk about this because this relates directly to his motion for protective order not to be deposed in his personal capacity.
>
> BY MR. BEHRE:
>
> Q.   He opened the door to this and if you want this to go before the judge in Florida we can do that but, you know, you know how that judge has already started to view him so if you want to instruct him not to answer you you can if that's your instruction you go ahead?
>
> MR. BARET:  He answered but I think this line of questioning is inappropriate for the purpose of this deposition.
>
> …
>
>   MR. BARET:  He's saying he didn't write it.
>
> BY MR. BEHRE:
>
> Q.   But you can ask him about it he can deny?
>
> MR. BARET:  He just did.
>
> BY THE WITNESS:
>
> Q.    If you want to instruct him not to answer we'll do this some more are you instructing him not to answer?
>
> MR. BARET:  I'm saying that it's not the subject of today's deposition.
>
> BY THE WITNESS:
>
> Q.   Let me because he opened the door to it by saying he didn't investigate Farhad Azima he can be impeached?
>
> MR. BARET:  That proves that he lied earlier today about investigating Farhad Azima.

MR. BARET:  That's what you're saying but he's saying he didn't write this report.

MR. BEHRE:  He can say that all he wants but you can examine because it's a deposition if you want to instruct him not to answer be my guest and we'll and we will seek costs for this entire trip.

MR. BARET:  All I'm saying it's not his report now if he wants to continue answering it's his choice go ahead answer.

…

10. Despite the threats of Petitioner's counsel, and the hours of overly broad questions proposed by counsel for the Petitioner, the deponent did provide direct responses to questions which were within the scope of the Rule 30(b)(6) designations, and as noted above in those responses **the deponent unequivocally testified that neither corporate Respondent, nor Amit Forlit himself, ever investigated the Petitioner, nor were they ever hired to investigate or "hack" the Petitioner.  The Deponent also testified that he was not involved in any "cover up" story to be presented to the Courts in the U.K.**:

Q.  So in the in the document subpoena that you have in front of you Exhibit No. One it asks in on page nine of 39 so the numbering is in the upper right-hand corner under 1A the asks for all reports. Do you see that?

A.  Yes.

Q.  And are those the reports you referenced as having not been retained?

A.  **No we have no reports on Azima because we didn't do any reports on Azima.**

Q.  So it was your testimony that there was no report that mentioned Farhad Azima?

A.  **No.  In my opinion there were reports that mentioned Azima Farhad Azima not as the subject of an investigation but as someone whose name came up in the investigation.  And as I said earlier no reports were preserved so everything that I'm saying now is from memory.**

Q.  So is it your testimony that the reports that mentioned Azima didn't reflect any investigation by your company of Azima?

**A.   My company did not investigate Farhad Azima so my company investigated Dr. Khater Massaad. In some of the transactions that Khater Massaad was involved in, other people were involved like members of the republican guard in -- revolutionary guard in Iran.  Like other people that were involved in these transactions and their names were mentioned.  And Farhad Azima's name came up in some of the transactions.**

…

Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?

A.   **<u>I was working only Khater Massaad as the subject of my investigation</u>** and it went only under Project Beech.

…

Q.   Were you involved in writing this report?

A.   No.

Q.   A few minutes ago you said you weren't sure one way or the other why are you now sure you weren't?

A.   **Because I see that this is a report of an investigation on Farhad Azima and we never investigated Farhad Azima.**

…

Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?

A.   **<u>I was working only Khater Massaad as the subject of my investigation</u>** and it went only under Project Beech.

…

Q.   **Amit were you ever asked to investigate Farhad Azima?**

A.   **No.**

Q.   **Did you ever author or somebody under you author any reports regarding Farhad Azima?**

A.   **No.**

Q.   After you provided the report to Stuart did you have any control over what was added to the report?

A.  No.

Q.   Before Stuart provided a report or forwarded it to the client did he ever share with you the final version of the report that was produced to the client?

A.  No.

MR. BARET:  No further questions.

…

Q.   Well you're aware aren't you that by the time that meeting was held in Switzerland, Farhad Azima had already sued Rakia the boss for hacking him in the United States; right?

A.   I don't I have no information regarding who hacked into Farhad Azima's computers but I do know that in the wake of the trial in the U.K. it was decided that the boss he was right that he yeah that he was right.

