**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE SOUTHERN DISTRICT OF FLORIDA
3                        MIAMI DIVISION
4    _____
5    FARHAD AZIMA,                    )
6                      Petitioner,    )
7    vs.                             ) Case No.:
                                      ) 1:22-MC-20707
8    INSIGHT ANALYSIS AND RESEARCH LLC )
     AND SDC-GADOT LLC,               )
9                                     )
                     Respondents.     )
10   _____ )
11
12
13
14          Videotaped 30(b)(6) Deposition of
15          INSIGHT ANALYSIS AND RESEARCH LLC
16      by and through its Corporate Representative
17                     AMIT FORLIT
18                Thursday, July 21, 2022
19            11:07 a.m. Israel Daylight Time
20
21
22
23
24
25   Reported by:  BRENDA MATZOV, CSR NO. 9243
```

**Page 3**

```
1    APPEARANCES:
2    FOR PETITIONER:
3         BARET LAW GROUP
          By:  ELAN I. BARET, ESQ.
4         3999 Sheridan Street
          Suite 200
5         Hollywood, Florida 33021
          (954) 486-9966
6         elan@baretlawgroup.com
7
8    FOR RESPONDENTS:
9         MILLER & CHEVALIER CHARTERED
          By:  KIRBY D. BEHRE, ESQ.
10             IAN A. HERBERT, ESQ.
          900 16th Street N.W.
11        Black Lives Matter Plaza
          Washington, D.C. 20006
12        (202) 626-5800
          kbehre@milchev.com
13        iherbert@milchev.com
14        BURLINGTONS LEGAL, LLP
15        By:  DOMINIC HOLDEN
          5 Stratford Place
16        London, W1C 1AX
          +44 20 7529 5420
17        dominic.holden@burlingtons.legal
18
19
20
21
22
23
24
25
```

**Page 2**

```
1              Videoconference 30(b)(6) deposition
2    of INSIGHT ANALYSIS AND RESEARCH LLC, by and
3    through its Corporate Representative, AMIT
4    FORLIT, taken in the above-entitled cause
5    pending in the United States District Court,
6    for the Southern District of Florida, Miami
7    Division, before BRENDA MATZOV, CSR NO. 9243,
8    at the David Intercontinental Hotel, Tel Aviv,
9    Israel, and simultaneously in the Zoom
10   participants' remote locations, on Thursday,
11   the 21st day of July, 2022, at 11:07 a.m.
12   Israel Daylight Time.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1    APPEARANCES (Continued):
2    ALSO PRESENT (in Israel):
3         MITCHELL COOPERSMITH, Videographer
4         HAYA SHAVIT-KEDAR, Hebrew Interpreter
5         RUCHIE AVITAL, Hebrew Interpreter
6
7    ALSO PRESENT (remotely via Zoom):
8         LESLEY SEMONES, Miller & Chevalier
9         FREDERICK WILMOT-SMITH, Burlingtons Legal
10        LUKE HACKETT, Burlingtons Legal
11        FARHAD AZIMA
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              I N D E X
 2  WITNESS
 3  Amit Forlit
 4  (Witness Location:  Tel Aviv, Israel)
 5
 6  EXAMINATION                          PAGE
 7  By Mr. Behre                           9
 8  By Mr. Baret                         129
 9
10            E X H I B I T S
11  NUMBER      DESCRIPTION            MARKED
12  Exhibit 1   Multiple Invoices from
               SDC-Gadot LLC to Page
13             Group ME Ltd. and Page
               Risk Management DMCC,
14             Multiple Dates
               (Provided by Amit Forlit)
15             (No Bates Number)          13
16  Exhibit 2   Multiple Invoices from
               Insight Analysis and
17             Research LLC to Page
               Group ME Ltd., PGME,
18             and Page Risk Management
               DMCC, Multiple Dates
19             (Provided by Amit Forlit)
20             (No Bates Number)          15
    Exhibit 3   Document Entitled
21             "Electronic Articles of
               Organization for Florida
22             Limited Liability Company,"
               for Insight Analysis and
23             Research LLC, Date Filed
               October 18, 2017, and
24             Related Documents
               (No Bates Number)          52
25
```

**Page 6**

```
 1            E X H I B I T S
 2  NUMBER      DESCRIPTION            MARKED
 3  Exhibit 4   Document Entitled
               "Business Resolution or
 4             Authorization for Opening
               and Maintaining Banking
 5             Relationship," Dated
               October 30, 2017
 6             (BANA_Azima000284 to 000288)   61
 7  Exhibit 5   Multiple Bank of America
               Statements for Insight
 8             Analysis and Research LLC,
               Multiple Dates
 9             (BANA_Azima000222 to 000283
               and BANA_Azima000001 to 000182) 63
10  Exhibit 6   Document Entitled
11             "Project Beech - Financial
               Investigation Report #1,"
12             Dated March 13, 2016
               (No Bates Number)          101
13  Exhibit 7   Multiple Invoices from
14             Insight Analysis and
               Research LLC to Page
15             Group ME Ltd., PGME,
               and Page Risk Management
16             DMCC, Multiple Dates
               (No Bates Number)          120
17
18
19
20   Q U E S T I O N S  I N S T R U C T E D
21          N O T  T O  A N S W E R
22                 (None.)
23
24
25
```

**Page 7**

```
 1              THURSDAY, JULY 21, 2022
 2            11:07 A.M. ISRAEL DAYLIGHT TIME
 3
 4              THE VIDEOGRAPHER:  Today's date is
 5  July 21st, 2022.  And the time on the video
 6  monitor is 11:07 a.m.
 7              This is the videotaped deposition
 8  of Amit Forlit, in the matter of Farhad
 9  Azima versus Insight Analysis and Research
10  LLC and SDC-Gadot LLC, being heard in the
11  United States District Court, Southern
12  District of Florida, Case No. 1:22-MC-20707.
13              The videotaped deposition is taking
14  place in Tel Aviv, Israel, as well as parties
15  are attending remotely.
16              Would the counsel present -- present
17  in Tel Aviv please voice-identify themselves
18  and whom they represent.
19              MR. BEHRE:  Kirby Behre, on behalf
20  of Mr. Azima.
21              MR. BARET:  Elan Baret, on behalf
22  of Insight and Gadot SDC.
23              MR. HERBERT:  Ian Herbert, on
24  behalf of Farhad Azima.
25              MR. HOLDEN:  Dominic Holden, on
```

**Page 8**

```
 1  behalf of Farhad Azima.
 2              THE VIDEOGRAPHER:  Will the court
 3  reporter please affirm the interpreters and
 4  the witness.
 5
 6              HAYA SHAVIT-KEDAR
 7                    and
 8              RUCHIE AVITAL,
 9        the interpreters, were duly affirmed
10        to translate from English to Hebrew
11        and from Hebrew to English.
12
13        (The following proceedings were
14        conducted through the interpreters,
15        unless otherwise indicated, and
16        excluding colloquy.)
17
18              THE COURT REPORTER:  I will ask
19  counsel to please stipulate that, in lieu
20  of formally swearing in the witness, the
21  reporter will instead ask the witness to
22  acknowledge that their testimony will be
23  true under the penalties of perjury, that
24  counsel will not object to the admissibility
25  of the transcript based on proceeding in
```

9

```
1   this way, and that the witness has verified
2   that he is Amit Forlit.
3           Counsel, do you agree?
4   MR. BEHRE:  Yes.
5   MR. BARET:  Agreed.
6           THE COURT REPORTER:  Mr. Forlit,
7   do you hereby acknowledge that your testimony
8   will be true under the penalties of perjury
9   and do you affirm that the testimony you are
10  about to give in this deposition will be the
11  truth, the whole truth, and nothing but the
12  truth?
13          THE WITNESS:  Yes.
14
15                  AMIT FORLIT,
16          called as a witness, was examined
17          and testified under penalty of
18          perjury as hereinafter set forth.
19
20                  EXAMINATION
21  BY MR. BEHRE:
22      Q.  Good morning, Mr. Forlit.
23      A.  Good morning.
24      Q.  Would you please state your full
25  name for the record?
```

11

```
1       Q.  And that is a Florida corporation;
2   correct?
3       A.  Yes.
4       Q.  Yesterday you testified on behalf
5   of SDC-Gadot; correct?
6       A.  Yes.
7       Q.  (Partially translated.)  And the
8   "SDC" in that name refers to "safe data
9   control"; correct?
10          THE INTERPRETER:  Say that again.
11          THE COURT REPORTER:  "Safe -- safe
12  data" --
13          THE WITNESS:  (In English.)  "Safe
14  data" --
15          THE COURT REPORTER:  -- "control."
16          THE WITNESS:  (In English.)
17  -- "control."
18          (Remainder of pending question
19      translated.)
20          THE WITNESS:  Apparently, yes.
21  You just reminded me of it.
22  BY MR. BEHRE:
23      Q.  Now, since your testimony last
24  night, other than with counsel, have you
25  had any discussions about your testimony?
```

10

```
1       A.  Amit Forlit.
2       Q.  Have you ever used any other name
3   besides Amit Forlit?
4       A.  In my former years of service in
5   the Israeli secret service, I had a nickname.
6       Q.  And what was that nickname?
7       A.  Omer.
8           THE INTERPRETER:  Omer?
9           THE WITNESS:  (In English.)  Captain
10  Omer.
11          THE INTERPRETER:  "Omer."
12  BY MR. BEHRE:
13      Q.  Could you spell that?
14      A.  (In English.)  O-m-e-r.
15          (Translated.)  O-m-e-r.
16      Q.  And what does that stand for, if
17  anything?
18      A.  It's a nickname.  No, just a nickname.
19      Q.  Other than that nickname, have you
20  ever used any other name, first and/or last?
21      A.  No.
22      Q.  You are here today as the corporate
23  representative for Insight Analysis and
24  Research LLC; correct?
25      A.  Yes.
```

12

```
1       A.  I spoke with my -- members of
2   my family about it.
3       Q.  And by that, do you mean your
4   wife?
5       A.  Yes.
6       Q.  Your son?
7       A.  Also, yes.
8       Q.  Anyone else?
9       A.  Not that I recall.  No.
10      Q.  Did you talk with anyone about
11  SDC-Gadot?
12      A.  I spoke -- I spoke about the process.
13  So I assume we may have mentioned SDC-Gadot.
14  I spoke about my experience.
15      Q.  And other than your family, did you
16  talk to anybody else about SDC-Gadot?
17      A.  Yes.  I also spoke to Omri.  I asked
18  him to prepare for me the invoices.
19      Q.  Okay.  And those -- by "invoices,"
20  you're talking about the SDC-Gadot invoices
21  we discussed yesterday?
22      A.  Yes.
23      Q.  And did you bring those with you
24  today?
25      A.  Yes.
```

13

```
1        Q.  And how many invoices were you able
2   to locate?
3        A.  I'm counting.  Eight.
4            MR. BEHRE:  Okay.  And could we mark
5   this as an exhibit, please.
6            THE COURT REPORTER:  He's got the
7   stickers.  I don't know what number you want.
8            MR. HERBERT:  Start at 1?
9            MR. BEHRE:  I guess it's 1.  You
10  want to put it on the document, not on the
11  plastic.
12           THE COURT REPORTER:  It's okay.
13  I'll put it --
14           MR. HERBERT:  No, I can --
15           THE COURT REPORTER:  Thanks.
16           Might as well staple it too.
17           MR. BEHRE:  Let me just jot down
18  what the dates are and the invoice number.
19  You need to mark it, the number.
20           MR. HERBERT:  Oh, sorry.
21           (Exhibit 1 marked.)
22  BY MR. BEHRE:
23       Q.  Now I'm showing you what we've
24  marked as Exhibit No. 1.
25           Those are the invoices you brought
```

14

```
1   today that you were able to locate overnight
2   regarding SDC-Gadot; correct?
3        A.  (Examining.)  Yes.
4        Q.  And who -- who located these for you?
5        A.  My financial person, Omri.
6        Q.  Omri Gur Lavie?
7        A.  Yes.
8            MR. BEHRE:  Do you want the spelling
9   of that?
10           THE COURT REPORTER:  I think we have
11  it.
12  BY MR. BEHRE:
13       Q.  And are these all the invoices he
14  was able to find?
15       A.  These are all the invoices related
16  to the Beech Project.
17       Q.  For SDC-Gadot?
18       A.  Yes.
19       Q.  And you also, several times yesterday,
20  indicated that you would look for additional
21  documents.
22           Were you able to locate any other
23  documents overnight?
24       A.  What do you mean?
25       Q.  Were you able to locate any other
```

15

```
1   documents overnight?
2        A.  The -- the invoices of Insight
3   LLC [sic] in regards to the Beech Project.
4        Q.  And did you bring those with you
5   today?
6        A.  Yes.
7        Q.  And how many of those are there?
8        A.  I'll count them.  I think -- I
9   believe 19.  But I'll check.  18.
10           MR. BEHRE:  And can we mark that
11  as Exhibit No. 2.
12           (Exhibit 2 marked.)
13  BY MR. BEHRE:
14       Q.  I'm showing you what's been marked
15  as Exhibit No. 2.
16           Are these the invoices you were
17  able to locate overnight regarding Insight?
18       A.  (Examining.)  Yes.
19       Q.  Did you obtain those from Mr. Gur
20  Lavie as well?
21       A.  Yes.
22       Q.  Other than the invoices, what else
23  did you discuss with Mr. Gur Lavie overnight?
24       A.  Only the issue of money transfers
25  and the invoices.
```

16

```
1        Q.  And what did you discuss regarding
2   money transfers?
3        A.  I asked -- I requested him to
4   provide all the invoices that pertain to
5   Project Beech.
6        Q.  Well, you referenced a discussion
7   about money transfers.
8            What did that concern?
9        A.  The invoice is against a transfer
10  of fund [sic].  That was what I meant.
11       Q.  And did Mr. Gur Lavie confirm
12  that, for each invoice, there was, in
13  fact, a payment received?
14       A.  I -- I don't think -- I don't
15  believe that we discussed it that much
16  in-depth.  We discussed the invoices.  And
17  perhaps this former definition of mine of
18  discussing bank transfers was not exactly
19  accurate.
20       Q.  Okay.  Did you talk to Mr. Propis
21  since your deposition yesterday?
22       A.  No.
23       Q.  What about Mr. Goldberger?
24       A.  No.
25       Q.  What about Stuart Page?
```

17

```
1        A.   No.
2        Q.   And what about Neil Gerard?
3        A.   No.
4        Q.   What about David Hughes?
5        A.   No.
6        Q.   Anyone else that I haven't covered
7   yet?
8        A.   And I -- neither did I speak with
9   the boss.
10       Q.   In addition to the two sets of
11  invoices, are there any other documents
12  that you've located that you'd like to
13  provide to us today?
14       A.   At your request, I have located
15  the dates of my visit to London in the
16  beginning of 2020.  Unfortunately, I don't
17  have the dates of the trial in London.  So
18  I cannot confirm if I was there at the time
19  of the trial.
20       Q.   And did you bring those records
21  with you?
22       A.   I made myself a note.
23            Would you like me to give you the
24  dates?
25       Q.   Yes, please.
```

19

