IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| In re: Application Pursuant to | ) | |
| 28 U.S.C. 1782 of | ) | |
| | ) | |
| FARHAD AZIMA | ) | Case No.: 22-20707-cv-JEM |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | |
| INSIGHT ANALYSIS AND RESEARCH, | ) | |
| LLC, and SDC-GADOT LLC, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| _____ | ) | |

## RESPONDENTS'[1] MOTION FOR RECONSIDERATION OF DE # 1 AND DE # 5:

Respondents, INSIGHT ANALYSIS AND RESEARCH, LLC and SDC-GADOT, LLC, by and through the undersigned attorneys, hereby file this, their Motion for Reconsideration of DE # 1 and DE #5, as follows:

1. The instant discovery proceeding is one which, at this point, has veered completely off of the proverbial rails. This action was initiated by the Petitioner (a man whose potential criminal exploits[2]

---

[1] This Motion has been filed on behalf of Respondents, INSIGHT ANALYSIS AND RESEARCH, LLC and SDC-GADOT, LLC.  Though Petitioner decided to amend the case caption to include AMIT FORLIT, AMIT FORLIT is not yet a party Respondent in these proceedings, as though he has been provisionally identified by the Respondent in an Amended Petition for Discovery filed per 28 US C 1782, this Court has not yet ruled upon said Petition and has not yet determined that AMIT FORLIT should be made a Respondent in these proceedings.

[2] During July 2022 Rule 30(b)(6) depositions of a corporate representative of the Respondents, Petitioner's counsel produced multiple "reports" which identify Petitioner and members of his family, financial information relating to the Petitioner, business information relating to the Petitioner, and potential criminal activities perpetrated by the Petitioner. These reports have not been filed with the Court due to the sensitive nature of the information contained therein (though they were made exhibits to the subject Rule 30(b)(6) depositions), however one such "report" (titled "Project Beech Report – Farhad Azima") states the following regarding the Petitioner:

"The main effort is placed in order to assist the client in taking the Generator out of the dispute between KM and the client. To do so, one of the main objectives is to point out any potential criminal activity by FA in order to present it to US law enforcement authorities.  Without getting

remain at the heart of the instant proceedings but which Petitioner has completely avoided discussing

or addressing, let alone denying, up to this point in time) under the guise of obtaining "discovery" for

use in proceedings pending in the United Kingdom. However, Petitioner and his counsel have,

throughout their conduct and filings in this action, shown the true underlying purpose of this action,

which is to intimidate and harass the Respondents, as well as non-party Amit Forlit, to seek unfettered

access to information pertaining to persons and entities having nothing whatsoever to do with the

Petitioner or anything alleged in the "UK Proceedings", to identify further individuals which the

Petitioner can draw into his web of harassment, and to coerce someone else (anyone really) to

corroborate the "sworn" statements which the Petitioner coerced from his primary witness and "fact"

source, Stuart Page.

2.  As is reflected in the Docket for this action (and in multiple other actions, as will be addressed in more

detail below), Petitioner has begun relying extremely heavily upon recent "sworn statements" of Mr.

Stuart Page, who was previously a named Defendant in the Amended Counterclaim asserted by the

Petitioner in his "UK Proceedings". It is upon Mr. Page's January 2022 "sworn" statement that

Petitioner relies to continually (and falsely) assert that these Respondents "hacked" the Petitioner, and

then played a role in masterminding a "cover up" for the "hack". These false "facts" are the entire

basis underpinning the Petitioner's request for discovery in this action, and Petitioner has continued

---

into legal analysis, it seems that FA's actions are potentially in violation of the US sanctions
against Iran, FCPA laws, Money Laundering laws, the Patriot Act etc. <u>The following are the main
findings on FA:</u> a) FA was involved in the bribery of an Azeri tax officer regarding an entity he
partially owns in Azerbaijan. B) FA maintains tied business relationship with three Iranians,
designated on the US OFAC SDN list together with eight related entities. Since 2011 they have
conducted several financial deals and transactions together. In 2011 FA was the mastermind
behind supplying them with new St. Kitts passports. C) FA is having financial relationship with
Mohammad Hossein Mahallati, an Iranian – US businessman suspected to be an agent of the
Iranian regime. D) According to our sources, FA is still in touch with Shahab Izadpanah. E) FA
is promoting an ISR project in order to export intelligence and surveillance technologies to the
Middle East and Ukraine, allegedly against the Patriot Act."

to rely upon them even though a) Petitioner knows of the falsity of these "facts" as sworn to (after coercion) by Mr. Page, and b) Petitioner has at all times been prosecuting direct claims in the District of North Carolina against the actual perpetrators of the "hack" which kicked off the Petitioner's multi year litigation campaign against RAK, RAKIA, and the other "UK Defendants".