Q.   The boss was right about what?

A.   He Wanzor the trial in England his suit against Farhad Azima.

…

Q.   Directing your attention go to 54 that's the SDC-Gadot statement for March 2018 there is a there's a wire on March first for $30,000 to Aviram Hawk which is Aviram Azari's company

A.   Yes that's correct.

Q.   And Mr. Azari recently pled guilty in Federal Court in New York to hacking didn't he?

A.   Yes he confessed to seven separate incidents of computer hacking in New York.

Q.   And the document in which he pled guilty references an Israeli company but they don't name that company was that company yours?

A.  No.

Q.  How do you know that?

**A.  Because I've never commissioned hacking have never paid for hacking.**

…

Q.   This document is labeled Project Beech you were involved in Project Beech and this establishes just like the last document contrary to your testimony that Farhad Azima was not only being investigated he was being attacked he was being targeted and he was in jeopardy because of that isn't that right?

A.   As I said my reports on Project Beech were sent to Stuart Page in an open format.

A.   I don't know who else Stuart used the name Project Beech with he made up that name.

A.   **I know that we did not investigate Farhad Azima we did not target him as a target** but it's quite clear that somebody did because somebody hacked and hacked and leaked his computers and based on the procedures that are used in the U.S. I think you know who it is.

Q.   And who would that be?

A.   Nick Del Rosso based on the proceedings against Nick deli conclude that.

Q.   And what's your basis for saying Nick Del Rosso is the party who wrote this report is that what you're saying?

A.   **I didn't say Nick Del Rosso wrote this report I said that we did not write this report.** And based on all the proceedings that are being carried out the person who is responsible for the hack and the leaks (Spelling) of the harking is Nick Del Rosso.

…

Q.   Well you're aware aren't you that by the time that meeting was held in Switzerland, Farhad Azima had already sued Rakia the boss for hacking him in the United States; right?

A.   I don't I have no information regarding who hacked into Farhad Azima's computers but I do know that in the wake of the trial in the U.K. it was decided that the boss he was right that he yeah that he was right.

Q.   The boss was right about what?

A.   He Wanzor the trial in England his suit against Farhad Azima.

11. As this Court is well aware, the Petitioner has filed an Amended Petition seeking a deposition of Amit

Forlit, individually, as well as the right to seek production of documents from Amit Forlit relating to

the two (2) issues identified in the Declaration of Dominic Holden (which are the exact designated areas of inquiry identified in the Respondents' Rule 30(b)(6) designations.

12. Amit Forlit appeared, and provided testimony about those two (2) areas of inquiry, as well as matters far afield of those areas of inquiry, for more than fifteen (15) hours over two (2) days.

13. At this point, the discovery sought by the Amended Petition is moot, as the Petitioner has already completed the discovery deposition which Petitioner sought, and Petitioner has already received the sworn answers that Petitioner sought to obtain.

14. Unequivocally, Amit Forlit has testified that neither he, nor the Respondents, ever investigated Farhad Azima, they were not retained to investigate Fahrad Azima, they did not "hack" or retain anyone to "hack" Fahrad Azima, and they were not involved in any "coverup" conspiracy to mask the origination of the information that was utilized in the UK trial involving Fahrad Azima.

15. Even though Petitioner's counsel essentially decided to utilize subterfuge to obtain the opportunity to ask the proffered corporate representative a multitude of questions in his individual capacity, and despite the fact that no authorization for such a deposition had been issued or provided by this Court, the testimony was still provided, thereby giving the Petitioner the answers to very questions he is currently petitioning this Court to authorize be asked of Amit Forlit.

16. As stated previously, discovery permitted under 28 USC § 1782 lies in the sound discretion of the Court, and it is not mandatory.  The Court may exercise its discretion to disallow discovery, or more narrowly tailored (or "trim") the Petitioner's discovery requests.  And at a bare minimum, it is incumbent upon the Court not to allow a Petitioner to harass and bury a Respondent under discovery requests which are lodged purely for oppressive purposes. "The district court's discretion to allow discovery if all § 1782 requirements are met *is not boundless*. Rather, district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide

similar assistance to our courts." <u>Intel Corp.</u>, 542 U.S. at 252 (quoting <u>Advanced Micro Devices, Inc.</u> <u>v. Intel Corp.</u>, 292 F.3d 664, 669 (9th Cir. 2002)). The Supreme Court has identified four discretionary factors that also "bear consideration" in arriving at a decision. <u>Id.</u> at 264. The first factor to consider is whether the person from whom discovery is sought is a party to the foreign proceeding, in which case "the need for § 1782(a) aid generally is not as apparent" because a "foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." <u>Id.</u> The second factor, at issue here, was adopted from a Senate Report explaining that a court "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." <u>Id.</u> (citing S. Rep. No. 88-1580, at 7 (1964), <u>as reprinted in</u> 1964 U.S.C.C.A.N. 3782, 3788 (hereinafter "Senate Report")). The third factor to consider is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." <u>Id.</u> at 265. ***Finally, the fourth factor addresses whether the request is "unduly intrusive or burdensome" to the extent that it should either be "trimmed" or rejected outright***. <u>Id.</u> In sum, a district court must first determine whether the statutory requirements are met. If they are, the district court should then consider the four discretionary factors before arriving at a decision." See *Schlich v. Broad Inst.*, Inc. (In re Schlich), 893 F.3d 40, 46-47 (1st Cir. 2018).

17. Here, the Petitioner has already conducted a broad fishing expedition through this action, and the conduct of the Petitioner and his counsel show how the Petitioner has been conducting a "bait and switch" game with this Court, in that though arguing that the "purpose" for these proceedings is to gather testimony and evidence for use in the UK proceedings, in reality Petitioner's counsel is probing around in order to complete a pre-suit investigation to determine if the Petitioner may assert causes of action against Amit Forlit individually. This is clear based upon review of the questions asked by counsel for the Petitioner on July 20,

2022 and July 21, 2022 which were outside the scope of the Rule 30(b)(6) designated areas of inquiry agreed upon by the Petitioner and The Respondents in advance of said depositions.

18. Again, all this Court authorized when the initial 28 USC 1782 Petition was granted was the service of document production subpoenas upon these Respondents.

19. Now, the Respondents have been forced to incur tens of thousands of dollars of expenses participating in these proceedings, and Amit Forlit has been forced to incur significant expense as well in order to address the improper methods used to try and drag him into these proceedings, where neither the Respondents, nor Amit Forlit, are parties to the UK Proceedings, or any pending litigation involving the Petitioner.

20. 28 USC 1782 does not authorize *carte blanche* unlimited discovery directed to non-parties merely because the requesting party comes before a Court and states that they believe the proposed Respondent may possess information useful to an ongoing foreign action, or may be a witness at a later time in the ongoing foreign action.

21. Here, the Petitioner and his counsel have grossly abused the discretion of this Court[4], and 28 USC § 1782, and as such this Court should DENY the Supplemental Petition seeking to compel further discovery from Amit Forlit. Furthermore, the relief sought by the Supplemental Petition is moot, as Amit Forlit has already answered questions on July 20, 2022 and July 21, 2022 which the Petitioner's counsel would ask him in an individual deposition if this Court were to determine that ordering such a deposition were somehow proper under 28 USC 1782.

---

[4] Particularly where the Petitioner, and his counsel, have already identified the individual and entities responsible for his "hacking", and are pursuing direct relief against those entities in another District Court in the United States. See EX # 2 which is a copy of the Petitioner's filed Complaint against said parties, as well as EX # 3, EX #4, and EX # 5, which are published news articles detailing the Petitioner's activities, and Petitioner's efforts to address Mr. Del Rosso's hacking activities.

**WHEREFORE** AMIT FORLIT respectfully requests that the Court review this Supplement, review the Exhibits hereto and the Transcripts filed in conjunction herewith, review DE # 31, and thereafter enter a Ruling DENYING the Supplemental Petition filed by the Petitioner, that the Court grant AMIT FORLIT a recovery of reasonable attorney's fees and/or costs associated with this filing and with DE # 31, and that the Court Grant AMIT FORLIT such other and further relief as this Court may deem just and proper.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 5th day of August, 2022, that a true and correct copy of the foregoing has been filed through the Court's CM/ECF-filing portal and that a true copy has been served through the portal upon all counsel of record in this action.

Respectfully submitted,

By: */s/ Elan I. Baret, Esq.*
　　Elan I. Baret, Esquire
　　Florida Bar No.: 20676
　　3999 Sheridan Street, 2nd Floor
　　Hollywood, Florida 33021
　　Tel: (954) 486-9966
　　Facsimile: (954) 585-9196
　　Email: elan@baretlawgroup.com

By: */s/ Christopher S. Salivar, Esq.*
　　Christopher S. Salivar, Esquire
　　Florida Bar No.: 57031
　　6576 Whispering Wind Way
　　Delray Beach, FL 33484
　　Tel: (561) 628-8908
　　Email: cssalivarattorney@gmail.com