```
1        A.   I am aware that we opposed some
2   of your requests in this regard.  And we
3   are still awaiting the final judgment
4   regarding this issue.
5        Q.   And did Insight -- did or does
6   Insight file tax returns with the U.S.
7   Government or a State Government?
8        A.   Insight, just like SDC-Gadot,
9   regularly and duly reports to the authorities.
10       Q.   Which authorities?
11       A.   We're employing an accountant who
12  takes care of that.  I assume that he's
13  reporting to the authorities of Florida.
14  But I don't know it for a fact.
15       Q.   And what's the name of that
16  accountant?
17       A.   It's the -- CPA firm Aminach.
18            THE INTERPRETER:  Aminach.
19  BY MR. BEHRE:
20       Q.   Could you spell that, please?
21       A.   I can spell it in Hebrew.
22            THE INTERPRETER:  A-m-i-n-a-c-h.
23  Aminach.
24            THE WITNESS:  It's one of the
25  larger companies here in Israel -- firms.
```

18

```
1        A.   Between the 27th and the 30th of
2   January and between the 17th of February
3   to the 20th of February.
4        Q.   And those are dates you were in
5   London?
6        A.   Yes.
7        Q.   And were you with Stuart Page
8   when you were in London on those two trips?
9        A.   I do not remember clearly and
10  specifically if we met.  But I assume that
11  we met.  Because, generally, when I would
12  come to London and he would be in London,
13  we would meet.
14       Q.   And do you recall if you met with
15  anybody else regarding Project Beech during
16  those two trips?
17       A.   I don't remember.
18       Q.   You're aware that a subpoena for
19  documents was served on Insight, the Florida
20  entity; correct?
21       A.   I found out quite belatedly.  But
22  yes, I did find out eventually.
23       Q.   And are you aware that no documents
24  to date have been provided by you or your
25  counsel regarding this company?
```

20

```
1   BY MR. BEHRE:
2        Q.   And do they have an office in
3   Florida?
4        A.   No.  They have a license to --
5   to perform accounting work in America.
6   They have a department especially designed
7   for that.
8        Q.   Did Insight file tax returns
9   at any point with U.S. State or Federal
10  Government?
11       A.   I don't know.
12       Q.   Can you tell us what you've done
13  to prepare for today's deposition as the
14  corporate representative of Insight?
15       A.   I reviewed all the payments that
16  we received in regard to the Beech Project.
17       Q.   And how were you able to determine
18  and review all the payments that you received
19  regarding Project Beech?
20       A.   The preparation for the testimony
21  on Insight was the same as I did for SDC-Gadot.
22  I did not prepare anything special for today.
23  And since our bank account with the Bank of
24  America was closed, I assume that all these
25  invoices were paid.  And that is the source
```

21

1  of my information about all these payments.
2      Q.  Have you reviewed bank records
3  from the Bank of America regarding Insight?
4      A.  No.  Because, as I said, since our
5  account has been closed, we have no access
6  to the bank records.
7      Q.  And you said "our account."
8          Are you referring to you and
9  Mr. Gur Lavie as the account holders?
10     A.  Mr. Gur Lavie is merely a financial
11 officer.  So when I say "we," I refer to
12 the company, Insight as a company, exclusively
13 to myself.
14     Q.  Did you speak with Mr. Gur Lavie
15 in preparation for your testimony here
16 today?
17     A.  I -- I had spoken to him before
18 my -- yesterday's testimony about Gadot.
19 I spoke to him yesterday merely to ask
20 him to prepare those invoices that I had
21 promised you.
22     Q.  Did you talk to him about Insight
23 specifically since that's why you're here
24 today to testify?
25     A.  I see Omri almost on a daily basis.

22

1  Until the day before yesterday, we discussed
2  quite a lot.  We discussed these issues quite
3  a lot.  I discuss it with him also as a friend.
4  But since yesterday, we -- basically we discussed
5  only the -- the invoices that I requested from
6  him.  I have no recollection of any other
7  discussions.
8      Q.  Regardless of whether it was yesterday
9  or the day before yesterday or even before
10 that, did you talk to Mr. Gur Lavie to prepare
11 for your testimony today?
12     A.  I assume yes.
13     Q.  And do you recall what you discussed
14 with him to prepare for your testimony today?
15     A.  Mainly I requested him to -- to
16 re-produce the -- invoices, if he could
17 re-produce the invoices.
18     Q.  Anything else other than about the
19 invoice reproduction?
20     A.  No.
21     Q.  Did or does Insight conduct business
22 in the United States?
23     A.  No.
24     Q.  And you -- I've asked you this.  I
25 wasn't sure of the answer.

23

1  Did or does Insight file tax returns
2  in the U.S.?
3      A.  Yes.
4      Q.  And you say that Insight doesn't
5  conduct business in the United States.
6          What is the purpose of forming
7  Insight, if not to conduct business in the
8  U.S.?
9      A.  The purpose of setting up Insight
10 was a conduit or a pipeline to transfer
11 funds in a more convenient manner, in view
12 of the difficulties that we've had with
13 money transfers prior to the setting up
14 of the two companies SDC-Gadot and Insight.
15         When -- when I mentioned that it
16 was not conducting any business in the United
17 States, I meant that it does not perform any
18 work, any operations, any -- anything that
19 could be termed as business other than merely
20 money transfers.
21     Q.  And are those -- yesterday, during
22 your deposition for SDC-Gadot, you indicated
23 that that company was set up primarily so
24 that Stuart Page could pay you for Project
25 Beech.

24

1          Is that the same purpose that
2  Insight was set up as well?
3      A.  Yes.  But not only as pertaining
4  to the Beech Project or as pertaining Stuart
5  Page.
6      Q.  And what else besides pertaining
7  to the Beech Project or Stuart Page was --
8  were these companies set up for?
9          Sorry.
10     A.  Stuart Page had other projects
11 in addition to the project that we are
12 calling Project Beech.  And there were
13 also other clients.
14     Q.  Okay.  Is Insight affiliated
15 with Insight GSIA, a BVI company?
16     A.  No.
17     Q.  And you're involved in Insight
18 GSIA; correct?
19     A.  No.
20     Q.  Do you own that company?  Or have
21 you ever owned it?
22     A.  No.
23     Q.  Who owns it?
24     A.  A guy named Effi Lavie.
25     Q.  And who is Effi Lavie?

25

```
 1        A.   Another investigator who, to the
 2   best of my knowledge, has worked with Stuart
 3   Page.
 4        Q.   And, in fact, Effi Lavie was your
 5   business partner in Gadot EA going back to
 6   the 1990s; correct?
 7        MR. BARET:  Excuse me.  I would
 8   ask counsel to stick to the purpose of the
 9   deposition.  This is not a deposition of
10   Mr. Amit Forlit.  And --
11        MR. BEHRE:  Oh, we're getting
12   there.
13        MR. BARET:  -- I'm trying -- no.
14        MR. BEHRE:  We're getting there.
15        MR. BARET:  Okay.
16        MR. BEHRE:  I'll tie it up.
17        MR. BARET:  I'm trying -- I'm
18   trying to not interfere.
19        MR. BEHRE:  Okay.
20        MR. BARET:  But --
21        MR. BEHRE:  I'll get there.  It'll
22   tie directly.
23        MR. BARET:  Yeah, but you -- you --
24   you are deposing Amit Forlit as Amit Forlit,
25   not Insight.
```

27

```
 1        Q.   Now, you're aware that Insight
 2   LLC was discussed at Mr. Azima's trial;
 3   correct?
 4        A.   I don't know.
 5        Q.   Did -- have you read Stuart
 6   Page's testimony at the trial of --
 7   involving Farhad Azima?
 8        A.   I did not read the testimony.
 9   I heard about it from him.
10        Q.   And did you hear that he testified
11   that Insight was responsible for preparing
12   written reports regarding Project Beech?
13        A.   I don't recall that.
14        Q.   Did Insight have a role in preparing
15   invoices for the Project Beech project?
16        A.   Insight U.S. had a role in preparing
17   the invoices.  And we charged through Insight
18   U.S.
19        Q.   And charged who for those reports?
20        A.   We charged Stuart Page's company
21   for work that we did on Project Beech.
22        Q.   And when you say "we did on Project
23   Beech," who is "we"?
24        A.   My firm.
25        Q.   And which firm is that?
```

26

```
 1        MR. BEHRE:  No, I'm not.
 2        MR. BARET:  You're asking him about --
 3        MR. BEHRE:  No.  Just wait.
 4        MR. BARET:  -- companies --
 5        MR. BEHRE:  Just -- just wait and
 6   see.
 7        Did he finish his answer?
 8        THE WITNESS:  Effi Lavie has no
 9   connection whatsoever to Insight LLC.  [sic]
10   BY MR. BEHRE:
11        Q.   Isn't it a fact that Effi Lavie
12   was the financial controller of Insight?
13        A.   Which Insight?
14        Q.   In -- I don't know which Insight.
15   You tell me.
16        A.   Effi Lavie has no connection
17   whatsoever to Insight LLC in the U.S.
18        Q.   Does he have any involvement
19   with any entity called Insight?
20        A.   I assume yes, to the Insight
21   registered in BVI.
22        Q.   But not the one in the U.S.?
23        A.   Correct.
24        Q.   And you're sure of that?
25        A.   Yes.
```

28

```
 1        A.   Gadot Information Services.
 2        Q.   And why is Gadot Information Services
 3   billing through a company known as Insight?
 4        A.   Because it was convenient for us
 5   to charge via a number of U.S. companies.
 6   And we split up the charge.
 7        Q.   And, in your view, is it a good
 8   business practice for one company to bill
 9   for the work of another company with a
10   totally different named formed in a
11   totally different country?
12        A.   At the time it was.
13        Q.   And why -- why was that a good
14   business practice?
15        A.   It was ultimately -- because,
16   with Insight, when the bank did not have
17   limitations on the transfer amounts,
18   ultimately Insight was more active than
19   Gadot LLC [sic].
20        In other words, the reason why
21   we opened up two companies turned out to
22   be the right thing to do.
23        Q.   Why did you create --
24        A.   Or at least convenient to do.
25        Q.   Why did you create, at the exact
```

29

1  same time, two U.S. entities when you only
2  needed one?
3      A.   Ultimately, we tried to open
4  another bank account in Chase Manhattan.
5  And that didn't go well.  But what happened
6  was we worked with Insight.  And it was --
7  turned out to be more active than the other
8  company.
9      Q.   So if I understand your testimony,
10  the project updates were prepared by Gadot,
11  the Israeli company.  But that work was
12  billed through a company called Insight
13  that was created in the United States?
14      A.   (Translated.)  Insight and
15  Gadot LL -- SDC.
16          (In English.)  SDC.
17      Q.   And payment was made into the
18  U.S. via wire for that work; correct?
19      A.   In the United States.  Yes.
20          Yes, the money transferred to the
21  U.S. company and, from there, transferred
22  to Israel, to the Israeli company rather.
23      Q.   And can you give us some explanation
24  for why, upon receipt of the money in the
25  U.S., it was then transferred, sometimes

30

1  immediately, over to Israel and the Gadot
2  company in Israel?
3      A.   The money was transferred based
4  on financial considerations having to
5  do with the -- with the case and other
6  considerations.
7      Q.   During your meetings in Cyprus,
8  was Insight ever discussed?
9      A.   Not that I can recall.
10      Q.   And during those meetings, Stuart
11  Page's testimony was rehearsed; correct?
12      A.   In Cyprus?  No.
13      Q.   What about in Switzerland, was
14  Stuart Page's testimony rehearsed there?
15      A.   I don't know.  Because, in most
16  of the discussions that related to the
17  trial, I wasn't present.
18      Q.   (Partially translated.)  Was
19  a woman by the name of Liat Czerwonagora
20  involved in preparation of the reports
21  that were billed through Insight in the
22  United States?
23          THE INTERPRETER:  Did I get
24  that right?  Czergora [sic]?  Could you
25  spell it?

31

1          MR. BEHRE:  C-z -- oh, it's on
2  the screen.
3          THE INTERPRETER:  Kind of.  Yeah.
4  C-z-e-r-w-o-n-a-g-o-r-a.
5          (Pending question fully translated.)
6          THE WITNESS:  No.  I don't think
7  so.
8  BY MR. BEHRE:
9      Q.   (Partially translated.)  Well,
10  she -- she helped manage a hostel in London
11  called Hayarkon 48 Hostel; is that correct?
12          THE INTERPRETER:  Could you repeat
13  the name?
14          THE WITNESS:  (Comment in Hebrew.)
15          (Remainder of pending question
16      translated.)
17          THE WITNESS:  No.  It's not correct.
18  BY MR. BEHRE:
19      Q.   Well, isn't it true that that hostel,
20  Hayarkon 48 Hostel, was owned by Omri Gur Lavie?
21      A.   Yes.
22      Q.   And you made payments to that hostel
23  several times from your accounts in the United
24  States?
25      A.   Correct.  But that hostel is located

32

1  in Israel, not London.
2      Q.   Okay.  The payments were made to
3  that hostel; correct?
4      A.   "Kin."
5          The company Hayarkon 48 is owned
6  by Omri Gur Lavie.
7      Q.   And those payments were, at least
8  in part, payments for the role that Liat
9  played in the preparation of the reports;
10  correct?
11      A.   No.
12      Q.   Do you know Jean Goldi Horta?
13      A.   Yes, I do.
14      Q.   She was involved in the preparation
15  of the reports that were paid through the
16  U.S. entities; correct?
17      A.   No.
18      Q.   Didn't she hold a position with
19  one of the U.S. entities as a risk analyst
20  and data scientist?
21      A.   To the best of my knowledge, no.
22      Q.   Was she ever employed by Insight
23  or Gadot?
24      A.   No.
25      Q.   Was she a freelance consultant

1    to any of those entities?
2        A.   No.
3        Q.   So it's your testimony she did
4    no work for any of your entities?
5        A.   None of the American companies.
6    I think she worked for Dinka.
7        Q.   And what is Dinka?
8        A.   Dinka is a company owned by Rafi
9    Pridan.
10       Q.   And Dinka was paid through one
11   or both of your U.S. entities; correct?
12       A.   I don't recall.  I'd have to
13   review.
14       Q.   Okay.  We can do that.
15            And she worked with Rafi Pridan;
16   correct?
17       A.   In my opinion, she worked with
18   Rafi Pridan.  But she did not work on
19   Project Beech.
20       Q.   And Pridan introduced Stuart
21   Page to you; is that correct?
22       A.   In 2007 or '8.
23       Q.   And Stuart Page ultimately gave
24   you work on Project Beech for which you
25   were paid through your U.S. entities;

1    correct?
2        A.   I received payment for Project
3    Beech through the American companies.
4        Q.   And you paid Rafi Pridan a
5    10 percent commission on the work that
6    Stuart gave you -- Stuart Page gave you;
7    correct?
8        A.   I paid him commission.  But I
9    don't recall the exact percentage.
10       Q.   And those commissions were paid
11   to him, at least in part, through the two
12   U.S. entities; correct?
13       A.   Correct.
14       Q.   And Rafi Pridan has been twice
15   charged for wiretapping offenses in Israel;
16   correct?
17       A.   From general knowledge, I have
18   heard that too.
19       Q.   And, in 1999, he was sentenced
20   to four years imprisonment for that type
21   of conduct involving an Israeli media
22   mogul by the name of Ofer Nimrodi?
23       A.   I didn't know him in 1999.
24       Q.   Did you know him in 2011?
25       A.   Yes.

1        Q.   And in that year, he was again
2    sentenced for similar conduct against an
3    individual by the name of Avigdor Lieberman.
4        A.   Okay.
5        Q.   Were you aware of that?
6        A.   I guess I was.
7        Q.   Rafi Pridan is a known hacker,
8    isn't he?
9        A.   Not to the best of my knowledge.
10       Q.   Well, on two occasions, he was
11   prosecuted and convicted and sentenced
12   for hacking; right?
13       A.   You said 1999 was wiretapping.
14       Q.   Well, I'm asking you --
15       A.   And, in 2011, I don't think the
16   charge was hacking.
17       Q.   What was the charge?
18       A.   In 2011, I think it was something --
19   fax collecting or something like that.  I
20   don't know.  Something to do with Lieberman.
21            MR. BEHRE:  Facts, f-a-c-t-s,
22   collecting?
23            THE INTERPRETER:  No.  Fax, f-a-x.
24   Facsimile machine.
25            MR. BEHRE:  Aah.

1            THE INTERPRETER:  Facsimile machine.
2            MR. BEHRE:  That's very retro.  Okay.
3    BY MR. BEHRE:
4        Q.   You know Alan Apelblat; right?
5        A.   No.
6        Q.   Wasn't he a senior intelligence
7    and business analyst for one of your entities?
8        A.   I don't remember.  I had a lot of
9    employees.  Alan?  Maybe.
10            Alan didn't work in any of the
11   American companies.
12       Q.   Did he work on the project updates
13   that were paid for through the American
14   companies?
15       A.   No, I'm not familiar with anything
16   called "project update."  And to the best
17   of my knowledge, Alan did not work on
18   Project Beech.
19       Q.   Apologies.
20            When I say "project update," I'm
21   referring to the updates that were prepared
22   by you and your company for Project Beech.
23       A.   They weren't updates.  There were
24   reports of findings in the project known as
25   Beech.

37