3. Of note, prior to the Petitioner naming Mr. Page as a Defendant in the Petitioner's Amended Counterclaim, Mr. Page testified before the U.K. Courts in support of fraud and conspiracy claims brought against the Petitioner by Mr. Page's employer (Ras Al Khaimah, often referred to by Petitioner as "RAK"). Of note, Mr. Page's testimony led the Petitioner's counsel to openly assert the following regarding Stuart Page's trial testimony: "**Page was a dishonest witness who lied about a number of matters**". The Court in the initial UK Proceedings between the Petitioner and RAK furthermore commented on the reliability of Mr. Page as a witness, finding Mr. Page to be "**an unsatisfactory and unreliable witness**." *See In re Application of Karam Salah Al Din Awni al Sadeq and Stokoe Partnership Solicitors*, 2021 WL 4844754 (M.D. NC 2021).

4. In the aforementioned Middle District Court decision, the Court further noted the following findings of the U.K. Courts as to the Mr. Page's testimony when initially presented to the Court and in the context of the Petitioner's "hacking" claim: " in the context of the [Azima] hacking claim, **his witness statement was misleading** in relation to two significant matters. First, his witness statement implied that he did not produce written reports for the Ruler on his investigations whereas in fact he did so on a regular basis. Second, his witness statement said that he first came across the name of Mr Azima in early 2016 whereas ... it was in fact a year earlier. His evidence in connection with the discovery of the hacked material was both internally inconsistent and at odds with the contemporary documents. **[Judge Lenon] ha[s] concluded that it would be unsafe to rely on any evidence from Mr Page that was not corroborated by some other source**." *See Id*[3].

---

[3] This case decision filed and was utilized by Petitioner in support of its request for discovery in other proceedings

5. After he testified before the UK Court in 2020, Mr. Page came into the Petitioner's crosshairs, and he was identified as a party Defendant in a proposed Amended Counterclaim the Petitioner sought to bring in the UK Proceedings. This led Petitioner to apply the full weight of his measurable financial pressure upon Mr. Page. It was at this time (and after multiple family problems, and two apparent failed suicide attempts) that Mr. Page reached out to his former employer and others, in an attempt to bring together funds to stand up to the Petitioner's fully funded litigation machine (comprised of multiple law firms advancing Petitioners' interests simultaneously in the UK and abroad).

6. As can be seen in Exhibit "1" attached hereto, Mr. Page communicated directly with Mr. Jamie Buchanan (an agent of RAK) and stated: "<u>if I have to implicate Nick/ Patrick, Decherts, Neil and the boss to get me out of this I will</u>." Mr. Page asked for financial support to defend against the claims the Petitioner asserted against him, and when RAK declined to pay for such a defense, Mr. Page stated "<u>FYI I am planning to go and see Alex Ibragimov as soon as I can to ask him what he wants from me to back off and leave me alone</u>", and "<u>I will stand my ground if I am supported I will not if I am quite frankly treated this way</u>."

7. Around this time Mr. Page "settled" with the Petitioner[4], which resulted in his execution of multiple "sworn statements" in which he refuted his prior trial testimony, and he swore to the commission of perjury before the UK Courts during the initial trial between the Petitioner and RAK. Moreover, Mr. Page "swore" to multiple false facts pertaining to these Respondents and non-party Amit Forlit, in order to provide some basis for the Petition to initiate this discovery proceeding (and others) in order to initiate a campaign of harassment with the goal of forcing these Respondents to capitulate and to "swear" to whatever the Petitioner requests to support his litigation claims in the UK.

---

before the United States District Court in and for the Southern District of New York (specifically in Case No.: 1:21-mc-00501(PGG)), but Petitioner has never referenced said action, or the filing of this decision, at any time in these current proceedings.

[4] Mr. Page actually communicated with non-party Amit Forlit about being forced to cooperate with the Petitioner, as reflected in DE 26-5 filed in this action.

8.  As this Court is aware, the "factual" support for this 28 U.S.C. § 1782 proceeding is comprised of a) Mr. Pages' testimony, and b) a "Declaration" of one Dominic Holden, who attests to matters of fact about which he possesses no personal knowledge, and which contain a gross mischaracterization of Mr. Page's "sworn" statements.

9.  Looking to Mr. Page's January 2022 "sworn" statement filed at DE 1-7, at paragraph 34 Mr. Page attests to the following: ""In August 2016, Amit provided to me the link to a tranche of Mr Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil for their further handling. Amit, his team and I were not instructed to download or review the material, and so I had no further involvement in handling this material. However, in 2018, in the context of these proceedings, it became clear that Neil was desperate to rely on this material for RAKIA's claims against Mr Azima." See DE 1-7 filed by the Petitioner in this action.

10. Petitioner took this statement, gave it to Dominic Holden, had it turned around into an affirmative accusation that Mr. Forlit and these Respondents "hacked" the Petitioner (and that Mr. Forlit was an "Israeli Hacker"), and Petitioner's counsel has continued to run with this "theme" ever since, all while turning a blind eye to the fact that Mr. Page openly stated that "I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data."