```
 1      Q.   Okay.  Are you familiar with
 2 Guerillmo Fremd, F-r-e-m-d.
 3      A.   I think he also worked for one
 4 of my companies, but nothing to do with
 5 Project Beech.
 6      Q.   Didn't he assist in the preparation
 7 of reports for Project Beech for which you
 8 received payment in the United States?
 9      A.   No.
10      Q.   He had a title of senior
11 intelligence and business analyst; correct?
12      A.   I never gave anybody that title.
13      Q.   Now, specifically with regard to
14 Insight and its bank account at Bank of
15 America, did it have a $50,000 wire limit
16 like you had in SDC-Gadot?
17      A.   No.  I think there might have
18 been a limit at 250,000.  But I'm not sure.
19      Q.   And the Insight Bank of America
20 account was opened in 2017; correct?
21      A.   Correct.
22      Q.   And between 2017 and through
23 2020, more than $10 million was deposited
24 into that account; correct?
25      A.   I have to assume that you are
```

38

```
 1 right, because you have the bank statements
 2 and I don't.
 3      Q.   Does that sound about right?
 4      A.   Yes.  That seems to make sense.
 5      Q.   (Partially translated.)  And
 6 of that over $10 million, $7,488,310 was
 7 received from Stuart Page in those four
 8 years.
 9           Does that sound correct?
10      A.   No.
11           THE INTERPRETER:  Could you --
12           THE WITNESS:  No.
13           THE INTERPRETER:  Four --
14           THE WITNESS:  Seven --
15           (Pending question partially
16      re-translated.)
17           THE WITNESS:  (In English.)  Ten.
18 It's not of seven.
19           THE INTERPRETER:  Could you repeat
20 the number?
21           MR. BEHRE:  7,488,310.
22           THE WITNESS:  (In English.)  No
23 cents.
24           (Pending question re-translated.)
25           THE WITNESS:  Stuart Page paid for
```

39

```
 1 a number of projects besides Project Beech.
 2 So yes, that sounds about right.
 3 BY MR. BEHRE:
 4      Q.   And yesterday we talked about the
 5 deposits into the U.S. account for SDC-Gadot.
 6 And those records indicated that you received
 7 about 2.7 million from Stuart Page into that
 8 account.
 9           Do you recall that testimony?
10      A.   Yes.
11      Q.   And so combining the two U.S.
12 entities, during those four years -- 2017,
13 2018, 2019, and 2020 -- you received over
14 $10 million from Stuart Page into your
15 U.S. accounts; correct?
16      A.   That is correct.  But only part
17 of it -- and I'm not sure exactly which
18 part -- I'd have to add it up -- came
19 because of payment for Project Beech.
20      Q.   So approximately what percentage
21 would you estimate of that over $10 million
22 was attributable to Project Beech?
23      A.   I estimate about 50 percent.
24      Q.   So over $5 million over four years;
25 correct?
```

40

```
 1      A.   Correct.
 2      Q.   And of that $5 million approximately,
 3 how much was paid out to your subcontractors
 4 or vendors that were working on Project
 5 Beech?
 6      A.   Most of the sum, in my opinion,
 7 was paid to Gadot Israel.
 8      Q.   How were your subcontractors or
 9 vendors paid?
10      A.   They were paid by Gadot Israel.
11 And a small number, I guess, I estimate,
12 received payment from the American account.
13      Q.   In addition to subcontractors or
14 vendors, were there any other individuals
15 or entities that worked on Project Beech
16 at your direction for which you paid them?
17      A.   I don't recall.  It's possible.
18      Q.   Has Insight ever had employees?
19      A.   No.
20      Q.   Now, you indicated yesterday
21 that, in addition to subcontractors and
22 vendors, at times you used sources to get
23 information from certain targets that you
24 were investigating.
25           Do you recall that testimony?
```

41

```
1      A.   Yes.
2      Q.   And how were those sources paid
3  for the work they did on Project Beech?
4      A.   Through the subcontractors.
5      Q.   And who were those subcontractors?
6      A.   Majdi Halabi was one of them.
7      Q.   Who else?
8      A.   I don't recall.
9      Q.   And how was Halabi paid?  Through
10 what entity?
11     A.   I don't recall.  But I think we
12 probably wired him money from an Israeli
13 bank to his Israeli bank.
14     Q.   So if I understand the money
15 flow, Stuart Page would pay your entities
16 for Project Beech through your two U.S.
17 entities.  And those two U.S. entities
18 would send the money to your Israeli
19 company Gadot, which would then pay
20 Halabi?
21          Do I have that correct?
22     A.   Sounds right.  I think Halabi
23 also received direct payment from the
24 legal firms of the client.
25     Q.   And who were those legal firms?
```

42

```
1  Dechert?
2      A.   You'd have to ask him.  I don't
3  know.
4      Q.   (Not translated.)  Stewarts
5  Law?  Do you recall that name?
6      A.   I remember those two names,
7  Stewarts Law and Dechert.  But I don't
8  know who commissioned his work and who
9  paid him.
10     Q.   You indicated earlier that,
11 from the Insight Bank of America account
12 for the U.S. entity Insight, monies were
13 sent to Gadot Information Services in
14 Israel; correct?
15     A.   Money -- money was transferred
16 from the American company to the Israeli
17 company for work done on Project Beech.
18     Q.   And would it surprise you to
19 learn that the total amount transferred
20 to the bank -- from the Bank of America
21 account to Gadot Information Services
22 during the four years I mentioned, 2017
23 through 2020, was more than $6.5 million?
24     A.   It would not surprise me.
25     Q.   And you indicated that Mr. Halabi
```

43

```
1  found sources who provided information
2  regarding Project Beech; correct?
3      A.   Human sources.  Yes.
4      Q.   How many human sources did
5  Mr. Halabi oversee regarding Mr. Azima?
6          MR. BARET:  That's not the
7  question.
8          THE INTERPRETER:  (Comment in
9  Hebrew.)
10         THE WITNESS:  (Comment in Hebrew.)
11         (Pending question partially
12         re-translated.)
13         MR. BARET:  Okay.  Yeah.  That's
14 the question.
15         THE WITNESS:  Not -- not one.
16 BY MR. BEHRE:
17     Q.   Well, there were -- you indicated
18 yesterday there were sources close to
19 Mr. Azima that you and your team relied
20 upon for information; correct?
21     A.   Sources that were close to Khater
22 Massaad.
23     Q.   Well, didn't you prepare reports
24 that were paid for through your U.S. entities
25 that contained information obtained from
```

44

```
1  sources who befriended or were close to
2  Mr. Azima?
3      A.   I don't know if the sources were
4  close to or befriended Mr. Azima.  But we --
5  we're talking about sources that were close
6  to Khater Massaad.  I remember that Stuart
7  Page once handled a source that was close
8  to Farhad Azima.
9      Q.   And who was that source?
10     A.   If I remember correctly, it was
11 an attorney from London.
12     Q.   Do you know the attorney's name?
13     A.   I -- I don't -- I don't remember.
14 But I think that he used the source to
15 solve a problem that Farhad Azima had
16 in Saudi Arabia.
17     Q.   Did Mr. Halabi play any role
18 in preparing the reports that were paid
19 for through the U.S. entities?
20     A.   I do not recall if he drafted
21 the report.  But based on information
22 that he brought, some of it was included
23 in the report.  I'm not sure that he wrote
24 or edited the report.
25     Q.   And Mr. Halabi provided to you
```

45

1   and your team the information he obtained;
2   correct?
3       A.  Yes.
4       Q.  And you incorporated that
5   information into the reports; correct?
6       A.  Yes.
7       Q.  And those reports were then
8   provided to Mr. Page; correct?
9       A.  They were sent to him.
10      Q.  And you recruited Mr. Halabi
11  to become a witness in the U.K. trial;
12  correct?
13      A.  No.
14      Q.  Who did?  Who picked him to be
15  a witness?
16      A.  I stated yesterday that Mr. Halabi
17  was part of the office and that he had heard
18  about the leakage just like everybody else
19  heard about it.  And when we were requested
20  to say who had reported it to Stuart, somebody
21  proposed -- or he may have proposed it himself,
22  thanks to his name, his background, and the
23  fact that that would prevent embarrassment
24  to the client.  And that is how he was
25  selected, or he selected himself.

46

1       Q.  What do you mean when you use
2   the term "leakage"?
3       A.  There was a leakage of materials
4   pertaining to Farhad Azima, which was
5   published on -- on the Internet.
6       Q.  And by "leakage," are you talking
7   about the data that was stolen from Farhad
8   Azima?
9       A.  So it seems.
10      Q.  So "leakage" is a polite word for
11  the stolen data from Farhad Azima; right?
12      A.  We're all polite here, aren't we?
13      Q.  Most of the time.
14      A.  One of the best songs by Bob Dylan.
15      MR. BARET:  Can we take, like, a --
16  five, ten minutes?  I need --
17      MR. BEHRE:  Sure.
18      THE VIDEOGRAPHER:  Going off the
19  record at 12:20.
20      (Recess from 12:20 p.m. to 12:39 p.m.
21  Israel Daylight Time.)
22      THE VIDEOGRAPHER:  Back on record
23  at 12:39.
24  BY MR. BEHRE:
25      Q.  (Not translated.)  Mr. Forlit,

47

1   did you communicate with anybody about
2   your testimony other than your lawyer
3   during the break?
4       A.  (In English.)  No.
5       (Pending question translated.)
6       THE WITNESS:  No.
7   BY MR. BEHRE:
8       Q.  Who worked on the Project Beech
9   reports that you and your team prepared?
10      A.  On behalf of Gadot LLC [sic]
11  and Insight, no one.
12      Q.  Not with regard to those two
13  entities.
14      Anyone who worked on those
15  reports that were paid for through the
16  two U.S. entities.
17      A.  No one was paid through the
18  American entities.
19      Q.  Stuart Page paid you, in part,
20  for the work your -- you and your team
21  did in preparing reports; correct?
22      A.  The reports were prepared by
23  Gadot Israel.
24      Q.  Yes.
25      And they were paid for through

48

1   your U.S. entities, including, you said,
2   over $5 million from Stuart Page to your
3   Insight U.S. account; right?
4       A.  It -- Insight and Gadot both.
5   And they paid Gadot Israel.  And Gadot
6   Israel paid.
7       Q.  And Gadot -- Gadot Israel paid
8   the individuals who prepared the reports;
9   correct?
10      A.  Correct.  It paid salaries to
11  people.
12      Q.  And what are the names of the
13  people who prepared those reports that
14  were paid for [sic] the monies provided
15  by Stuart Page via the U.S. entities?
16      A.  To the best of my understanding --
17  and I am responding here as the corporate
18  representative of the two companies --
19  Gadot Israel did not --
20      Q.  Sorry.
21      A.  -- Gadot Israel is the one who
22  made the payments.  And Gadot Israel is
23  not being investigated here.
24      MR. BEHRE:  That wasn't my
25  question.

49

```
 1          Could you read my question
 2   back, please?
 3          THE COURT REPORTER:  Let me
 4   read it, Haya, and then you re-interpret.
 5          (Last full question read and
 6      re-translated.)
 7          THE WITNESS:  Since these people
 8   are employed and receive their payment from
 9   Gadot Israel, I am not prepared to divulge
10   their names.
11   BY MR. BEHRE:
12      Q.   So you know their names.  You're
13   just not willing to provide them; right?
14      A.   I'm not entirely sure how exactly
15   prepared those reports.  I know the names
16   of employees who worked at the time in the
17   company.  But I cannot be exactly precise
18   about who prepared the reports.
19      Q.   What are the names of those
20   employees?
21      A.   I'm not prepared to tell.
22      Q.   You're not willing to provide
23   those names; right?
24      A.   Yes.  Correct.
25          MR. BEHRE:  Will counsel instruct
```

50

```
 1   his client to answer?
 2          MR. BARET:  (Not translated.)  If
 3   you -- if you -- if you wish, you may answer.
 4          THE INTERPRETER:  Sorry?
 5          (Comment in Hebrew.)
 6          MR. BARET:  If you wish to answer,
 7   you can answer.
 8          THE WITNESS:  I don't want to.
 9   BY MR. BEHRE:
10      Q.   Why is it -- why is it such a
11   secret, the names of the individuals who
12   prepared these reports?
13      A.   With some of them, I have NDA
14   agreements.  And others have a security
15   clearance in their work in the reserve
16   duty in the IDF.
17      Q.   And part of the reason you're
18   unwilling to provide those names is because
19   the reports they worked on contain stolen
20   data; correct?
21      A.   This is not correct.  In the --
22   the reports to Mr. Page did not contain
23   any stolen information to the best of our
24   knowledge.  Whatever Mr. Page added and
25   transferred to the client, I don't know.
```

51