11. At all times Petitioner, and his counsel, have known full well that these Respondents, and Mr. Forlit, did not "hack" the Petitioner. This is because the Petitioner has been prosecuting multiple 28 USC § 1782 actions in parallel to this one in order to obtain information relating to the real hacking

perpetrators (Indian cyber firms retained by Nicholas Del Rosso), and moreover the Petitioner has also actively been prosecuting affirmative claims against the actual perpetrators who retained two (2) Indian cyber hacking firms to target the Petitioner and his data.

12. As noted in prior filings in this action (such as DE # 45-2), the Petitioner initiated suit against one Nicholas Del Rosso and his related corporate entity, Vital Management Services, Inc., on October 15, 2020.  A current Docket print-out for said action is filed herewith as Exhibit 2. In those proceedings, the Petitioner sued Mr. Del Rosso and his company based upon their involvement in retaining two (2) Indian "hack-for-hire" firms (CyberRoot and BellTroX Info Tech Services) for the purposes of hacking the Petitioner. Those proceedings were ongoing for more than one and a half years before this instant 28 USC § 1782 proceeding was initiated, and therein Petitioner detailed how Mr. Del Rosso had retained the entities that successfully "hacked" the Petitioner. Moreover, Exhibit "3" filed herewith is a copy of DE 64 filed in NCMD Case No.: 1:20-cv-00954-WO-JLW, which attaches the Amended Counterclaim filed by Petitioner in the UK Proceedings, and RAK and RAKIA's filed Answer directed thereto. Those filings detail Mr. Del Rosso's alleged involvement in the hacking of the Petitioner, as well as RAK's admission that Mr. Del Rosso's firm (Vital) was hired by RAKIA to perform investigative tasks pertaining to the loss of assets in India during the time frame in which the Petitioner claims he was the subject of "spear fishing" hacking attempts carried out by CyberRoot and BellTroX Info Tech Services. Also of note, the Answer to Petitioner's Amended Counterclaim filed by RAK and RAKIA details prior activities by the Petitioner to approach, and to coerce, favorable testimony from witnesses who subsequently appeared and provided statements in support of the Petitioner's claims (including the response to Paragraph 22 of the Amended Counterclaim, in which the responding Defendants outlined Petitioner's threatening, and then financial coercion, of a Mr. Vikash Kumar Pandey).

13. At the same time Petitioner was pursuing Mr. Del Rosso and Vital, the Petitioner appeared before the United States District Court in and for the Southern District of New York, requesting discovery directed to one Amir Ali Handjani. In that action (S.D. N.Y. Case No.: 1:21-mc-00501(PGG)) Petitioner sought discovery from Respondent Amir Ali Handjani, and in support of the Petition for Discovery the Petitioner submitted entirely different "Declarations" which again identified "Vital Management, Nick Del Rosso, and Gravitas" as the parties who hired two Indian hack-for-hire firms (CyberRoot and BellTroX Info Tech Services) for the purposes of hacking the Petitioner. Exhibit "4" attached hereto is the Order entered by the Court in (1:21-mc-00501(PGG)), entered on **July 15, 2022** (mere days prior to the Rule 30(b)(6) depositions of the Respondents held in this action based upon an agreement reached with, and then broken by, Petitioner's counsel). In that Order, the Court granted the Petitioner's request for discovery, finding that Petitioner had made a showing of all factors under 28 U.S.C. § 1782 which would allow for *discretionary* authorization of the requested discovery, noting that Petitioner's evidence showing Nicholas Del Rosso and Veritas' retention of Indian hacking firms, and Handjani's potential continuing affiliation with RAKIA and his potential knowledge of Del Rosso's activities (and the "View from the Window" document), justified allowing the requested discovery. Specifically, the Court stated:

> Here, Azima has adequately shown that the requested discovery is relevant and is reasonably calculated to lead to the discovery of admissible evidence. He has shown that Handjani has an ongoing relationship with the ruler of RAK and that he is a senior advisor at KARV Communications - the public relations firm that disseminated the "View from the Window" document that is the subject of Azima's application. (See Holden Deel. (Dkt. No. 5) ,r,r 13, 21-22, 32; UK Trial Transcript (Dkt. No. 12-4) at 3-5) It is also undisputed that Handjani received emails in (1) April and July 2015 that instructed him and others to "target" and "go after" Azima; and (2) in August 2016 that purported to "break the news" regarding the discove1y of Azima's hacked data. (See April and July 2015 Emails (Dkt. No. 5-4); Aug. 2016 Emails (Dkt. No. 5-7); UK Trial Transcript (Dkt. No. 12-4) at 11-13; UK Trial Transcript (Dkt. No. 12- 5) at 13)9 Although Handjani has denied any involvement with or knowledge of the plot to hack Azima, this Com1 concludes that Azima has alleged sufficient facts to demonstrate that Handjani may have evidence regarding the hacking.