```
 1   I did not see the reports sent by Mr. Stuart.
 2      Q.   So you seem to be suggesting that
 3   the -- if any report contains stolen data,
 4   it was put in there by Stuart Page and not
 5   you or your team.
 6          Is that what you're alleging?
 7      A.   I -- I -- what I claim is that
 8   I do not know.  I did not see the reports
 9   that he transferred.  So I cannot refer
10   to whatever was in those reports.
11      Q.   What subcontractors worked on
12   the Project Beech reports?
13      A.   I don't remember.
14      Q.   You don't remember or you're not
15   willing to name them?
16      A.   I don't remember.
17      Q.   Were any of the subcontractors
18   based in India?
19      A.   Definitely not.
20      Q.   Were any of the employees who
21   worked on the reports based in India?
22      A.   Definitely not.
23      Q.   (Not translated.)  Have you
24   ever worked with a company named CyberRoot?
25          THE INTERPRETER:  Cyber?
```

52

```
 1          MR. BEHRE:  Root.
 2          (Pending question translated.)
 3          THE WITNESS:  Never.
 4   BY MR. BEHRE:
 5      Q.   Some of the project reports you
 6   prepared use the term "electronic sources."
 7          What does that mean?
 8      A.   Many -- many investigations
 9   within or on the web include chat rooms,
10   collecting information from the dark
11   net, contacts with some obscure sources
12   that promise information.  Overall, this
13   is called an Internet investigation.
14      Q.   Your reports use the term
15   "electronic sources."
16          What does that specific term
17   mean?
18      A.   I haven't seen a report of mine
19   that is using that term of "electronic
20   sources."
21      Q.   Okay.
22          (Exhibit 3 marked.)
23   BY MR. BEHRE:
24      Q.   I'm showing you what's been
25   marked as deposition Exhibit No. 3.
```

53

```
1        It's a series of corporate
2   records regarding Insight Analysis and
3   Research LLC including the Articles of
4   Organization for the State of Florida
5   and annual reports for the company for
6   2018, 2019, 2020, 2021, and 2022.
7        Could you look at that exhibit
8   and see if you can identify it?
9        A.   (Examining.)  Yes.  I identify
10  the documents.
11       Q.   And were these documents filed
12  at your direction?
13       A.   I assume they were.
14       Q.   And in the Article [sic] of
15  Organization, which is the first two
16  pages of the exhibit, it lists in
17  Article IV an address for Alon Omri
18  Gur Lavie.
19       A.   "Kin."
20       Q.   Do you see that?
21       A.   (In English.)  Yes.
22       "Kin."
23       Q.   And the address is 5 HaBarzel
24  Street in Tel Aviv.
25       Do you see that?
```

54

```
1        A.   Yes.
2        Q.   And that's the same address that
3   was used for you in the corporate records
4   for SDC-Gadot; correct?
5        A.   Yes.  Correct.
6        Q.   Who lives at that address?
7        A.   These -- these were the corporate
8   offices of Gadot in the past.
9        Q.   Are they currently the corporate
10  offices of Gadot?
11       A.   Yes.
12       Q.   And is that an office building?
13       A.   Yes.
14       Q.   How much office space do you have
15  there?
16       A.   About 140 square meters.
17       Q.   How many individual offices are
18  included in the office suite?
19       A.   Four.
20       THE INTERPRETER:  "Four."
21       THE WITNESS:  Four and a
22  conference room.
23  BY MR. BEHRE:
24       Q.   Who occupies the four offices?
25       A.   No one today.  This serves as
```

55

```
1   a storage for my own belongings.
2        Q.   If you look at the first annual
3   report --
4        (Brief technical interruption
5        in the proceedings.)
6        THE WITNESS:  (Comment in Hebrew.)
7        MR. BARET:  Strike that.
8   BY MR. BEHRE:
9        Q.   -- for 2018 -- so that's the third
10  page of the exhibit -- it lists Mr. Gur Lavie
11  on the signature line as being the CEO of
12  Insight Analysis and Research LLC.
13       Do you see that?
14       A.   (Translated.)  On page 3?
15       (In English.)  Gur Lavie.  Gur
16  Lavie.  "Signature."  "Date."
17       Q.   It's the annual report for April --
18  filed on April 29th, 2018.
19       A.   (Comment in Hebrew.)
20       (Translated.)  Aah, yes.
21       Q.   Is that accurate?
22       Was Mr. Gur Lavie the CEO?
23       A.   Since these companies were not
24  serving basically any other purpose than
25  being a conduit for transfer of funds, we
```

56

```
1   were not very particular about the choice
2   of -- the choice of titles.  But for all
3   intents and purposes, it was me who was
4   running the company.
5        Q.   So then this particular annual
6   report is not accurate; correct?
7        Mr. Gur Lavie is not the CEO?
8        A.   It could be that he was a
9   co-managing director.
10       Q.   But not --
11       THE INTERPRETER:  Or "co" --
12  BY MR. BEHRE:
13       Q.   -- CEO?
14       THE INTERPRETER:  -- "CEO."
15  "Co-CEO."
16  BY MR. BEHRE:
17       Q.   Co-CEO with who else?
18       A.   With me.
19       Q.   How were the revenues and
20  profits of Insight Analysis and Research
21  LLC shared between you and Mr. Gur Lavie?
22       A.   To the best of my recollection,
23  there were no revenues or profits as such
24  in -- that we left in -- in the company.
25  So Mr. Gur Lavie was receiving a salary,
```

57

```
 1    which was paid to him sometimes directly
 2    from Insight to companies belonging to
 3    him and sometimes in other -- other avenues
 4    or other ways.  But I don't remember the
 5    details.
 6              MR. BEHRE:  Can I see that?
 7              THE COURT REPORTER:  Yeah, I
 8    was just writing to Adi about that.
 9              (Brief construction interruption
10         in the proceedings.)
11              MR. BEHRE:  It's getting closer
12    and closer.
13              THE COURT REPORTER:  I wrote to
14    her.
15              MR. BEHRE:  It's like a horror
16    flick.
17              MR. BARET:  Hopefully they're
18    not going to fall through like in --
19              THE INTERPRETER:  Chainsaw --
20              THE COURT REPORTER:  You want
21    to --
22              MR. BEHRE:  I know.
23              THE COURT REPORTER:  You want to
24    go off for --
25              THE INTERPRETER:  Chainsaw massacre.
```

58

```
 1              THE COURT REPORTER:  Ruchie, we're
 2    on the video.
 3              Go off for a second.
 4              MR. BEHRE:  Why don't we take
 5    a --
 6              THE VIDEOGRAPHER:  Going off --
 7              MR. BEHRE:  -- brief break.
 8              THE VIDEOGRAPHER:  -- record at --
 9    12:59.
10              (Recess from 12:59 p.m. to 1:04 p.m.
11         Israel Daylight Time.)
12              THE VIDEOGRAPHER:  Back on record
13    at 1:04.
14    BY MR. BEHRE:
15         Q.  (Partially translated.)  You said
16    before the break that Mr. Gur Lavie received
17    a salary and that he was paid either directly
18    from Insight U.S. to him or his companies;
19    correct?
20              THE INTERPRETER:  You said Halavi?
21              MR. BEHRE:  Gur Lavie.
22              THE COURT REPORTER:  Gur Lavie.
23              THE WITNESS:  Gur Lavie.
24              THE INTERPRETER:  Gur Lavie.
25    //
```

59

```
 1              (Remainder of pending question
 2         translated.)
 3              THE WITNESS:  He received his
 4    salary directly to companies of his, not
 5    to him personally.
 6    BY MR. BEHRE:
 7         Q.  And what were the companies of
 8    his that received his salary?
 9         A.  I believe it was Hayarkon 48
10    and Yessodot.
11              THE INTERPRETER:  Y-e, double
12    s, o-d-o-t.
13    BY MR. BEHRE:
14         Q.  And how much was his salary?
15         A.  His salary was $20,000 a month.
16    I do not recall the exact and precise
17    accounting, you know, which money came
18    from what source.
19         Q.  And what did he do for Insight
20    Analysis and Research in order to receive
21    that level of salary?
22         A.  Omri's role is to manage all the
23    finances of all my companies.  And, once
24    again, I do not remember precisely what
25    came from where.  But he was not working
```

60

```
 1    only for Insight.  He was working for all
 2    of my -- the -- all the companies connected
 3    to me.
 4         Q.  And how many companies are there
 5    connected to you?
 6         A.  I believe that, in Israel, there
 7    are two of them and the two American companies.
 8         Q.  Gadot Information [sic] in Israel.
 9              And what's the other Israeli company?
10         A.  I have another company, whose name
11    I don't even remember, that is engaged in
12    real estate, also Gadot with something.
13         Q.  So Mr. Gur Lavie, as it relates
14    to Insight Analysis and Research, was a
15    salaried employee; correct?
16         A.  No.  He received a salary into
17    a company in Israel.  But he ran all the
18    financial affairs that are connected to
19    me.  He did not receive a salary per se
20    from the companies in United States.  He
21    received transfers to companies of his
22    in Israel.
23         Q.  Well, just a few minutes ago
24    you referred to it as a salary.
25              Are you changing your testimony
```

61

```
 1    now?
 2         A.   Let's be more precise.  What
 3    I was talking about is wages.  Perhaps
 4    the term "salary" is not exactly accurate.
 5    These are wages in the tune of $20,000
 6    that he received for the management of
 7    all my financial affairs.
 8         Q.   So he received wages and he
 9    was not an owner, was he?
10         A.   Correct.
11         Q.   And so looking at the annual
12    report that was filed on January 21st
13    2019, that is inaccurate in describing
14    Mr. Gur Lavie as an owner, isn't it?
15         A.   I believe these reports were
16    submitted by an accountant --
17              THE INTERPRETER:  Okay.
18              THE WITNESS:  -- an accountant
19    firm.  And the questions should be asked to
20    them, why did they change their terminology
21    from one annual report to the next.
22              (Exhibit 4 marked.)
23    BY MR. BEHRE:
24         Q.   I'm showing you next what's been
25    marked as Exhibit No. 4 for this deposition.
```

62

```
 1    It's a five-page document that appears to
 2    be opening documents for the Bank of America
 3    account for Insight Analysis and Research.
 4         A.   (Examining.)  Okay.  Go ahead.
 5         Q.   Is that what this is, the bank
 6    opening documents for this account at Bank
 7    of America for Insight Analysis and Research?
 8         A.   It would seem so.
 9         Q.   And there's only one individual
10    who's authorized to transact business in
11    this account; correct?
12         A.   Correct.
13         Q.   And that individual is Mr. Gur
14    Lavie and not you; correct?
15         A.   Correct.
16         Q.   And were you present with
17    Mr. Gur Lavie when he opened this account?
18         A.   Yes.
19         Q.   And was this opened in Florida
20    or New York or somewhere else?
21         A.   In Miami, Florida.
22         Q.   So you were present but you weren't
23    put on the account.
24         Q.   Why not?
25         A.   At the same time, we opened the
```

63

```
 1    account for the other company at Citibank.
 2    And we decided, for convenience purposes,
 3    to open two accounts, one for each of the
 4    companies and have one of us in each one
 5    of them.
 6         Q.   Were those two bank accounts,
 7    the one at Citi for Gadot and the one
 8    at Bank of America for Insight, opened
 9    on the same day?
10         A.   To the best of my recollection,
11    yes.  Or the next day.
12         Q.   And is there some reason why one
13    of the accounts is in your name and one of
14    the accounts is in his name?
15         A.   No.
16              (Exhibit 5 marked.)
17    BY MR. BEHRE:
18         Q.   I'm showing you next what we'll
19    mark as Exhibit No. 5 in this deposition.
20              These are Bank of America bank
21    statements for Insight Analysis and Research.
22    And they bear Bates numbers, so numbers at
23    the bottom of the pages.  They start at
24    000222 and they run through 000 -- no, I
25    take that back.  They're not subsequently
```

64

```
 1    numbered, at least my copy isn't.
 2              So what I'll tell you is that
 3    these are bank records that move -- that
 4    are from October 30th, 2017, through the
 5    bank statement for October 1st, 2021.
 6              And the bank -- bank statements,
 7    starting with the December 1st, 2018,
 8    statement is numbered five zeros, 1 --
 9    is it six zeros? -- 000001.  And they
10    run through 000283 [sic].  They're just
11    not in order because they were produced
12    on two separate occasions by the Bank of
13    America.
14         A.   (Examining.)
15         Q.   Have you had a chance to look
16    at those bank records?
17         A.   No.  Because I didn't have an
18    opportunity -- I didn't have access to
19    the --
20         Q.   Okay.
21         A.   -- bank --
22         Q.   Well --
23         A.   -- account.
24         Q.   -- take a minute to make --
25         A.   But I --
```

65

```
1      Q.  -- yourself --
2      A.  -- thank you.
3      Q.  -- familiar with them.
4      A.  It's about 500 pages, isn't it?
5          I think you'll probably refer
6  me to a specific page?
7      Q.  I want to first see if you can
8  identify what these are.
9      A.  Yes, these look like the bank
10 statements.
11     Q.  (Not translated.)  Directing
12 your attention to the bank statement for
13 the month of December 2017, could you
14 look at that?  It's just a few pages in,
15 six, seven pages in.
16     A.  (Comment in Hebrew.)
17         THE INTERPRETER:  (Comment in
18 Hebrew.)
19         THE WITNESS:  Okay.
20 BY MR. BEHRE:
21     Q.  And if you look at Bates page
22 230 --
23     A.  Yes.
24     Q.  -- you'll see that the bank
25 statement is addressed to Insight Analysis
```

66

```
1  and Research in Miami, Florida; correct?
2      A.  Correct.
3      Q.  And on the first page, it indicates
4  that there were deposits in the amount of
5  $459,950.
6          Do you see that?
7      A.  Yes.
8      Q.  And there were withdrawals of
9  $430,092.70?
10     A.  Yes.
11     Q.  And looking at page 232, you'll --
12 you will see that Page Group deposited
13 $280,000 minus the wire transfer fee of
14 apparently $50.
15         Do you see that?
16     A.  Yes.  And I -- I believe that,
17 if it was -- this was for part of Project
18 Beech, then he also received the invoice.
19     Q.  Directing your attention to the
20 time entry -- or the transaction entry on
21 December 26, 2017, it indicates that there
22 was a $200,000 wire payment made from this
23 account to Global Impact Services.
24         Do you see that?
25     A.  Yes.
```

67