> See Exhibit "4".

14. Of note, **none** of the foregoing information was provided to this Court in this proceeding.  And notably absent from the Court's ruling (and the evidence submitted as support for the Petition for discovery) was any reference to these Respondents.

15. In this action Petitioner has never discussed the "View from the Window" document prepared by KARV Communications, the multiple email communications in Petitioner's possession discussing the proposed "leak" of Petitioner's information, or Petitioner's **ongoing** lawsuit against Vital Management and Nicholas Del Rosso in the Middle District of North Carolina. Instead, it was up to these Respondents to discover these proceedings and bring them to light before this Court.

16. Instead, in this proceeding the Petitioner and his counsel have been playing fast and loose with the new "sworn" statement they procured from Stuart Page in order to seek discovery from these Respondents pertaining to other individuals and corporate entities who **have nothing to do whatsoever with the Petitioner**.

17. As this Court has already seen via the deposition transcripts for the July 20, 2022 and July 21, 2022 Rule 30(b)(6) depositions of these Respondents, Amit Forlit (as representative of these Respondents) unequivocally testified that a) the Respondents were never retained to investigate the Petitioner, b) the Respondents never hacked the Petitioner, c) the Respondents never hired or retained anyone to hack the Petitioner, and d) the Respondents had no hand in the creation of any testimony, false or otherwise, that was presented to the Court in RAK's trial against the Petitioner.

18. Moreover, Amit Forlit, as representative of the Respondents, testified that the Respondents do not have the very documents which are now the subject of the Petitioner's latest Motion to Compel[5].

---

[5] Each class of documents identified in the Petitioner's Motion is addressed in turn in Respondents' separately filed Response to DE # 50.

19. Despite this, Petitioner has filed a Motion to Compel documents it has already been told, under oath, do not exist[6], and moreover Petitioner has decided to continue twisting "facts" around before the Courts of this State, now doing so in even more 28 U.S.C. § 1782 proceedings wherein Petitioner has creatively paraphrased Amit Forlit's deposition testimony (despite having the actual transcripts) and in so doing Petitioner and his counsel are now actively making false representations to this very Court in newly initiated Case No.: 9:22-mc-DMM.

20. Attached hereto as Exhibit "5" is the latest petition filed by the Petitioner, which was filed in the Southern District of Florida shortly after Rule 30(b)(6) depositions were conducted in this action on July 20, 2022 and July 21, 2022. Of note, in this new petition the Petitioner and his counsel grossly misrepresent deposition testimony provided in this proceeding as a basis to seek discovery from Respondents Eitan Arusy, Global Impact Services, and Truist Financial Corporation.  Specifically, Petitioner has asserted the following in his filed Petition in Case No.: 9:22-mc-DMM:

   a. "Forlit revealed that Eitan Arusy and his Florida-based entity Global Impact Services, Inc. ("GIS") played an integral role in the investigation of Petitioner and others, as it relates to the U.K. Proceeding."

   b. "Forlit paid Arusy (through GIS) to assist with the investigation that Forlit, Page and others were conducting on behalf of the UK Defendants. As alleged in the UK Proceeding, that work included the hacking of Azima and others."

   c. "As alleged in the UK Proceeding, the UK Defendants held regular meetings to discuss the result of hacking and to plan further hacking. Arusy was an active participant in "staff meetings" regarding the investigation. Arusy was one of the select few people involved in those meetings, along with Forlit, Page, and UK Defendant Neil Gerrard and Jamie Buchanan."

   d. Based on the testimony of Forlit, it is clear that Arusy played an integral role in the investigation that Mr. Page and Forlit referred to as "Project Beech", focused, in part, on Petitioner, and that Forlit paid GIS for Arusy's work on the project. At the Rule 30(b)(6) depositions of Insight and Gadot, Forlit revealed that Arusy was part of the

---

[6] Petitioner is also now seeking to argue that its discovery requests are "more broad" than they are actually written, so as to encompass any and all business dealings of non-party Gadot Israel and any payments it received (through either Respondent) for any work done, at any time, on behalf of any client.  Clearly this is at opposite with the Petitioner's presentation that its initially sought discovery (as reflected in DE # 1 and DE # 5) was narrowly tailored to meet the requirements of the fourth *Intel* factor.

inner circle of people who, along with UK Defendants Mr. Gerrard and Mr. Buchanan, Mr. Page, and Forlit, attended regular "staff meetings" to discuss the investigation, which included the hacking of Petitioner. Forlit estimated that Arusy met with UK Defendant Gerrard about the investigation into Petitioner and his associates approximately five to ten times.  Based on Forlit's testimony, which is corroborated by bank records showing substantial payments between Forlit's entities and Arusy's entities, it appears that Arusy played a critical role in the investigation, targeting, and hacking of Petitioner and others. For these reasons, there is a basis to seek discovery from Arusy, GIS and Truist."