```
1      Q.  And Global Impact Services is
2  owned by Eitan Arusy; is that correct?
3      A.  Correct.
4      Q.  And could you spell that for us?
5      A.  In Hebrew?
6      Q.  Yes.
7          MR. BEHRE:  And then you can
8  translate it.
9          THE WITNESS:  I think he spells
10 Eitan, E-i-t-a -- E-i-t-a -- t-h-a-n?
11 T-h-a-n.
12         THE INTERPRETER:  Arusy?
13         MR. BARET:  Very similar to
14 English spelling; right?
15         THE WITNESS:  (In English.)
16 A-r-u-s-i.
17         (Translated.)  A-r-u-s-i,
18 question mark.
19 BY MR. BEHRE:
20     Q.  And Mr. Arusy is your business
21 partner; correct?
22     A.  He's not a business partner.  We
23 collaborate on certain jobs.
24     Q.  And you have or had an agreement
25 with him that, for each payment you received
```

68

```
1  from Stuart Page, he received a percentage
2  of that payment; right?
3      A.  I don't recall.  But he was paid
4  for work that he did, that he supplied.
5      Q.  What work did he do?
6      A.  He did a variety of different
7  works, including analysis and investigations,
8  in-depth investigations.
9      Q.  What do you mean by "analysis"?
10     A.  Eitan is a very gifted person.  And
11 he once worked for the Manhattan prosecutor.
12 And he's -- has analytic skills.
13     Q.  And at one point, he was working
14 on investigating individuals and entities
15 that were violating sanctions against doing
16 business with Iran; correct?
17     A.  Eitan doesn't work only with me.
18 And he had some large U.S. companies as his
19 clients that were involved in investigating
20 sanctions -- or violations, rather, of the
21 sanctions.  And I think he had a large case
22 that he worked on for the D.A. in Manhattan.
23     Q.  And the company Global Impact
24 Services is a company established in the
25 United States; correct?
```

69

```
1        A.  I think so.
2        Q.  And Mr. Arusy is currently or
3   was affiliated in some capacity with a
4   U.S. law firm; right?
5        A.  I don't know.  I know that he
6   worked for the D.A.  He was hired by the
7   D.A. in Manhattan.
8        Q.  And Mr. Arusy attended some of
9   the Project Beech meetings, didn't he?
10       A.  I think so.  Yes.
11       Q.  And he attended at least one
12  meeting in Cyprus; correct?
13       A.  I don't recall.
14       Q.  Did he ever attend any meetings
15  with you?
16       A.  It did happen.  Yes.
17       Q.  Do you recall where those meetings
18  occurred?
19       A.  I assume in London.  But I don't
20  recall exactly.
21       Q.  Did he attend at your invitation
22  or the invitation of someone else?
23       A.  I -- I honestly don't remember.
24       Q.  Did you ever attend a meeting in
25  New York with him regarding Project Beech?
```

JULY 21, 2022 - AMIT FORLIT
30(B)(6) INSIGHT ANALYSIS AND RESEARCH LLC

70

```
1        A.  I don't recall a meeting of that
2   nature.  But I do recall a meeting I had
3   alone in New York about Project Beech.
4        Q.  And who was that meeting with?
5        A.  With Jamie Buchanan.
6        Q.  Do you remember when that was?
7        A.  I think late 2018.
8        Q.  And who else attended besides you
9   and Mr. Buchanan?
10       A.  At that specific meeting, just
11  the two of us.
12       Q.  And what was the purpose of the
13  meeting?
14       A.  So Stuart Page got a request from
15  two people.  One of them was a very close
16  friend of his.  His name was Alex Ibragimov.
17  And the second person's name was Dmitry.
18  But, once again, this is what I heard
19  from Stuart.
20       The meeting was held in London.
21  And Stuart told me that, at that meeting,
22  he was threatened and told to implicate or
23  frame Neil and Gerard in improper actions
24  in managing the file.
25       He was so disturbed by the meeting
```

JULY 21, 2022 - AMIT FORLIT
30(B)(6) INSIGHT ANALYSIS AND RESEARCH LLC

71

```
1   that he asked me to meet with Jaime urgently
2   and tell him about the content of the meeting.
3   I spoke to Jaime.  We had arranged to meet
4   in his room -- I believe it was the --
5   Park Hyatt in Manhattan.  And I told him
6   what Stuart had requested.
7        To the best of my recollection,
8   this is one of the very few meetings in
9   which I had met Jaime without Stuart.
10       Later on, at the request of Jaime
11  and Neil, we met all four of us in London.
12  And then Jaime and Neil asked Stuart to
13  report this meeting to the FBI.
14       Q.  Jamie Buchanan lives in London;
15  right?
16       A.  To the best of my recollection,
17  at the time, he was distributing his time
18  between Dubai, London, and Canada.
19       Q.  What year was this?
20       A.  I believe this was at the end
21  of 2018.
22       Q.  And at the time, you lived in
23  Israel; right?
24       A.  Correct.
25       Q.  So why does somebody who lives
```

JULY 21, 2022 - AMIT FORLIT
30(B)(6) INSIGHT ANALYSIS AND RESEARCH LLC

72

```
1   at least part time in London and somebody
2   who lives in Israel fly all the way to
3   New York to meet?
4        A.  Jaime was on the move constantly.
5   And Stuart was so disturbed by the -- by
6   the meeting that he had asked me to meet
7   Jaime as fast as possible, at the earliest.
8   And at that time, Jaime was in New York.
9   So I took a flight to New York to meet
10  him.
11       Q.  And then, later on, there was
12  a meeting in London.
13       What happened at that meeting
14  where, if I understand it, you, Jaime,
15  Neil, and Stuart met?
16       A.  I believe that the meeting took
17  place in a club called George that Jaime
18  was a member of.  Here too, at the request
19  of Stuart, we performed a security check
20  to make sure that none was being followed.
21       And I remember, at the meeting,
22  that Stuart told Jaime and Neil how the
23  conversation with Dmitry and Alex had gone.
24  I think that, by the time the meeting was
25  held, Alex spoke once again with Stuart
```

JULY 21, 2022 - AMIT FORLIT
30(B)(6) INSIGHT ANALYSIS AND RESEARCH LLC

73

```
1    or with his son perhaps.  And what was
2    discussed at that meeting was whether
3    or not Stuart would agree to report his
4    meeting to the authorities.
5         And in my opinion, his trip to
6    the United States to meet FBI agents --
7    and I wasn't there, I had nothing to do
8    with that -- was for that purpose.
9    Q.   (Partially translated.)  And
10   when you say his trip to meet the FBI,
11   who is -- who is "his"?
12   A.   Stuart Page.
13   Q.   And so when you met with Jamie
14   Buchanan in New York and you met with the
15   three others in London, in both instances
16   you were paid for that work; right?
17   A.   This is funny.  Stuart promised
18   that he would take care of the costs, in
19   the context of special expenses, that were
20   beyond the scope of my work.  And I know
21   that he got more than he was budgeted to
22   get.  But he never paid me for it.  So
23   one could say that this trip was voluntary.
24   Q.   Or at least unpaid?
25        MR. BARET:  Pro bono.
```

74

```
1         THE COURT REPORTER:  What?
2         MR. BARET:  Pro bono.  Not --
3    not volunteer.
4         THE WITNESS:  (In English.)
5    Pro bono.
6         MR. BARET:  Just not -- not --
7    not paid.
8         THE INTERPRETER:  Pro bono.
9    BY MR. BEHRE:
10   Q.   Do you own any part of Global
11   Impact Services?
12   A.   No.
13   Q.   With regard to Eitan Arusy, did
14   he work with Stuart Page?
15   A.   It's possible.
16   Q.   Did he ever meet with Stuart Page
17   to the best of your knowledge?
18   A.   Yes.
19   Q.   Was that always on Project Beech
20   or some other project?
21   A.   Not just Project Beech.
22   Q.   Okay.  To the best of your knowledge,
23   did Eitan Arusy ever meet with Neil Gerard?
24   A.   Yes.
25   Q.   About how many times?
```

75

```
1    A.   I can estimate five to ten times.
2    But I don't have that information.
3    Q.   And it appeared, didn't it, that
4    Gerard believed that Arusy was an intelligent
5    person?
6    A.   I don't know what he believed or
7    didn't believe.
8    Q.   Well, Gerard asked, on occasion,
9    Arusy his opinion on certain aspects of
10   the investigation; correct?
11   A.   Correct.
12   Q.   And Arusy advised Gerard on the
13   investigation; correct?
14   A.   (Translated.)  When we had staff
15   meetings, everybody, including me, would
16   raise ideas.  And various subjects were
17   discussed.  That was the nature of the
18   meetings.  Eitan was not the chief consultant
19   to Neil about Project Beech.  I don't think
20   that Neil ever met with Stuart --
21        (In English.)  -- ever met with --
22        MR. BARET:  Eitan.
23        THE WITNESS:  (In English.)
24   -- either Eitan or --
25        (Translated.)  -- either Eitan --
```

76

```
1         (In English.)  -- or me without
2    Stuart.
3         (Translated.)  -- or me without
4    Stuart.
5    BY MR. BEHRE:
6    Q.   When you say "staff meetings,"
7    what do you mean?
8    A.   There was Jaime.  There was
9    Stuart.  Sometimes Eitan.  Me.  And Neil.
10   Q.   Did Amir Handjani ever attend
11   any of those meetings?
12   A.   I personally never met Amir
13   Handjani.  If he was at meetings that
14   I didn't attend, I don't know.
15   Q.   Do you have any knowledge of
16   what role Mr. Handjani played in Project
17   Beech?
18   A.   I only know that, towards the
19   end of the project, that certain people
20   threatened Stuart on behalf of the client.
21   Not exactly threatened.  They cautioned
22   him to stop trying to make contact with
23   the boss.  So he turned, among others,
24   to Amir Handjani.  And I know that he
25   was always considered a close consultant
```

1   of the boss.

2       Q.   So the boss turned to Handjani

3   to threaten Page not to do what towards

4   the end of the project?

5       A.   Towards the end of the project,

6   Stuart tried to get a meeting with the

7   boss.  And he went through all kinds of

8   acquaintances of his to get to the boss.

9   One of those acquaintances was Amir.

10          And I know that at one time

11  he even got a letter from RAK's attorneys.

12  And that's the first time I encountered

13  that term "cease and desist."  And they

14  simply said to him:  Stop trying to make

15  contact.

16      Q.   Why was Stuart trying to make

17  contact with the boss, that is, the ruler?

18      A.   To the best of my understanding --

19  and this is based completely on hearsay --

20  he thought he had a bonus coming to him

21  at the end of this case.

22      Q.   And how much of a bonus did he

23  think he had coming to him?

24      A.   Something about $2 million.

25      Q.   And was any of that bonus

---

1   letter.

2           What -- did you ever see that?

3       A.   I don't remember if he just told

4   me about it or actually sent me a copy of

5   it.

6           And I -- I remember he was very

7   offended.  And it was presented as if this

8   was a termination of his employment and

9   that he would be paid a compensation of

10  one and a half million dirham, which is

11  about $400,000.

12          And he talked to me, asked my

13  advice about how -- how to respond to that.

14  And he responded by saying that he had --

15  he had never had a contract with the --

16  but rather an oral agreement with the

17  boss.  And he asked for four and a half

18  million dirham.

19          THE INTERPRETER:  I'd like to

20  correct something I said earlier.  I said --

21  I said "termination of employment."  It

22  should have been "termination of a contract."

23  BY MR. BEHRE:

24      Q.   And what year and month was this

25  occurring in, if you recall?

---

1   supposed to go to you?

2       A.   The oral agreement we had was

3   that, for all the work that we did, he

4   would -- 70 percent of what he charged

5   for our work, which wasn't the entire

6   amount, 30 percent would be his commission.

7   We were also supposed to get part of the

8   bonus.

9           Today I know that, in his dismissal

10  letter, he did receive a certain sum.  I

11  don't know how much to this day.  And he

12  denies -- up to the point that I last spoke

13  to him, he denied ever receiving that.  And

14  I was supposed to receive part of that amount

15  too.  But I didn't.

16      Q.   Who wrote the cease and desist

17  letter to Stuart Page, if you know?

18      A.   I think the attorneys that are

19  representing Rakia in England.

20      Q.   Stewarts Law?

21      A.   I don't know.  I think they

22  switched attorneys at some point.  But

23  I don't know.  There was an attorney, I

24  think, named Louise.  But I'm not sure.

25      Q.   And you mentioned a dismissal

---

1       A.   I think about two or three months

2   after he testified at the trial.

3       Q.   And the bonus was because the

4   Rakia case had gone well in Rakia's view;

5   right?

6       A.   I can't say.  I can't say.  That's --

7   Stuart thought it went well.  And he wanted

8   the bonus.  And I think he -- he asks for

9   a bonus from every -- his clients when he

10  stops working with them.

11      Q.   And one last thing, and we'll

12  take a break.

13          You indicated a few moments ago

14  that there was a 70/30 split.  And I want

15  to make sure I understand it correctly.

16          That every payment Stuart Page

17  received, you got 70 percent of it and he

18  kept 30?

19      A.   No.  Stuart Page presented that,

20  for our work on the case, he would charge

21  an amount of money that varied over time.

22  Besides our work, he charged for other jobs

23  large amounts of money, which I don't know

24  how much.  I even know that he once charged

25  $2 million for a job and he had to give it

81

```
1   back because he was unable to perform it.
2           And from the amounts that he
3   claimed to have charged, where the division
4   was 70/30, but I never knew if what he was
5   saying was actually true.
6       Q.   So who got the 70 percent and who
7   got the 30 percent?
8       A.   My companies were supposed to get
9   70.  And he was supposed to get 30.
10      Q.   And that's because you were doing
11  most of the work; right?
12      A.   I'm -- I'm relating to the work
13  I did.  He didn't do anything.  For what
14  he did, he charged different sums.
15      Q.   So you -- you did all the work,
16  but he got 30 percent of the money?
17      A.   I was one of the contractors
18  who worked on the case.  If he paid me
19  about $5 million, as we had arranged on
20  this case, in my opinion, he charged more
21  than double.
22      Q.   Uh-huh.  Okay.
23          MR. BEHRE:  Why don't we take
24  our break.
25          THE VIDEOGRAPHER:  Going off
```

82

```
1   the record at 1:52.
2           (Recess from 1:52 p.m. to 3:08 p.m.
3       Israel Daylight Time.)
4           THE VIDEOGRAPHER:  Going back on
5   record at 3:08.
6   BY MR. BEHRE:
7       Q.   Before the lunch break, we were
8   looking at Exhibit No. 5, which are the
9   bank records from the Bank of America for
10  Insight Analysis and Research.
11          Could you pull up that exhibit
12  again?
13      A.   I have it.
14      Q.   I'm going to ask you questions
15  about names that appear in these bank
16  records.  And I can give you a page number
17  or not.  But let's just kind of go one at
18  a time and see if you recognize the name.
19          Who -- who is Gordon Glaze?
20      A.   (In English.)  Gordon Glaze "ve"
21  Ezekiel Golan are the same people.  The same --
22  it's the same guy.
23          (Translated.)  Gordon Glaze "ve"
24  Ezekiel Golan are one and the same person.
25          THE COURT REPORTER:  What was the
```

83