21. The transcripts for the July 20, 2022 and July 21, 2022 depositions of Amit Forlit (as representative of the Respondents) have been filed with this Court as DE 47-1 and 47-2, respectively. Of note, Mr. Arusy, GIS, and Truist **were never mentioned during the deposition of SDC-GADOT, LLC at all** (see DE 47-1) and were only briefly discussed during the deposition of INSIGHT ANALYSIS AND RESEARCH, LLC. The actual excerpts from DE 47-2 discussing Mr. Arusy and his companies are attached hereto as Exhibit "6". Of note, the following is the actual testimony from the July 21, 2022 deposition of Mr. Forlit as representative of Respondent INSIGHT:

Q. And Global Impact Services is owned by Eitan Arusy; is that correct?

A. Correct.

…

BY MR. BEHRE:

Q. And Mr. Arusy is your business partner; correct?

A. He's not a business partner. We collaborate on certain jobs.

Q. And you have or had an agreement with him that, for each payment you received from Stuart Page, he received a percentage of that payment; right?

A. I don't recall. But he was paid for work that he did, that he supplied.

Q. What work did he do?

A. He did a variety of different works, including analysis and investigations, in-depth investigations.

Q. What do you mean by "analysis"?

A. Eitan is a very gifted person. And he once worked for the Manhattan prosecutor. And he's -- has analytic skills.

Q. And at one point, he was working on investigating individuals and entities that were violating sanctions against doing business with Iran; correct?

A. Eitan doesn't work only with me. And he had some large U.S. companies as his clients that were involved in investigating sanctions -- or violations, rather, of the sanctions. And I think he had a large case that he worked on for the D.A. in Manhattan.

Q. And the company Global Impact Services is a company established in the United States; correct?

A. I think so.

Q. And Mr. Arusy is currently or was affiliated in some capacity with a U.S. law firm; right?

A. I don't know. I know that he worked for the D.A. He was hired by the D.A. in Manhattan.

Q. And Mr. Arusy attended some of the Project Beech meetings, didn't he?

A. I think so. Yes.

Q. And he attended at least one meeting in Cyprus; correct?

A. I don't recall.

Q. Did he ever attend any meetings with you?

A. It did happen. Yes.

Q. Do you recall where those meetings occurred?

A. I assume in London. But I don't recall exactly.

Q. Did he attend at your invitation or the invitation of someone else?

A. I -- I honestly don't remember.

Q. Did you ever attend a meeting in New York with him regarding Project Beech?

A. I don't recall a meeting of that nature. But I do recall a meeting I had alone in New York about Project Beech.

Q. And who was that meeting with?

A. With Jamie Buchanan.

Q. Do you remember when that was?

A. I think late 2018.

Q. And who else attended besides you and Mr. Buchanan?

A. At that specific meeting, just the two of us.

Q. And what was the purpose of the meeting?

A. So Stuart Page got a request from two people. One of them was a very close friend of his. His name was Alex Ibragimov. And the second person's name was Dmitry. But, once again, this is what I heard from Stuart. The meeting was held in London. And Stuart told me that, at that meeting, he was threatened and told to implicate or frame Neil and Gerard in improper actions in managing the file. He was so disturbed by the meeting that he asked me to meet with Jaime urgently and tell him about the content of the meeting. I spoke to Jaime. We had arranged to meet in his room -- I believe it was the – the Park Hyatt in Manhattan. And I told him what Stuart had requested. To the best of my recollection, this is one of the very few meetings in which I had met Jaime without Stuart. Later on, at the request of Jaime and Neil, we met all four of us in London. And then Jaime and Neil asked Stuart to report this meeting to the FBI.

…

BY MR. BEHRE:

Q. Do you own any part of Global Impact Services?

A. No.

Q. With regard to Eitan Arusy, did he work with Stuart Page?

A. It's possible.

Q. Did he ever meet with Stuart Page to the best of your knowledge?

A. Yes.

Q. Was that always on Project Beech or some other project?

A. Not just Project Beech.

Q. Okay. To the best of your knowledge, did Eitan Arusy ever meet with Neil Gerard?

A. Yes.

Q. About how many times?

A. I can estimate five to ten times. But I don't have that information.

Q. And it appeared, didn't it, that Gerard believed that Arusy was an intelligent person?

A. I don't know what he believed or didn't believe.

Q. Well, Gerard asked, on occasion, Arusy his opinion on certain aspects of the investigation; correct?

A. Correct.

Q. And Arusy advised Gerard on the investigation; correct?

A. (Translated.) When we had staff meetings, everybody, including me, would raise ideas. And various subjects were discussed. That was the nature of the meetings. Eitan was not the chief consultant to Neil about Project Beech. I don't think that Neil ever met with Stuart -- (In English.) -- ever met with --

MR. BARET: Eitan.