```
1   name?
2           MR. BEHRE:  Ezekiel.
3           THE INTERPRETER:  Golan Glaze [sic]
4   and Ezekiel Golan, one --
5           THE WITNESS:  (In English.)  No.
6           THE INTERPRETER:  -- and the same.
7           THE WITNESS:  Gordon Glaze and
8   Ezekiel Golan.
9           THE INTERPRETER:  "Gordon Glaze
10  and Ezekiel Golan."
11          THE WITNESS:  We mentioned him
12  yesterday.
13  BY MR. BEHRE:
14      Q.   They're both companies [sic]
15  owned by whom?
16      A.   It's one and the same person.
17  He holds both a Canadian passport and an
18  Israeli passport.
19      Q.   Those are two names for the same
20  person?
21      A.   Yes.
22      Q.   And is there any particular reason
23  he has two names?
24      A.   I don't know.
25      Q.   What kind of work did he perform?
```

84

```
1       A.   Work that is not connected neither
2   to Stuart nor to Beech.
3       Q.   What kind of work did he perform?
4       A.   Something in the medical field.
5       Q.   Florida IP Telecom made numerous
6   payments into this Bank of America account.
7           What is Florida IP Telecom?
8       A.   It is a client from South America.
9   And the work was performed in South America.
10      Q.   And it's a U.S. company located
11  in Florida?
12      A.   Apparently the payment came from
13  an American company.  The work was performed
14  in South America for a South America customer.
15      Q.   Did this work relate to Elliott
16  Management in Argentina?
17      A.   No.
18      Q.   Mona Tours Ltd.
19          What is Mona Tours?
20      A.   Mona Tours.  It's a travel agency.
21      Q.   And there's significant payments
22  to Mona Tours.
23          What was that for?
24      A.   For flights.
25          MR. BEHRE:  Say it again.
```

85

1     THE INTERPRETER:  "For flights."
2   BY MR. BEHRE:
3     Q.   Okay.  Overseas Consulting.
4     Q.   Where is it?
5     Q.   (Partially translated.)  If you
6   go to page 244, you'll see it.
7     Overseas Consulting Limited made
8   a payment to you of $300,000 on March 23rd,
9   2018.
10     THE INTERPRETER:  Two hundred
11   or three hundred?
12     MR. BEHRE:  300,000.
13     (Remainder of pending question
14     translated.)
15     THE WITNESS:  I don't remember.
16   But this is not connected neither to Stuart
17   nor to Beech.
18   BY MR. BEHRE:
19     Q.   Well, if you don't remember, how
20   do you know it wasn't connected to Project
21   Beech?
22     A.   Because, in the Project Beech,
23   I received money only from Stuart.
24     Q.   And then, on page 248, Aviram
25   Hawk Consultant, there's a payment you

86

1   made to him on April 26, 2018.
2     And as we talked about yesterday,
3   that's the account for Mr. Azari; right?
4     A.   Correct.  An account of Mr. Azari.
5     Q.   I'm directing your attention to
6   page 258, a $6,000 payment on June the 6th,
7   2018, to Tey, T-e-y, Global Strategic.
8     Do you know what that is for?
9     A.   No.  I don't remember.
10     Q.   Were they a subcontractor on
11   Project Beech?
12     A.   I don't recognize it.  I would
13   have to go over the invoices.  But I don't
14   recognize it.
15     Q.   (Not translated.)  And then also
16   on June the 6th, 2018, there's a $8,050
17   payment to Bitachon Eintegrativi.
18     Do you see that?
19     A.   (Comment in Hebrew.)
20     (In English.)  Which page?
21     (Pending question translated.)
22     THE WITNESS:  I don't remember.
23   BY MR. BEHRE:
24     Q.   (Partially translated.)  And
25   then, on page 268, there's another payment

87

1   for $352,740 to Primum Viridi Navitas.
2     A.   (In English.)  No.
3     THE INTERPRETER:  Say the number
4   again.  Sorry.
5     THE WITNESS:  (In English.)  No.
6     (Comment in Hebrew.)
7     THE INTERPRETER:  3,052?
8     MR. BEHRE:  352,740.
9     THE INTERPRETER:  352,740.
10     (Remainder of pending question
11     translated.)
12     THE WITNESS:  "Kin."
13     (Comment in Hebrew.)
14     THE COURT REPORTER:  I don't
15   have the name.
16     THE WITNESS:  (In English.)
17   Primum --
18     THE INTERPRETER:  "Kin."
19     Navitas.
20     THE WITNESS:  (In English.)
21   -- Viridi --
22     THE INTERPRETER:  (Comment in
23   Hebrew.)
24     MR. BEHRE:  I'll read it.
25     P-r-i-m-u-m, space, V-i-r-i-d-i,

88

1   space, Navitas, N-a-v-i-t-a-s.
2     THE WITNESS:  (In English.)  I'm
3   trying to Google it.  Maybe --
4     THE INTERPRETER:  Primum Viridi
5   Navitas.
6   BY MR. BEHRE:
7     Q.   Trying to Google it.
8     A.   I don't remember what it is.
9     It's maybe a company in Cyprus.
10   But I have to check.
11     Q.   Who is Brian Tulloch?
12     A.   I have no clue.
13     Q.   If you look at the -- at page
14   25, which is the bank statement for May
15   2019, you'll see there's two wires to him,
16   one on May 6 for 64,000, one on May 14th
17   for 75,000, and then a third on May 22nd
18   for 42,000.  It's Brian --
19     A.   (Comment in Hebrew.)
20     (In English.)  Brian Tulloch.
21     THE INTERPRETER:  "Brian Tulloch,"
22   he says.
23     THE WITNESS:  I don't remember.
24   BY MR. BEHRE:
25     Q.   Before the lunch break, we talked

89

1  about Global Impact Services and its owner,
2  Eitan Arusy; correct?
3      A.  Correct.
4      Q.  And we talked about the fact
5  that you were making payments to him.
6          Do you remember that?
7      A.  Yes.
8      Q.  Did there come a time when he
9  actually started making payments to you
10 into this account?
11     A.  It is possible.  The -- the
12 accounting between us was on a global
13 level.  So probably there were times
14 when he had to make payments to me.
15     Q.  For what reason would he be
16 making payments to you?
17     A.  I'd -- I have to go back to
18 the documents to check.  But sometimes
19 I would make payments to him.  Sometimes
20 he would make payments to me.  I would
21 have to check that.
22     Q.  And was that because you were
23 doing work for him?
24     A.  Sometimes we did jobs together.
25 Some of the projects we carried out

90

1  together.
2      Q.  If you look at page 109 and
3  the entries on September 8th, 2020,
4  and September 24th, 2020, you'll see
5  two payments that he -- that that entity
6  made to Insight's U.S. bank account.  One
7  entry is for $65,000.  The other one's
8  for 75,000.
9      A.  As I've said before, sometimes
10 Eitan would bring a client and I would
11 provide services.  And sometimes it was
12 the other way around.  Sometimes the
13 payment would come from the client to
14 me and then from me to Eitan.  And
15 sometimes the other way around.
16         As far as these two specific
17 entries are concerned, I do not recall.
18     Q.  Okay.  And I note that, in
19 that month of September 2020, the only
20 deposits into this account were from
21 Global Impact Services; right?
22     A.  Correct.
23     Q.  And if you go to the next
24 month, October 2020, page 117, you'll
25 see the same thing, that the only deposit

91

1  made into the account for Insight in the
2  U.S. was one for $70,000 sent by Global
3  Impact Services.
4          Do you see that?
5      A.  Yes.  I do see it.
6      Q.  And if you go to page 123 in
7  November 2020, you'll see yet another
8  payment from Global Impact Services,
9  this one for 71,000.
10         Do you see that on November
11 9th, 2020?
12     A.  Yes, I see.
13         At that time I believe that
14 the Beech Project had already been
15 completed.  It was completed, I believe,
16 on the -- in the beginning of 2020.  And,
17 hence, I do not see the connection between
18 that and our investigation.
19     Q.  Well, there's a deposit on
20 November 2nd, 2020, that says it's
21 coming from SDC-Gadot in your name;
22 right?
23         Do you see that, the -- the
24 entry above that?
25     A.  Of the 24 [sic]?

92

1      Q.  No.  November 2nd, 2020.
2      A.  Yes.
3      Q.  And why is there money moving
4  from the Gadot bank account in the United
5  States and you're the person initiating
6  the wire?  Why is there movement going
7  between the two U.S. entities when you
8  said they both played the same role?
9      A.  I imagine that the finance
10 person -- the -- the person in charge
11 of finances decided that funds should
12 be concentrated in this particular account.
13 I do not know a specific reason.  But I
14 imagine that we could find the opposite
15 as well.
16     Q.  When did you stop working with
17 Stuart Page on the project?
18     A.  When did you stop, you say?
19     Q.  Stop.  Yeah.
20         When did your relationship --
21 when did your relationship with Stuart
22 Page end?
23     A.  In this specific project, I
24 believe that -- about May 2020.  But we
25 remained in contact until at least the

93

1   middle or the end of 19 -- '21.
2       Q.   And why did your relationship
3   with Stuart Page end regarding Project
4   Beech in May 2020?
5       A.   When his job was interrupted
6   or terminated, then so was mine.  It's
7   not -- the relationship did not stop.
8   The work stopped.
9       Q.   Uh-huh.
10           And once your relationship
11  with Page ended, did Global Impact
12  Services take over the role that Page
13  played?
14      A.   It's a bit of a confused question --
15  confusing.
16           (Comment in Hebrew.)
17      MR. BARET:  That's not the question
18  he asked.  Answer his question.
19      THE WITNESS:  (Comment in Hebrew.)
20      MR. BEHRE:  Can you translate
21  that first, please?
22      THE INTERPRETER:  He said that:
23  "The reason that the relations between
24  Stuart and me stopped was because he
25  insisted that I participate in his

95

1   respond to that request?
2       A.   I told him that he was cheeky,
3   impudent.
4       MR. BARET:  You know what is
5   chutzpah?  You know what's chutzpah?
6           (Comment in Hebrew.)
7           It's chutzpah.
8   BY MR. BEHRE:
9       Q.   Did Global Impact Services play
10  a role similar to the role that Stuart
11  Page played in Project Beech?
12      A.   No.
13      Q.   Did it play any role with regard
14  to Project Beech?
15      A.   They did -- they did play a role.
16  Global was working vis-a-vis Stuart.  But
17  only Stuart was in contact with the client.
18      Q.   (Not translated.)  With the "client"
19  being who?
20      A.   (In English.)  The boss.
21           (Translated.)  The boss.
22      Q.   Yesterday you indicated that you
23  thought the ruler was worried about being
24  overthrown.
25           Is that right?

94

1   legal fee -- legal -- legal expenses."
2       THE WITNESS:  Whether or not
3   Global pursued the relations with him,
4   I don't know.
5   BY MR. BEHRE:
6       Q.   Stuart Page asked you to help
7   pay his legal bills?
8       A.   Yes.
9       Q.   What did he have legal bills for?
10      A.   He said that he was being sued
11  in many aspects, that it's very distressing
12  to him.  He said -- he said that he had
13  tried twice to commit suicide.  He said
14  that he had had himself hospitalized once
15  for a week and then for another week in
16  home hospitalization and that his legal
17  fees are killing him.
18      Q.   And did he give you any reason
19  why he thought that you should be helping
20  pay his legal bills?
21      A.   He said that he believed that
22  I had made a lot of money from him and
23  that, as a friend, I should be helping
24  him.
25      Q.   And did you -- how did you

96

1       A.   Correct.
2       Q.   And how do you know that?
3       A.   In some of Stuart's briefings
4   to us, Stuart -- Stuart said that the
5   ruler was suspecting that Khater Massaad
6   was collaborating with one of his siblings,
7   the siblings of the boss.  And he feared
8   that this was in the context of trying
9   to topple him.
10      Q.   And did you hear about this
11  concern about being overthrown from Neil
12  Gerard as well?
13      A.   I do not recall.  But I seem
14  to remember I did hear that from Jaime.
15      Q.   And are you aware that some of
16  the individuals that the ruler wanted to
17  target had been trying to bring to light
18  human rights violations by the ruler and
19  those working for him?
20      A.   I don't remember such a thing.
21      Q.   Now, you've testified over the
22  last two days that Stuart Page hired you,
23  in effect, to work on Project Beech; right?
24      A.   Correct.
25      Q.   Who hired Stuart Page to become

97

```
1   involved in Project Beech?
2          Was it Neil Gerard?
3      A.  According -- according to Stuart
4   Page, the ruler himself had hired him.  And
5   in the first few months, he was reporting
6   only to the ruler.
7      Q.  And what -- what happened after
8   the first few months in terms of who he
9   reported to?
10     A.  After a few months, I remember
11  Jaime and Neil joining in the meetings.
12         And to the instructions given to
13  Stuart, in the beginning, he was reporting
14  only to the ruler of RAK.  He was traveling
15  there and reporting to him.  And after that,
16  he was also reporting to Jaime and Neil.
17     Q.  Okay.  And who -- who paid Page
18  for his work?
19     A.  In the early years, he told us
20  that he had received money directly from
21  the palace, from the private accounts of
22  the ruler.  He said he had to -- he had
23  to submit an invoice each time anew to the
24  PA of the ruler and it only went through
25  them.  In the very last months, I remember
```

98

```
1   that the person who would authorize the
2   invoices was Jaime.
3      Q.  And who or what entity paid Page
4   for the payments that -- that Buchanan
5   authorized?
6      A.  I don't know.
7      Q.  Are you aware of any corporate
8   entities that Jamie Buchanan had that
9   he ran?
10     A.  Do you mean companies that
11  belonged to Jaime or companies that he
12  managed for RAK?
13     Q.  Both.
14     A.  I think he was the -- Jaime was
15  the CEO of Rakia.  And I think he also --
16  he said he also invoiced for his services.
17  He was -- that he was a subcontractor, he
18  told me.
19     Q.  (Not translated.)  Did Jaime have
20  a company that was involved in balloon sales?
21         THE INTERPRETER:  Balloons like
22  birthday party balloons or hot air balloons?
23  Which one?
24         MR. BEHRE:  The first.
25         THE INTERPRETER:  The first.
```

99

```
1          (Pending question translated.)
2          THE WITNESS:  Not that I know of.
3   BY MR. BEHRE:
4      Q.  Yesterday you made some serious
5   allegations about Nicholas Del Rosso.
6          Do you recall that?
7      A.  Everything I know about Nicholas
8   Del Rosso comes from the legal proceedings
9   that I think you are carrying out against
10  him.
11     Q.  What have you seen in those legal
12  proceedings?
13     A.  That he paid a sum of $1 million
14  to an Indian company that was known for
15  being a hacking company on the date of
16  the hacking and that he -- and that he
17  received money from Dechert.
18     Q.  Do you know if those allegations
19  are true to the best of your knowledge?
20     A.  In retrospect, it seems to be
21  right.
22     Q.  And why do you say, in retrospect,
23  it seems to be right?
24     A.  Because at the time the leak
25  suddenly occurred, we didn't understand
```

100