THE WITNESS: (In English.) -- either Eitan or -- (Translated.) -- either Eitan – (In English.) -- or me without Stuart. (Translated.) -- or me without Stuart.

BY MR. BEHRE:

Q. When you say "staff meetings," what do you mean?

A. There was Jaime. There was Stuart. Sometimes Eitan. Me. And Neil.

Q. Did Amir Handjani ever attend any of those meetings?

A. I personally never met Amir Handjani. If he was at meetings that I didn't attend, I don't know.

…

Q. Before the lunch break, we talked about Global Impact Services and its owner, Eitan Arusy; correct?

A. Correct.

Q. And we talked about the fact that you were making payments to him. Do you remember that?

A. Yes.

Q. Did there come a time when he actually started making payments to you into this account?

A. It is possible. The – the accounting between us was on a global level. So probably there were times when he had to make payments to me.

Q. For what reason would he be making payments to you?

A. I'd -- I have to go back to the documents to check. But sometimes I would make payments to him. Sometimes he would make payments to me. I would have to check that.

Q. And was that because you were doing work for him?

A. Sometimes we did jobs together. Some of the projects we carried out together.

Q. If you look at page 109 and the entries on September 8th, 2020, and September 24th, 2020, you'll see two payments that he -- that that entity made to Insight's U.S. bank account. One entry is for $65,000. The other one's for 75,000.

A. As I've said before, sometimes Eitan would bring a client and I would provide services. And sometimes it was the other way around. Sometimes the payment would come from the client to me and then from me to Eitan. And sometimes the other way around.
As far as these two specific entries are concerned, I do not recall.

Q. Okay. And I note that, in that month of September 2020, the only deposits into this account were from Global Impact Services; right?

A. Correct.

Q. And if you go to the next month, October 2020, page 117, you'll see the same thing, that the only deposit made into the account for Insight in the U.S. was one for $70,000 sent by Global Impact Services. Do you see that?

A. Yes. I do see it.

Q. And if you go to page 123 in November 2020, you'll see yet another payment from Global Impact Services, this one for 71,000. Do you see that on November 9th, 2020?

A. Yes, I see. At that time I believe that the Beech Project had already been completed. It was completed, I believe, on the -- in the beginning of 2020. And, hence, I do not see the connection between that and our investigation.


…

Q. Uh-huh. And once your relationship with Page ended, did Global Impact Services take over the role that Page played?

A. It's a bit of a confused question -- confusing. (Comment in Hebrew.)

MR. BARET: That's not the question he asked. Answer his question.

THE WITNESS: (Comment in Hebrew.)

MR. BEHRE: Can you translate that first, please?

THE INTERPRETER: He said that: "The reason that the relations between Stuart and me stopped was because he insisted that I participate in his legal fee -- legal -- legal expenses."

<u>THE WITNESS: Whether or not Global pursued the relations with him, I don't know.</u>

BY MR. BEHRE:

<u>Q. Stuart Page asked you to help pay his legal bills?</u>

<u>A. Yes.</u>

<u>Q. What did he have legal bills for?</u>

<u>A. He said that he was being sued in many aspects, that it's very distressing to him. He said -- he said that he had tried twice to commit suicide. He said that he had had himself hospitalized once for a week and then for another week in home hospitalization and that his legal fees are killing him.</u>

<u>Q. And did he give you any reason why he thought that you should be helping pay his legal bills?</u>

<u>A. He said that he believed that I had made a lot of money from him and that, as a friend, I should be helping him.</u>

Q. And did you -- how did you respond to that request?

A. I told him that he was cheeky, impudent.

MR. BARET: You know what is chutzpah? You know what's chutzpah? (Comment in Hebrew.) It's chutzpah.

BY MR. BEHRE:

<u>Q. Did Global Impact Services play a role similar to the role that Stuart Page played in Project Beech?</u>

<u>A. No.</u>

<u>Q. Did it play any role with regard to Project Beech?</u>

A. They did -- they did play a role. Global was working vis-a-vis Stuart. But only Stuart was in contact with the client.

Q. (Not translated.) With the "client" being who?

A. (In English.) The boss. (Translated.) The boss.

…

See Exhibit "6".

22. The foregoing shows the lengths to which Petitioner and his counsel are willing to bend the obligation of candor to this Court, and to directly misstate and misrepresent actual deposition testimony despite having the deposition transcripts to refer to and to provide to the Court for direct review and reference, all in the furtherance of Petitioner's agenda of harassment, coercion, and scorched earth litigation.

23. Moreover, during the Rule 30(b)(6) depositions of these Respondents Petitioner's counsel did ask about the actual culprit who engineered the Petitioner's "hacking", and specifically Petitioner's counsel asked the following:

BY MR. BEHRE:

Q. I'm showing you next what's been marked as Exhibit No. 6 in this deposition. It's entitled: "Project Beech – Financial Investigation Report #1."