```
1   where it had come from or why.  And from
2   my familiarity with the charges against
3   my friend Aviram, who was in jail in New
4   York, it appears -- appears to be -- it
5   seems to be a similar -- a similar M.O.
6      Q.  And what's that M.O.?
7      A.  That this company Beltox (phonetic)
8   or some other Indian company is hired.  They
9   do the hacking.  And they're paid for it.
10     Q.  Now, Del Rosso had a company;
11  right?  It's called Vital Management?
12     A.  I -- I don't know.  I guess,
13  if you say so.
14     Q.  Did -- did Del Rosso write his
15  own reports regarding Project Beech?
16     A.  I don't know him.  I don't know
17  what he did.  And I don't know what he
18  wrote.
19     Q.  Did you ever receive any reports
20  that you thought were written by Del Rosso
21  or his company?
22     A.  I don't know.  Possibly Stuart
23  sent reports of that nature.  But I don't
24  recall.
25     Q.  And if there were such reports,
```

1 Stuart would send them to you, and you'd
2 consider them for inclusion in your own
3 report; correct?
4      A.   No.  Stuart would send information
5 sometimes and ask to have that information
6 included in the report.  And sometimes he
7 would re-write the reports himself and add
8 his own information.  And I don't know what
9 his sources were, if it was Del Rosso or
10 somebody else.
11           (Exhibit 6 marked.)
12 BY MR. BEHRE:
13      Q.   I'm showing you next what's been
14 marked as Exhibit No. 6 in this deposition.
15 It's entitled:
16           "Project Beech - Financial
17 Investigation Report #1."
18           MR. BARET:  Which one is it?
19           MR. BEHRE:  No. 6.
20           MR. BARET:  Do you have a copy
21 for me?
22           MR. BEHRE:  He will when he gets
23 back.  I believe he went to make a copy.
24           MR. BARET:  Okay.
25           THE WITNESS:  (Examining.)

1 involved in preparing this report at
2 all?
3      A.   Since I didn't keep any of
4 the documents related to this case, I
5 don't know.  I can't find out if this
6 report is based on a report I wrote
7 or whether Stuart wrote it or whether
8 Stuart amended it.
9      Q.   So you don't recall one way
10 or the other whether you were involved
11 in preparing this report?
12      A.   I do not remember.
13      Q.   You would agree, wouldn't you,
14 that it appears to contain confidential
15 financial information to which the author
16 would not have a right to; correct?
17      A.   I'm not sure.  It could be human
18 intelligence sources that provided this
19 information.  I don't know.  It could be
20 fake.
21      Q.   If you look at page 8, it contains
22 very specific financial information about
23 Khater Massaad, doesn't it?
24      A.   Yes.
25      Q.   And those -- the precision

1 BY MR. BEHRE:
2      Q.   (Not translated.)  Have you had
3 a chance to look at that report?
4      A.   (In English.)  Yes.
5      Q.   (Not translated.)  I direct your
6 attention to the first paragraph.  And it
7 says, quote:
8           "The following report focuses
9 on the findings regarding KM's bank
10 accounts as appeared in 'Vital Management
11 Services' (hereinafter:  'VMS') report
12 dated 12.11.2014."
13           Do you see that?
14      A.   "Kin."
15           (In English.)  Yes.
16      Q.   And that would suggest that
17 there was a report prepared by Del
18 Rosso and his company, Vital Management,
19 concerning financial issues; right?
20      A.   Based on what I'm reading
21 here, yes.
22      Q.   Were you involved in the
23 preparation of this report?
24      A.   No.
25      Q.   You're certain you weren't

1 of those numbers suggest it's highly
2 unlikely that a human source would be
3 able to provide those numbers without
4 the aid of a bank record; right?
5      A.   Unless this human source was
6 privy to the bank records.
7      Q.   Yesterday you said that Nick
8 Del Rosso was working on Project Beech
9 but he was working in parallel to you
10 but on different issues.
11           Do you recall that testimony?
12      A.   Yes, I recall.  I -- I think
13 he -- he might have worked for the same
14 client.  But I'm not sure it should be
15 called Project Beech.  Project Beech
16 was a name that Stuart made up.
17      Q.   Putting aside what the name
18 of the project was, you indicated that
19 you thought Nick Del Rosso was working
20 in parallel but on different issues.
21           What did you mean by that?
22      A.   At first, we knew that Nick
23 was involved.  But I don't know if --
24 how Stuart knew, if he knew it from the
25 boss or other sources.  And there were

1    certain aspects in the case where we were
2    told:  You don't have to investigate this.
3    It's being taken care of.
4         Q.   And what were those other aspects
5    that were being taken care of by others?
6         A.   One was Farhad Azima.  And there
7    was another family I recall named Rothman.
8              THE INTERPRETER:  Rothman?
9              THE WITNESS:  Rothman.
10             THE INTERPRETER:  Rothman.
11             THE WITNESS:  (Comment in Hebrew.)
12             THE INTERPRETER:  Rothman.
13             R-o-t-m-a-n or R-o-t-h-m-a-n.
14   BY MR. BEHRE:
15        Q.   And what about Farhad Azima was
16   being taken care of by others?
17        A.   They didn't tell us Farhad Azima
18   was being taken care of by somebody else.
19             At first -- they didn't tell us:
20   You don't have to investigate Farhad Azima.
21             But, at first, they told us that
22   he was serving as some kind of mediator
23   between RAK and Khater Massaad.  And then
24   the trial started with this mutual accusations
25   and it wasn't necessary.

1    called Project Beech?
2         A.   I think Stuart Page has a big
3    ego.  And if to base myself on what you
4    said yesterday, he was mad that he was
5    taking away business from him.
6         Q.   Do you know who worked with
7    Nick Del Rosso?
8         A.   No.
9         Q.   Do you know if he had any
10   employees?
11        A.   No.  I don't know him.  I've --
12   I've never seen him.  I don't know him
13   at all.
14        Q.   Did there come a time, to the
15   best of your knowledge, that Nick Del
16   Rosso's work for the boss either was
17   suspended or ended?
18        A.   I think -- I think that, at
19   the time that our work was terminated,
20   Stuart said that that work was also
21   terminated.  But I -- I don't really
22   know.
23        Q.   How would you describe the
24   role of Neil Gerard in Project Beech?
25        A.   "Rega."

106

1         Q.   And who was this individual Rothman
2    that you mentioned?
3         A.   During the investigation, a suspicion
4    came up regarding some kind of arms deal that
5    involved the Rothman family, some kind of --
6    they were accused of some kind of fictitious
7    deal.  And as part of the findings of the
8    investigation, this is something I recall.
9    We were told not to touch it.
10        Q.   And is that because somebody else
11   was going to touch it or just to stay out
12   of it entirely?
13        A.   The initial question was:  What
14   do I think Nick Del Rosso did?
15             At that time, I did not think there
16   was anybody else doing any investigating.
17             Based on the findings in the court,
18   today I do believe that Nick Del Rosso was
19   investigating.
20        Q.   Was investigating what?
21        A.   I think he was investigating all
22   the matters dealing with Farhad Azima.
23        Q.   Why was Stuart Page so upset that
24   Nick Del Rosso was brought in to provide
25   assistance with regard to the -- what you

108

1              (In English.)  Wait.  It cut
2    off.
3              (Brief technical interruption
4         in the proceedings.)
5    BY MR. BEHRE:
6         Q.   (Not translated.)  You can go
7    ahead.  Yeah.
8         A.   I think he was like the quarterback.
9    He was a very close advisor to the boss.  I
10   think his decisions were very impactful.
11        Q.   And who reported to him regarding
12   Project Beech issues?
13        A.   Based on what Stuart told me and
14   what I remember, there were subjects that
15   Jaime and Stuart said to consult with Neil.
16             THE INTERPRETER:  With Neil?
17             THE WITNESS:  (Comment in Hebrew.)
18             THE INTERPRETER:  (Comment in
19   Hebrew.)
20   BY MR. BEHRE:
21        Q.   What was David Hughes' role in
22   Project Beech?
23        A.   In my -- in my recollection, I --
24   I saw David Hughes twice.  And my feeling
25   is that he was some kind of assistant for

109

1    Neil.

2        Q.   Did it appear to you that he was

3    subservient to Neil Gerard?

4        A.   I wouldn't call it subservient.

5    Subordinate.  He was a subordinate of --

6    of him, like you and you.  (Indicating.)

7        MR. BARET:  He's actually the

8    boss.  He's just --

9        MR. BEHRE:  Yeah.  You just --

10       MR. BARET:  -- mentoring --

11       MR. BEHRE:  -- didn't know it.

12       MR. BARET:  -- his work.  He's --

13   just make sure --

14       THE INTERPRETER:  The ruler.

15       MR. BARET:  -- he's doing his

16   job right.  That's it.

17   BY MR. BEHRE:

18       Q.   What about Andrew Frank, what was

19   his role in Project Beech?

20       A.   I never met and never knew Andrew

21   Frank.  I heard that he was responsible for

22   the PR.

23       Q.   And what PR are you talking about?

24       A.   There was somebody in charge of PR.

25   He was in charge of PR.  I -- I did my part

110

1    of the project.  I don't know what the other

2    people did.

3        MR. BEHRE:  Could you just try

4    and unmute that or maybe you could help

5    him?

6        THE VIDEOGRAPHER:  Off the record

7    at 4:06.

8        (Recess from 4:06 p.m. to 4:07 p.m.

9    Israel Daylight Time.)

10       THE VIDEOGRAPHER:  Back on the

11   record at 4:07.

12   BY MR. BEHRE:

13       Q.   Okay.  We're talking about the

14   PR effort that Andrew Frank was apparently

15   making.

16       A.   Is there a question?

17       Q.   No.  I'm just trying to start

18   back up where we were.

19       Did that PR include some of the

20   negative press that came out about Farhad

21   Azima?

22       A.   I don't know.  I never had a

23   meeting or was present at a meeting with

24   Andrew Frank.

25       Q.   (Not translated.)  And what about

111

1    Amir Handjani, who worked with Andrew Frank

2    at Karv, what was his role in Project Beech,

3    if you know?

4        THE INTERPRETER:  I'm sorry.  I

5    didn't catch --

6        MR. BEHRE:  "If you know."

7        THE INTERPRETER:  "If you know."

8        (Pending question translated.)

9        THE WITNESS:  I never met Andrew --

10   Amir Handjani either.  And towards the end

11   of our engagement, Stuart presented him

12   as a close associate or close -- somebody

13   close to the boss, consultant -- close

14   advisor of the boss.

15   BY MR. BEHRE:

16       Q.   Have you ever heard the name

17   Brandon Neuman before?

18       A.   No.

19       Q.   (Partially translated.)  Have

20   you ever heard the name Chris Swecker

21   before?

22       A.   No.

23       Q.   (Partially translated.)  Have

24   you ever heard the name Linda Goldstein

25   before?

112

1        A.   No.

2        Q.   Yesterday you said that there

3    were approximately ten meetings that you

4    attended with Neil Gerard.

5        And you said that one or two of

6    them were at the Dechert offices in London,

7    one or two of them were at the Metropolitan

8    Hotel where you were staying at the time,

9    and there were another ten times or so

10   when you met with him.

11       Do you recall that testimony?

12       A.   (Translated.)  I recall that

13   I said that we had a total of about ten

14   meetings.

15       Yes, we met at Dechert once

16   or twice, in Cyprus, in Switzerland with

17   Stuart, at the Metropolitan --

18       (In English.)  To Stuart's office.

19       (Translated.)  -- at that club --

20       THE INTERPRETER:  Sorry.

21       THE WITNESS:  (Translated.)

22   -- at Stuart's --

23       (In English.)  Office.

24       (Translated.)  -- office, at

25   the Metropolitan, at that club with Jaime.

113

```
 1    Might have been a little more than ten.
 2    BY MR. BEHRE:
 3        Q.   And you mentioned meetings or
 4    a meeting at Page's offices.
 5             Where were they located?
 6        A.   (Comment in Hebrew.)
 7             THE INTERPRETER:  You asked about?
 8             MR. BARET:  Stuart's office.
 9             THE WITNESS:  (In English.)  Stuart
10    office.
11             THE INTERPRETER:  Page's office.
12    I'm sorry.
13             THE WITNESS:  (In English.)  Page
14    office.
15             THE INTERPRETER:  Yeah.
16             THE WITNESS:  I think -- I think
17    it was somewhere near the -- near Buckingham
18    Palace, near the Taj Hotel.  That's where
19    I was staying.  That's where the --
20    offices were at that time.
21             He used to switch offices every
22    year.  Each time he tried to find something
23    cheaper.  In the end, he ended up near some
24    church somewhere, some corner.
25             THE INTERPRETER:  "In some church."
```

114

```
 1    BY MR. BEHRE:
 2        Q.   (Partially translated.)  Did there
 3    come a time in 2019 when there was a great
 4    deal of interest by the boss in Neil Gerard
 5    and others about who was funding both the
 6    Azima litigation and the torture litigation
 7    brought by victims of torture at the hands
 8    of RAK?
 9             THE COURT REPORTER:  Say the end.
10    I'm sorry.  Torture litigation?
11             THE INTERPRETER:  "Tort" or "torture"?
12             MR. BEHRE:  Involving those tortured --
13             THE INTERPRETER:  "Torture."
14             MR. BEHRE:  -- at the hands of RAK.
15             (Pending question fully translated.)
16             THE WITNESS:  Since the meeting
17    with Alex Ibragimov and Dimitri, who
18    represented himself as -- as representing
19    Alpha but really represented -- he worked
20    in a place called Alpha Group.  But he was
21    actually running or managing the entire
22    strategic file of ENRC.
23             And since that, it was -- the
24    prevalent opinion among us was that it
25    was ENRC that was behind the funding of
```

115

```
 1    all that litigation that you mentioned.
 2             Regarding the torture litigation,
 3    I don't know anything at all about that.
 4    BY MR. BEHRE:
 5        Q.   So the comments you just made
 6    concern the Azima litigation; right?
 7        A.   Yes.  The Azima case.
 8             I imagine that you're relating
 9    to the torture that came up as a subject
10    in the trial of Karam Sadaq?
11        Q.   Yes.
12        A.   So on that litigation, we learned
13    from the meeting held by Stuart with Paul
14    Robinson.
15        Q.   Is it true that Neil Gerard became
16    very interested, as -- as did the boss, in
17    finding out who was funding this litigation?
18    And, therefore, he asked Stuart Page to
19    find out who was funding it?
20        A.   My -- my feeling is that Stuart
21    was deeply offended that he was not entrusted
22    with that investigation and he had heard
23    about it because he was a personal friend
24    of Paul Robinson's father.
25             And I believe he was extremely
```

116