MR. BARET: Which one is it?

MR. BEHRE: No. 6.

MR. BARET: Do you have a copy for me?

MR. BEHRE: He will when he gets back. I believe he went to make a copy.

MR. BARET: Okay. THE WITNESS: (Examining.)

Q. (Not translated.) Have you had a chance to look at that report?

A. (In English.) Yes.

Q. (Not translated.) I direct your attention to the first paragraph. And it says, quote: "The following report focuses on the findings regarding KM's bank accounts as appeared in 'Vital Management Services' (hereinafter: 'VMS') report dated 12.11.2014." Do you see that?

A. "Kin." (In English.) Yes.

Q. And that would suggest that there was a report prepared by Del Rosso and his company, Vital Management, concerning financial issues; right?

A. Based on what I'm reading here, yes.

Q. Were you involved in the preparation of this report?

A. No

Q. Yesterday you said that Nick Del Rosso was working on Project Beech but he was working in parallel to you but on different issues. Do you recall that testimony?

A. Yes, I recall. I -- I think he -- he might have worked for the same client. But I'm not sure it should be called Project Beech. Project Beech was a name that Stuart made up.

Q. Putting aside what the name of the project was, you indicated that you thought Nick Del Rosso was working in parallel but on different issues. What did you mean by that?

A. At first, we knew that Nick was involved. But I don't know if -- how Stuart knew, if he knew it from the boss or other sources. And there were certain aspects in the case where we were told: You don't have to investigate this. It's being taken care of.

Q. And what were those other aspects that were being taken care of by others?

A. One was Farhad Azima. And there was another family I recall named Rothman.

THE INTERPRETER: Rothman?

THE WITNESS: Rothman.

THE INTERPRETER: Rothman.

THE WITNESS: (Comment in Hebrew.)

THE INTERPRETER: Rothman. R-o-t-m-a-n or R-o-t-h-m-a-n.

BY MR. BEHRE:

Q. And what about Farhad Azima was being taken care of by others?

A. They didn't tell us Farhad Azima was being taken care of by somebody else At first -- they didn't tell us: You don't have to investigate Farhad Azima. But, at first, they told us that he was serving as some kind of mediator between RAK and Khater Massaad. And then the trial started with this mutual accusations and it wasn't necessary.

Q. And who was this individual Rothman that you mentioned?

A. During the investigation, a suspicion came up regarding some kind of arms deal that involved the Rothman family, some kind of -- they were accused of some kind of fictitious deal. And as part of the findings of the investigation, this is something I recall. We were told not to touch it.

Q. And is that because somebody else was going to touch it or just to stay out of it entirely?

A. The initial question was: What do I think Nick Del Rosso did?  At that time, I did not think there was anybody else doing any investigating. Based on the findings in the court, today I do believe that Nick Del Rosso was investigating.

Q. Was investigating what?

A. I think he was investigating all the matters dealing with Farhad Azima.

Q. Why was Stuart Page so upset that Nick Del Rosso was brought in to provide assistance with regard to the -- what you called Project Beech?

A. I think Stuart Page has a big ego. And if to base myself on what you said yesterday, he was mad that he was taking away business from him.

Q. Do you know who worked with Nick Del Rosso?

A. No.

Q. Do you know if he had any employees?

A. No. I don't know him. I've -- I've never seen him. I don't know him at all.

Q. Did there come a time, to the best of your knowledge, that Nick Del Rosso's work for the boss either was suspended or ended?

A. I think -- I think that, at the time that our work was terminated, Stuart said that that work was also terminated. But I -- I don't really know.

See DE 47-2, at Pages 101 to 107 of the Transcript for the July 21, 2022 Deposition.

24. In addition to the foregoing, Petitioner and his counsel recently filed an updated "Declaration" of Dominic Holden (filed as DE 1-2) in Petitioner's latest 28 USC § 1782 (initiated as S.D. Fla. Case No.: 9:22-mc-81299-DMM) involving Respondents Eitan Arusy et al. In Mr. Holden's newer declaration, he stated the following under penalty of perjury:

Mr. Del Rosso is the President and owner of Vital Management Services Inc ("Vital"), a private investigations firm. It is Mr. Azima's case that Vital was one of RAKIA's agents who instructed at least two 'hack for hire' firms to carry out the hacking of Mr. Azima's computers on RAKIA's behalf. ***RAKIA has admitted that Vital was instructed by Dechert (RAKIA's English solicitors) to carry out work for RAKIA and provide certain instructions to one of the 'hack for hire' companies (CyberRoot).***

See Exhibit "7".

25. Furthermore, attached to Mr. Holden's declaration is an Affidavit of one Paul Robinson dated

February 7, 2022 (i.e. before this action was initiated), wherein Mr. Robinson states the following:

Mr Del Rosso is a private investigator and managing director of Vital Management Services ("VMS"), based in North Carolina, USA. I was first introduced to him through another private investigator in around 2016. Over the following years, Mr Del Rosso instructed me to carry out a number of different enquiries for which I received payment.