```
 1    angry at Neil for not entrusting him with
 2    that investigation.  I don't think he ever
 3    investigated it.  And at this stage, they
 4    had asked -- by that time, they had asked
 5    Stuart to stop contacting them.
 6        Q.   Are you aware that Stuart Page
 7    met with Neil Gerard and Amir Handjani
 8    at the Royal Automotive Club in London
 9    about this very issue, who was funding
10    the litigation?
11        A.   No.
12             When was it?
13        Q.   During the Azima litigation.
14        A.   No, I did not know that this
15    subject was debated.
16        Q.   Did you prepare any report
17    regarding who was funding that litigation?
18        A.   Not that I recall.
19        Q.   Did you perform any surveillance
20    in Dubai on behalf of anyone for Project
21    Beech?
22        A.   No.
23        Q.   Have you ever been to RAK?
24        A.   No.
25             The first time I flew to Dubai
```

117

1    was after the project had ended.
2        Q.   (Not translated.)  Were you
3    involved in surveillance that was conducted
4    on the Stokoe legal team in the U.K.?
5        A.   (Comment in Hebrew.)
6            THE INTERPRETER:  Stoke legal
7    team?
8            MR. BEHRE:  S-t-o-k-o-e.  Stokoe.
9            THE INTERPRETER:  Okay.
10           (Pending question translated.)
11           THE WITNESS:  No.
12   BY MR. BEHRE:
13       Q.   Do you know who Radha Stirling
14   is?
15       A.   No.
16           (Comment in Hebrew.)
17           THE INTERPRETER:  "What is the
18   name again," he asked.
19   BY MR. BEHRE:
20       Q.   Radha Stirling.
21       A.   No.
22       Q.   Earlier we talked about an entity
23   called Insight GSIA Limited, which is a BVI
24   corporation.
25           Do you remember that discussion?

118

1        A.   Yes.
2        Q.   And at that time -- maybe I got
3    it wrong -- you indicated you -- you didn't
4    know anything about this entity; is that
5    right?
6        A.   No.  I did not say that.
7        Q.   I'm sorry.
8            Are you familiar with that entity?
9        A.   Yes.  I did say that this was a
10   company owned by Effi Lavie.
11       Q.   And you had no interest in it?
12       A.   No.
13       Q.   And are you aware that Insight
14   GSIA Limited provided Project Beech
15   assistance to Stuart Page?
16       A.   It's possible, yes.
17       Q.   Are you familiar with a company
18   called Sublime Solutions Innovations and
19   Trade?
20       A.   Not that I recall.  No.
21       Q.   Would it surprise you that they
22   provided Project Beech services to Stuart
23   Page?
24       A.   As I've said before, Stuart Page
25   utilized numerous subcontractors and also

119

1    provided services that do not relate to
2    my work.
3        Q.   Did your Insight entity ever
4    have a website?
5        A.   I don't think so.
6        Q.   Did anybody make efforts to
7    scrub any mention of Insight from the
8    Internet?
9        A.   I have no clue.
10       Q.   Have you ever attempted to
11   reduce the profile of any entity you're
12   involved in by attempting to manipulate
13   the Internet so that searches for those
14   companies would not be so fruitful?
15       A.   No.
16           But I don't possess a website
17   for my companies.  So there's nothing
18   to reduce or remove.
19           MR. BEHRE:  I think Ian has
20   gone out to get copies of the records
21   that you brought.  So we'll just need
22   to take a couple-minute break until he
23   comes back.  We're getting close to done.
24   So ...
25           THE VIDEOGRAPHER:  Going off the

120

1    record at 4:25.
2            (Recess from 4:25 p.m. to 4:40 p.m.
3        Israel Daylight Time.)
4            THE VIDEOGRAPHER:  Going on record
5    at 4:40.
6            (Exhibit 7 marked.)
7    BY MR. BEHRE:
8        Q.   I'd like to next show you
9    Exhibit 2, which is the set of Insight
10   Analysis and Research LLC invoices you
11   brought to your deposition today.  And
12   I'd also like to give you another exhibit
13   we're marking as Exhibit 7, which is a --
14   another packet of Insight Analysis and
15   Research LLC invoices as well.
16           And I want to direct your
17   attention to Invoice 1036 in both packets.
18   Okay?  So just get 1036 in the version
19   you brought and 1036 in the version of
20   the other exhibit.
21           Do you have both of those
22   exhibits opened to Invoice 1036?
23       A.   (Examining.)  Yes.
24       Q.   And while they're both labeled
25   Invoice 1036, they appear to be different

1    in that they -- each one has a different
2    logo.  So they're not identical copies.
3            Do you see that?
4       A.   Yes.
5       Q.   Can you explain why that is?
6       A.   No.
7       Q.   Was there ever a case where
8    invoices were re-written or edited after
9    they were issued?
10      A.   There were cases where Stuart
11   delayed payment or he asked us to re-send
12   an invoice and we may have used a different
13   software.  But I see that the amount is the
14   same in both of them.  So I don't see that
15   there's any problem in this.
16      Q.   Okay.  Would you do the same thing
17   with Invoice No. 1038.
18           Do you have that in front of you,
19   1038?
20      A.   (In English.)  Yes.
21           (Translated.)  Yes.
22      Q.   Now, it appears that there's a --
23   in the set you brought today, there's an
24   additional invoice labeled 1038.  And then,
25   in handwriting, an "A" is placed after it

1            Did you do that?
2       THE INTERPRETER:  From the --
3       THE WITNESS:  (Comment in Hebrew.)
4       THE INTERPRETER:  -- Israeli agency.
5       (Comment in Hebrew.)
6       THE WITNESS:  (Comment in Hebrew.)
7       THE INTERPRETER:  You mean the
8    Ministry?
9       MR. BEHRE:  Yes.
10      (Remainder of pending question
11   translated.)
12      THE WITNESS:  I put in a request.
13   And as soon as it comes, I will send it
14   to you.
15   BY MR. BEHRE:
16      Q.   Okay.  And you also said you'd
17   look at your WhatsApp for more communications
18   with Stuart Page; right?
19      A.   I scanned through my phone.  I
20   couldn't find any.  But I may have it on
21   other phones.  So I'll look.
22      Q.   How many phones do you have?
23      A.   I have one phone.  But I replace
24   it every year.  And when you replace it,
25   I -- when I replace it, I don't back up

1    and it's for a different amount than 1038.
2            Do you see that?
3       A.   That's right.  1038A is for the
4    same amount.  And 1038 is for a different
5    amount.
6       Q.   Correct.
7            And can you explain why there's
8    a one oh -- 1038 and a 1038A?
9       A.   I'm trying to look at the deposit
10   of the money.  I think I must have given
11   them another invoice that Stuart didn't
12   issue, wherever they got it from.  Because
13   I see a payment of $250,000 for the invoice.
14   I think mine is more precise because there's
15   a deposit of 250,000 and a deposit of 300,000 --
16      Q.   So --
17      A.   -- one in August and one in July.
18      Q.   So both were paid?
19      A.   Based on what I see here in the
20   Bank of America, yes.
21      Q.   (Partially translated.)  Okay.
22   Yesterday you said you were going to obtain
23   and give us a copy of your travel records
24   that you got from the Israeli agency that
25   provides that.

1    the WhatsApps.
2       Q.   How did you communicate with
3    Neil Gerard?
4       A.   Via Stuart.
5       Q.   Did you ever text him or e-mail
6    him?
7       A.   No.
8       Q.   Did you ever use WhatsApp or
9    a -- or a method like that to communicate
10   with him?
11      A.   No.
12      Q.   What about Jamie Buchanan, how
13   did you communicate with him?
14      A.   With Signal.  It's an application
15   called Signal.
16      Q.   Any other way?
17      A.   Not with Jaime.  I don't think
18   so.
19      Q.   Did you use Signal for other
20   communications involving Project Beech?
21      A.   I -- I would assume that I did.
22      Q.   With who?
23      A.   With Stuart.  With employees
24   from my firm sometimes.
25      Q.   What other apps do you use to

125

1  communicate?

2      A.  We once used Silent Circle and

3  Wire.  Today we use a phone that we have

4  developed for ourselves.

5      Q.  And would you also please look

6  at your Signal communications with Jamie

7  Buchanan and, if they concern Project

8  Beech, provide them to us?

9      A.  There's nothing there.  It's

10 programmed to disappear after one week.

11     Q.  Let me ask you to take out

12 Exhibit No. 6 again.  It's the project

13 update we looked at previously.

14     "Kin."

15     Q.  I know that you said you didn't

16 recognize that report.

17     But is that in the format that

18 your reports were done regarding Project

19 Beech?  So in other words, the -- the

20 pagination or the font or the lettering,

21 that type of thing, does it look like

22 it's in a similar style as the reports

23 you did create?

24     A.  Yes.

25     Q.  And what is it that's -- that

126

1  looks familiar?

2      A.  The way the report is set up.

3      Q.  Who besides Stuart Page received

4  your reports?

5      A.  To the best of my knowledge,

6  Stuart Page.  Maybe other people in his

7  firm got it, that helped him.

8      Q.  Do you know who he distributed

9  the reports to?

10     A.  No.

11     Q.  Did you ever discuss that with

12 him?

13     A.  He sometimes mentioned that he

14 passed it on to Neil or to Jaime.  But

15 it never was a subject that was discussed.

16     Q.  Okay.  Did you ever get any

17 feedback from Jamie Buchanan or Neil

18 Gerard that made you think they'd

19 actually read your reports?

20     A.  At the meetings that I was

21 present together with them, I -- I could

22 understand that they had read the reports.

23     Q.  Because the reports contained

24 information that became the basis for

25 discussion at the meetings; right?

127

1      A.  Yes.  But they're also subjects

2  that they raised.

3      Q.  Did you ever attend any meetings

4  in the U.S. about Project Beech?

5      A.  Other than the meeting with Jaime

6  that I described earlier, I don't recall

7  any others.

8      MR. BEHRE:  We need a two-minute

9  break.  Sorry.

10     THE VIDEOGRAPHER:  Going off the

11 record at 4:56.

12     (Recess from 4:56 p.m. to 5:00 p.m.

13 Israel Daylight Time.)

14     THE VIDEOGRAPHER:  Back on record

15 at 5:00 o'clock.

16 BY MR. BEHRE:

17     Q.  Mr. Forlit, were you involved

18 in any investigation of Karam Al Sadeq?

19     A.  No.

20     Q.  Dima Al Sadeq?

21     THE COURT REPORTER:  "Dima"

22 or "Dena"?

23     MR. BEHRE:  Dima.

24     THE INTERPRETER:  Dima.

25     THE WITNESS:  No.

128

1  BY MR. BEHRE:

2      Q.  Jihad Quzmar?

3      A.  No.

4      Q.  Did you do, prior to 2015, any

5  other work regarding any other RAK-related

6  matters besides Project Beech?

7      A.  In 2008, I worked for Rafi, who

8  was working for Stuart concerning some

9  aspects related to the case.

10     Q.  Did that involve Sheikh Khaled?

11     A.  "Kin."

12     THE INTERPRETER:  "Khaled"?

13     THE WITNESS:  "Khaled."

14     MR. BEHRE:  "Khaled."

15     THE INTERPRETER:  "Yes."

16 BY MR. BEHRE:

17     Q.  What about Sheikh Faisal?

18     A.  I don't recall.

19     THE INTERPRETER:  "I don't

20 remember that."

21     Sorry.

22 BY MR. BEHRE:

23     Q.  And did that involve the -- the

24 potential overthrow of the Sheikh, of the --

25 of the ruler

129

```
1        A.   No.  There was -- there was no
2   potential overthrow at that time.  There
3   were two princes fighting over who was
4   going to be the king.  There wasn't any
5   overthrow.
6        MR. BEHRE:  Okay.  I have no
7   further questions.  Thank you.
8        THE VIDEOGRAPHER:  That concludes
9   the deposition of Amit Forlit at 5:03.
10        (Brief pause in the proceedings.)
11        THE VIDEOGRAPHER:  Back on record
12   at 5:03.
13
14              EXAMINATION
15   BY MR. BARET:
16        Q.   Amit, were you ever asked to
17   investigate Farhad Azima?
18        A.   No.
19        Q.   Did you ever author or somebody
20   under you author any reports regarding
21   Farhad Azima?
22        A.   No.
23        Q.   After you provided the report
24   to Stuart, did you have any control over
25   what was added to the report?
```

131

```
1              CERTIFICATE OF REPORTER
2
3        I, BRENDA MATZOV, CSR NO. 9243, do
4   hereby certify:
5        That, prior to being examined, the
6   witness named in the foregoing deposition was
7   asked to acknowledge that their testimony will
8   be true under the penalties of perjury and will
9   be the truth, the whole truth, and nothing but
10   the truth.
11        That the foregoing deposition was taken
12   before me, at which time the aforesaid proceedings
13   were stenographically recorded by me and thereafter
14   transcribed by me;
15        That the foregoing transcript, as typed,
16   is a true record of the said proceedings;
17        And I further certify that I am not
18   interested in the action.
19
20        Dated this 30th day of July, 2022.
21
22
23        BRENDA MATZOV, CSR NO. 9243
24
25
```

130

```
1        A.   No.
2        Q.   Before Stuart provided a report
3   or -- or forwarded it to the client, did
4   he ever share with you the final version
5   of the report that was produced to the
6   client?
7        A.   No.
8        MR. BARET:  No further questions.
9        THE VIDEOGRAPHER:  That concludes
10   the deposition of Amit Forlit at 5:05.
11        (The deposition concluded at 5:05 p.m.
12   Israel Daylight Time.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

132

```
1              CERTIFICATE OF WITNESS
2
3        I, AMIT FORLIT, witness herein, do
4   hereby certify and declare the within and
5   foregoing transcription to be my examination
6   under oath in said action taken on July 21,
7   2022, with the exception of the changes
8   listed on the errata sheet, if any;
9        That I have read, corrected, and
10   do hereby affix my signature under penalty
11   of perjury to said examination under oath.
12
13
14
15
16
17   AMIT FORLIT, Witness          Date
18
19
20
21
22
23
24
25
```

```
 1                    ERRATA SHEET
 2    Case:    FARHAD AZIMA vs. INSIGHT ANALYSIS AND
 3             RESEARCH LLC AND SDC-GADOT LLC
 4    Date:    JULY 21, 2022
 5    Witness: AMIT FORLIT
 6
 7    Page _____ Line _____ Change _____
 8    Reason _____
 9    Page _____ Line _____ Change _____
10    Reason _____
11    Page _____ Line _____ Change _____
12    Reason _____
13    Page _____ Line _____ Change _____
14    Reason _____
15    Page _____ Line _____ Change _____
16    Reason _____
17    Page _____ Line _____ Change _____
18    Reason _____
19    Page _____ Line _____ Change _____
20    Reason _____
21    Page _____ Line _____ Change _____
22    Reason _____
23
24    _____        _____
          AMIT FORLIT, Witness              Date
25

              JULY 21, 2022 - AMIT FORLIT
        30(B)(6) INSIGHT ANALYSIS AND RESEARCH LLC
```