…

**NICHOLAS DEL ROSSO**

(1) Payments

20. From about 2016, Mr Del Rosso instructed me to carry out a number of different enquiries for which I received payment. On 28 January 2018, my company (Company Diligence) entered into a consultancy agreement with VMS for which VMS made a payment of £500 per month (PR2/71-73).

21. Whilst the Grayson enquiries centered upon what I now understand to have been matters related to litigation linked to Ras Al Khaimah ("RAK"), some of the prior research investigations upon which I was directly instructed by Mr Del Rosso also concerned UAE matters. An example of this concerns Mr Farhad Azima who, I understand from press reports, was involved in litigation with RAK. Mr Del Rosso instructed me to carry out investigations including research on the deep web concerning Mr Azima. I instructed a subcontractor who undertakes deep web research and they produced a lengthy report on Mr Azima (PR2/74-1552). I then delivered this report to Mr Del Rosso. The invoice for that particular investigation is dated 27 June 2016 and has the narrative "Due Diligence – deep web research" (PR2/46). This is an example of how an invoice might be sanitised, removing details of the target of the enquiry (in this case Azima) and replacing it with an anodyne description.

See Exhibit "8" attached hereto.

26. As noted above, the foregoing information regarding the true perpetrator of the "hack" of the Petitioner was known **at all times** to the Petitioner and his counsel **before he initiated this proceeding**. Petitioner and his counsel initiated this proceeding despite knowing that Petitioner had coerced and procured false testimony from Stuart Page, whereafter Petitioner and his counsel have repeatedly defamed and falsely asserted that these Respondents and non-party Amit Forlit were responsible for "hacking" of the Petitioner where nothing of the sort ever occurred.

27. As the Petitioner and his counsel procured an Order of this Court authorizing *discretionary* discovery based upon the known use of false and perjurious testimony[7], this Court should revisit its Order at DE-5, and upon such revisiting (and in consideration with the Respondents' Motion to Terminate Discovery) this Court should revoke the discretion that it initially was willing to extend to the Petitioner, and the Court should terminate these proceedings and all future discovery herein.

**WHEREFORE** Respondents, SDC-GADOT, LLC and INSIGHT ANALYSIS AND RESEARCH, LLC, respectfully request that the Court review this Motion, review the Exhibits hereto and the Transcripts filed in this action reflecting the testimony of the Respondents at the Rule 30(b)(6) depositions conducted on July 20, 2022 and July 21, 2022, and thereafter enter a Ruling finding that the Respondents utilized false sworn statements as the underlying basis to initiate this proceeding and failed to disclose evidence in their possession (which Petitioner was actively utilizing to prosecute claims before the Courts in the Middle District of North Carolina) which directly contradicted the false "sworn" statements of Mr. Page used as the basis to initiate this proceeding, that the Court enter a subsequent Order vacating DE-5 and exercising its discretion to terminate and disallow further discovery in this proceeding, that the Court grant the Respondents a recovery of reasonable attorney's fees and/or costs associated with this Motion for relief, and that the Court Grant the Respondents such other and further relief as this Court may deem just and proper.

---

[7] Petitioner also failed to advise this Court that Petitioner's own counsel had successfully attacked the credibility of Stuart Page in the original trial held in the UK Proceedings, and that the Court found Mr. Page's testimony to be effectively lacking in all credibility absent additional corroborating documentary evidence.

## <u>CERTIFICATE OF COMPLIANCE WITH FONT AND PAGE REQUIREMENTS</u>:

The undersigned hereby certifies that this Motion complies with the requirements of Local Rules 5.1 and 7 pertaining to font size and length of this Motion.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7 REGARDING CONFERRING PRIOR TO FILING OF MOTION</u>:

The undersigned hereby certifies that prior to the filing of this Motion the undersigned conferred orally with Petitioner's counsel in a goof faith effort to discuss the relief sought hereby (i.e., a termination of these discovery proceedings) and thereby obviate the need for this Motion.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 7th day of September, 2022, that a true and correct copy of the foregoing has been filed through the Court's CM/ECF-filing portal and that a true copy has been served through the portal upon all counsel of record in this action.

Respectfully submitted,

By: */s/ Elan I. Baret, Esq.*
Elan I. Baret, Esquire
Florida Bar No.: 20676
3999 Sheridan Street, 2nd Floor
Hollywood, Florida 33021
Tel: (954) 486-9966
Facsimile: (954) 585-9196
Email: elan@baretlawgroup.com

By: */s/ Christopher S. Salivar, Esq.*
Christopher S. Salivar, Esquire
Florida Bar No.: 57031
6576 Whispering Wind Way
Delray Beach, FL 33484
Tel: (561) 628-8908
Email: cssalivarattorney@gmail.com