Exhibit A-5

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF FLORIDA

 3                    MIAMI DIVISION

 4    _____
                                             )
 5    FARHAD AZIMA,                          )
                                             )
 6                      Petitioner,          )
                                             )
 7    vs.                                    ) Case No.:
                                             ) 1:22-MC-20707
 8    INSIGHT ANALYSIS AND RESEARCH LLC      )
      AND SDC-GADOT LLC,                     )
 9                                           )
                        Respondents.         )
10    _____)

11

12

13

14            Videotaped 30(b)(6) Deposition of

15                    SDC-GADOT LLC

16        by and through its Corporate Representative

17                      AMIT FORLIT

18               Wednesday, July 20, 2022

19          11:09 a.m. Israel Daylight Time

20

21

22

23

24

25    Reported by:  BRENDA MATZOV, CSR NO. 9243
```

```
 1              Videoconference 30(b)(6) deposition

 2    of SDC-GADOT LLC, by and through its Corporate

 3    Representative, AMIT FORLIT, taken in the

 4    above-entitled cause pending in the United

 5    States District Court, for the Southern

 6    District of Florida, Miami Division, before

 7    BRENDA MATZOV, CSR NO. 9243, at the David

 8    Intercontinental Hotel, Tel Aviv, Israel,

 9    and simultaneously in the Zoom participants'

10    remote locations, on Wednesday, the 20th

11    day of July, 2022, at 11:09 a.m. Israel

12    Daylight Time.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   FOR PETITIONER:

 3           BARET LAW GROUP
             By:  ELAN I. BARET, ESQ.
 4           3999 Sheridan Street
             Suite 200
 5           Hollywood, Florida 33021
             (954) 486-9966
 6           elan@baretlawgroup.com

 7

 8   FOR RESPONDENTS:

 9           MILLER & CHEVALIER CHARTERED
             By:  KIRBY D. BEHRE, ESQ.
10                IAN A. HERBERT, ESQ.
             900 16th Street N.W.
11           Black Lives Matter Plaza
             Washington, D.C. 20006
12           (202) 626-5800
             kbehre@milchev.com
13           iherbert@milchev.com

14

             BURLINGTONS LEGAL, LLP
15           By:  DOMINIC HOLDEN
             5 Stratford Place
16           London W1C 1AX
             +44 20 7529 5420
17           dominic.holden@burlingtons.legal

18

19

20

21

22

23

24

25

              JULY 20, 2022 - AMIT FORLIT
              30(B)(6) SDC-GADOT LLC
```

```
 1   APPEARANCES (Continued):

 2   ALSO PRESENT (in Israel):

 3           MITCHELL COOPERSMITH, Videographer

 4           HAYA SHAVIT-KEDAR, Hebrew Interpreter

 5           RUCHIE AVITAL, Hebrew Interpreter

 6

 7   ALSO PRESENT (remotely via Zoom):

 8           LESLEY SEMONES, Miller & Chevalier

 9           FREDERICK WILMOT-SMITH, Burlingtons Legal

10           LUKE HACKETT, Burlingtons Legal

11           FARHAD AZIMA

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2    WITNESS

 3    Amit Forlit

 4   (Witness Location:  Tel Aviv, Israel)

 5

 6    EXAMINATION                               PAGE

 7    By Mr. Behre                               11

 8

 9                    E X H I B I T S

10    NUMBER           DESCRIPTION            MARKED

11    Exhibit 1        Document Entitled
                       "Subpoena to Produce
12                     Documents, Information,
                       or Objects or to Permit
13                     Inspection of Premises in
                       a Civil Action," Service
14                     Date March 23, 2022
                       (No Bates Number)         45
15
      Exhibit 2        Document Entitled
16                     "Electronic Articles of
                       Organization for Florida
17                     Limited Liability Company,"
                       for SDC-Gadot LLC, Date
18                     Filed October 18, 2017,
                       and Related Documents
19                     (No Bates Number)         61

20    Exhibit 3        Two Affidavits of Amit
                       Forlit, Dated May 12, 2022,
21                     and June 1, 2022
                       (No Bates Number)         73
22
      Exhibit 4        Multiple Citibank Bank
23                     Statements for SDC-Gadot
                       LLC, Multiple Dates
24                     (SDC-GADOT-CITI_00044 to 00147)   114

25
```

```
 1                    E X H I B I T S

 2    NUMBER          DESCRIPTION                    MARKED

 3    Exhibit 5       Document Entitled "Letter
                      of Engagement," Dated
 4                    March 1, 2016
                      (No Bates Number)                162
 5
      Exhibit 6       Multiple Invoices from
 6                    SDC-Gadot LLC to Page
                      Group ME Ltd. and Page
 7                    Risk Management DMCC,
                      Multiple Dates
 8                    (No Bates Number)                165

 9    Exhibit 7       Multiple Invoices from
                      Gadot Information Services
10                    to PPS Ltd., Multiple Dates
                      (No Bates Number)                172
11
      Exhibit 8       WhatsApp Messages between
12                    Stuart Page and Amit Forlit
                      (No Bates Number)                175
13
      Exhibit 9       E-mail from Mario Ros
14                    to "amit@gadot.co" Dated
                      September 7, 2019, Subject:
15                    "Citibank"
                      (SDC-GADOT-CITI_00155)           181
16
      Exhibit 10      Document Entitled "Project
17                    Beech Report - Farhad Azima,"
                      Dated August 4, 2015
18                    (No Bates Number)                183

19    Exhibit 11      Document Entitled "Project
                      Beech - Comprehensive Action
20                    Plan," Dated January 26,
                      2016
21                    (No Bates Number)                193

22

23

24

25
```

```
 1          Q U E S T I O N S   I N S T R U C T E D

 2              N O T   T O   A N S W E R

 3                  PAGE     LINE

 4                  179       10

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 WEDNESDAY, JULY 20, 2022

 2              11:09 A.M. ISRAEL DAYLIGHT TIME

 3

 4              THE VIDEOGRAPHER:  Today's date

 5    is July 20th, 2022.  The time on the video

 6    monitor is 11:09 a.m.

 7              This is the videotaped deposition

 8    of Amit Forlit, in the matter of Farhad

 9    Azima versus Insight Analysis and Research

10    LLC and SDC-Gadot, being heard in the United

11    States District Court, Southern District

12    of Florida, Case No. 1:22-MC-20707.

13              This videotaped deposition is

14    taking place in Tel Aviv, Israel, as well

15    as parties are attending remotely.

16              Would the counsel present in

17    Tel Aviv please voice-identify themselves

18    and whom they represent.

19              MR. BEHRE:  Good morning, Kirby

20    Behre, on behalf of Farhad Azima.

21              MR. BARET:  Morning.  Elan Baret,

22    on behalf of SDC-Gadot and Insight.

23              MR. HERBERT:  Ian Herbert, on

24    behalf of Farhad Azima.

25              THE COURT REPORTER:  Dominic?
```

```
 1              MR. HOLDEN:  Dominic Holden, on
 2    behalf of Farhad Azima.
 3              THE VIDEOGRAPHER:  Something is
 4    making noise.  I don't --
 5              THE COURT REPORTER:  Let's go off
 6    the record for a second.
 7              THE VIDEOGRAPHER:  Can we go --
 8    off the record at 11:11.
 9              (Recess from 11:11 a.m. to 11:15 a.m.
10        Israel Daylight Time.)
11              THE VIDEOGRAPHER:  Back on record
12    at 11:15.
13
14                  HAYA SHAVIT-KEDAR
15                       and
16                  RUCHIE AVITAL,
17            the interpreters, were duly affirmed
18            to translate from English to Hebrew
19            and from Hebrew to English.
20
21            (The following proceedings were
22        conducted through the interpreters,
23        unless otherwise indicated, and
24        excluding colloquy.)
25    //
```

```
 1              THE COURT REPORTER:  I will ask

 2     counsel to please stipulate that, in lieu

 3     of formally swearing in the witness, the

 4     reporter will ask the witness to acknowledge

 5     that their testimony will be true under the

 6     penalties of perjury, that counsel will not

 7     object to the admissibility of the transcript

 8     based on proceeding in this way, and that

 9     the witness has verified that he is Amit

10     Forlit.

11              Counsel, do you agree?

12              MR. BEHRE:  Agreed.

13              MR. BARET:  Agreed.

14              THE COURT REPORTER:  Mr. Forlit,

15     do you hereby acknowledge that your testimony

16     will be true under the penalties of perjury

17     and do you affirm that the testimony you

18     are about to give in this deposition will

19     be the truth, the whole truth, and nothing

20     but the truth?

21              THE WITNESS:  Yes.

22     //

23     //

24     //

25     //
```

```
 1                         AMIT FORLIT,

 2                  called as a witness, was examined

 3                  and testified under penalty of

 4                  perjury as hereinafter set forth.

 5

 6                         EXAMINATION

 7    BY MR. BEHRE:

 8         Q.   Good morning, Mr. Forlit.

 9         A.   Good morning.

10         Q.   Would you please state your full

11    name for the record?

12         A.   Amit Forlit.

13         Q.   And how old are you?

14         A.   Soon 55.

15         Q.   And where are you a resident in?

16         A.   In Israel.

17         Q.   What countries are you a citizen

18    of?

19         A.   Only Israeli citizenship.

20         Q.   So you're here today to testify

21    on behalf of SDC-Gadot LLC; is that correct?

22         A.   Yes.

23         Q.   And is that a Florida corporation?

24         A.   Yes.

25         Q.   And is that your company?
```

1     A.   Yes.

2     Q.   And is Insight Analysis and Research

3  LLC also your company?

4     A.   No.

5     Q.   How about Insight GSIA, is or was

6  that your company?

7     A.   No.

8     Q.   How about Gadot Information Services,

9  is that your company?

10    A.   Yes.

11    Q.   Who owns Insight Analysis and Research,

12 if not you?

13    A.   A gentleman who manages my finances.

14 His name is Omri Gur Lavie.

15    Q.   And what about Insight GSIA, who

16 owns that?

17    A.   If I recall, his name is Effi

18 Lavie.

19    Q.   And do you have any ownership

20 interest in Insight Analysis and Research

21 LLC?

22    A.   I don't have an interest in the

23 ownership.  But I am partner to its management.

24    Q.   And what management position do

25 you hold?

```
 1        A.   This is -- I'm not quite sure
 2   I understand.  This is a wallet company.
 3   Almost every decision that is made is
 4   made by me.
 5        Q.   A wallet company?
 6        A.   The company was established
 7   mainly because there was a problem
 8   transferring monies from Dubai to Israel
 9   at that time.  And at the request of
10   Mr. Page, two companies were established
11   in the United States to facilitate the
12   transfer of money.
13        Q.   Okay.  Okay.  Well, we'll get
14   a little more into that later.
15             You know who I am -- right? --
16   Kirby Behre?
17        A.   "Kin."
18        Q.   And you've known my name for
19   many years, haven't you?
20        A.   That's correct.
21        Q.   And you know my client Farhad
22   Azima's name; right?
23        A.   I've heard of him.  Yes.
24        Q.   And you've known that name for
25   many years too; right?
```

1        A.   Yes.

2        Q.   And when do you think you first

3   heard the name Farhad Azima?

4        A.   So at the start of the investigation

5   of Gadot Israel, which is also known as

6   Gadot Information Services, we learned that

7   the subject of the investigation was a man

8   named Dr. Khater Massaad.  Khater Massaad

9   was referred to your firm by your client

10  Farhad Azima.

11       Q.   And do you recall what year you

12  learned that name -- the name of Farhad

13  Azima?

14       A.   Because I reviewed some of the

15  material in preparation for today, I --

16  I would say it was in March 2015, early

17  2015.

18       Q.   And in conjunction with your

19  investigation of Farhad Azima, was the

20  name Project Beech used?

21            MR. BARET:  Objection.  Form.

22            THE WITNESS:  I have never

23  investigated Farhad Azima.  The

24  investigation was of Dr. Khater Massaad.

25  //

1   BY MR. BEHRE:

2       Q.   Okay.  So in preparation for your

3   testimony today, you said that you reviewed

4   some documents; is that correct?

5       A.   Yes.

6       Q.   And what have you reviewed to

7   prepare for your testimony here today?

8       A.   Affidavits given by Stuart Page.

9       Q.   Okay.  Anything else?

10      A.   Bank accounts.  Invoices for --

11  for Stuart Page.

12      Q.   And when you say "bank accounts,"

13  what are you referring to specifically?

14      A.   I wanted to see when we first

15  charged for the work concerning Khater

16  Massaad.

17      Q.   And when you say "the work

18  regarding Khater Massaad," did that include

19  anything having to do with Farhad Azima?

20      A.   The name of Farhad Azima came up

21  throughout all the years the investigation

22  was being carried out, in a number of

23  transactions which were suspected of

24  being illegal that we investigated.

25  But the client or the representatives

1  of the client, especially at the beginning

2  of the investigation, said that Farhad

3  Azima served as a mediator or a go-between

4  between them and Khater Massaad.  And

5  that's why neither we nor the client were

6  asked to investigate Farhad Azima -- were

7  asked not to investigate Farhad Azima.

8       Q.   What's the business of SDC-Gadot

9  LLC?

10      A.   In Gadot SDC, as well as in Insight,

11  there's no business activity other than to

12  serve as a conduit to transfer money to Gadot

13  Israel.

14           And the issue or the matter was

15  because Stuart Page, according to him, received

16  the money directly in a bank account in Dubai

17  from the ruler Ras Al Khaimah -- RAK.

18           THE INTERPRETER:  I'm sorry?

19           THE WITNESS:  (Comment in Hebrew.)

20           THE COURT REPORTER:  It's here.

21  It's here.

22           THE INTERPRETER:  RAK.  Okay.

23  Yeah.  Okay.

24           THE WITNESS:  "The head of the

25  tent."  This is what -- the meaning.

```
 1              THE INTERPRETER:  "The head of
 2   the tent"?
 3              THE WITNESS:  Ras Al Khaimah
 4   is the "head of the tent."
 5              THE INTERPRETER:  Okay.
 6              THE WITNESS:  And in order to
 7   transfer the money to us, he had to transfer
 8   it first to Hong Kong and then to transfer
 9   it to Israel.  In the early years, we
10   experienced very serious problems in the
11   transfer of the money.  And, consequently,
12   Stuart asked or -- either Stuart or his
13   person in charge of finance to simplify
14   and streamline it by opening companies
15   in the United States.
16   BY MR. BEHRE:
17        Q.   And what was or is the business
18   of Gadot here in Israel?
19        A.   Are you referring to the Israeli
20   company Gadot Israel or the Florida company?
21        Q.   The Israeli company, which I
22   understand you're now saying was using
23   the U.S. entity to transmit funds.
24        A.   Gadot Israel is a firm for crisis
25   management that uses the collection of
```

1  data, data analysis, and recommendations

2  for actions to be taken by their customers.

3      Q.   And in your role with Gadot, has

4  Gadot ever had in its possession stolen

5  data, including stolen e-mails?

6      A.   The answer to that question is

7  a little bit problematic.  Because the

8  analysts of Gadot sometimes use information

9  that has been leaked to various websites

10  such as WikiLeaks.  Sometimes e-mails

11  that were stolen have been published.

12          So to say that we don't use

13  stolen e-mails in our data collection

14  or as part of our data collection, that

15  would not be accurate.  But I can say --

16  but I can say that Gadot Israel does

17  not steal data and does not do anything

18  criminal in its activities involving --

19  in its work here in Israel.

20      Q.   When you mentioned analysts

21  at Gadot, what specifically is the role

22  that analysts play in the company?

23      A.   In many cases, we get from

24  customers too and from open sources --

25  also from collecting from open sources

1   and from investigations.  For example,

2   by participating in chat rooms and

3   investigations of pretext and --

4   pretext and monitoring, all this data

5   that is collected is analyzed by analysts.

6       Q.   And by "pretext," do you mean

7   misrepresentations by individuals about

8   who they are to get information?

9           Correct?

10      A.   So every -- so as far as I'm

11   concerned, pretext -- every -- every case

12   should be judged separately.  But it could

13   involve hanging out in a bar and overhearing

14   a conversation or talking to someone.

15          Anything -- I consider anything

16   where you don't introduce yourself and say

17   I am so-and-so and I am investigating is

18   what I would consider pretext.

19      Q.   And you also used the term

20   "monitoring."

21          What is it you're monitoring?

22      A.   (Comment in Hebrew.)

23          THE INTERPRETER:  "Surveillance"?

24          THE WITNESS:  "Surveillance."

25          THE INTERPRETER:  Okay.

```
 1                THE WITNESS:  (Comment in Hebrew.)

 2                THE INTERPRETER:  The word should

 3    have been "surveillance."

 4    BY MR. BEHRE:

 5        Q.  And "surveillance," you mean

 6    human --

 7                THE INTERPRETER:  Physical

 8    surveillance -- I'm sorry -- he -- he --

 9    he explained.

10                He said:  "Physical surveillance."

11                MR. BEHRE:  Okay.  Thank you.

12                THE INTERPRETER:  Actually

13    surveilling someone.

14    BY MR. BEHRE:

15        Q.  Following someone without them

16    knowing it, is that an example of surveillance?

17        A.  Yes.  That's an example.

18        Q.  So just to jump back, you said

19    you looked at some bank statements; is that

20    correct?

21        A.  My own.

22        Q.  Okay.  And by your own, which

23    company are you talking about?

24        A.  Gadot SDC and Insight.

25        Q.  And which banks are those?
```

1      A.   Insight in Bank of America and

2  Gadot at Citibank.

3      Q.   Okay.  And in addition, you

4  mentioned reviewing invoices in preparation

5  for your testimony.

6           Who are those invoices to and from?

7      A.   The invoices from Insight and from

8  Gadot in the U.S. to Stuart Page in the Beech

9  case.

10     Q.   And could you spell "Beech," please,

11  for the record?

12     A.   Sometimes we got it wrong.  But I

13  think it's B-e-e-c-h.

14     Q.   (Not translated.)  So the intent

15  is "beach" like the ocean and not "beech"

16  like the tree?

17     A.   (In English.)  No.

18          (Translated.)  It was Stuart Page

19  who chose the name.

20          (Last question translated.)

21          THE WITNESS:  I think his initial

22  intention was to the tree.  But we might

23  have got the spelling wrong.

24  BY MR. BEHRE:

25     Q.   In addition to the bank statements

1    and the invoices, what else did you review

2    to prepare for your testimony?

3         A.   I spoke to my attorneys about

4    the legal proceedings we've been involved

5    in until now.

6         Q.   Yeah.  I'm just asking you about

7    documents now, not -- not discussions.

8         A.   In this case, there was a security

9    protocol that was dictated by the customer

10   not to preserve any documentation in the

11   case.

12        Q.   And who was the customer?

13        A.   RAK.

14        Q.   And was Stuart Page a customer?

15        A.   Stuart Page asked to meet me --

16   I think it was March 2015.

17             And he told me that the ruler

18   wanted him to -- wanted to investigate

19   the illegal activities of Khater Massaad.

20   And according to what Stuart told me, his

21   work was directly vis-a-vis the ruler.  And

22   the payment he received, according to what

23   Stuart said, was also -- also came directly

24   from the account of the ruler rather than

25   some company.

1          Throughout the entire investigation,

2    we would call the ruler "the boss."  That

3    was his nickname.  But my actual customer

4    was Stuart Page.

5          Q.   Okay.  And you said that the

6    customer dictated the policy of not

7    preserving documents; correct?

8          A.   That's what Stuart Page told

9    me.  I never met the boss.

10         Q.   And, again, by "boss," you mean

11   the ruler; right?

12         A.   Yes.

13         Q.   And what were the documents that

14   were created but were not retained?

15         A.   Approximately every month, but

16   not always, and based on the findings of

17   the investigation, we would produce a report.

18         The report had an executive summary

19   at the beginning.  And this was followed by a

20   breakdown of the findings of the investigation.

21   And we would send these reports using the

22   method that Stuart described quite accurately

23   in his affidavit to Stuart.

24         Stuart always asked, from the

25   beginning, that we leave the report in

1    an open format for two reasons.  The first

2    one was that he said that our English was

3    beneath contempt.  And he would also add

4    sections to the report involving investigations

5    that he did that had nothing to do with us.

6        Q.   Did you draft or write any portion

7    of those reports?

8        A.   The report was prepared by the

9    staff of analysts.  I would review the

10   report before it was sent out, sometimes

11   make corrections or changes.

12       Q.   And when you say the "staff of

13   analysts," who were those people specifically?

14       A.   This was a staff of people who

15   worked for Gadot.  And for reasons of

16   privacy, I will not state their names.

17       Q.   And what are the reasons of

18   privacy that you can't disclose the

19   employees of your company?

20       A.   First and foremost, this

21   investigation relates to Gadot U.S.A.

22   and to Insight.  And these employees

23   are not employees of Gadot or Insight.

24            And, secondly, some of them

25   have security clearances here in Israel.

1   Some of them came from the various security

2   systems, Israeli security systems.

3        Q.   Well, as I understand your

4   testimony, the payments that were made

5   to SDC-Gadot were payments for the work

6   of Gadot here in Israel; correct?

7        A.   Correct.

8        Q.   And, therefore, the work of

9   SDC-Gadot directly relates to Gadot?

10        A.   Yes.

11        Q.   So I'm asking you for the names

12   of the employees who prepared the report --

13   or reports I should say.

14        A.   I understood your question.  But

15   I will not answer that question.

16        Q.   Okay.  Well, that's not a -- it --

17   it's not a valid reason not to answer.

18            MR. BEHRE:  And if you want to

19   interject anything -- I mean, we can --

20            MR. BARET:  Well --

21            MR. BEHRE:  -- go to the Court.

22   But --

23            MR. BARET:  Well, I -- I disagree

24   with your analysis, with all due respect.

25   I don't think Gadot --

```
 1            THE INTERPRETER:  (Comment in
 2  Hebrew.)
 3            MR. BARET:  Gadot SDC did not
 4  have any employees.  And Gadot -- and the
 5  subject of this deposition is for Gadot SDC,
 6  not for Gadot Israel.  So he -- he decided
 7  not to answer.  And you can -- you can make
 8  a note of that.
 9            MR. BEHRE:  Are you instructing
10  him not to answer?
11            MR. BARET:  I'm not instructing
12  him anything.  He made a decision.  And
13  I'm not instructing him to answer.  [sic]
14            MR. BEHRE:  Okay.
15            MR. BARET:  You didn't hear me --
16            MR. BEHRE:  In addition --
17            MR. BARET:  I'm sorry.  You didn't
18  hear me instructing him not to answer; right?
19  Just so we're clear.  I'm not instructing
20  him not to answer.
21            MR. BEHRE:  But you're not
22  instructing him to answer?
23            MR. BARET:  He's -- he's a
24  grown man.  If he doesn't want to answer,
25  that's his choice.
```

1  BY MR. BEHRE:

2       Q.   So in addition to the bank

3  statements, the invoices, did you look

4  at anything else to prepare for today?

5       A.   No.

6       Q.   Well, you indicated before we

7  started that you had documents in front

8  of you -- correct? -- that included Stuart

9  Page's declaration or declarations?

10      A.   Yes.  These are Stuart Page's

11 declarations.  And these are lists which

12 I made for myself to assist myself in

13 reconstructing the proceedings that we've

14 been through so far.

15      Q.   (Not translated.)  Could you

16 tell us what statements you have in front

17 of you by date --

18           THE INTERPRETER:  Statements?

19 BY MR. BEHRE:

20      Q.   (Not translated.)  -- and title?

21           THE INTERPRETER:  Statements?

22           MR. BEHRE:  Witness statements.

23 Affidavits.

24           (Pending question translated.)

25           THE WITNESS:  I have Stuart's

1  affidavit from the 7th of January, 2022.

2  And an additional one by Stuart from the

3  7th of February.

4        I also -- I also had the affidavit

5  of Majdi Halabi.  But I don't seem to find

6  it here.  I probably left it in my office.

7  BY MR. BEHRE:

8        Q.   So in front of you you have two

9  affidavits of Stuart Page; right?

10       A.   Yes.

11       Q.   And you also have some handwritten

12  notes you made; correct?

13       A.   Correct.

14       Q.   And those are one page or more?

15       A.   More.  Eleven.

16       Q.   And in addition to the things

17  we've just discussed, is there anything

18  else document-wise you looked at to

19  prepare for your testimony?

20       A.   No.

21       Q.   Have you ever reviewed any of

22  the pleadings in Farhad Azima's U -- U.K.

23  case?

24       A.   (Translated.)  Not -- not in

25  the last few days.  But I am familiar

1   with these proceedings, with this claim

2   or this action that Farhad Azima is

3   conducting versus Nick Del Rosso --

4           (In English.)  NDR.

5           (Translated.)  -- NDR.

6       Q.   And so you've looked at -- at

7   pleadings involving the Azima versus Del

8   Rosso case in the United States?

9       A.   Yes.  I've been through the

10  pleadings.  And many times journalists

11  from Reuters approached me.  And I think

12  that I'm pretty well familiar with these

13  proceedings.

14      Q.   And when Reuters approached you,

15  did you speak with them?

16      A.   Yes.

17      Q.   And what was the name of the

18  reporter?

19      A.   Raphael Satter.

20          MR. BEHRE:  I think that's

21  Satter, S-a-t-t-e-r.

22          THE INTERPRETER:  Satter?

23          MR. BEHRE:  Satter.  Yeah.

24          THE INTERPRETER:  Satter.

25          THE WITNESS:  It's like Beech

1    is both a tree and a seashore.

2    BY MR. BEHRE:

3        Q.   In preparation for your testimony

4    here today, have you spoken to anyone to

5    gain information about which you can

6    testify?

7        A.   No.

8        Q.   Have you spoken to Stuart Page

9    about your testimony here today?

10       A.   No.

11       Q.   When's the last time you spoke

12   with Stuart Page?

13       A.   I estimate that it's been about

14   seven, eight months since we last spoke.

15       Q.   When did you last communicate

16   with him?

17            And by that, I mean text or

18   e-mail or messaging app.

19       A.   I can check that and provide

20   an accurate reply.

21       Q.   Just a rough estimate?

22       A.   Seven, eight months.

23       Q.   Okay.  What about his assistant

24   Caroline Timberlake, when's the last time

25   you spoke with her?

1          A.   In my opinion, I haven't spoken

2     to her in about two years.

3          Q.   And when's the last time you

4     communicated with her, again, text, e-mail,

5     or messaging app?

6          A.   The same answer.

7          Q.   What about Neil Gerard, did you

8     talk to him in preparation for your testimony

9     here today?

10          A.   In my view, the last time I spoke

11     to Neil Gerard was in that meeting that

12     I described in -- which took place in

13     Switzerland.

14          Q.   And when's the last time you

15     communicated with Neil Gerard?  And I

16     can keep repeating it.  But text?  E-mail?

17          A.   First of all, throughout the --

18     all the -- all these years, I did not have

19     a direct connection or direct communication

20     with Neil Gerard.

21              My opinion -- my evaluation is

22     that, ever since the first trial that took

23     place between Farhad Azima and the client

24     in London, I did not speak to him, I did

25     not meet him, I did not correspond with him.

```
1        Q.   But there was a time you met with
2   Neil Gerard at Dechert's offices in London;
3   right?
4        A.   All along the time that this
5   procedure is being run, I believe I've
6   been in Dechert's office once or twice
7   in London.  It can be checked in the
8   log-in of Dechert, because it's been
9   verified.
10            Beyond my meetings with Neil
11  at Dechert, I believe that, in the last
12  four or five years of conducting this
13  case, I met Neil perhaps another ten
14  times.  I have never met Neil without
15  Stuart's presence.  And that's it as
16  far as Neil is concerned.
17       Q.   Now, you indicated the Dechert
18  log-in system for visitors, it's been
19  verified.
20            What did you mean by that?
21       A.   When you come to visit their
22  offices -- when you come to visit their
23  offices, you have to present some document
24  of identification.  And then they issue for
25  you a magnetic card, which you use throughout
```

```
 1   your visit to open the doors, to open the
 2   elevator -- I don't remember.
 3        Q.   And you've also visited with Neil
 4   Gerard at your apartment at the Metropolitan
 5   Hotel in London too; correct?
 6        A.   (Translated.)  Once or twice,
 7   a few times -- I don't remember exactly --
 8   Neil came to meetings which were held in
 9   the apartment.  But these meetings as well
10   were attended by Stuart Page.
11             And this -- and this apartment
12   is a room in a hotel.  It's not as if I
13   have an apartment there.
14             (In English.)  I wish I had.
15        Q.   It would be a very expensive
16   apartment.
17        A.   (In English.)  Also to rent.
18        Q.   Yeah.  And, finally, have you
19   ever visited Gerard at his home?
20        A.   Never.
21        Q.   Now, what about Jamie Buchanan,
22   did you speak with him about your testimony
23   here today?
24        A.   No.
25        Q.   When's the last time you spoke
```

1   with him?

2       A.   I estimate something like

3   ten months.  That's my estimate.  Even

4   before I became aware that there's some

5   proceedings here against me.

6       Q.   And when's the last time you

7   communicated with him?

8       A.   After I learned about the

9   testimony that Stuart gave, I -- I

10  communicated with him not directly,

11  but via his attorney.

12      Q.   And who is his attorney?

13      A.   A woman -- a woman by the

14  name of Sue or something like that,

15  in England, in --

16      Q.   In --

17      A.   -- the U.K.

18          THE INTERPRETER:  "A women

19  by the name of Sue or something like

20  that in the U.K."

21  BY MR. BEHRE:

22      Q.   What about the ruler, when's

23  the last time you spoke with him?

24          And did you talk to him to

25  prepare for your testimony today?

1       A.   In all my 55 years of existence,

2   I have never spoken to the ruler nor met

3   him.

4       Q.   Have you ever communicated with

5   him in text, e-mail, or messaging?

6       A.   Never.  Never.

7       Q.   How about Amir Handjani, did you

8   talk to him to prepare for your testimony?

9       A.   Same answer as for the ruler.

10          In all my 55 years of existence,

11  I never met him.  I never spoke to him.

12  I never communicated.  I don't know him.

13      Q.   And did you attend the trial

14  of Farhad Azima in London in 2019?

15      A.   No.

16      Q.   Were you in London at the time?

17      A.   I don't recall.  I can check

18  that.  I don't think so.

19      Q.   Did you meet with any of the

20  parties on behalf of RAK who were at that

21  trial at the time they were in that trial?

22      A.   I don't think so.  I don't think

23  so.

24          I believe I did meet with Stuart,

25  because I had a very close contact with --

1   very close connection with Stuart.  I don't

2   think it was at the time of the proceedings.

3          I -- I have something to add.

4          I went over a few more documents

5   in preparation to this testimony, which I

6   forgot to mention before.  I took out from

7   the Ministry of Interior all the dates of

8   my exits and entries into the country in

9   order to refresh my memory as to these

10   visits or trips.

11     Q.   Exits and entries from which

12   country?

13     A.   Only from Israel.  Because I

14   possess an Israeli passport.  That's

15   the only -- the only thing that could

16   be checked.

17     Q.   And why did you look at that

18   information to prepare?

19     A.   Because, when I read the affidavit

20   by Majdi Halabi, I did not remember some of

21   the meetings that he described as me being

22   in attendance.  So I wanted to check whether

23   at all I had been present in the places as

24   he was describing it.

25     Q.   And did you receive a printout

1   from the Israeli Ministry about your travel?

2        A.   Yes.  Every citizen can do that.

3        Q.   And do you have a copy of that

4   with you today?

5        A.   I have it in the mail.  I can

6   have it printed if you want.

7        Q.   Okay.  We'd appreciate that.

8        A.   My attorney will provide you

9   that in reference to the specific dates.

10       Q.   (Not translated.)  Now, going

11  back to the people you might have spoken

12  with to prepare for your testimony, did

13  you -- did you speak with anyone from

14  Karv Communications, such as Andrew

15  Frank, before you --

16            THE INTERPRETER:  From Karv?

17  BY MR. BEHRE:

18       Q.   (Not translated.)  -- testified

19  here today?

20            THE INTERPRETER:  Karv -- Karv

21  Communications?

22            MR. BEHRE:  Karv, K-a-r-v.

23            THE INTERPRETER:  Okay.

24            (Pending question translated.)

25            THE WITNESS:  Just like my

1   previous answer, I have never met him.

2   I don't know him.  I have never communicated

3   with him.

4   BY MR. BEHRE:

5       Q.   And how about David Hughes?

6       A.   I have met David Hughes when he

7   was working at Dechert.  And I believe that

8   the last time I met him was in that meeting

9   in Cyprus, which is described in Stuart's

10  affidavit.  I have never communicated with

11  him directly, neither before nor after, and

12  not indirectly either.

13      Q.   Okay.  And how about Majdi Halabi?

14      A.   The last time I spoke to Majdi

15  Halabi was after he submitted his affidavit.

16          After I have learned about his

17  affidavit from the Reuters reporter, I

18  called him.  And he refuted, he denied

19  that he had provided such an affidavit.

20  And when I saw -- when I saw it, I -- I

21  cut my connections with him.  And since

22  then, I have not spoken to him.

23      Q.   When's the last time you

24  communicated with him by text, e-mail,

25  or messaging service?

1        A.   It was a telephone conversation.

2   And I believe it was close to the date

3   that he had submitted his affidavit.  And

4   since then, I had no communication with

5   him whatsoever.

6        Q.   (Partially translated.)  Okay.

7   How about the U.K. lawyer, Lucy Ward, did

8   you speak with her before you testified

9   here today?

10            THE COURT REPORTER:  "Lucy."

11            THE INTERPRETER:  What's her

12   name?  Lucy Ward.  Lucy Ward.

13            (Remainder of pending question

14       translated.)

15            THE WITNESS:  I don't know this

16   lady.  And I've never spoken to her.

17   BY MR. BEHRE:

18       Q.   Have you ever communicated with

19   her in any other way?

20       A.   No.

21       Q.   How about Nicholas Del Rosso,

22   did you speak with him before you

23   testified here today?

24       A.   Same answer.

25            In all my 55 years of existence,

1  never met, never heard, never spoken, don't

2  know.

3      Q.  But you've certainly heard of him;

4  right?

5      A.  Yes.

6          Now, seriously, in the beginning

7  of the investigation, I learned that Nick

8  Del Rosso was recruited and he's working

9  on the case in parallel to us but on

10  different -- other issues.

11          I remember that Stuart Page

12  was deeply offended that Nick Del Rosso

13  is being employed.  And he was told that

14  Nick's employment had been suspended.

15          And the next time we encountered

16  the name of Nick Del Rosso, we were told

17  that he was making the connection between

18  a company that was studying the materials

19  leaked from Farhad Azima and the customer,

20  the client.

21          THE COURT REPORTER:  "And" or

22  "in"?

23          THE INTERPRETER:  "And the client."

24  BY MR. BEHRE:

25      Q.  The connection between a company

1    that was?

2         A.   He made a connection to a company

3    that was analyzing materials, the materials

4    that had been leaked from Farhad Azima.

5         Q.   And what was the name of that

6    company?

7         A.   I -- I don't remember.  Once

8    again, all my information comes from

9    Stuart.

10        Q.   What about an investigator by

11   the name of Craig Thomas, did you speak

12   with him to prepare for your testimony

13   here today?

14        A.   I don't even have the faintest

15   clue who this person is.  Until now, I

16   recognize the names.  But this one ...

17        Q.   What about Patrick Grayson?

18        A.   I heard about him.  Never spoken

19   to him, never met him, never communicated

20   with him.

21        Q.   Was he involved in Project Beech,

22   if you know?

23        A.   No.  Not to my knowledge.

24        Q.   Did you speak with Paul Robinson

25   to prepare for your testimony here today?

    1        A.   I heard about Paul Robinson from

    2   Stuart Page, even in the course of the

    3   meetings held by Stuart Page with Robinson.

    4   But I don't know him.  I haven't spoken

    5   to him.  And that's it.

    6        Q.   In preparation for your testimony

    7   here today, have you spoken to anyone else

    8   affiliated with Dechert, the law firm?

    9        A.   No.

   10        Q.   (Not translated.)  And how about

   11   anyone from Stewarts Law, the law firm in

   12   the U.K. that represents RAK?

   13        A.   "Lo."

   14             (Pending question translated.)

   15             THE WITNESS:  No.

   16             MR. BEHRE:  RAK is all -- all

   17   caps, R-A-K.

   18             THE WITNESS:  (Comment in Hebrew.)

   19             THE INTERPRETER:  No.  No.

   20             THE COURT REPORTER:  He wants to

   21   smoke an electronic cigarette.

   22   BY MR. BEHRE:

   23        Q.   It's not good for your health.

   24   We're not going to do that here.

   25        A.   No, this is good for my health.

```
 1        Q.   You -- you received -- or I should

 2   say S -- SDC-Gadot received a subpoena for

 3   documents; correct?

 4        A.   After a long time after servicing

 5   the documents to somebody in Florida, I

 6   learned that they had been requested to

 7   provide documents.

 8            MR. BEHRE:  After servicing the

 9   documents to somebody in Florida?

10            THE INTERPRETER:  After -- after

11   the servicing -- serving the -- the -- the

12   subpoena, I imagine.  Serving, not servicing.

13   Serving.  Serving.  Sorry.  Sorry.  Serving.

14            MR. BEHRE:  Okay.  Let me just

15   ask the question again.

16            THE INTERPRETER:  Okay.

17   BY MR. BEHRE:

18        Q.   Do you recall receiving a subpoena

19   for documents from SDC-Gadot in conjunction

20   with the Florida case?

21        A.   Yes.

22        Q.   And are you aware that, in response

23   to that, no documents were produced?

24        A.    I am aware that my bank said --

25   did send them the documents -- my documents
```

1    that he was requested -- that the bank was

2    requested to submit.  And immediately after

3    learning about the subpoena, I recruited

4    the services of my attorney here in order

5    to defend myself in respect to the substance

6    of the subpoena.  And only recently did I

7    determine what I am supposed to produce and

8    what I'm -- I'm not.

9         Q.   But you would agree that, in

10   preparation for your testimony here today,

11   you reviewed documents that would be required

12   to be produced under that subpoena; correct?

13        A.   Okay.  In the first subpoena,

14   they required documents connected to the

15   American companies and to the connection

16   to -- the connection to Stuart Page in

17   the connection of the investigation of

18   Farhad Azima.  And since there was no

19   investigation against Farhad Azima, or

20   of Farhad Azima, my initial interpreting

21   was that I have no documents to submit,

22   since I did not investigate Farhad Azima.

23            But pretty soon, they started to

24   submit more and more requests to the Court,

25   which go well beyond the initial request.

1          So to the best of my understanding,

2     we submitted an opposition, an objection

3     to these requests.  And, finally, the --

4     the agreement was that in -- following

5     the initial -- the first subpoena, I

6     would be deposed here in Israel.

7          And, once again, I will say

8     that I have no connection.  I have

9     never investigated Farhad Azima.

10          (Exhibit 1 marked.)

11     BY MR. BEHRE:

12     Q.  I'd like to show you --

13          MR. BEHRE:  Do you have a copy

14     for counsel?

15     BY MR. BEHRE:

16     Q.  I'd like to show you what we've

17     marked as exhibit --

18          MR. BEHRE:  Do you have a binder

19     clip or something?  Do you have one?  Thank

20     you.  Yeah.

21     BY MR. BEHRE:

22     Q.  Showing you what's been marked --

23     pre-marked as Exhibit No. 1.  That's a copy

24     of the subpoena that I believe was served

25     on SDC-Gadot LLC for documents.

1          Could you take a look at that

2   and see if you've seen that before?

3          A.   (Examining.)  I -- I don't

4   remember.

5               But I do recall that, at some

6   stage, the gentleman whose names -- whose

7   name appears here -- I think it's Shimon

8   Goldenberg [sic] -- is a person I don't

9   know personally, by the way -- he called

10  and he said that he had received a lot

11  of documents and that we should come and

12  see them.  He said he had been trying

13  to e-mail us the documents but that the

14  e-mail had bounced.

15              And when I corrected him --

16  because he had written ".com" instead

17  of ".co.il" -- the -- the documents

18  arrived.

19              In actual fact, the first

20  time I -- I received the documents

21  was a long time after they had been

22  initially sent.  I think my attorney

23  related to this in one of his responses

24  to the Court.

25         Q.   And by "the documents," you're

1    talking about the subpoena, not the

2    documents in response to the subpoena;

3    right?

4         A.   Yes.  That's correct.

5         Q.   (Translated.)  And if you

6    would look, please, at page -- page 8

7    of 39.  So if you look at the number

8    in the upper right-hand corner, page 8.

9              (Not translated.)  And just

10   directing your attention to paragraph

11   21, it describes the scope of the

12   subpoena as covering not just Farhad

13   Azima but also others, including

14   Khater Massaad.

15             Do you see that?

16        A.   Yes.

17        Q.   (Partially translated.)  And

18   the documents that you've indicated you've

19   reviewed in preparation for your testimony

20   included SDC-Gadot's bank records, as well

21   as invoices; right?

22        A.   Yes.

23        Q.   And those --

24             THE COURT REPORTER:  Let her

25   translate.

1   BY MR. BEHRE:

2        Q.   And those would be responsive

3   to the subpoena, wouldn't they?

4        A.   That's correct.

5        Q.   And in addition, you indicated

6   you reviewed other documents as well;

7   correct?

8        A.   Bank statements.

9        Q.   And what about -- what about

10  the corporate records of SDC-Gadot, did

11  you look at those before you testified?

12       A.   No.

13       Q.   And by that, I'm referring to

14  the -- the documentation you file with

15  the Florida Secretary of State every

16  year or so.

17       A.   I did not review them.

18       Q.   And you would agree, wouldn't

19  you, that they would be responsive to

20  this subpoena as well; right?

21       A.   (Comment in Hebrew.)

22            MR. BARET:  Just -- just for the

23  record, you have those documents.  You --

24  you provided it to us.  Would you like us

25  to send it back to you?  Because the only --

```
 1   other than some of these documents that you
 2   provided to us, there is no records, for
 3   the record.
 4             MR. BEHRE:  I don't -- I don't --
 5   I don't know if that's true or not.
 6             MR. BARET:  Oh.  So I'm telling
 7   you he doesn't have any records.  So nothing
 8   was produced because -- nothing was produced
 9   because there are no records other than what
10   you already have.
11             MR. BEHRE:  Well --
12             MR. BARET:  But if you want
13   us to produce those records to you, even
14   though you have them, which is Sunday's
15   (phonetic) record, we can do that.
16             MR. BEHRE:  I don't know if
17   they're the same as what I've got or
18   not.  He indicated he has bank records.
19   He indicated he has invoices.
20             MR. BARET:  Only what --
21             MR. BEHRE:  I don't see --
22             MR. BARET:  -- was produced --
23             MR. BEHRE:  -- those.
24             MR. BARET:  -- to us by you.
25             So the bank -- actually, you have
```

```
 1    more bank records than what he does.  Because

 2    you got the subpoena from the bank.  And,

 3    actually, some of the records we've got is

 4    from whatever you produced and received by

 5    issuing a subpoena to Bank of America and

 6    Citibank.

 7              THE WITNESS:  (Comment in Hebrew.)

 8              THE COURT REPORTER:  Wait.  Wait.

 9    She has to translate the --

10              THE INTERPRETER:  I have to --

11              THE COURT REPORTER:  -- last answer.

12              THE INTERPRETER:  I have to --

13              His answer was:  "I'm not especially

14    proficient in the procedural matters."

15              THE WITNESS:  Our bank accounts

16    were closed in August or September of 2021.

17    And we don't have access to the bank.

18              So the subpoena -- the -- the

19    subpoena that you're referring to is much

20    more comprehensive than what we have because

21    we only kept documents in a sporadic fashion.

22              And regarding the invoices for

23    Stuart Page, I would assume -- I assume

24    that you have copies of them from Stuart

25    Page, because he's cooperating with you
```

1   very well.

2   BY MR. BEHRE:

3       Q.   Well, just because you assume

4   we have something doesn't mean you're

5   not obligated to produce them if they're

6   in your possession.

7       A.   So I apologize.  And I will

8   review, once again, what I have.

9           MR. BARET:  I -- I don't think

10  bank records were requested in the subpoena.

11          Can you please direct me where

12  you are requesting bank records?

13          MR. BEHRE:  Well, I'm not

14  testifying, so no.

15          MR. BARET:  No, so I'm just --

16  for the record, the subpoena you -- you --

17          MR. BEHRE:  It's --

18          MR. BARET:  -- are showing --

19          MR. BEHRE:  -- all records regarding

20  the company, which would include bank records,

21  tax records, for example.

22  BY MR. BEHRE:

23      Q.   Do -- does SDC-Gadot file any

24  taxes in the U.S.?

25      A.   It filed returns.

1      Q.   And where do they file those --

2  where does the company file those tax

3  returns?

4      A.   I have to check.  But I would

5  guess it's in Florida.

6      Q.   And those would be responsive

7  to this subpoena, wouldn't they?

8      A.   I'm not sure.  I just have --

9  I have to go back and check.

10      Q.   (Not translated.)  And Ari Propis

11  is the accountant for SDC-Gadot; is that

12  right?

13           THE INTERPRETER: R.E.?

14           MR. BEHRE:  Ari, A-r-i.  Propis.

15           THE INTERPRETER:  Propis.

16           MR. BEHRE:  P-r-o-p-i-s.

17           THE WITNESS:  No.

18  BY MR. BEHRE:

19      Q.   What is his role, if any, with

20  regard to SDC-Gadot?

21      A.   Ari Propis has no position

22  whatsoever in SDC-Gadot.  He just liaised

23  for us and connected us so we could open

24  the bank account.

25      Q.   Who prepared the company's tax

1   returns?

2        A.   There is an accountant.  I'd

3   have to ask the financial person.  I

4   don't remember his name.

5        Q.   And who's the financial person

6   you'd have to ask that of?

7        A.   Omri.

8        Q.   Who's Omri?

9        A.   Omri Gur Lavie.  He's our finance

10  person.

11       Q.   And does SDC-Gadot pay taxes to

12  the U.S. Government as best you know?

13       A.   I -- I know that we filed returns

14  and that all income and expenses were reported

15  in the jurisdictions in which we had to do

16  so.  Whether taxes were or were not paid,

17  I would have to check.

18       Q.   (Not translated.)  And who keeps

19  the business expenses for the company?

20            THE INTERPRETER:  What do you

21  mean by "keeps"?  Records?

22            MR. BEHRE:  Keeps the business

23  expense records.

24            THE INTERPRETER:  Who records.

25  Okay.

1                (Pending question translated.)

2                THE WITNESS:  The accountant.

3    BY MR. BEHRE:

4         Q.   And the accountant is who?

5              Gur Lavie?

6         A.   If you give me a few minutes --

7    it's a U.S. CPA.  He's a U.S. CPA that

8    works from Israel.  If you give me a few

9    minutes, I can check on my phone and --

10   and I'll get back to you with that.

11        Q.   But it's not Mr. Gur Lavie?  It's

12   somebody else?

13        A.   He's the financial director.  But

14   he doesn't work vis-a-vis the authorities.

15   There's an accountant, and that's his job.

16   I'm the one that authorizes all expenses.

17        Q.   Are there any other documents

18   that are filed on behalf of SDC-Gadot

19   with any Government agency that you

20   know of?

21        A.   No.

22        Q.   Are there any filings that

23   SDC-Gadot makes with any banking authority

24   that you know of in the U.S.?

25        A.   What do you mean by "documents"?

1   You mean like opening a bank account?

2       Q.   Any sorts of filings or forms

3   or applications or anything submitted to

4   a bank.

5       A.   So the only bank that we actually

6   banked with in America was Citibank.   We

7   tried to work with Chase Manhattan.   But

8   it didn't work out.   So we may have filed

9   some forms there at one point, but -- with

10  Chase Manhattan.

11      Q.   Chase Manhattan refused to open

12  an account for you?

13      A.   No.   They did open an account.

14  I don't recall exactly why -- there was

15  some kind of limitations or something.

16  But we just -- it wasn't convenient for

17  us to work with them.

18      Q.   (Not translated.)  Have you

19  ever had any bank account frozen in

20  the U.S.?

21      A.   No.

22      Q.   (Not translated.)  Has any

23  U.S. Government body ever tried to

24  obtain information about your bank

25  accounts, as best you know?

```
 1      A.   (In English.)  No.

 2           (Translated.)  No.

 3      Q.   (Not translated.)  So in the --

 4   in the document subpoena that you have

 5   in front of you, Exhibit No. 1, it asks

 6   in -- on page 9 of 39 -- so the numbering

 7   is in the upper right-hand corner.

 8           Under 1.a, the -- it asks for

 9   all reports.

10           Do you see that?

11      A.   Yes.

12      Q.   And are those the reports you

13   referenced as having not been retained?

14      A.   No, we have no reports on Azima,

15   because we didn't do any reports on Azima.

16      Q.   So it is your testimony that there

17   was no report that mentioned Farhad Azima?

18      A.   No.  In my opinion, there were

19   reports that mentioned Azima -- Farhad

20   Azima, not as the subject of an investigation,

21   but as someone whose name came up in the

22   investigation.  And as I said earlier, no

23   reports were preserved.  So everything that

24   I'm saying now about this is from memory.

25      Q.   So is it your testimony that the
```

1    reports that mentioned Azima didn't reflect

2    any investigation by your company of Azima?

3         A.   My company did not investigate

4    Farhad Azima.  So my company investigated

5    Dr. Khater Massaad.

6              In some of the transactions that

7    Khater Massaad was involved in, other people

8    were involved, like members of the republican

9    guard in -- Revolutionary Guard in Iran,

10   like other people that were involved in

11   these transactions.  And their names were

12   mentioned.  And Farhad Azima's name came

13   up in some of the transactions.

14        Q.   (Not translated.)  Did you ever

15   use any human intelligence resources to

16   obtain information about Farhad Azima?

17        A.   We -- some of the sources

18   included human intelligence sources.

19   Some of the sources that involved human

20   intelligence mentioned the name Farhad

21   Azima in -- in the context of the

22   investigation into Khater Massaad.

23              The first source in this case

24   told us that Farhad Azima brought Khater

25   Massaad to your firm to represent him.

1        Q.   And so your source was a source
2   close to Farhad Azima; correct?
3        A.   It -- it would be more correct
4   to say he was close to your firm.
5        Q.   And who was that source?
6        A.   I'm sorry.  I can't divulge that.
7        Q.   And on what basis will you not
8   divulge that?
9        A.   Based on privilege.
10            THE INTERPRETER:  I don't know
11   if "privilege" is the right word to use.
12   I think "privilege" is only attorney-client.
13            "But based on privilege of the
14   source or maintaining the privacy of the
15   source."
16   BY MR. BEHRE:
17        Q.   (Not translated.)  Well, I don't --
18   I don't think that's a valid basis.  And
19   I'd ask and instruct the witness to answer.
20            MR. BEHRE:  Counsel?
21            MR. BARET:  You can do whatever
22   you want.
23            THE WITNESS:  "Ma"?
24            MR. BARET:  Do you want to
25   disclose the source?

1              You can -- you can answer.

2              THE WITNESS:  I don't want to

3    disclose the source.

4    BY MR. BEHRE:

5         Q.   (Not translated.)  I appreciate

6    you don't want to.  But this is a legal

7    proceeding.  And you're required to disclose

8    it.  And if it's -- if you refuse to do it,

9    we'll have to go to the Court and seek the

10   Court's approval to require that disclosure.

11   And that will require you to come back.

12        A.   There was a gentleman who presented

13   himself as a member of the PR staff of your

14   firm who told the story in a -- kind of a

15   friendly social context.

16        Q.   And who was the person with the

17   PR firm?

18        A.   I don't recall his name.

19        Q.   And was the PR person at my firm

20   or someone that was hired by my firm?

21        A.   I don't recall.

22        Q.   The -- the subpoena for documents

23   also asks you for an engagement letter

24   relating to Mr. or -- Mr. Azima or the

25   project.

1              Do you see that?

2         A.   We never had an engagement

3    letter with Stuart.

4         Q.   (Not translated.)  It's your

5    testimony you've never had an engagement

6    letter with Stuart Page?

7         A.   To the best of my recollection,

8    we did not have an engagement letter with

9    Stuart.

10             (Comment in Hebrew.)

11             THE COURT REPORTER:  Ruchie.

12             MR. BARET:  Can we have a short

13   break?

14             THE INTERPRETER:  "When are we" --

15             MR. BARET:  He needs a cigarette --

16             THE INTERPRETER:  "Are we going

17   to have a smoking break?"

18             MR. BARET:  -- and a bathroom

19   break.

20             MR. BEHRE:  We can have an

21   e-cigarette break right now.  That would

22   be fine.

23             MR. BARET:  All right.  So 15?

24             THE INTERPRETER:  Do we have to

25   keep working --

```
 1              MR. BARET:  10?

 2              THE INTERPRETER:  -- if we're not --

 3              MR. BARET:  10, 15 minutes, it's

 4    good?

 5              MR. BEHRE:  Yeah.  Does he have

 6    to go all the way downstairs?  So probably.

 7              THE WITNESS:  No.

 8              MR. BARET:  I don't know.  Is

 9    there a balcony?

10              MR. BEHRE:  We better go off the

11    record for that discussion.

12              MR. BARET:  Is there a --

13              THE COURT REPORTER:  One moment.

14              MR. BEHRE:  10 minutes.

15              THE COURT REPORTER:  One moment.

16              THE VIDEOGRAPHER:  Going off the

17    record at 12:38.

18              (Recess from 12:38 p.m. to 1:00 p.m.

19         Israel Daylight Time.)

20              THE VIDEOGRAPHER:  Back on record

21    at 1:00 o'clock.

22              (Exhibit 2 marked.)

23    BY MR. BEHRE:

24         Q.   I'd like to next show you what

25    we've marked as Exhibit No. 2 and see if
```

1    you can identify what these are.

2            For the record, it's a collection

3    of corporate records from the State of

4    Florida regarding your company SDC-Gadot.

5        A.   (Examining.)

6        Q.   Have you had a chance to look at

7    those documents?

8        A.   Yes, now.

9        Q.   And are they the corporate records

10   for STD -- SDC-Gadot LLC from the State of

11   Florida?

12       A.   It seems so.  Yes.

13       Q.   (Not translated.)  And for the

14   record, the first document is the Articles

15   of Organization for SDC-Gadot, filed on

16   October 18th, 2017.

17       A.   (In English.)  Okay.

18       Q.   The next document contained in

19   this exhibit is the annual report filed

20   on April 29, 2018.

21           The next exhibit --

22       A.   (In English.)  Okay.

23           (Translated.)  Okay.

24       Q.   The next exhibit is the annual

25   report filed on January 21st, 2019.

```
 1              Do you see that?

 2       A.   Yes.

 3       Q.   And next is the annual report

 4  for SDC-Gadot filed on April 11th, 2020.

 5              Do you see that?

 6       A.   (In English.)  Okay.

 7              (Translated.)  Okay.

 8       Q.   And the next one is the annual

 9  report for SDC-Gadot filed on February

10  3rd, 2021.

11              Do you see that?

12       A.   Yes.  They're pretty well --

13       Q.   And then finally --

14       A.   -- organized.

15       Q.   (Not translated.)  And then,

16  finally, do you see the annual report that

17  was filed for SD -- SDC-Gadot on January

18  27th, 2022?

19              THE INTERPRETER:  27?  January --

20              MR. BEHRE:  Yes.

21              THE INTERPRETER:  -- 27?

22              MR. BEHRE:  January 27, 2022.

23              (Pending question translated.)

24              THE WITNESS:  Okay.  Yes.

25  //
```

1   BY MR. BEHRE:

2        Q.   So this is the articles of

3   incorporation [sic] filed in 2017 and

4   the annual reports up to this year 2022;

5   right?

6        A.   Okay.

7        Q.   Looking at the Articles of

8   incorporation -- or of -- of Organization --

9   apologies -- which is the first page

10  of the exhibit, it indicates a mailing

11  address in Miami, Florida.

12           Do you see that?

13       A.   Yes.

14       Q.   And whose address is that?

15       A.   I imagine that this is the agent

16  through which we set up the company, because

17  we had to provide a -- an address, a local

18  address.

19       Q.   And do you know who lives at the --

20  this address?

21       A.   No.

22       Q.   And if you look at the second

23  page of this exhibit -- or I'm sorry --

24  the second page of this document, the

25  Articles of Organization for October 18,

```
 1   2017, there's an electronic signature

 2   affixed to it.

 3             Do you see that?

 4       A.   Aah, yes.

 5       Q.   And that electronic signature

 6   purports to be yours; correct?

 7             MR. BARET:  Here.  (Indicating.)

 8   The back of the page.  It just says:

 9             "Amit Forlit."

10             THE WITNESS:  I'm looking for it.

11             MR. BARET:  The second page.

12             THE WITNESS:  (Comment in Hebrew.)

13             It's not a manual signature, not

14   a handwritten signature.

15   BY MR. BEHRE:

16       Q.   Right.

17             It's an electronic signature.

18       A.   I don't recall.  But it would

19   seem so.

20       Q.   So do you -- do you see the page

21   that I'm asking about?  It's -- turn to the

22   page that has the exhibit sticker on it.

23             MR. BARET:  This one.  (Indicating.)

24   The -- the back of this page.

25   //
```

1  BY MR. BEHRE:

2        Q.   And flip it over.

3        A.   Aah.  "Po."

4        Q.   And it indicates that your

5  electronic signature was affixed to

6  this document; correct?

7        A.   Yes.

8        Q.   And did you electronically

9  sign this document?

10        A.   I assume I did.  I do not recall.

11        Q.   Okay.  And this document was filed

12  electronically with the State of Florida;

13  correct?

14        A.   Correct.

15        Q.   Now, going to the first annual

16  report dated April 29, 2018.

17             Do you see that?

18        A.   Yes.

19        Q.   And it indicates on the signature

20  line -- again, electronically signed -- that

21  you signed as the CEO of the company.

22             Is that correct?

23        A.   Yes.

24        Q.   And if you go to the next one

25  from January 21st, 2019, again -- again,

1    you electronically signed here, indicating

2    that you are the, quote, "Owner," end

3    quote --

4         A.   (In English.)  Okay.  "Kin."

5         Q.   -- of the company; correct?

6         A.   Okay.  Yes.

7         Q.   And did all -- were all those

8    documents filed electronically with the

9    State of Florida, as best you know?

10        A.   Yes.

11        Q.   And did you authorize the

12   submission of all these documents on

13   behalf of SDC-Gadot LLC in Florida?

14        A.   I assume I did.

15        Q.   And it -- the -- the first

16   page indicates -- that is, the Article

17   [sic] of Organization indicates that

18   your registered agent in the State of

19   Florida is Shimon Goldberger; is that

20   correct?

21        A.   I assume it is.

22        Q.   Did you hire Mr. Goldberger

23   and his company SRSL Management, Inc.,

24   to represent SDC-Gadot in Florida?

25        A.   I don't recall such a thing.

 1      Q.   Do you know who Mr. Goldberger

 2   is?

 3      A.   Only recently, when he made

 4   contact with us in order to send us the

 5   subpoena, I have learned of his existence.

 6   To the best of my knowledge, we did not

 7   hire him and we did not pay him.  We used

 8   his address when setting up the company.

 9      Q.   And when you signed electronically

10   the Articles of Organization, it indicates

11   on the document you electronically signed

12   that your registered agent was Shimon

13   Goldberger.  And he too affixed an

14   electronic signature.

15           Do you see that?

16      A.   I see it.  But I simply do not

17   remember.

18      Q.   And looking at the annual report

19   from April 29, 2018, the current principal

20   place of business has changed.  And now

21   it indicates an address in New York.

22           Do you see that?

23      A.   Yes.

24      Q.   And the address is West 210

25   89th Street in New York City; correct?

1      A.   Yes.

2      Q.   And in -- in one place says

3  Apartment 1K.  And in another place,

4  it says apartment K1.

5           Do you know which is correct?

6      A.   I believe it to be the same.

7      Q.   Who lives at that address?

8      A.   A friend of mine.

9      Q.   What's your friend's name?

10     A.   Elad Lev Ran.

11     Q.   Could you spell the last name?

12     A.   L-e-v, dash, R-a-n.

13          THE INTERPRETER:  No.  "Revach."

14  "Space."

15          THE WITNESS:  For -- simply for

16  the purpose of receiving mail.  Because,

17  once again, I do not know what was the

18  first address.  So we changed the address

19  so, when the bank would send documents,

20  they would arrive.

21  BY MR. BEHRE:

22     Q.   And, for example, where did the

23  Citibank records get mailed to?

24     A.   As far as Citibank is concerned,

25  mostly they would send a debit card.  But

1    the rest of the documents was usually sent

2    via the application, the app.

3        Q.   And did they send those -- did

4    they send the debit cards to New York or

5    to Miami?

6        A.   No.  They sent it to Israel.

7             I had a fraud event with my card.

8    So I canceled the card.  And they sent me

9    a new card, which they sent to Israel.

10       Q.   And the fraud on the card was

11   for a debit card?

12       A.   Yes.

13       Q.   Who actually used those debit

14   cards during the life of this account at

15   Citibank?

16       A.   I did.

17       Q.   Did anyone else use those cards?

18       A.   With the exception of the fraud

19   case --

20       Q.   Yes.

21       A.   -- nobody else.

22       Q.   So all the purchases, then, that

23   would be indicated in the bank statements

24   for Citi that were made on the debit card

25   would have been your personal charges;

1  correct?

2       A.   These are not personal expenses.

3  These are company expenses.

4       Q.   (Not translated.)  And so when

5  you purchased a Porsche in Pennsylvania,

6  was that a business expense or a personal

7  expense?

8            THE INTERPRETER:  When you acquired

9  what?  Sorry.

10           MR. BEHRE:  Porsche.

11           THE INTERPRETER:  Porsche, the car?

12           (Pending question translated.)

13           THE WITNESS:  I never bought a

14  Porsche in Pennsylvania.

15  BY MR. BEHRE:

16       Q.   Okay.  We'll get to that.

17           What e-mail addresses were

18  associated with SDC-Gadot, if any?

19       A.   I believe "amit001@me.com."

20       Q.   And in addition, did you ever

21  use "amit@gadot.com"?

22       A.   No.  No.  I used "amit@gadot.co"

23  [sic] not ".com."

24       Q.   Did anyone else associated with

25  SDC-Gadot use a e-mail address that ended

1   with "@gadot.co"?

2        A.   I believe no.

3        Q.   Did you receive an e-mail from

4   Mr. Goldberger, attempting to resign as

5   your registered agent?

6        A.   Could be.  I don't recall.

7        Q.   Do you recall he threatened to

8   resign?

9        A.   I -- I remember he sent something

10   that he was being pestered by all these

11   subpoenas that are being sent to him.  And

12   he -- he asked us to put a stop to it.

13            But since we did not receive them,

14   we did not know what to answer.

15            I understood belatedly that what

16   he had written was "com" instead of "co"

17   and that's why we did not get these mails.

18        Q.   Now, during the course of this

19   litigation in Florida, you've submitted

20   two affidavits; is that correct?

21        A.   I assume yes.

22        Q.   And one of those affidavits was

23   signed by you on May 12th, 2022.  And the

24   second was signed by you on June 1st, 2022.

25            Do you recall that?

```
 1      A.   Yes.

 2           (Exhibit 3 marked.)

 3  BY MR. BEHRE:

 4      Q.   I'd like to next show you what's

 5  been marked as Exhibit No. 3.

 6           MR. BEHRE:  Do we have a stapler

 7  by any chance?

 8           THE COURT REPORTER:  Moshe, go off.

 9           THE VIDEOGRAPHER:  Off the record

10  at 1:19.

11           (Recess from 1:19 p.m. to 1:21 p.m.

12      Israel Daylight Time.)

13           THE VIDEOGRAPHER:  Back on the

14  record at 1:21.

15  BY MR. BEHRE:

16      Q.   So looking at Exhibit 3 -- and

17  when I say Exhibit 3, I'm talking about

18  the sticker that says Exhibit 3.  And,

19  unfortunately, the document happens to

20  have typed on it "Exhibit 2," which is

21  from the court case.  So apologies for

22  that confusion.

23           But this is Exhibit 3.

24      A.   (Examining.)  Okay.

25      Q.   Are those the two affidavits
```

1    that you submitted to the Court in Florida?

2        A.   Yes.

3        Q.   And were each of those affidavits

4    filed electronically, as indicated in the

5    top of the doc -- of each affidavit?

6        A.   I assume they did.

7        Q.   Directing your attention to the

8    first affidavit that you signed on May the

9    12th, 2022 -- so it's the second page of

10   the exhibit.

11       A.   Okay.

12       Q.   And it indicates in the second

13   paragraph -- numbered paragraph:

14           "I do not reside in the State

15   of Florida."

16       A.   Correct.

17       Q.   And it says:

18           "I do not reside in the United

19   States."

20           Do you see that?

21       A.   Yes.

22       Q.   Have you ever resided in the

23   State of Florida?

24       A.   Only as a tourist.  I never

25   resided there.

1       Q.   Have you ever resided in the

2  United States?

3       A.   No.

4       Q.   Have you ever purchased a

5  vacation home in the United States?

6       A.   No.

7       Q.   Have you ever attempted to

8  purchase a vacation home in the United

9  States?

10      A.   No.

11      Q.   Did you ever form an LLC to

12  purchase a vacation home in the United

13  States?

14      A.   No.  I bought once a caravan,

15  an RV.

16      Q.   Did you ever form an LLC with

17  your wife in an effort to buy a vacation

18  home somewhere in the United States?

19      A.   (Translated.)  I set up an LLC

20  with my wife in order to buy a caravan,

21  not --

22           (In English.)  "RV."

23           (Translated.)  -- not a vacation

24  home.  An RV.

25           (In English.)  Recreational vehicle.

```
 1      Q.   What was the last part?  Sorry.

 2           THE INTERPRETER:  "An RV."

 3           THE WITNESS:  RV.  Rec --

 4           THE INTERPRETER:  Recreational --

 5           THE WITNESS:  Recreational --

 6           THE INTERPRETER:  -- vehicle.

 7           THE WITNESS:  -- vehicle.

 8           THE INTERPRETER:  An RV.

 9  BY MR. BEHRE:

10      Q.   And when -- when was that?

11      A.   I believe it was in 2012.  And

12  then when we -- maybe 20 -- or maybe 2014.

13           THE INTERPRETER:  He adds.

14           THE WITNESS:  And when we divorced

15  in 20 -- the end of 2017, beginning of

16  2018, as part of the divorce arrangement,

17  I transferred to her the ownership of the

18  RV.

19  BY MR. BEHRE:

20      Q.   And while you owned the RV, where

21  was it stored when it was not being used?

22      A.   It was in use about one month

23  or one month and a half per year.  And

24  we would store it in the place that we

25  would be -- we would be arriving at.
```

1          Q.   And what state was that?

2          A.   I believe we visit -- visited

3     something like 30 states, like all over

4     the place.

5          Q.   Was it ever stored in the State

6     of Florida?

7          A.   I don't believe so.

8          Q.   Where would --

9          A.   Because we were more in -- on the

10    west.

11         Q.   And where -- from what state were

12    the license plates obtained from?

13         A.   I don't -- I honestly don't remember.

14         Q.   In what state did you purchase the

15    RV?

16         A.   New Jersey.

17         Q.   Now, you indicate in the third

18    paragraph of this affidavit dated May 12,

19    2022, that SDC-Gadot LLC:

20              "Has not conducted business in

21    the State of Florida."

22              Do you see that?

23         A.   Yes.

24         Q.   Is that an accurate statement?

25         A.   I believe it is.

1      Q.   And when you say you -- it --

2   the company "has not conducted business

3   in the State of Florida," what do you mean?

4      A.   That we did not do any business

5   in the State of Florida.  We -- we did not

6   carry out any investigation.  And we did

7   not conduct any business activity.

8      Q.   Did you engage in any financial

9   transactions that involve the State of

10  Florida?

11     A.   Please define if -- what you mean

12  by the "State of Florida."

13          Like, if somebody in Florida made

14  a payment to me, does this mean that it

15  involves the State of Florida?

16     Q.   Did you give or receive any funds

17  from an entity or person in the State of

18  Florida?

19     A.   Possibly.  I do not remember.

20     Q.   And you indicate, at the end

21  of paragraph 3, that SDC-Gadot:

22          "Has not conducted any business

23  in years."

24          Correct?

25     A.   Well, what I mean by that is,

1   since the closure of the account about

2   a year and a half ago, maybe even a

3   little before that -- sadly, since the

4   beginning of COVID -- I do not recall

5   any activity after that.

6        Q.   When is the last time that

7   SDC-Gadot conducted business?

8        A.   I believe -- I believe before

9   the summer of 2021.  2020 maybe.

10        Q.   And what business was conducted

11   in 2020?

12        A.   I think collecting funds from

13   somebody who was owing me money.  But it

14   was not an activity per se.

15        Q.   So you would agree receiving

16   funds is conducting business; correct?

17        A.   It's a -- it's a business

18   transaction of the account, not of the

19   company.  The company did not carry out

20   any -- any activity.

21        Q.   Well, the statement says that

22   the company "has not conducted any business

23   in years," which clearly suggests that it

24   had conducted business at some point.

25             So what does it mean when you

1  add to your statement "in years"?

2       A.   When I say "in years," we're

3  already talking about two years and more.

4  When COVID started, we practically stopped

5  any operations, also in Gadot in Israel.

6  And my meaning is that there was no work

7  carried -- carried out.  If there were

8  some collecting of funds or debts, in

9  my opinion, this is not operations.

10      Q.   Looking next at the second

11 affidavit, which you executed on June

12 the 1st, 2022.

13           Do you have that in front of

14 you?

15      A.   Yes.

16      Q.   You indicate, in paragraph 3,

17 you had not been in the State of Florida

18 since 2017; correct?

19      A.   Correct.

20      Q.   And what were you doing in

21 Florida in 2017?

22      A.   I opened a bank account.

23      Q.   And which bank account was that?

24      A.   The account in Citibank, which

25 is the bank account of SDC-Gadot.

1      Q.   And you came to Florida in 2017

2   solely for the purpose of opening that

3   account or for some other reason?

4      A.   I came as a tourist.  I visited

5   some friends.  And then I took a flight

6   to D.C.

7      Q.   And what did you do when you

8   arrived in D.C.?

9      A.   I don't recall.  I assume that

10   I had business meetings.

11      Q.   During that trip in 2017, did

12   you meet with anyone from the Dechert law

13   firm?

14      A.   No.  I didn't meet anyone in there.

15   The only person I knew from Dechert was Neil.

16   And I didn't meet him in the United States.

17      Q.   (Not translated.)  Well, earlier

18   you indicated you knew David Hughes as well,

19   who was at Dechert; right?

20      A.   David Hughes worked at Stewarts

21   Law before that, before I knew him.

22      Q.   Well, where did he work first,

23   Dechert or Stewarts Law?

24      A.   When I met him, he was working

25   at Stewarts Law.  And I was told that,

1   previously, he had worked at Dechert.

2        Q.   (Not translated.)  Okay.  Now,

3   in paragraph 3 as well, you say the last

4   time you were in the United States was 2019.

5             What were you doing in the U.S.

6   in 2019?

7        A.   I was on a trip in the Yosemite

8   National Park and went up to Canada.  I

9   was with my partner.

10       Q.   You indicate, in paragraph 6,

11  that you are an investigator and you

12  were hired by Stuart Page to, quote:

13            "Run intelligence gathering

14  services."

15            End quote.

16            Do you see that?

17       A.   I'm looking -- looking for it.

18            Yes, I see it.

19       Q.   Are you considered a private

20  investigator?

21       A.   Among other things, yes.

22       Q.   Are you registered as a private

23  investigator here in Israel?

24       A.   I'm registered.  And I have a --

25  the -- a firm certificate.

1       Q.   Are you -- do you have a license

2   to be a private investigator?

3       A.   There are two levels.  I'm --

4   I have a private investigator's license.

5   And I have a license to run an -- an

6   investigating firm.  I don't actually

7   use them here in Israel.

8            But I have those documents

9   from the Justice Department or Ministry.

10  I don't think I've even renewed those

11  licenses.

12      Q.   (Not translated.)  Has your

13  license ever been suspended or revoked

14  by the Government of Israel?

15      A.   Yes.  Yes.  I don't even recall

16  why they suspended it.  But then they

17  reinstated.

18      Q.   And do you recall what year

19  it was suspended?

20      A.   2005 or '6.

21      Q.   And did it relate to your

22  involvement in smuggling someone out

23  of the State of Israel who was wanted

24  by the Israeli Government?

25      A.   I was accused of that.  There

1   was a trial.  I was not found -- I was

2   not convicted.  And so my license was

3   restored.

4       Q.   So that was the reason your

5   license was suspended?

6       A.   I think so.  But I don't

7   recall exactly.

8       Q.   Who was the person you were

9   accused of smuggling?

10          MR. BARET:  Excuse me.  How

11  does that relate to SDC-Gadot Florida,

12  which is the purpose of this deposition?

13          MR. BEHRE:  It's right in

14  his affidavit.  He's claiming he's an

15  investigator.  And I'm probing about

16  his license to be --

17          MR. BARET:  This is --

18          MR. BEHRE:  -- an investigator.

19          MR. BARET:  -- not -- this wasn't

20  for SDC Gadot.  This affidavit was -- was --

21  was provided to the Court as an objection

22  to deposing personally.  It wasn't --

23          MR. BEHRE:  It doesn't matter.

24  It's the same case.

25          MR. BARET:  No, it's not.

```
 1            I mean, there is objection to

 2  his deposition, which the Court has not

 3  ruled yet.  We objected for his deposition.

 4  And since you came from Washington, I'm --

 5  I'm -- I'm sitting quietly and I'm trying

 6  not to interfere.  But it turns out that

 7  you are deposing Amit Forlit as Amit Forlit,

 8  which we objected to this deposition.  And

 9  the Court hasn't ruled yet.

10            And we're here for the purposes

11  of investigating or taking deposition of

12  a representative of SDC-Gadot Florida.

13            MR. BEHRE:  Correct.

14            MR. BARET:  Now, it happens to

15  be Amit Forlit.  But the Court has not

16  ruled as to our objection to depose him

17  personally.  And it turns out that this

18  deposition turns to be taking a deposition

19  in his personal capacity, which we are

20  objecting and -- object to.  So --

21            MR. BEHRE:  In the affidavit,

22  paragraph 5, he specifically references:

23            "SDC-Gadot LLC."

24            In paragraph 6, he says:

25            "I am an investigator."
```

1          MR. BARET:  This is -- this

2     affidavit was provided in our objection

3     to depose him personally.  It wasn't --

4          MR. BEHRE:  I'm -- I'm --

5          MR. BARET:  We never objected to

6     deposition of SDC-Gadot.  We're not objecting

7     to SDC-Gadot.  It's a Florida corporation.

8     He happens to be a representative of that

9     corporation.  And I request that your

10    questioning will be related to SDC-Gadot

11    and not to Amit personally, as the Court

12    hasn't ruled yet as to your right to depose

13    him personally.  If the Court will --

14         MR. BEHRE:  Okay.  I hear your

15    objection.

16         MR. BARET:  -- rules that he can

17    be deposed, then we'll -- we'll come here

18    again.  And you can depose Amit Forlit in

19    his personal capacity.

20    BY MR. BEHRE:

21    Q.  (Not translated.)  Sir, you're

22    aware that the Court ordered you to be

23    deposed in Florida; correct?

24    A.  (In English.)  Yes.

25    Q.  And you know, as a courtesy to

JULY 20, 2022 - AMIT FORLIT
30(B)(6) SDC-GADOT LLC

1  you, we came here; right?

2      A.   First of all, I truly appreciate

3  the fact that you came here.  As far as

4  the deposition is concerned, we submitted

5  an objection, which has not been answered

6  yet.  And like the other people present,

7  we could have done it by Zoom.

8      Q.   But it wouldn't have been as

9  intimate as this is.

10     A.   That's the reason why I'm happy

11 that you came here.

12     Q.   Well, thank you.  I'm glad to

13 be here.

14          Whose idea was it to call the

15 project that's the subject of SDG-Gadot

16 [sic] Project Beech?

17     A.   Stuart Page idea.  [sic]

18     Q.   And Stuart Page uses the term

19 "SIGINT."

20          Did SDC-Gadot use SIGINT?

21     A.   I can -- I can state the various

22 methods that -- that SDC-Gadot used.  But,

23 you know, SIGINT is a -- quite an umbrella

24 term that comes from -- from the field of

25 defense.  And on top of that, Gadot SDC did

```
 1   not use anything.  It operated Gadot Israel.

 2        Q.   (Not translated.)  Well, it did

 3   operate Gadot Israel, didn't it?

 4             Because it facilitated the money

 5   that was owed to Gadot Israel and that money

 6   ran through Florida; right?

 7        A.   (Comment in Hebrew.)

 8             THE INTERPRETER:  (Comment in

 9   Hebrew.)

10             May I?  I'm not sure you got

11   correctly the --

12             THE COURT REPORTER:  No, just --

13             THE INTERPRETER:  -- translation.

14             You -- he said that SDC-Gadot was

15   operating Gadot Israel.

16             MR. BEHRE:  Uh-huh.

17             THE INTERPRETER:  Okay?  Okay.

18             (Pending question translated.)

19             THE WITNESS:  Yes.

20   BY MR. BEHRE:

21        Q.   Did any of the payments that

22   SDC-Gadot received relate to Gadot's

23   use of subcontractors who were located

24   in the United States?

25        A.   Not that I can recall.
```

1      Q.  Did you have any subcontractors

2  in the United States?

3      A.  Not subcontractors.  I had vendors

4  that I paid, not --

5      Q.  And did you have --

6      A.  -- subcontractors.

7      Q.  Did you have vendors located

8  in the United States?

9      A.  I had vendors in the United

10  States.  But they are not connected to

11  the case related to Stuart Page.

12      Q.  When you were drafting the

13  reports that you spoke about earlier

14  today, did you have an e-mail account

15  you shared with Stuart Page's assistant

16  Caroline in which you created the reports?

17      A.  As part of transferring the

18  reports, we had something that was called

19  a DLB, a dead letter box.  The reports

20  were sent through that account.  But I

21  don't recall who drafted them.

22      Q.  But they were drafted by someone

23  under your direction; correct?

24      A.  I would assume that yes.

25          Because part of our expertise

1   was to set the security protocols, because

2   we were experts in cyber-security.  So

3   that was why we did it in this way, why

4   it was decided to do it in this way.

5        Q.   So if I understand the way the

6   dead letter box works is that you share

7   an e-mail account.  And you or someone

8   at your direction writes something in

9   the e-mail.  And then Caroline, on the

10  other side, accesses that same e-mail

11  account, because she knows the password

12  too.  And then Stuart Page gets the report.

13       A.   Basically, yes.  But it's much

14  more complicated than that.  And there's

15  much more security surrounding it.

16       Q.   And why was there so much secrecy

17  and security about these reports?

18       A.   So starting from the beginning

19  of the investigation, one of the greatest

20  concerns of the boss was that Khater

21  Massaad had joined forces with someone

22  else or other people in his family and

23  they wanted to topple him.

24            Throughout the investigation,

25  there were bizarre things that occurred

1   where there was a lack of cooperation

2   with the Emirates, for example, and

3   other authorities.  And after all,

4   the boss is the State.

5           So later we discovered that

6   there were other parties who were harming

7   or trying to harm the investigation and

8   the boss.  And that's why we set up these

9   security protocols.

10       Q.   And part of the objective of

11  your work was to prevent those who you

12  thought was harming RAK from doing harm;

13  right?

14       A.   So from -- the investigation

15  concentrated or focused on the criminal

16  activities carried out by Khater Massaad,

17  both business -- in business and in politics,

18  such as, for example, assisting Hezbollah

19  or violating the sanctions on Iran and

20  he -- and the use -- his use of various

21  infrastructures belonging to RAK, the

22  State, in order to commit these illegal

23  activities, criminal activities.

24           In -- among other things, we

25  provided protection.  And our work included

1   protecting -- creating protocols in order

2   to project -- protect the entire environment.

3   The boss was very, very concerned.  And he --

4   he refused even to talk on the telephone

5   because he was so concerned.

6        Q.   And SDC-Gadot received payments

7   that were, at least in part, for the

8   preparation of those reports; correct?

9        A.   (Translated.)  So SDC-Gadot

10  received payment for the whole Beech

11  case.  And that included the security

12  protocols and --

13            (In English.)  The reports.

14            (Translated.)  -- the reports.

15       Q.   And it also included payments

16  for the work that was reflected in those

17  reports; right?

18       A.   Yes.

19       Q.   Now, as part of your work for

20  which you were paid through SDC-Gadot,

21  you attended two meetings in Cyprus;

22  correct?

23       A.   I held more than two meetings

24  in Cyprus.

25       Q.   Okay.  How many were there?

```
 1        A.   So in this -- I don't recall
 2   how many exactly.
 3             But in this case, I held meetings
 4   about once a month with Stuart and also
 5   sometimes with James and Neil, but must --
 6   much less frequently than with Stuart.
 7   The meetings were held on an as-needed
 8   basis, not on a specific day or month
 9   or something like that.
10             Cyprus was simply a convenient
11   location because they could stop there
12   on their way from Dubai to England.  And
13   for me, it's just a very short flight.
14        Q.   So approximately how many meetings
15   were held in Cyprus involving your work
16   for Stuart Page?
17        A.   I can estimate about five to
18   ten meetings were held with Stuart in
19   Cyprus.
20        Q.   And how many of those were
21   attended by Neil Gerard?
22        A.   I think just one.
23        Q.   How many were held with David
24   Hughes?
25        A.   The same one.
```

 1      Q.   How about with Jamie Buchanan?

 2      A.   I think, with Jamie Buchanan, we

 3 met at least three times over that period

 4 in Cyprus.

 5      Q.   How about Majdi Halabi, how many

 6 times did you meet with him in Cyprus?

 7      A.   Once.

 8      Q.   And did you meet in Cyprus with

 9 at least some of these people on November

10 21st, 2018?

11      A.   There was one meeting --

12           MR. BARET:  What -- what's the

13 date of the -- the meeting you're referring

14 to?

15           MR. BEHRE:  November 21st, 2018.

16           THE INTERPRETER:  So I'll just --

17           "There was one meeting in Cyprus.

18 It was a -- a team meeting that -- and

19 Majdi was present for a short part of it,

20 the part that related to him.  I -- if I --

21 if I could see Majdi's affidavit, I would

22 be able to tell you exactly when it was."

23 BY MR. BEHRE:

24      Q.   So Majdi Halabi's affidavit was

25 accurate on this point?

1        A.   (In English.)  If -- if -- if

2   I can see the -- the affidavit, I can

3   refer to it.  But --

4            (Translated.)  If I could look

5   at it, I could tell you what is accurate

6   and what's not.

7            MR. BEHRE:  Okay.  I think we're

8   at -- why don't we take our break.  It's

9   2:00 o'clock.

10           MR. BARET:  Okay.

11           THE INTERPRETER:  Good idea.

12           THE VIDEOGRAPHER:  Going off the

13  record at 2:00 o'clock.

14           (Recess from 2:00 p.m. to 3:06 p.m.

15       Israel Daylight Time.)

16           THE VIDEOGRAPHER:  Going back on

17  record at 3:06.

18  BY MR. BEHRE:

19       Q.   Okay.  I'd like to go back to

20  something we talked about earlier, which

21  relates to Stuart Page's payments to Gadot.

22           Do you know about how much Stuart

23  Page, through his entities, paid to SDC-Gadot?

24       A.   Yes.

25       Q.   Do you know about how much?

```
 1        A.   We have to go back to the records.
 2   But in terms of the U.S. companies, it was
 3   between two hundred, two hundred and one
 4   per month.  Relating to this specific case.
 5   Because there are other cases as well.
 6        Q.   Okay.  Would it surprise you
 7   if, into your Gadot account at Citibank
 8   in the U.S., the total amount received
 9   from Page Group, Page Group ME, and Page
10   Risk Management totals more than $2.6
11   million?
12        A.   It wouldn't surprise me.  And
13   it is not only for this specific case.
14        Q.   Okay.  How did you first meet
15   Stuart Page?
16        A.   I believe it was in 2008 or
17   2007.
18        Q.   And how did you meet him?
19        A.   I went to London.  And I was
20   requested to do some job for him.
21        Q.   Requested by who?
22        A.   Through a mutual acquaintance
23   for whom I was working at the time.
24        Q.   And who is that mutual
25   acquaintance?
```

1        A.   How is this connected to

2    this case?

3        Q.   It's directly related.  Stuart

4    Page paid you 2 point -- Stuart Page paid

5    you $2.6 million into the U.S. account.

6             And I want to know how it is you

7    first came in contact with Stuart Page.

8        A.   I met him through a mutual

9    acquaintance.  I believe it was Mr. Rafi

10   Pridan.

11             MR. BEHRE:  What's the name?

12             THE INTERPRETER:  Rafi Pridan.

13   Rafi Pridan.

14   BY MR. BEHRE:

15       Q.   And Mr. Pridan's been convicted

16   of hacking, hasn't he?

17       A.   I'm not familiar with this.

18   I don't think so.

19       Q.   He's been charged with hacking,

20   hasn't he?

21       A.   No.  To the best of my knowledge,

22   he was not accused of hacking.

23       Q.   Okay.  And what you -- you said

24   it was 2008 when you first met him?

25       A.   I think so.

1       Q.   When were you first hired for

2  Project Beech?

3       A.   I believe it was March 2015.

4       Q.   So you worked with Stuart Page

5  for approximately seven years before this

6  project; right?

7       A.   Not consistently.  But between

8  2008 and 2015, on and off.

9       Q.   And did your work for Stuart Page,

10  relating to Khater Massaad and the others,

11  such as Farhad Azima, did they go by any

12  other name than Project Beech?

13       A.   I was working only on Khater

14  Massaad, as the subject of my investigation.

15  And it went only under Project Beech.

16       Q.   Was there ever a time when that

17  investigation was also called Project Oak?

18       A.   No.  Project Oak is something else.

19       Q.   Okay.  You testified earlier that

20  you did not have a retainer agreement with

21  Stuart Page; is that correct?

22       A.   To the best of my recollection,

23  there was no retainer agreement.

24            Occasionally, when we had problems

25  with funds transferring with Hong Kong,

1    we would make some arrangements that would

2    pacify the banks.  But to the best of my

3    recollection, there was no organized orderly

4    retainer agreement with him.

5         Q.   What was the purpose for which

6    you were hired?

7         A.   You mean on the Beech Project?

8         Q.   Yes.

9         A.   As I specified earlier, there

10   were concerns and suspicions on the part

11   of the boss that Khater Massaad was stealing,

12   was causing damage to the State, including

13   assistance given to political opponents,

14   including felonies that would embarrass

15   the boss very seriously vis-a-vis the

16   United States, in terms of violations

17   of the sanctions against Iran.

18        Q.   Did your investigation involve

19   at all Karam Al Sadaq?

20        A.   The correct name is Karam Al --

21   Karam --

22             THE INTERPRETER:  Karam Al --

23             THE WITNESS:  -- Al Sadeq.

24             THE INTERPRETER:  -- Sadeq.

25             THE WITNESS:  Karam.  Karam.

 1              THE INTERPRETER:  Karam Al --

 2    Karama?

 3              THE WITNESS:  Karam.

 4              THE INTERPRETER:  Karam Sadeq.

 5              THE WITNESS:  "Kaf," "aleph,"

 6    "mem" -- "resh," "mem."

 7              THE INTERPRETER:  Karam Sadeq.

 8              THE WITNESS:  Karam Al Sadeq.

 9              THE INTERPRETER:  Karam Al Sadeq.

10              THE WITNESS:  I also speak Arabic.

11              When we launched our investigation,

12    Karam was already arrested by the authorities

13    of RAK.  And we did -- we did get feedback

14    from -- concerning him from the investigation.

15    He had already been investigated by RAK, among

16    other things, concerning offshore companies

17    that he had.

18    BY MR. BEHRE:

19        Q.   The allegations against Al Sadeq

20    were similar to the allegations against

21    Massaad; right?  They were related?

22        A.   Not -- not exactly.

23              To the best of my recollection,

24    Sadeq assisted in creating the infrastructure

25    for Massaad's activity.  But the -- the

1    initiator was Massaad.

2         Q.   Were you present for any of the

3    interrogations of Al Sadaq?

4         A.   No.  And I've never been to Ras

5    Al Khaimah.

6         Q.   And how long did you work on

7    Project Beech for for which payments were

8    received by SDC-Gadot?

9         A.   I estimate that it was from the

10   beginning of 2018 and up to April 2020.

11        Q.   Right before we went to lunch,

12   we talked about a meeting that you recalled

13   in Cyprus.

14             Do you remember that discussion?

15        A.   Yes.

16        Q.   And that was on November 21st,

17   2018?

18        A.   (Translated.)  I have to see

19   the affidavit of Majdi Halabi in order

20   to remember --

21             (In English.)  The exact date.

22             (Translated.)  -- the exact date.

23        Q.   Well, wouldn't your travel records

24   show?

25        A.   Yes.  But I don't have them with

1    me right here.

2          Q.   Well, I'm -- I'm confused.

3               Because I thought you didn't --

4    you thought Mr. Halabi wasn't telling the

5    truth.

6               But you want to read his witness

7    statement to find out what the truth is?

8          A.   Mr. Halabi stated in -- two

9    meetings in his affidavit.  One of them

10   was not held.  If I see -- if I -- if

11   I see his affidavit, I will see in which

12   meeting -- to which meeting he relates

13   where Mr. Hughes was present.  And that

14   is the meeting that did take place indeed.

15   But I need to see the affidavit in order

16   to -- to ascertain that.

17         Q.   Well, putting aside the precise

18   day, was it November 2018?

19         A.   Once again, I think so.

20         Q.   Okay.  And that was the meeting

21   where Hughes was present, Gerard was

22   present, Buchanan was present; right?

23         A.   Yes.

24         Q.   And Halabi was present?

25         A.   In part of it.  And Stuart

1  also.

2       Q.   And Stuart Page.

3            What was discussed at that

4  meeting, if you recall?

5       A.   It was a coordination meeting

6  concerning the management of the case.

7  One of the subjects was the fact that

8  in the procedure -- or the proceedings --

9            THE INTERPRETER:  Sorry.

10           THE WITNESS:  -- involving

11  Farhad Azima, Stuart was requested to

12  tell who was it that divulged to him

13  the existence of the leaked materials.

14           Since the -- there was a fear

15  on the part of the client to divulge that

16  an Israeli firm was working for him and

17  that it would be mis-used by his political

18  opponents, we decided that Majdi Halabi,

19  who was working on the case, is the one

20  who will say that he is the one who told

21  Stuart about the leaked information or

22  the leaked files, leaked materials.

23           And I'd like to clarify that,

24  to this day, we do not know who it was

25  who had reported to Stuart the existence

1  of those leaked documents.

2  BY MR. BEHRE:

3       Q.   So when you attended that

4  meeting in Cyprus in November 2018,

5  you were paid by Page -- one of Page's

6  entities to SDC-Gadot; right?

7       A.   As I said before, the payment

8  was made for the entire activity on

9  this case, among other things for that

10  specific meeting.

11      Q.   And that specific meeting

12  concerned Farhad Azima; correct?

13      A.   This was -- this related

14  to a legal proceedings that the client

15  had requested us to refer to, legal

16  proceedings bearing on or touching

17  Farhad Azima.

18      Q.   So you were paid to attend

19  the meeting in Cyprus that concerned

20  Farhad Azima; correct?

21      A.   Yes.

22      Q.   Who ran that meeting in Cyprus?

23      A.   I think it was Neil.

24      Q.   You ran the meeting?

25      A.   (Comment in Hebrew.)

```
 1              THE INTERPRETER:  (Comment in
 2  Hebrew.)
 3              MR. BARET:  He said "Neil."
 4              THE INTERPRETER:  (Comment in
 5  Hebrew.)
 6              MR. BARET:  "Neil."
 7              THE INTERPRETER:  "Neil."  "Neil."
 8              MR. BEHRE:  Oh.  I'm sorry.  I
 9  thought it was "me."
10              THE INTERPRETER:  Sorry.  "Neil."
11              MR. BARET:  No.  "Neil."
12              MR. BEHRE:  "Neil."
13              THE INTERPRETER:  No.  "Neil."
14  BY MR. BEHRE:
15      Q.   Okay.  So Neil Gerard ran the
16  meeting?
17              Apologies.
18      A.   "Kin."
19      Q.   And how many -- where did the
20  meeting occur?
21      A.   In a conference room of this
22  type in one of the hotels there.  But
23  I do not -- don't recall specifically
24  which.
25      Q.   How long did the meeting last?
```

1        A.    I estimate about two hours.

2        Q.    Did you stay -- did anybody

3   stay overnight?

4        A.    Not that I know of.

5        Q.    What did Neil Gerard say the

6   purpose of the meeting was?

7        A.    The -- the purpose was the --

8   the coordination of the management of

9   this case generally.  And one of the

10  specific subjects was the preparation

11  by Stuart for his testimony in the

12  trial.

13       Q.    And by the "management of

14  this case generally," you're referring

15  to the lawsuit involving Farhad Azima

16  and Rakia?

17       A.    One of the subjects was that.

18       Q.    You also attended a meeting in

19  Switzerland; correct?

20       A.    Yes.

21       Q.    Do you recall when that was?

22       A.    I believe it was the end of 2019.

23       Q.    Was it in December 2019?

24       A.    I believe so.

25       Q.    Was it at the Hotel Moosegg?

```
 1       A.   Yes.

 2       Q.   And who was responsible for

 3  booking that hotel and for security

 4  arrangements for all the parties to

 5  get there?

 6       A.   Stuart had asked me to organize

 7  a meeting under the seal of secrecy that

 8  would be secured and secluded.

 9            At first I suggested to him

10  to hold it in Israel because, in Israel,

11  it's the easiest for me to arrange the

12  security.  Then he asked it to be in

13  Switzerland.  So I'm the one who reserved

14  the hotel.  I also booked security personnel,

15  cars, vehicles that would drive the people,

16  and all that on Stuart's request.

17       Q.   And were all those expenses

18  billed through and paid from Page to

19  SDC-Gadot?

20       A.   I assume so.  Yes.

21       Q.   How long did that meeting at

22  the Swiss hotel last?

23       A.   Two or three days.

24       Q.   And you rented out the entire

25  hotel for those two or three days; right?
```

1       A.   It was a hotel that was not

2   active during the week.  It was only

3   active on weekends.  So there -- that

4   is why it was convenient to -- to book

5   it for our purpose.  And it was easy

6   to -- to arrange the security arrangements.

7       Q.   And during your stay there, you

8   had a private chef and a private wine cellar

9   to use; right?

10      A.   I -- I believe it is a slightly

11  exaggerated or overrated description.

12           Someone was cooking for us.  And

13  I personally don't consume alcohol at all,

14  whatsoever.  But with the meals, there was

15  also alcohol served.

16      Q.   Well, Mr. Gerard likes his wine;

17  right?

18      A.   Mr. Stuart likes the honey that

19  he took from the hotel.  Each one has his

20  own likings.

21      Q.   What was the purpose of the

22  meeting?

23      A.   As far as I'm concerned, the

24  purpose was another coordination meeting

25  in the management of this case.

1           The atmosphere in the meeting

2    was, of course, more homely [sic], more

3    pleasant.  And he asked the people who

4    had submitted affidavits to do some sort

5    of rehearsal for the trial.

6           As I personally was no party

7    to this trial, in the parts that related

8    specifically to the trial, I practically

9    did not participate.

10        Q.   And the rehearsal of -- the

11   rehearsal of the trial testimony concerned

12   Mr. Page and Mr. Halabi; correct?

13        A.   Yes.  Correct.

14        Q.   And Mr. Gerard too, because

15   he was going to testify at the trial;

16   right?

17        A.   I would assume so.  I'm not

18   really very well-versed in, you know,

19   what was -- had to do with the running

20   of the trial.  I wasn't a party to it --

21   to that case.

22           So -- but yes, I would assume

23   that Gerard also was to give testimony

24   at that trial.

25        Q.   And you instructed everybody

1   that attended the meeting to leave their

2   phone home or to turn it off when they

3   were at the location so their location

4   device on the phone would not work; right?

5        A.   No.  I had my phone.  Majdi had

6   his phone.  The -- the security team had

7   theirs.  Nobody gave those instructions.

8        Q.   (Not translated.)  So what was

9   the purpose of the -- of a security team?

10       A.   At that stage, so the -- at that

11  time, the boss was extremely concerned that

12  somebody was trying to topple him or that

13  he was going to be toppled.  And he asked

14  Stuart -- because I got my instruction from

15  Stuart.  He asked Stuart -- he insisted that

16  there be the most stringent security measures

17  possible taken.

18       Q.   But as I understand what you're

19  saying, there were bodyguards who you hired

20  to guard the hotel.

21            Am I right?

22       A.   Yes.  The -- the -- the bodyguards'

23  job was to stand outside and to keep a lookout

24  to see if there were any surveillance teams

25  surveilling the hotel.  They -- they didn't

1    personally guard people inside.

2         Q.   Okay.

3         A.   And -- and some of the time, I

4    actually let them go eat and I took over

5    for them.

6         Q.   Were you present when Mr. Halabi

7    was rehearsing his testimony?

8         A.   I don't recall.  It's possible

9    for part of the time.  But I -- I don't

10   recall specifically.

11        Q.   You're the one that asked Halabi

12   to be involved in the case; isn't it true?

13        A.   Halabi was involved in this case

14   long before 2018 or '19 or whenever it was.

15   Halabi, in fact, covered very large parts

16   of areas in the Gulf and Saudi Arabia.

17   And he was well-versed in the details of

18   the case.

19             It might have been me or perhaps

20   it was him who suggested this minor detail

21   that the leaked information was on the

22   Internet.

23        Q.   And you say that's a minor detail.

24             But that was a big issue in the

25   case, wasn't it?

```
 1        A.   I'm not a legal expert.  And I

 2   didn't follow all the details of the case,

 3   because that's not my job.  I consider it

 4   a minor detail.

 5        Q.   Well, you're aware, aren't you,

 6   that by the time that meeting was held

 7   in Switzerland, Farhad Azima had already

 8   sued Rakia, the boss, for hacking him in

 9   the United States; right?

10        A.   I don't -- I have no information

11   regarding who hacked into Farhad Azima's

12   computers.  But I do know that, in wake

13   of the trial in the U.K., it was decided

14   that the boss -- he was right, that he --

15   yeah, that he was right.

16        Q.   The boss was right about what?

17        A.   He won the trial in England,

18   his suit against Farhad Azima.

19        Q.   But you're aware now that two

20   of the witnesses who testified at the

21   trial admitted they committed perjury

22   and that the plot to commit that perjury

23   occurred at that Swiss hotel that you

24   set up?

25             Are you aware of that?
```

1      A.   I was not part of the trial.

2   I was asked -- I was asked to organize

3   the meeting and be in charge of security.

4   And I understand that there's a trial now

5   regarding the liability of the person who

6   did what he said he did.

7      Q.   But you're aware that two of the

8   people that attended that meeting, under

9   high security in Switzerland, Mr. Page and

10  Mr. Halabi, have now confessed to committing

11  perjury and have said they learned their

12  perjury in Switzerland and the headmaster

13  of that perjury school was Neil Gerard?

14          That's what they both say; right?

15     A.   I cannot relate to the content

16  of the conversations between Neil Gerard,

17  Stuart Page, and Majdi Halabi, because

18  I was not a part of those conversations.

19          What I can say -- what I can

20  say is that, upon reading the new affidavits

21  from Majdi Halabi and Stuart Page, I identify

22  certain statements that are not true.

23     Q.   And you're aware that Stuart Page

24  specifically says he hired you to hack; right?

25          That's what he says.

1      A.   And that's one of the parts that

2  are lies.

3            (Exhibit 4 marked.)

4  BY MR. BEHRE:

5      Q.   I'd like to next show you what

6  we've marked as Exhibit No. 4.  It's the

7  Citibank bank statements --

8      A.   (Comment in Hebrew.)

9      Q.   -- the first one being an account

10 statement for October 2017, the last statement

11 being an account statement for June 2021.

12           And they have a Bates number, so

13 a number at the bottom right-hand corner,

14 that starts with the last five digits 00044

15 through 00147.

16     A.   Okay.  (Examining.)

17           MR. BEHRE:  And apologies if my

18 sentences are too long.

19           THE INTERPRETER:  No, it's fine.

20 I have it --

21           MR. BEHRE:  You should --

22           THE INTERPRETER:  -- in front --

23           MR. BEHRE:  -- both feel free --

24           THE INTERPRETER:  -- of me.

25           MR. BEHRE:  -- to stop me.

1          THE INTERPRETER:  It's -- no, you're

2     fine.

3          MR. BEHRE:  Okay.

4          THE INTERPRETER:  You can go on as

5     long as you like.  We have it right in front

6     of us.  So --

7          MR. BEHRE:  Okay.

8          THE INTERPRETER:  -- we have the

9     true notes, the realtime, or whatever it's

10    called.

11    BY MR. BEHRE:

12       Q.   (Not translated.)  Are -- and --

13    and I -- I don't know if I said the obvious.

14          But these are SDC-Gadot LLC's

15    bank records; correct?

16       A.   I thank you, first of all, for

17    bringing it to me, because I didn't have

18    it.

19          (Pending question translated.)

20          THE WITNESS:  Yes, yes.  That's

21    correct.

22    BY MR. BEHRE:

23       Q.   And it appears that the account

24    was opened, from the first page that's

25    Bates number 44, on October 30th, 2017,

1   with a deposit of a thousand dollars;

2   right?

3        A.   Yes.  That's at the opening

4   of the account.

5        Q.   And you testified earlier

6   that you opened this account in person

7   in Florida; correct?

8        A.   Yes.

9        Q.   And when you opened the account,

10  what did you represent to Citibank the

11  business of SDC-Gadot was?

12       A.   I do not recall.

13       Q.   Did you fill out an application

14  form that you recall?

15       A.   I assume that I did.  But I do

16  not recall.

17       Q.   I'd like to turn your attention

18  to page 48.  And, again, the numbers are

19  in the lower right-hand corner.  It's the

20  bank statement for the period of December

21  1st through December 31st, 2017.

22            It should be five pages in.

23       A.   (Comment in Hebrew.)

24            (In English.)  Yes.

25            (Translated.)  Okay.  Yes.

```
 1        Q.   And you see on December 20th,

 2   2017, a credit for $5,000, which was a

 3   wire from Insight Analysis and Research;

 4   right?

 5        A.   Yes.

 6        Q.   And then two pages later, on

 7   page 50, there's $45,000 wired again by

 8   Insight Analysis.

 9             Do you see that?

10        A.   (In English.)  Yes.

11             (Translated.)  Yes.

12        Q.   And Insight Analysis is your

13   other Florida-based LLC; correct?

14        A.   Yes.

15        Q.   (Not translated.)  And now going

16   to page 52, which is the statement for

17   February 2018, you'll see another deposit,

18   this time for $111,950.  And it's a wire

19   from Page Group ME.

20             Do you see that?

21        A.   "Kin."

22             (In English.)  Yes.

23        Q.   And that's a payment from Mr. Page,

24   who hired you for Project Beech; correct?

25        A.   (Translated.)  Yes.
```

```
 1              (In English.)  I suppose so.

 2              (Translated.)  I suppose so.  But

 3   I'm not -- I'm not sure.  Because there were

 4   other projects.  Mr. Page paid me for other

 5   projects other than Beech.  So I'd have to

 6   check to make sure.

 7       Q.   And your invoices would indicate

 8   if it was Project Beech; correct?

 9       A.   (In English.)  Yes.

10              (Translated.)  Yes.

11       Q.   And you indicated you reviewed

12   some invoices to prepare for your testimony

13   today.

14              Did those invoices say "Project

15   Beech" on them?

16       A.   Yes.  But I don't have them here.

17   I can bring them tomorrow.

18       Q.   (Translated.)  Okay.  Would you

19   do that, please?

20              (Not translated.)  And if you

21   look on the same page, that's page 52,

22   on February 6 and February 13, just about

23   a week apart, there were two transfers,

24   one for 49,000 and one for 50,000, to

25   Fusion GPS.
```

```
 1              Do you see that?

 2    A.    "Kin."

 3              (In English.)  Yes.

 4              (Last question partially

 5         translated.)

 6              THE INTERPRETER:  "Yes."

 7    BY MR. BEHRE:

 8    Q.    And Fusion GPS is an

 9    investigative firm; is that correct?

10    A.    Yes.  But there's no connection

11    whatsoever to Stuart Page or Project Beech.

12    Q.    And Fusion GPS was a subcontractor

13    to SDC-Gadot; correct?

14    A.    No.  They did not do any work for

15    SDC-Gadot.  But they -- they received payment

16    for something else.

17    Q.    (Partially translated.)  Well, SD --

18    let me -- let me rephrase it.

19              SDC-Gadot paid Fusion GPS $99,000

20    in February of 2018; right?

21              THE INTERPRETER:  2018?  2018.

22              MR. BEHRE:  Yes.

23              (Remainder of pending question

24         translated.)

25              THE WITNESS:  Yes.
```

1  BY MR. BEHRE:

2       Q.   And what were they paid for?

3       A.   I don't recall what the payment

4  was for.  But I can say that Fusion GPS

5  had no connection to Stuart Page or

6  Project Beech.

7       Q.   But if you can't recall what

8  it was for, how could you be sure?

9       A.   Because I know that Fusion had

10  nothing to do with this case.

11       Q.   If you turn the page, on page 53,

12  you'll see that Fusion gets another 50,000

13  on February 15, another 50,000 on February

14  20, and another 50,000 on February 27.

15            Do you see that?

16       A.   Yes.

17       Q.   And so --

18       A.   Same answer.

19       Q.   So for the month of February,

20  Fusion GPS was paid 250 --

21            (Brief telephone interruption.)

22  BY MR. BEHRE:

23       Q.   -- $250,000 by SDC-Gadot; right?

24       A.   That's correct.

25       Q.   And did the payments to Fusion

```
 1   GPS relate to anything you were doing

 2   for Stuart Page?

 3       A.   Under no circumstances.  Not

 4   at all.

 5       Q.   Well, earlier today you said

 6   this account was opened simply because

 7   Stuart Page had trouble transmitting

 8   funds to you; right?

 9       A.   That's correct.

10       Q.   (Partially translated.)  And

11   the other entry on page 53 is a $275,000

12   credit, a wire from Insight, your other

13   Florida entity, to this Gadot account;

14   right?

15            THE INTERPRETER:  Two hundred

16   and seventy-five, you said; right?

17            MR. BEHRE:  Yes.

18            (Remainder of pending question

19       translated.)

20            THE WITNESS:  Yes.  That's

21   correct.

22   BY MR. BEHRE:

23       Q.   (Partially translated.)  There's

24   a $47,000 payment on February 22nd, a wire

25   to an Olam Hamachshevim.
```

```
 1              Who is that?

 2              THE INTERPRETER:  Did I get that

 3   right, Olam Hamachshevim?

 4              THE WITNESS:  "Kin."  Olam

 5   Hamachshevim.

 6              (Remainder of pending question

 7      translated.)

 8              THE WITNESS:  (Translated.)  It's

 9   a vendor who supplied me with equipment.

10   Again, it has nothing to do with --

11              (In English.)  Stuart Page.

12              (Translated.)  -- Stuart Page.

13   BY MR. BEHRE:

14      Q.  So it's your testimony that Olam

15   [sic] sold you equipment?

16      A.  Yeah.  It's a computer store, Olam

17   Hamachshevim.

18              THE INTERPRETER:  That -- interpreter's

19   note.  That means "computer world" in -- in

20   Hebrew.

21              "So yeah, I -- I guess it must

22   have been for equipment."

23   BY MR. BEHRE:

24      Q.  (Partially translated.)  And your

25   contact point at Fusion GPS was Glenn Simpson;
```

1    right?

2            THE INTERPRETER:  What was his name

3    again?

4            THE COURT REPORTER:  Glenn.  Glenn.

5            THE WITNESS:  Glenn.

6            MR. BEHRE:  Glenn Simpson.

7            (Remainder of pending question

8        translated.)

9            THE WITNESS:  Not only.  But yes,

10   him too.

11   BY MR. BEHRE:

12       Q.  And the other one was Peter French;

13   right?

14       A.  Yes.  Peter French too.

15       Q.  (Not translated.)  Directing

16   your attention to 54.  That's the SDC-Gadot

17   statement for March 2018.

18           There is a -- there's a wire on

19   March 1st for $30,000 to Aviram Hawk, which

20   is Aviram Azari's company; correct?

21           THE INTERPRETER:  Whose company?

22           THE COURT REPORTER:  Aviram's.

23           MR. BEHRE:  Aviram Azari.

24           THE INTERPRETER:  Azari.

25           (Pending question translated.)

1              THE WITNESS:  Yes.  That's

2  correct.

3  BY MR. BEHRE:

4       Q.   And Mr. Azari recently pled

5  guilty in Federal Court in New York to

6  hacking, didn't he?

7       A.   Yes.  He confessed to seven

8  separate incidents of computer hacking

9  in New York.

10       Q.   And the document in which he

11  pled guilty references an Israeli company.

12  But they don't name that company.

13              Was that company yours?

14       A.   No.

15       Q.   How do you know that?

16       A.   Because I've never commissioned

17  hacking and have never paid for hacking.

18       Q.   You're aware that Mr. Azari is

19  cooperating with Federal law enforcement

20  officials in the U.S.; correct?

21       A.   I wish him all the best.

22       Q.   Have you been contacted by those

23  prosecutors about this case?

24              MR. BARET:  It's not related to

25  SDC-Gadot.  You don't have to answer that.

1                THE WITNESS:  This has nothing

2      to do with this case or with Stuart.

3      BY MR. BEHRE:

4          Q.   Well, I beg to differ.

5                The SDC-Gadot bank statement,

6      which is directly related to this case,

7      has a wire out to a man who's confessed

8      to and now convicted of hacking.  This

9      case is all about hacking.  And I'm asking

10     the witness about his relationship with

11     the hacker.

12               MR. BARET:  You can ask about

13     the transaction, why it was paid.  And he

14     can confess to a -- confess to a murder.

15     I mean, it doesn't mean that it's got

16     anything to do with SDC-Gadot.

17               MR. BEHRE:  I am entitled to

18     explore it.  If you want to instruct him

19     not to answer, then we'll have to just

20     raise this issue too.  It's up to you.

21               MR. BARET:  I mean --

22               THE WITNESS:  I -- I have answered

23     that this has nothing to do with this case.

24     And Aviram Azari did other jobs, other than

25     hacking, that he was paid for.

1          "Rega."

2          THE INTERPRETER:  No.

3          THE WITNESS:  The prosecutors,

4    in the case of Aviram Azari, have never

5    contacted me or asked me for any information.

6    BY MR. BEHRE:

7          Q.   What work did Azari do for you,

8    if it wasn't hacking?

9          A.   For me he never did any work.

10         Q.   Yet he was paid $55,000 on March

11   1st and March 12, 2018.

12         A.   He did work for Gadot.  And

13   that work included economic investigations

14   or financial investigations.

15         Q.   And by --

16         THE INTERPRETER:  "Financial

17   investigations" or "economic."

18   BY MR. BEHRE:

19         Q.   And by "financial investigations,"

20   does that mean obtaining confidential

21   banking and financial records about

22   individuals who were being investigated?

23         A.   The investigations that Azari

24   did for me had nothing to do with Project

25   Beech or anything to do with Stuart at all.

1    And I asked him that any investigations he

2    did to me -- for me be done in accordance

3    with the law.

4        Q.   Why did you find it necessary to

5    tell him to act lawfully?

6        A.   I say that to every one of my

7    subcontractors.

8        Q.   If you look on the same page,

9    that's page 54, there are two entries on

10   March 15th, 2018, where you received wires.

11   And one of them -- the first one is from

12   Florida AP [sic] Telecom, Inc.

13            Do you see that?

14            It's $100,000 that came in from

15   a Florida entity; correct?

16       A.   This is -- this is a -- a different

17   customer.  It has nothing to do with Page

18   or any of this case.

19            And I can add that the investigation,

20   in this particular instance, was in South

21   America and has nothing to do with what's

22   going on.

23       Q.   In your affidavit that you

24   submitted in this case in Florida, you

25   indicated that you didn't transact business

1    in Florida.  And yet we have a transaction

2    where you received $100,000 from a Florida

3    company.

4              What business did you transact

5    with this Florida company?

6         A.   I did not transact any business

7    in Florida, as I said earlier.  And this

8    payment is for work that was done in South

9    America.

10        Q.   With a Florida company; right?

11        A.   The payment, as I see here,

12   came from Florida.  But again -- once

13   again, this has nothing whatsoever to

14   do with Stuart Page or Project Beech.

15        Q.   And if you go to the next page,

16   page 55, here's another wire from Florida

17   IP Telecom on March 16th for $200,000.

18             Do you see that?

19        A.   Yes.

20        Q.   (Partially translated.)  And

21   Florida IP Telecom is owned by Fernando

22   Alonzo Paredes; right?

23             THE INTERPRETER:  Could you

24   repeat the name?  Fernando?

25             MR. BEHRE:  Fernando Alonzo

1   Paredes, P-a-r-e-d-e-s.

2           (Remainder of pending question

3       translated.)

4           THE WITNESS:  That may be

5   correct.

6   BY MR. BEHRE:

7       Q.   (Partially translated.)  And

8   he also owns a company called Overseas

9   Consulting Limited, LLP, another Florida

10  company; correct?

11          THE INTERPRETER:  Could you

12  repeat the name of the company?

13          MR. BEHRE:  Overseas Consulting

14  Limited, LLP.

15          (Remainder of pending question

16      translated.)

17          THE WITNESS:  I have no idea.

18  I don't know the person.  I have no way

19  of confirming or denying that.

20  BY MR. BEHRE:

21      Q.   Well, if you look on March 23rd,

22  on page 55, you received $350,000 from

23  Overseas Consulting Limited, LLP; correct?

24      A.   There's no connection whatsoever

25  between these wires and Stuart Page.  And

1   I -- I can't answer beyond saying that

2   this has nothing to do with Project Beech,

3   Farhad Azima, or Stuart Page.

4        Q.   So in the month of March 2018,

5   you received $650,000 from Florida

6   companies; correct?

7        A.   This work was not executed

8   in Florida.  The customer is not a U.S.

9   citizen.  And apparently part of the

10   payment for this work was transferred

11   through an American -- through American

12   companies.

13        Q.   But are you aware that Overseas

14   Consulting Limited, LLP, is a Florida

15   corporation?

16        A.   It's not something I checked

17   then.  I believe you.

18        Q.   And then on that same page,

19   page 55, on March 19th and March 20th,

20   there are wires out to Gadot Information

21   Services, which, as I understand it, is

22   the Gadot entity here in Israel; correct?

23        A.   Correct.

24        Q.   And does it sound about right

25   that, between March 2018 and February 20 --

1   2021, in this bank account alone, you

2   transferred from the Citibank account

3   for Gadot SDC more than 2.5 million to

4   Gadot Information Services here in Israel?

5        A.   I didn't add it up.  But that

6   sounds about right.

7        Q.   And would it surprise you if

8   I said that the payments to Fusion GPS,

9   between just February 2018 and July 2018,

10   total more than $1.2 million?

11        A.   I do not understand the connection

12   between Page, the Beech Project, Azima,

13   and Fusion.

14        Q.   (Not translated.)  I'm just

15   asking you:  Does it surprise you that,

16   from February 2018 through July 2018,

17   there were payments from the SDC-Gadot

18   Citibank account with a Miami, Florida

19   address to Fusion, exceeding $1.2 million?

20        A.   My answer is that I'm not surprised.

21        Q.   Okay.  What is BM -- BMI Analysis

22   Limited?

23        A.   I don't remember.  It could be

24   one of the vendors or one of the customers.

25             Is it someone on the receiving

1    end?  On the paying end?

2              (Comment in Hebrew.)

3         Q.   If you look at March 30th.

4         A.   I'm looking for it.

5         Q.   March 30th.

6         A.   (In English.)  CBOL to BMI.  Aah.

7              (Translated.)  I paid.  So I guess

8    it's one of our vendors.

9         Q.   And it's true, isn't it, that BMI

10   Analysis Limited was also working on Project

11   Beech?

12        A.   I do not recall.

13        Q.   Okay.  Now let's go to April

14   2018, page number 56.

15        A.   Going backwards?

16        Q.   And you'll see that there are

17   five payments for $50,000 each to Fusion.

18   And there are several wires out to Gadot

19   Information Services for $50,000.

20              Why --

21        A.   Citibank restricted the amounts

22   of the transfers I could make to $50,000

23   each.  And that is why we divided payments

24   into several $50,000 payments.

25        Q.   And why did Citibank impose that

```
 1    restriction?

 2         A.   You have to ask them.

 3         Q.   Did it -- was it always that way?

 4    Or did they restrict you after you opened

 5    the account?

 6         A.   No.  It was from the start.

 7         Q.   And in April of 2018, there were

 8    several more wires out from SDC-Gadot to

 9    Gadot Information Services here in Israel;

10    right?

11         A.   Correct.

12         Q.   (Partially translated.)  Throughout

13    these bank records, there are debit card

14    purchases for iPostal1.

15              What are those?

16              THE INTERPRETER:  What's the name

17    again?

18              MR. BEHRE:  IPostal1.

19              (Remainder of pending question

20         translated.)

21              THE WITNESS:  (Comment in Hebrew.)

22              (In English.)  Which date?

23              (Translated.)  Which -- which line?

24    Which date?

25    //
```

1  BY MR. BEHRE:

2      Q.   It is March 17th -- April.  I'm

3  sorry.

4      A.   (Comment in Hebrew.)

5           THE INTERPRETER:  "Kin."

6           MR. BARET:  April 20th.

7  BY MR. BEHRE:

8      Q.   And April 20th too.  And April

9  24th too.

10          MR. BARET:  It's like $10.  9.99.

11          You see it?

12          THE WITNESS:  (In English.)  It

13 might be Apple Music or whatever, I think.

14          (Comment in Hebrew.)

15 BY MR. BEHRE:

16     Q.   Well, could it be --

17          THE INTERPRETER:  "I don't remember."

18 BY MR. BEHRE:

19     Q.   (Not translated.)  Could it be an

20 electronic mailbox where you kept messages?

21     A.   (In English.)  No.

22          (Translated.)  First of all, you

23 don't pay for electronic mail.  But I don't

24 remember.

25     Q.   Okay.  Let's go to pages 60, 61,

```
 1   62.  That's for May 2018.

 2        A.  Yes.

 3        Q.  And you'll see more wires to BMI

 4   Analysis Limited.

 5             Do you see that on May 1?

 6        A.  (In English.)  Okay.

 7             (Translated.)  Okay.

 8        Q.  And there are numerous wires

 9   out to your Gadot entity here in Israel,

10   starting on May the 2nd.

11             Do you see that?

12        A.  Yes.

13        Q.  (Partially translated.)  And

14   you'll see, on May 21st, Page Group ME

15   sends you $187,000 -- 187,450?

16             THE INTERPRETER:  180,000?

17             THE WITNESS:  Yes.  But I do

18   not know if this is on account of the

19   Beech Project or other projects.

20   BY MR. BEHRE:

21        Q.  And would the invoices tell

22   you whether it's Project Beech?

23        A.  I assume so.  Yes.

24        Q.  And do you have that invoice?

25        A.  As I said before, I will bring
```

1    them tomorrow.

2         Q.   Because you would need to retain

3    those invoices for your tax purposes; right?

4         A.   The invoices in Israel, I do

5    have to preserve them.  The invoices for

6    the United States, I have to preserve them

7    only for two years.

8         Q.   And, finally, on page 62, you'll

9    see there are three more wires to Fusion

10   GPS, 50,000 each time, three.

11              So $150,000 between May 29th

12   and May 31st; right?

13        A.   Yes.  Correct.

14        Q.   Moving to June 2018, pages 64

15   and 65, two large wires coming in from

16   Florida companies, one on June 14th

17   for $100,000 and one on June 15th for

18   $350,000.

19              Do you see those entries?

20        A.   Yes, I see.

21        Q.   And then, on the next page,

22   page 65, four more payments to Fusion

23   GPS, 50,000 each, plus the one on the

24   prior page on June the 5th, totaling

25   $250,000 wired to Fusion GPS in June

1   of 2018; correct?

2        A.   Yes.

3        Q.   Going to July 2018, pages 66,

4   67, 68, you'll see numerous wires out

5   to Gadot Information Services.  I haven't

6   totaled them all up.  But it looks to be

7   five, six, or seven of those.

8             Do you see those, starting on

9   May -- on July 9?  I'm sorry.  Starting

10  on July 2nd?

11       A.   Yes, I see.

12       Q.   And so that's in July 2018 alone,

13  almost a half a million dollars wired out

14  of the SDC -- SDC-Gadot account to --

15            THE INTERPRETER:  Sorry.

16  BY MR. BEHRE:

17       Q.   So my question is:  You went

18  through all this trouble to open the

19  SDC-Gadot LLC account with Citibank.

20  And yet you appear to be moving money

21  just about as fast as you get it out

22  to the Israeli entity.

23            Why?

24       A.   Most of the work was carried

25  out by Gadot Israel.  And as I explained

1   before, these accounts in the United

2   States were opened merely for convenience's

3   sake, which proved itself over time.

4        As I can see now, in July, there's

5   a lot of activity that is not connected to

6   Page at all, to Stuart Page.

7        Q.   Let's look at August, then.

8        Let's go to page 70 and 71.

9        On August 8, Stuart Page wires

10  you $276,950; right?

11       A.   Yes.  I do see it.

12       Q.   And that month, there were nine

13  wires out to Gadot.

14       A.   As I explained before, the bank

15  restricted us to $50,000 transfers.  That

16  accounts for the numerous transfers.  If

17  we could make a bigger transfer, we would

18  have been -- we would have made it a larger

19  transfer.

20       Q.   So looking at the second entry,

21  on August 1st, 2018, it says:

22       "Wire to SDC-Gadot."

23       "$50,000."

24       Did SDC-Gadot LLC have another

25  account besides Citibank?

```
 1        A.   As I've explained before, we had

 2   tried to open an account in Chase Manhattan.

 3   We opened actually.  We didn't try.  We

 4   opened.  And I'm guessing that this transfer

 5   was in that direction.  But -- and I don't

 6   even recall why we hardly used that account

 7   at all.

 8        Q.   And if you look at the wires on

 9   August 2nd, August 8, August 9, August 13,

10   again on August 13, August 20, August 21,

11   August 22, they all go to SDC-Gadot.

12        A.   I can only say, again, ask for

13   a subpoena to Chase Manhattan.  And we'll

14   be able to see what happened there.

15        Q.   Is the Chase Manhattan account

16   still open?

17        A.   No.

18             And I do not have the capacity

19   to see things myself because it is no

20   longer open.

21        Q.   When was that account closed?

22        A.   Quite quickly -- quite quickly,

23   I believe.  I do not recall exactly.  But

24   I'm going to consult, of course, with --

25   with my attorney.  But I believe I can
```

1   give you permission to go into there and

2   check the account.

3        Q.   And is the reason why, in this

4   particular month, you attempted to move --

5   make nine wires to the Chase Manhattan

6   account, is the reason because Citibank

7   had been starting to give you difficulties

8   regarding your account there with Citibank?

9        A.   Citibank had never caused any

10  difficulty to me in my account, with the

11  exception of that restriction to transfers

12  of $50,000.  And that is why I, in fact,

13  opened the account in Chase Manhattan,

14  because this was a way of trying to

15  circumvent that restriction of $50,000

16  that -- whose result was that we had

17  to make many transfers.

18       Q.   Isn't it true that Citibank

19  expressed money-laundering concerns to

20  you about this account?

21       A.   No.  Not in my ears.

22            THE COURT REPORTER:  "Years"

23  or "ears"?

24            THE INTERPRETER:  "Ears."

25  "Ears."  "In my ears."  "Not in my ears."

1    BY MR. BEHRE:

2         Q.   Moving to November 2018, that's

3    pages 76 and 77, I direct your attention

4    to the wire on November 20th from Page

5    Group ME.

6              THE COURT REPORTER:  From who?

7    From who?

8              MR. BEHRE:  Page Group ME.

9              THE WITNESS:  Yes.  But I still

10   do not know if that transfer was connected

11   to Project Beech or to other projects.

12   BY MR. BEHRE:

13        Q.   But the invoice would indicate

14   whether it was Project Beech; correct?

15        A.   Yes.  And I will bring them

16   tomorrow.

17        Q.   And since this payment in

18   November was presumably for an invoice

19   in October and because, in October, you

20   attended a Cyprus meeting, some of those

21   monies at least must have been related

22   to Project Beech; right?

23        A.   For the Beech product -- Project,

24   we had a monthly retainer.  So each month

25   we received a payment.  And I cannot say

```
 1   if this payment was specifically for the
 2   meeting in Cyprus or not.
 3        Q.   But you didn't -- you didn't
 4   go to Cyprus for free; right?
 5        A.   No.
 6        Q.   Somebody paid for it; right?
 7        A.   You are not here for free either.
 8        Q.   No.
 9        A.   (Comment in Hebrew.)
10             MR. BARET:  It's not pro bono?
11             THE INTERPRETER:  "Me neither."
12             THE COURT REPORTER:  Pardon?
13             MR. BARET:  No?  I was shocked.
14   I'm the only one who's not getting paid
15   here?
16             THE WITNESS:  (Comment in
17   Hebrew.)
18             THE INTERPRETER:  I hope so.
19   BY MR. BEHRE:
20        Q.   All right.  Directing your
21   attention to December 2018, page 79,
22   on December 10th, you wired $25,000
23   to Dinka Analysis Services.
24             And Dinka is owned by Raphael
25   Pridan; correct?
```

1      A.   Correct.

2      Q.   And Stuart Page has done

3   business with Dinka previously; correct?

4      A.   Stuart Page had done business

5   with Rafi Pridan previously.  But I do

6   not know which entity of Rafi Pridan

7   was used.

8      Q.   And Dinka was doing work for

9   Project Beech; correct?

10      A.   I do not remember.  Could be

11   yes.  Could be no.

12      Q.   (Not translated.)  Okay.  And

13   what about Ezekiel Golan Intellectual Pro,

14   there are several wires to that entity on

15   December 12th and 13th totaling $65,000.

16          THE COURT REPORTER:  She's going

17   to need the name again.

18          THE WITNESS:  (In English.)  Ezekiel

19   Golan.

20          MR. BEHRE:  Ezekiel Golan Intellectual

21   Pro.

22          (Pending question translated.)

23          THE WITNESS:  (Translated.)  Heskel

24   [sic] Golan is not connected in --

25          (In English.)  "Ezekiel."

1            (Translated.)  Ezekiel Golan

2    is not connected in any way whatsoever

3    to Stuart Page or to the Beech Project.

4    BY MR. BEHRE:

5        Q.   What services did Ezekiel Golan

6    Intellectual provide?

7        A.   I am prevented from answering

8    that.  This is not connected.  And it is

9    under privilege.

10       Q.   (Not translated.)  Under privilege

11   because you were acting under the -- at

12   the direction of a lawyer?

13       A.   No.  Because of my agreement

14   with Ezekiel Golan that commands a privilege.

15       Q.   Well, I don't think that's a valid

16   basis not to answer.

17       A.   I can -- I can tell you that it's

18   connected to some medical development, not

19   connected at all to these issues.

20       Q.   And directing your attention to

21   February 2019, page 83, there's a wire on

22   February 19th from Page Group ME.

23            Do you see that, for $82,455?

24       A.   Yes.  I do see.

25       Q.   Okay.  And that was for Project

1   Beech?

2       A.   I cannot know now.  I will know

3   tomorrow.

4       Q.   Okay.  Same question.  On March

5   20th, 2019, on page 84, you received a

6   wire from Page Group ME for $99,950.

7           Do you see that?

8       A.   Yes.  The same answer.

9       Q.   And then on April 10th, as

10  reflected on page 86, another wire in

11  from Page Group ME for $99,950.

12          Do you see that?

13      A.   Yes, I see.

14      Q.   And then just eight days later,

15  Page Group ME sends you another hundred --

16  $131,950 on April 18th.

17          Do you see that?

18      A.   Yes.

19      Q.   And then in May 2019, going to

20  May the 16th and May 31st, all found on

21  page 89, you receive two wires again from

22  Page Group ME, one for $99,950 and the

23  other one for $249,950.

24          Do you see that?

25      A.   Yes.

1        Q.   And why all of a sudden are you

2    going to being paid once a month by Page

3    to being paid twice a month?

4        A.   It could be for several projects.

5    And it could be also reflecting the fact

6    that he's paying me when he's being paid.

7        Q.   And that date would line up to

8    a meeting you had in London about Mr. Halabi's

9    witness statement for use in the U.K. hacking

10   case; right?

11            MR. BARET:  What -- what's the date?

12   What's the date?

13            THE WITNESS:  I don't recall meeting

14   Majdi Halabi in London.

15   BY MR. BEHRE:

16       Q.   (Not translated.)  Okay.  And then

17   in June 2019, on page 90, you receive from

18   Page $200,000 minus a five -- $50 wire fee;

19   right?

20            THE INTERPRETER:  200,000, you

21   said?

22            MR. BEHRE:  Yes.

23            THE INTERPRETER:  Okay.

24            (Pending question translated.)

25            THE WITNESS:  All the amounts are

1  round amounts.  But Stuart being somewhat

2  stingy, he always take the -- round down --

3  commissions from me.

4           MR. BARET:  The wire fee.

5           THE INTERPRETER:  The wire transfer

6  commission.

7           THE WITNESS:  (In English.)  You

8  ask.

9  BY MR. BEHRE:

10      Q.   And then, in July 2019, there's

11  a trip to Vegas.  You stayed at the --

12      A.   (In English.)  July?

13      Q.   (Translated.)  July 2019 you

14  went to the Prada store and spent $535.

15           (Not translated.)  You -- the

16  Montcler store --

17      A.   (In English.)  I bought a belt.

18      Q.   (Not translated.)  -- and spent

19  2,175.

20           You won a bet?

21      A.   (In English.)  I -- I bought

22  a belt --

23      Q.   (Not translated.)  Oh.  "Belt."

24      A.   (In English.)  -- in Prada.

25           I can bring it tomorrow.

```
 1        Q.   (Not translated.)  Okay.  I'll

 2   try it on.

 3        A.   (In English.)  Yeah.  No.  You

 4   are much thinner.

 5        Q.   And you saw the Beetles on Broadway.

 6   And you ate at Joel Robuchon.

 7             Right?

 8        A.   "Kin."

 9        Q.   And then Mr. Page sends you again,

10   in September 2019, $196,000 minus a $50 wire

11   fee on September 6th; correct?

12        A.   Yes.

13        Q.   (Not translated.)  What's Pandaface?

14             THE INTERPRETER:  What's?

15   BY MR. BEHRE:

16        Q.   What is Pandaface?

17        A.   Where is it?

18        Q.   It's on page 107.

19             On December 26, you sent Pandaface

20   $15,000.

21             THE COURT REPORTER:  How much?

22             THE WITNESS:  (Comment in Hebrew.)

23             THE INTERPRETER:  Fifteen.

24             MR. BEHRE:  15,000.  Sorry.

25             THE WITNESS:  (In English.)  "Wire
```

1    to Pandaface."

2              (Translated.)  I don't recall.

3    BY MR. BEHRE:

4        Q.   (Partially translated.)  And then

5    in January, January 16th, on page 108, you

6    send Pandaface another $7,500.

7              Do you see that?

8              THE INTERPRETER:  175,000?

9              MR. BARET:  7,500.

10             MR. BEHRE:  7,500.

11             (Remainder of pending question

12        translated.)

13             THE WITNESS:  I -- I don't know.

14   I think maybe -- maybe I sent someone, a

15   woman, some financial assistance.

16   BY MR. BEHRE:

17       Q.   (Partially translated.)  Okay.

18   And then, on January 27th, on page 108,

19   Page is sending you wires from a new

20   entity.  It's called Page Risk Management

21   DMCC.

22             Do you see that entry on January

23   27th?

24       A.   Yes.

25       Q.   Do you -- do you know why he

1    started using a different entity to wire

2    you those funds that he says were for

3    hacking?

4         A.   No.  No idea.

5         Q.   And that's the same entity that

6    sent you $222,435 on March 23rd on page

7    112.

8              Do you see that?

9         A.   Yes.  I see that the commissions

10   are getting larger.

11        Q.   And --

12        A.   Now it's $65 instead of $50.

13        Q.   Now, a payment in March of 2020

14   would be for work you did in February.

15             And February is when Mr. Azima's

16   trial occurred in the U.K.; correct?

17        A.   I didn't do anything regarding

18   the trial in England.  And this -- the

19   money, the payment is for Project Beech,

20   which continued.

21        Q.   Were you in London in late February

22   and early March?

23        A.   I'd have to check.  I don't recall.

24        Q.   Have you ever been to the Royal

25   Automotive Club?

```
 1       A.   No.

 2            MR. BEHRE:  Okay.  Why don't we

 3   take a break.

 4            THE VIDEOGRAPHER:  Going off the

 5   record at 4:43.

 6            (Recess from 4:43 p.m. to 5:02 p.m.

 7       Israel Daylight Time.)

 8            THE VIDEOGRAPHER:  Back on the record

 9   at 5:02.

10   BY MR. BEHRE:

11       Q.   Mr. Forlit, we just looked at some

12   of your Citibank bank records for SDC-Gadot.

13   And I want to ask you just a big picture.

14            You received between $200,000

15   and $300,000 a month almost every month

16   for almost five years.

17            What did you do for that money?

18       A.   In my earlier answers, I more

19   or less broke down the details of the

20   investigation, which covered a lot of

21   jurisdictions.

22            This whole line of questioning,

23   there's something unclear to me.

24            If this whole trial is about

25   hacking done by -- in 2015 by Azima and
```

1   Stuart, the liar, is saying that I've

2   been hacking from 2017 until 2020, how --

3   how does that have anything to do with

4   hacking that happened in 2015?

5              (Comment in Hebrew.)

6              THE INTERPRETER:  (Comment in

7   Hebrew.)

8   BY MR. BEHRE:

9       Q.   (Partially translated.)  My --

10  my question was:  What did you do to earn

11  two hundred to $300,000 a month for five

12  years?

13      A.   (Comment in Hebrew.)

14           MR. BARET:  Just for the record,

15  three years.  The -- the company opened in

16  2017 and to -- to 2020; right?

17           THE WITNESS:  So we carried out

18  investigations.  And in the three years

19  of the company's activities, we investigated

20  a large number of violations of the sanctions

21  on Iran, a lot of money-laundering done

22  through Lebanon --

23           (Comment in Hebrew.)

24           THE INTERPRETER:  You -- you

25  mean embezzling?  Or money disappearing?

```
 1   Misappropriation of funds?

 2              THE WITNESS:  And monies that

 3   disappeared from the company in -- in

 4   Saudi Arabia.

 5              We managed to locate Khater

 6   Massaad in Saudi Arabia and the authorities --

 7   and get the authorities to arrest him.  We

 8   had a regular source that visited him once

 9   a month in Saudi Arabia.

10              We investigated financial offenses

11   in Sri Lanka and in Switzerland.

12              We investigated transactions in

13   Georgia.

14              THE INTERPRETER:  Georgia, not

15   the U.S., the country.

16              THE WITNESS:  And that's just

17   what I can recall off the top of my head.

18   BY MR. BEHRE:

19       Q.   And when you say you investigated

20   transactions, are you referring to transactions

21   in bank records?

22       A.   We got a lot of information that

23   had its source in the customer's servers,

24   computer servers.  And a lot of the

25   information Stuart Page brought from his
```

1   own sources.  We interviewed a lot of people.

2   And that wasn't even one of the company's

3   larger cases.

4        Q.   When you say the customer's

5   computer servers, are you talking about

6   Rakia's computer servers?

7        A.   Sometimes yes.  There was a lot

8   of data that we got from servers in the

9   free zone of RAK.  And a lot of materials --

10  yes, the customer gave us a lot of materials.

11       Q.   And some of those materials

12  included bank records that were confidential;

13  correct?

14       A.   I don't recall.

15       Q.   To the best of your recollection,

16  did you ever have access to bank records

17  for any of the people that were being

18  investigated or any of the entities

19  that were being investigated?

20       A.   I don't recall precisely.

21  It's possible.

22       Q.   Do you recall ever attaching

23  confidential bank records to any of the

24  reports that you prepared?

25       A.   I don't recall.

```
 1        Q.   And do you recall ever attaching

 2   copies of confidential e-mails, for example,

 3   between Mr. Azima and his lawyers to your

 4   reports?

 5        A.   I don't recall.

 6        Q.   And do you recall ever excerpting

 7   and embedding into your reports confidential

 8   e-mails belonging to others?

 9        A.   I don't recall.  And everything

10   that appears in the reports were materials

11   that were presented legally.

12        Q.   And what types of materials did

13   Mr. Page provide to you, as you indicated

14   a few moments ago?

15             MR. BARET:  I'm -- I'm sorry.

16             Just for the -- when -- when

17   counsel's referring to "you," who are you

18   referring to?  Amit Forlit individually?

19             MR. BEHRE:  Yes.  As paid by --

20   for services by SDC-Gadot.

21             MR. BARET:  Right.  But --

22             THE WITNESS:  Amit Forlit did

23   not receive money from SDC-Gadot.  Gadot

24   Israel received money from SDC.  And I

25   was a representative of SDC-Gadot.
```

```
 1              And Page provided materials.
 2   He had his sources.  Maybe some of his
 3   clients and other sources.  I don't know.
 4   BY MR. BEHRE:
 5        Q.   What types of materials did
 6   Mr. Page provide?
 7        A.   A list of companies, a list
 8   of contacts of people who were involved,
 9   legal -- legal cases that he -- that were
10   taken from various places.
11        Q.   Did he ever provide you with
12   confidential e-mails or financial data
13   belonging to others to which he wasn't
14   entitled to have?
15        A.   I don't think so.
16        Q.   Now, regarding Mr. Halabi's
17   testimony, as rehearsed in Switzerland,
18   why was it decided that Halabi would
19   claim to have found the data on the
20   Internet?
21        A.   I don't remember who or why it
22   was decided that Halabi would be the one
23   to tell this or to -- to relate this.
24              And to this day, we -- I don't
25   know who in Halabi's firm found these links.
```

```
 1                  (Comment in Hebrew.)

 2                  THE INTERPRETER:  Oh.  "Office."

 3                  THE WITNESS:  Halabi was -- not

 4      his firm.  He was part of the office.

 5                  And everybody in the office learned

 6      about the leak quite quickly, because --

 7      because, you know, when there are people

 8      involved in the investigation, you can

 9      just put in a -- a Google alert.  And you

10      don't have to actually look for it.  It

11      just pops up.

12                  The reason that it was Halabi

13      that testified to this was because he would

14      not be identified as an Israeli investigator.

15      He was known as a journalist who wrote for

16      local newspapers in the Emirates.  And he

17      volunteered.  And this pleased the client,

18      the customer.  And -- and Halabi said that

19      he told Stuart this and that wasn't a lie.

20      And that didn't embarrass the customer.

21      BY MR. BEHRE:

22          Q.   But Halabi is Israeli; right?

23          A.   Halabi is an Israeli Druze, who

24      has an Arab name.  Arab -- his name sounds

25      Arab.
```

```
 1            So there's a difference between

 2   coming with a name like mine or a typical

 3   Israeli name or having a name like Majdi

 4   Halabi, which is a very common name in

 5   Syria, Iraq, in fact, the whole Middle

 6   East.

 7       Q.   Why was it so important not to

 8   focus on the nationality of the speaker?

 9       A.   At the time, Israel didn't have

10   diplomatic relations with the UAE.  And

11   according to what Stuart said, it was very

12   worrying to the client that it might be --

13   become known that he was using an Israeli

14   contractor.  He thought at that time that

15   his enemies would use this information

16   to topple him.

17       Q.   And Halabi didn't really find

18   the links, did he?

19       A.   I don't know.  As I said -- as

20   I said, it popped up for everyone.  And

21   you didn't need to be an analyst with a

22   Harvard education to figure it out.

23       Q.   But Halabi now says that was

24   all a lie.

25            You're aware of that; right?
```

1        A.   I read Halabi's affidavit.

2   He says we had at least four meetings

3   to coordinate this thing, including

4   visits in London to a number of places,

5   including in Cyprus.  And I can say

6   unequivocally that he is lying.

7            And, in Israel, there's no

8   way to leave or come back into the

9   country without having some record of

10  it at the -- by the borders authority.

11           And I can state that, on the

12  dates that he says I met with him in

13  London and in Cyprus, I was in Israel.

14  I can only guess why he's lying.

15       Q.   Well, with regard to his

16  admission, his confession that he lied

17  in court about finding the link, you

18  don't know of any reason why he would

19  lie about that, do you?

20       A.   I -- I don't think he lied to

21  the Court.  But as far as his affidavit

22  is concerned, it's riddled with lies.

23           And I -- I can't say right now

24  exactly what.  But I can say that, on the

25  dates that he says I was in London or in

1    Cyprus, I can say for a fact that I wasn't.

2         Q.   And I'm just focusing on the

3    fact that Halabi now confesses that he

4    lied to the Court about finding the links.

5              And you have no reason to

6    believe that that confession was itself

7    a lie, because why would somebody confess

8    to the crime of misleading a Court and

9    perjury if they hadn't done it?

10        A.   If a client -- if I have a client

11   that would ask me to investigate why he was

12   lying, then I'll investigate.  But I don't

13   know why.

14        Q.   Now, you testified earlier that

15   you're involved in private investigation;

16   correct?

17        A.   Yes.

18        Q.   And you don't provide IT services,

19   do you?

20        A.   I provide a security envelope

21   for computers, not necessarily IT, not

22   what you call IT.

23             We've, for example, developed

24   a telephone that can't be tapped into and

25   all kinds of technological developments.

1     Q.   (Not translated.)  But with regard

2   to Project Beech, you didn't provide any IT

3   security other than the open-ended e-mail

4   system where you put the reports; right?

5     A.   I did provide -- in Project Beech,

6   I actually did provide consultation services

7   regarding communication security.

8     Q.   But that was a very small part

9   of what you did for Project Beech; right?

10     A.   It was part.  I can't define it

11   as big or small.

12     Q.   (Not translated.)  But several

13   times today, I've asked you what you did

14   for the two or $300,000.

15          And you never mentioned that

16   service; right?

17          You just talked about doing

18   these investigations in all these

19   different countries.

20          But you never once mentioned

21   IT security, did you?

22     A.   It's much easier to describe

23   what happens in an investigation than

24   to -- than to explain IT security.  But

25   we did do it.

1      Q.   But much of what you did for

2   Project Beech was not IT security; right?

3      A.   I can't exactly tell you what

4   proportion.  But it was part of the scope

5   of work.  And I wouldn't call it IT security

6   in any case.  It was more security protocols

7   for computer, communications, and transfers.

8            (Exhibit 5 marked.)

9   BY MR. BEHRE:

10      Q.   (Not translated.)  Okay.  I'd

11   like to show you what we've marked as

12   Exhibit No. 5, which is a letter of

13   engagement between you, on behalf of

14   Gadot Information Services, and Page

15   Group Limited.

16            Previously you testified that

17   there was no written agreement between

18   you and Mr. Page; correct?

19      A.   (In English.)  Correct.

20            (Last question translated.)

21            THE WITNESS:  Correct.

22   BY MR. BEHRE:

23      Q.   So your testimony previously

24   that there was no written agreement is

25   inaccurate; correct?

```
 1       A.   Not correct.

 2            First of all, I mentioned that

 3   sometimes we had problems with money

 4   transfers and that we sometimes made all

 5   sorts of engagements in order to resolve

 6   that problem.

 7            Second, I do not -- do not see

 8   here any signature of mine or anyone on

 9   my behalf.

10            And, thirdly, once I finish

11   reading this -- I'm in the process of

12   reading it -- perhaps I will understand

13   what this is connected to.  Because it

14   definitely is not connected to the Beech

15   Project.

16       Q.   Okay.  Well, take your time to

17   read it, then.

18       A.   (Examining.)  I do not see here

19   any connection neither to SDC-Gadot nor

20   to the Beech Project.  And I do not see

21   any signature of Gadot on this document.

22            MR. BARET:  Just for the record,

23   this -- the -- this agreement is prior to

24   the creation of Gadot SDC, which is about

25   a year and change --
```

```
 1              MR. BEHRE:  Correct.

 2              MR. BARET:  -- a year -- a year

 3  and a half probably before.

 4  BY MR. BEHRE:

 5      Q.   So it's -- you don't recall seeing

 6  this before?

 7      A.   No.

 8      Q.   You don't recall signing it?

 9      A.   I am not a signatory to this

10  document.

11      Q.   Okay.  And its -- its content

12  is inaccurate, isn't it?

13      A.   The content could be accurate,

14  because we are engaged in such projects.

15              But this does not refer neither

16  to the dates of the U.S. companies nor to

17  the Beech Project.  As I said before, we

18  did other things for Stuart Page as well.

19      Q.   Well, this one provides for

20  almost two years of payments, the monthly

21  amount to be a hundred and fifty to 200,000

22  pounds, which equates to two hundred to two

23  fifty [sic] U.S. dollars per month; right?

24      A.   This is what is written here.

25  But to the best of my recollection, these
```

1    are not the amounts that we received from

2    Stuart Page to Gadot.

3              And I repeat again, this has no

4    connection whatsoever to SDC-Gadot or to

5    Project Beech.

6         Q.   Well, it refers, in the second

7    paragraph, to IT services for Page Group's

8    United Arab Emirates and Iraq clients.

9              Page Group's United Arab Emirates

10   client was RAK and the ruler of RAK, the

11   boss; right?

12        A.   RAK was not Stuart Page's only

13   client in the Emirates.

14        Q.   And you indicated that the

15   reason SDC-Gadot was created was because

16   of difficulty that Mr. Page was experiencing

17   in wiring money to Gadot Information

18   Services; right?

19        A.   When he was trying to transfer

20   funds from Dubai to Gadot Information

21   Services.  When he was transferring

22   from London, there was no problem.

23              (Exhibit 6 marked.)

24   BY MR. BEHRE:

25        Q.   I'd like to next show you what's

1   been marked as Exhibit No. 6.  And this

2   consists of seven invoices from SDC-Gadot

3   LLC to Page Group.

4        A.   (Examining.)  So I don't need

5   to bring them tomorrow?

6        Q.   This might not be all of them.

7        A.   May I keep this to compare?

8             MR. BARET:  Yeah.  That's yours.

9             MR. BEHRE:  No.  That's the court

10  reporter's.

11            MR. BARET:  No, no.

12            MR. BEHRE:  But you -- that's yours.

13            MR. BARET:  We have.  We have.

14            THE WITNESS:  (In English.)  Okay.

15            (Translated.)  So what's the

16  question?

17  BY MR. BEHRE:

18       Q.   Do you recognize these invoices?

19  Are they issued by SDC-Gadot, as indicated?

20       A.   Yes.

21       Q.   And you'll note that each one of

22  these invoices, in the "Description" area

23  says the payment requested is for Project

24  Beech; correct?

25       A.   Yes.  With a spelling mistake in

1    "beach."

2        Q.   But other than the spelling mistake,

3    they all concern Project Beech; right?

4        A.   Correct.

5        Q.   And the first two invoices state,

6    in the second line of the "Description,"

7    "according to agreement"; correct?

8        A.   Yes.  Correct.

9        Q.   What agreement is that?

10       A.   We would usually add this

11   particular sentence because that would

12   make the bank pay more easily.

13       Q.   So that would mislead the bank

14   into thinking there was an agreement when

15   there wasn't an agreement; correct?

16       A.   There was no written agreement.

17   But even an oral agreement is an agreement.

18       Q.   Were these invoices provided to

19   the bank in the case of the first invoice

20   to JP Morgan Chase?

21       A.   I don't recall.  It could be.

22   But -- I don't recall.  It could be.  But

23   I don't think that we supplied invoices

24   to the American bank.

25       Q.   What bank were you providing

1   invoices to?

2          A.   Normally to the Israeli bank.

3          Q.   And I note, in the first two

4   invoices, that the address provided for

5   SDC-Gadot in Miami Beach is not the same

6   as the one that is contained in your

7   corporate records, is it?

8          A.   I have to check that.  I have

9   no answer right now why is it so.

10          Q.   Whose address is 3200 Collins

11   Avenue, as indicated in the two invoices?

12          A.   I think -- I think -- I seem to

13   remember that we may have rented, in the

14   beginning, a physical mailbox.  But it's

15   not something that I remember precisely.

16          Q.   So the first invoice in Exhibit

17   6 is numbered Invoice 1019.

18             Do you see that?

19          A.   Yes.

20          Q.   The second -- the second invoice

21   is numbered Invoice 1024.  And that -- and

22   it's dated May 14, 2019.

23             Whereas, the first invoice is

24   dated November 6, 2018; correct?

25          A.   Yes.

1       Q.   So it would appear, between

2   November 18th -- November 2018 and May

3   2019, there were only four other invoices

4   that were issued by SDC-Gadot in six months;

5   correct?

6       A.   It is apparently correct.  I

7   have to check.  It is also possible that

8   the collection of funds due for the project

9   was done for Insight.

10          I can see that the 1024 was issued

11  twice to JP Morgan and to Citibank as well.

12  It would seem that we did not succeed in

13  operating the account correctly at JP Morgan

14  and that is why we -- we did it in Citibank.

15  It's the same number.

16      Q.   And you're referring to the third

17  invoice dated May 14th, 2019, on the third

18  page of the Exhibit 6; right?

19      A.   Yes.

20      Q.   And that particular invoice looks

21  like it's been cut and pasted.  If you look

22  at the -- the area right below the line at

23  the top of the page, that clearly was cut

24  and pasted from some other document and

25  placed on this.

1       A.   To me -- to me it seems that

2   we simply started using another software

3   for issuing invoices.  But since I did not

4   supply it, I -- I don't know who supplied

5   it.

6       Q.   Let me just go back to the invoice

7   numbers again.

8            In November 2018, you're on Invoice

9   1019.  In May 2019, six months later, you're

10  only on Invoice 1024.

11           That means SD -- SDC-Gadot only

12  issued four invoices between those two in

13  six months; right?

14      A.   If you give me a minute, I'll

15  go over it.  I'll see all the entries

16  from the bank.

17           (Examining.)  Yes.  There are

18  very few entries indeed.

19      Q.   Meaning that SDC-Gadot didn't

20  issue many invoices that weren't related

21  to Project Beech; correct?

22      A.   Are you talking about the entire

23  period or only about these four months?

24      Q.   It's six months.  But yes.

25      A.   Out of five invoices, there are

1   two pertaining to Beech.

2       Q.   (Partially translated.)   Okay.

3   On the third invoice, the third page of

4   the Exhibit 6, it looks like SDC-Gadot

5   has gone deluxe and they have their own

6   stamp; is that right?

7           THE INTERPRETER:   They've gone

8   to?

9           MR. BARET:   They're what?

10          THE INTERPRETER:   They've gone

11  to?

12          MR. BEHRE:   They have their own

13  stamp.

14          THE COURT REPORTER:   "Gone deluxe."

15          THE INTERPRETER:   Hmm?

16          THE COURT REPORTER:   "Deluxe."

17  "Deluxe."   "Deluxe."

18          MR. BARET:   "Deluxe."   Oh, okay.

19          THE INTERPRETER:   Okay.

20          (Pending question fully translated.)

21          THE WITNESS:   Look at the amounts

22  that we started receiving.

23          MR. BARET:   So it has a New York,

24  New York.

25  //

1   BY MR. BEHRE:

2        Q.   And who -- who obtained that stamp?

3        A.   I believe we probably bought it

4   in some shop.

5        Q.   And why is it only used on that

6   one particular invoice, if you know?

7        A.   Perhaps we lost it afterwards.

8   I really don't know.

9        Q.   Do you have any other invoices

10  besides the ones you've seen here?

11       A.   Tomorrow.  I have to check.

12  I have nothing on me here.

13            MR. BARET:  I should have been

14  a doctor.  I should have been a doctor.

15            (Exhibit 7 marked.)

16  BY MR. BEHRE:

17       Q.   I'm showing you next -- showing

18  you next more Gadot invoices.  It appears

19  to be 18 in number.  And these are 18

20  invoices issued in 2016 through August

21  2017.

22       A.   In August 2016 to August 2017,

23  the U.S. companies were not set up yet.

24       Q.   Correct.

25            But I'm directing your attention

1   to the "Description" line where we just

2   looked at a draft contract that you said

3   you didn't recall.  And yet these invoices

4   all say:

5           "IT security services Beech

6   Project."

7           Do you see that?

8       A.   (Examining.)  Yes.

9       Q.   And come 2017, the difficulties

10  you were having with getting wire transfers

11  caused these to stop and you to use SDC-Gadot;

12  correct?

13      A.   No.  The transfers by Stuart from

14  Dubai to Israel were not possible.

15      Q.   (Partially translated.)  Well, the

16  Stuart company is Page Protective Services.

17          And they have an address in Hong

18  Kong; right?

19      A.   To the best of my understanding,

20  we had agreed that we would focus on the

21  U.S. companies.  And because you came

22  all the way from the United States, I

23  was happy to expand and give you some

24  further information beyond what we had

25  originally agreed upon.

1             We are -- are in the midst of a

2    procedure vis-a-vis the Court to determine

3    what can be asked and what cannot be asked.

4    And these questions relate to Gadot Israel.

5         Q.   (Not translated.)  What is Project

6    Silk?

7              THE COURT REPORTER:  Project?

8    BY MR. BEHRE:

9         Q.   (Not translated.)  What is Project

10   Silk?

11             THE INTERPRETER:  "Silk"?

12             MR. BEHRE:  Like the fabric.

13             (Pending question translated.)

14             THE WITNESS:  Another project

15   which is not connected to the -- to the

16   client.

17   BY MR. BEHRE:

18        Q.   Does it involve Khater Massaad?

19        A.   If the truth be told, I do not

20   remember fully.  But generally speaking,

21   everything that was related to Khater

22   Massaad went into the Beech Project.

23        Q.   But Project Silk might have

24   involved Khater Massaad?

25        A.   To the best of my recollection,

1    no.

2           Q.   We talked earlier about Avi,

3    who's pled guilty in New York to hacking;

4    correct?

5           A.   Correct.

6           Q.   And in your case in Florida,

7    you filed some text messages between

8    you and Stuart Page in that case.

9                Do you remember that?

10          A.   You mean about Avi's case?

11          Q.   (Not translated.)  Well, I'm

12   asking about a series of text message

13   exchanges between you and Stuart Page.

14               Do you remember that was attached

15   to your filing in the U.S. District Court

16   in Florida?

17          A.   But it's not connected to Avi.

18               (Exhibit 8 marked.)

19   BY MR. BEHRE:

20          Q.   Okay.  Well, let -- let me show

21   it to you.

22               I'm going to show you Exhibit 5

23   to your motion for protective order.  And

24   it's -- and it's -- it was filed electronically

25   in U.S. District Court in Florida on June

1   14th, 2022.  And it's Document 26-5.  It

2   was filed by you through your counsel.

3        A.   Okay.  (Examining.)

4        Q.   You had a chance to look at that?

5        A.   Yes.

6        Q.   Directing your attention to the

7   last page of the e-mail exchange.

8             MR. BARET:  WhatsApp.  WhatsApp.

9             MR. BEHRE:  I'm sorry?

10            MR. BARET:  I think it's, like,

11   a WhatsApp.

12            MR. BEHRE:  WhatsApp.  I'm sorry.

13   BY MR. BEHRE:

14        Q.   Is this WhatsApp?

15        A.   (In English.)  Yeah.

16             (Translated.)  Yes.

17        Q.   And you recently pulled this off

18   of your WhatsApp so your lawyer could file

19   it in court; right?

20        A.   It wasn't recent.  I -- I had

21   saved it in the past as a picture.

22        Q.   And have you saved any other

23   WhatsApps between you and Stuart Page?

24        A.   I have to scan and see.

25        Q.   Okay.  And will you do that?

1      A.   Yes.

2      Q.   On the last page, you indicate --

3   and this is part of your -- the carry-over

4   statement:

5           "As you know, I'm not really

6   in the business since what happened"

7   to "Avi."  (As read.)

8           What did you mean by that?

9      A.   In my -- my meaning was that

10   it's a -- it's a date that we are both

11   familiar with.  It's a date that indicates

12   more or less when the activity in Israel

13   went down.  But it went down mostly because

14   of COVID.

15           Besides, what happened to Avi,

16   in my opinion, it's some type of miscarriage

17   of justice.  But it is not connected to --

18   to this.

19      Q.   Well, what happened to Avi is

20   Avi got arrested; right?

21      A.   I don't even recall if I meant

22   this Avi when I'm saying "Avi" here,

23   because the other guy is Aviram, not

24   Avi.  So I'm not even sure that I'm

25   referring to the same person.

```
 1              (Comment in Hebrew.)

 2              MR. BARET:  You don't have to

 3   talk about that.

 4              THE INTERPRETER:  "Furthermore,

 5   my correspondence here -- here with Stuart

 6   is -- well, never mind."

 7   BY MR. BEHRE:

 8        Q.   (Not translated.)  Well, the

 9   "I'm not really in the business since

10   what happened to Avi," Avi was arrested

11   and charged with hacking.  Avi's pled

12   guilty and confessed to hacking.  And he

13   was in the business of hacking.

14              And the business you're referring

15   to is hacking, isn't it?

16        A.   (In English.)  No.

17              THE COURT REPORTER:  You said

18   "yeah"?  "No"?

19              THE INTERPRETER:  "No."

20              THE WITNESS:  (In English.)  "No."

21              THE INTERPRETER:  He said "no."

22              THE COURT REPORTER:  Okay.  Let

23   her translate.

24              THE INTERPRETER:  Okay.

25              MR. BEHRE:  He didn't need a
```

1    translation on that, did he?

2              (Last question translated.)

3              THE WITNESS:  First and foremost,

4    the person who was arrested was Aviram and

5    not Avi.  And, second, there's no connection.

6              And, thirdly, I'm corresponding

7    here with a person who is libeling me.

8    So what do you expect?

9    BY MR. BEHRE:

10        Q.   (Not translated.)  Would it

11   surprise you if Stuart Page was certain

12   you were talking about the Avi who's

13   arrested for hacking?

14             MR. BARET:  You don't have

15   to talk about this.

16             He doesn't need to --

17             MR. BEHRE:  Why not?

18             MR. BARET:  -- address this.

19             MR. BEHRE:  What's that?

20             MR. BARET:  Again, this was

21   provided to the Court with a motion for

22   protective order not to depose Amit Forlit

23   in his personal capacity.  It's got nothing

24   to do with SDC-Gadot.

25             Again, you are confusing two --

1    two different filings.  This -- this was

2    filed with a motion for protective order.

3    And you are bypassing our request for

4    protection order.

5              MR. BEHRE:  No.  It was.  It

6    was filed in Federal Court.

7              MR. BARET:  Correct.

8              MR. BEHRE:  It was filed on

9    PACER via electronic --

10             MR. BARET:  Correct.

11             MR. BEHRE:  -- means.

12             MR. BARET:  For the purpose of --

13             MR. BEHRE:  And it's -- it's --

14   it's arguably a statement about his business,

15   which is the same as Avi's, which is hacking.

16             MR. BARET:  He's -- he's --

17             MR. BEHRE:  Now --

18             MR. BARET:  He answered that.

19             MR. BEHRE:  -- if you want to --

20   if you want to say that that's not something

21   we can reach, you can say it.

22             MR. BARET:  I'm saying it.

23             MR. BEHRE:  But it's going to

24   be an -- okay.  Then you've instructed

25   him not to answer; right?

1          MR. BARET:  I'm instructing

2   him not to talk about this, because this

3   is -- relates directly to his motion for

4   protective order not to be deposed in his --

5          MR. BEHRE:  Well, he --

6          MR. BARET:  -- personal --

7          MR. BEHRE:  -- opened --

8          MR. BARET:  -- capacity.

9          MR. BEHRE:  -- the door -- he

10  opened the door to this.  And if you want

11  this to go before the judge in Florida, we

12  can do that.  But, you know -- you know how

13  that judge has already started to view him.

14  So if you want --

15         MR. BARET:  Because --

16         MR. BEHRE:  -- to instruct him not

17  to answer, you -- you -- be my -- if -- if

18  that's your instruction, you go ahead.

19         MR. BARET:  He answered.  But I

20  think this line of questioning is inappropriate

21  for the purpose of this deposition.

22         MR. BEHRE:  Okay.  I'll move on.

23  And we can raise it with the Court.  Okay?

24         (Exhibit 9 marked.)

25  //

1   BY MR. BEHRE:

2       Q.   I'm showing you next what we're

3   marking as Exhibit 9.  It's a September 7,

4   2019, e-mail from your banker at Citi.

5   His name is Mario Ros, R-o-s.  And it's

6   regarding your account with Citi.

7       A.   (Examining.)

8       Q.   Do you recognize that exhibit?

9       A.   Yes.  But I do not remember this

10  mail.

11      Q.   And Mr. Ros at Citibank is e-mailing

12  you because at least he believes you're the

13  person responsible for that bank account

14  that we talked about earlier today; right?

15      A.   He's trying to sell some banking

16  service.

17          MR. BEHRE:  Okay.  Why don't we

18  take a quick break.

19          THE WITNESS:  (Comment in Hebrew.)

20          MR. BARET:  I think we're done

21  with our -- today.  It was set for -- from

22  11:00 to 6:00.

23          MR. BEHRE:  7:00.

24          MR. BARET:  Till 7:00?

25          THE VIDEOGRAPHER:  Going off the

1   record at 6:03.

2            (Recess from 6:03 p.m. to 6:12 p.m.

3       Israel Daylight Time.)

4            THE VIDEOGRAPHER:  Back on record

5   at 6:12.

6   BY MR. BEHRE:

7       Q.   (Not translated.)  Mr. Forlit,

8   you indicated you might have some documents.

9            Just so we're clear, do you have

10  any copies of the project updates left?

11      A.   (In English.)  No.

12           (Exhibit 10 marked.)

13  BY MR. BEHRE:

14      Q.   I'd like to show you what we're

15  going to mark as Exhibit No. 10.  It's --

16  it's labeled or titled:

17           "Project Beech Report - Farhad

18  Azima."

19      A.   (Examining.)

20           MR. BARET:  Looks good for his

21  age, actually.

22           MR. BEHRE:  What?

23           MR. BARET:  He looks good for

24  his age.

25  //

1  BY MR. BEHRE:

2       Q.   Have you had a chance to look

3  at that report?

4       A.   Yes.

5       Q.   And this is one of the Project

6  Beech reports, isn't it?

7       A.   I can't tell.  I did not keep

8  it.

9       Q.   Well, you were involved in its

10  authorship, weren't you?

11       A.   This is -- this is dated four --

12  August 4, 2015 -- 2015.  It's, like, seven

13  years.  And I -- we have not kept any record.

14  We have destroyed everything.  So I can't

15  tell.

16       Q.   Well, at 11:24 this morning, you

17  stated as follows:

18            "I have never investigated Farhas --

19  Farhad Azima.  The investigation was of

20  Dr. Khater Massaad."

21       A.   Correct.

22       Q.   And this report starts and states

23  as follows:

24            "The following document presents

25  a full intelligence report on Farhad Azima."

1          And he's -- and he's given the

2     nickname of "the Generator"; right?

3          The second line.

4     A.   I say, once again, I do not know

5     who wrote this report.

6     Q.   And the third line states -- and

7     I'll quote:

8          "The main effort is placed in

9     order to assist the client in taking the

10    generator out of the dispute between KM

11    and the client."

12         End quote.

13         (Brief telephone interruption.)

14    BY MR. BEHRE:

15    Q.   So this report talks about taking

16    out Farhad Azima, doesn't it?

17    A.   I did not go through it thoroughly

18    right now.  It's possible that there is

19    a report.  But I'm saying again, I do not

20    know who wrote this report.

21    Q.   Well, let me direct your attention

22    to a few things.

23         Look at page 3.  There's a --

24         MR. BARET:  Again, same objection

25    as before.

1          He answered some questions regarding

2   this report.  He said he didn't write it or

3   know whose write it.  [sic]  It's -- again,

4   it's not SDC-Gadot.  It's two years before

5   the cooperation of which has been represented

6   today was created.

7          If you get a chance to depose --

8          MR. BEHRE:  His --

9          MR. BARET:  -- him on a personal

10  level, then we can go back --

11          MR. BEHRE:  He opened the door.

12  He opened the door to this by saying:

13  I never --

14          MR. BARET:  SDC --

15          MR. BEHRE:  -- investigated --

16          MR. BARET:  -- Gadot -- SDC --

17          MR. BEHRE:  Hold on.

18          MR. BARET:  -- Gadot --

19          MR. BEHRE:  No, no, no.

20          MR. BARET:  -- didn't open --

21          MR. BEHRE:  No.

22          MR. BARET:  -- the door.  It's

23  SDC-Gadot.

24          MR. BEHRE:  Let me read you the

25  quote.

```
 1                "I have never investigated Farhad
 2   Azima," period.
 3             MR. BARET:  True.  And he said --
 4             MR. BEHRE:  This --
 5             MR. BARET:  And he --
 6             MR. BEHRE:  -- report establishes
 7   that not only did they investigate Farhad
 8   Azima --
 9             MR. BARET:  Who's "they"?
10             MR. BEHRE:  -- they targeted him.
11             MR. BARET:  Who's "they"?
12             MR. BEHRE:  This report was written
13   by your client.
14             MR. BARET:  He's -- he's saying he
15   didn't write it.
16             MR. BEHRE:  He can say that.  But
17   I can ask him about it.
18             MR. BARET:  But he already answered --
19             MR. BEHRE:  He can --
20             MR. BARET:  -- it.
21             MR. BEHRE:  -- deny it under oath,
22   if he'd like.
23             MR. BARET:  He just did.
24             MR. BEHRE:  But that doesn't prevent
25   me from asking the questions.
```

1            MR. BARET:  It -- it does, because --

2            MR. BEHRE:  So if you want to -- if

3    you want to instruct him not to answer, we'll

4    do this some more.

5            Is that what -- are you instructing

6    him --

7            MR. BARET:  I'm --

8            MR. BEHRE:  -- not to answer?

9            MR. BARET:  I'm saying that it's

10   not the subject of today's deposition.

11           MR. BEHRE:  It is --

12           MR. BARET:  It's not --

13           MR. BEHRE:  -- because --

14           MR. BARET:  -- the subject --

15           MR. BEHRE:  Let me tell you why

16   it is.

17           Because he opened the door to it.

18   By saying he didn't investigate Farhad Azima,

19   he can be impeached with his own report --

20           MR. BARET:  But that's not his

21   report.

22           MR. BEHRE:  -- that proves that

23   he lied earlier today about investigating

24   Farhad Azima.

25           MR. BARET:  That's what you're

1  saying.  He's saying --

2          MR. BEHRE:  I -- it is --

3          MR. BARET:  -- he didn't write --

4          MR. BEHRE:  -- what I'm saying.

5          MR. BARET:  -- this -- but he's

6  saying he didn't write this report.

7          Do you have any --

8          MR. BEHRE:  Well, he can --

9          MR. BARET:  -- proof --

10          MR. BEHRE:  -- he can say --

11          MR. BARET:  -- that he wrote

12  this report?

13          MR. BEHRE:  -- that all he wants.

14          MR. BARET:  He just did.

15          MR. BEHRE:  But I can examine,

16  because it's a deposition.

17          If you want to instruct him not

18  to answer, be my guest.  And we'll do this

19  all again.  And we will seek costs for

20  this entire trip.

21          MR. BARET:  All I'm saying is

22  that he answered it, that he said he's --

23  it's not his report.  Now, if he wants

24  to continue answering, it's his choice.

25          Go ahead, answer.

```
 1   BY MR. BEHRE:

 2        Q.   (Not translated.)  So if you look

 3   at page 3, there's what clearly appears to

 4   be a stolen copy of Farhad Azima's passport.

 5   If you look at page 6, you'll see --

 6             THE INTERPRETER:  May I?  Counsel,

 7   may I?

 8             (Last comment translated.)

 9   BY MR. BEHRE:

10        Q.   If you look at page 6, there

11   is data about the specific balance, down

12   to the U.S. dollar, in his bank accounts,

13   stolen financial data.

14             And if you look at page 7, there's

15   more stolen financial data about his brokerage

16   accounts at HSBC and Credit Suisse, right

17   down to the dollar.

18             Do you see that?

19        A.   Yes.

20        Q.   Look at page 10 and 11.

21             Did you prepare these organizational

22   charts, or people under your direction?

23        A.   No.

24        Q.   Do you know who did?

25        A.   No.
```

1        Q.   And if you look at page 12 and

2    13, there's extracts of financial data

3    regarding business opportunities that

4    the, quote, "Generator," was involved

5    in.

6              And the same on page 14 and

7    15 and 16, all stolen financial data.

8    And then on page 18, there's another

9    stolen passport.

10             And then on page 21, another

11   stolen passport.  And 22, another stolen

12   passport.  And 24, another stolen passport

13   and a driver's license.

14             And then on page 27, extracts

15   of his stolen e-mails, from Farhad Azima.

16             Do you see that stolen e-mail

17   that's embedded in this report?

18       A.   Yes.

19       Q.   More stolen e-mails on 30 -- page

20   30 and 31 and 32 and 33.

21             Where did these e-mails come from?

22       A.   I do not know.  I can estimate

23   that, based on all his e-mails that were

24   leaked, someone prepared that report.

25       Q.   Well, this is almost a year

 1   before the data was placed on the Internet.

 2          The date --

 3      A.   If you believe what is written

 4   here.

 5      Q.   The date?

 6      A.   Yes.

 7      Q.   So you think this is a falsified

 8   date?

 9      A.   I don't know.  I have no clue.

10      Q.   Well, at 11:41 this morning, you

11   said that the reports you wrote started with

12   an executive summary; right?

13      A.   Correct.

14      Q.   And you also stated that they were

15   followed by a breakdown of the findings of

16   the investigation; correct?

17      A.   Correct.

18      Q.   And that's exactly what this report

19   does, doesn't it?

20      A.   I also said that I -- I sent them

21   in an open format to Mr. Stuart Page.  And

22   I also said that I did not retain any report.

23      Q.   Were you involved in writing this

24   report?

25      A.   No.

1        Q.   A few minutes ago, you said you --

2    you weren't sure one way or the other.

3            Why are you now sure you weren't

4    involved in it?

5        A.   Because I see that this is a

6    report of an investigation on Farhad Azima.

7    And we never investigated Farhad Azima.

8            (Exhibit 11 marked.)

9    BY MR. BEHRE:

10       Q.   (Partially translated.)  I'm

11   showing you next what has been marked

12   as Exhibit No. 11.  It's entitled:

13           "Project Beech - Comprehensive

14   Action Plan."

15           It's dated January 26, 2016.

16           THE INTERPRETER:  What's the

17   date?

18           MR. BEHRE:  January 26, 2016.

19           Please --

20           (Remainder of pending question

21       translated.)

22           THE WITNESS:  (Examining.)

23   BY MR. BEHRE:

24       Q.   Have you had a chance to read

25   that?

```
 1      A.   (In English.)  Yeah.

 2           (Translated.)  Just I scanned

 3  through it as quickly as I could.

 4      Q.   And that's one of the Project

 5  Beech reports you prepared, isn't it?

 6      A.   I have no way of knowing, because

 7  I didn't keep any of the documents.  It's

 8  possible that we prepared part of it and

 9  parts of it were added by Stuart afterwards.

10  I have no way of knowing.

11      Q.   Directing your attention to the

12  second page, there's a photograph embedded

13  in this graph, or this chart, with a

14  photograph of Farhad Azima and Khater

15  Massaad.

16           Do you see that?

17      A.   Yes.

18      Q.   And the legend of the chart says

19  those items in red suggest targets for

20  future attack.

21           Do you see that?

22      A.   Yes.

23      Q.   And so not only was Mr. Azima

24  being investigated, he was being targeted

25  and attacked, wasn't he?
```

1          A.   First of all, I don't remember

2     if this report was even produced by us.

3     And by "attack," it means an intelligence

4     attack.

5          Q.   (Not translated.)  Previously

6     you said that Farhad Azima was not

7     investigated.

8          A.   And that's why I have doubts

9     as to whether this is indeed a report

10    that we produced.

11         Q.   Look at the third page.  Quote:

12              "We have been supplying the

13    client with intelligence 'ammunition'

14    against KM and other relevant players

15    such as SI and FA."

16              End quote.

17              "FA" is Farhad Azima, isn't it?

18         A.   I don't know who the "we" is.

19         Q.   Look at page 6.  The heading is

20    entitled:

21              "PR and Media Tools against FA."

22              Do you see that?

23         A.   Yes.

24         Q.   And you can see there that it's

25    talking about, in the second paragraph:

```
 1              "There are other issues
 2    that can be" effectively -- "effective
 3    regarding FA's reputation and even
 4    pose him a criminal exposure."  (As read.)
 5              End quote.
 6              Do you see that?
 7       A.   Yes.
 8       Q.   So it's clear, from that entry
 9    at this page 6, that Farhad Azima was
10    being investigated, he was being targeted,
11    and he was being exposed as a potential,
12    having criminal liability.
13              Do you see that?
14       A.   I didn't say he wasn't.  I just
15    said that I and the people that I represent
16    didn't do it.  Fact -- it -- the fact is
17    that somebody hacked him.
18       Q.   Look at page 7.
19              "We have access to a groundbreaking
20    technology."
21              And that's a quote.
22              That groundbreaking technology
23    was hacking, wasn't it?
24       A.   No.  First of all, I don't know
25    who wrote this document and who has this
```

1   technology.  And if somebody has hacking

2   ability, they just write that they can

3   hack.

4        Q.   And then on page 9, the war

5   terms continue:

6             "In order to eliminate FA's

7   activity" against the -- "regarding

8   the client," it says.  (As read.)

9             Do you see that?

10       A.   Where is it approximately on

11   the page?

12       Q.   (Not translated.)  Page 9 --

13            THE INTERPRETER:  Page --

14   BY MR. BEHRE:

15       Q.   (Not translated.)  -- under:

16            "5.  Involvement of" the "U.S.

17   Relevant Authorities."  (As read.)

18       A.   This looks like a strategic document

19   that somebody prepared.  And this -- this

20   is not a subject we deal with.

21       Q.   Well, not only does this document

22   entitled "Project Beech" --

23            MR. BARET:  Excuse me.  That's

24   not what he said.

25            He said:  "It's not our document."

```
 1              THE INTERPRETER:  Aah, you're right.
 2    Thank you.
 3              MR. BARET:  Okay.
 4              THE INTERPRETER:  "And it's not our
 5    document."
 6              Thank you.
 7    BY MR. BEHRE:
 8         Q.   This document is labeled:
 9              "Project Beech."
10              You were involved in Project Beech.
11    And this establishes, just like the last
12    document, contrary to your testimony, that
13    Farhad Azima was not only being investigated,
14    he was being attacked, he was being targeted,
15    and he was in jeopardy because of that.
16              Isn't that right?
17         A.   As I said, my reports on Project
18    Beech were sent to Stuart Page in an open
19    format.  I don't know who else Stuart used
20    the name Project Beech with.  He made up
21    that name.
22              I know that we did not investigate
23    Farhad Azima.  We did not target him as
24    a target.  But it's quite clear that
25    somebody did, because somebody hacked
```

1    and leaked his computers.

2            And based on the procedures

3    that are used in the U.S., I think you

4    know who it is.

5       Q.   And who would that be?

6       A.   Nick Del Rosso.  According --

7    based on the proceedings against Nick

8    Del Rosso, I conclude that.

9       Q.   And what's your basis for

10   saying Nick Del Rosso is the party who

11   wrote this report?

12           Is that what you're saying?

13      A.   I didn't say Nick Del Rosso

14   wrote this report.  I said that we did

15   not write this report.

16           And based on all the proceedings

17   that are being carried out, the person

18   who is responsible for the hack and the

19   leaks of the hacking is Nick Del Rosso.

20      Q.   Now, you indicated that Nick

21   Del Rosso and Stuart Page did not get

22   along; right?

23      A.   I heard from Stuart that he

24   didn't like, to put it mildly, Nick Del

25   Rosso.  But I -- I didn't even know if

 1   they knew each other.

 2        Q.   And the reason Stuart Page

 3   didn't like Nick Del Rosso is because

 4   Stuart Page thought Nick Del Rosso was

 5   taking business away from Stuart Page;

 6   correct?

 7        A.   I don't know.

 8        Q.   (Not translated.)  Nick Del

 9   Rosso didn't report to Stuart Page,

10   did he, because they hated each other?

11        A.   To the best of my knowledge,

12   no.

13        Q.   And so, therefore, Nick Del

14   Rosso is not a likely suspect for the

15   content of this report, since he would

16   have had to give it to his archenemy,

17   Stuart Page, to incorporate it in the

18   report; right?

19        A.   (Translated.)  I'm not attributing

20   this report to anyone's authorship.  I'm

21   just saying that we didn't write it and

22   we did not investigate --

23             (In English.)  Farhad Azima.

24             THE INTERPRETER:  Sorry.  It's

25   late.

```
 1            MR. BARET:  Say "FA."  Just

 2   use --

 3            THE INTERPRETER:  "FA."

 4            MR. BARET:  -- "FA."

 5            THE INTERPRETER:  Yeah.  It's

 6   late in the day.

 7   BY MR. BEHRE:

 8       Q.   Stuart Page paid you millions

 9   of dollars and your company, including

10   SDC-Gadot; correct?

11       A.   That is correct.

12       Q.   And -- and he paid you to

13   perform work for Project Beech; correct?

14       A.   Yes, he paid me.  But I don't

15   know how much he charged for it.  I don't

16   know what proportion of what he got he

17   paid me.

18            The bottom line is I don't know

19   what reports were submitted to the client.

20   I know what I sent to Stuart Page.  But

21   I don't know what he submitted afterwards.

22       Q.   Do you know what portion of this

23   particular report, Exhibit 11, you provided

24   to Stuart Page?

25       A.   No.  We don't have any documentation
```

1  of these reports in our records.  I don't

2  know.

3      Q.   Well, Stuart Page was your boss.

4  And he paid you millions of dollars.  And

5  he said you and your team authored every

6  one of these project updates about Project

7  Beech.

8          Is that accurate?

9      A.   Stuart Page told me, before

10  he gave his affidavit, that he tried

11  to commit suicide twice because they

12  pressured him and forced him to cooperate.

13          What I know is that we sent

14  reports to Stuart Page, at his request

15  the reports were left open, and that

16  we did not investigate Farhad Azima.

17      Q.   (Not translated.)  Earlier

18  today you had some, I think, ten or

19  eleven pages of notes.  And we'd ask

20  that that be marked as an exhibit since

21  the witness had it in front of him.

22          MR. BARET:  He did not use it.

23  It's privileged.  It's notes we prepared

24  just going over --

25          MR. BEHRE:  His notes were prepared

```
 1   in your presence?

 2           MR. BARET:  Yes.

 3           MR. BEHRE:  Okay.  One second.  I'm

 4   almost done.  Okay.  That's all I have.  Thank

 5   you very much.

 6           THE VIDEOGRAPHER:  Going off the

 7   record at 6:49.

 8           (The deposition concluded at 6:49 p.m.

 9       Israel Daylight Time.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, BRENDA MATZOV, CSR NO. 9243, do

 4    hereby certify:

 5            That, prior to being examined, the

 6    witness named in the foregoing deposition was

 7    asked to acknowledge that their testimony will

 8    be true under the penalties of perjury and will

 9    be the truth, the whole truth, and nothing but

10    the truth.

11            That the foregoing deposition was taken

12    before me, at which time the aforesaid proceedings

13    were stenographically recorded by me and thereafter

14    transcribed by me;

15            That the foregoing transcript, as typed,

16    is a true record of the said proceedings;

17            And I further certify that I am not

18    interested in the action.

19

20            Dated this 30th day of July, 2022.

21

22    _____

23    BRENDA MATZOV, CSR NO. 9243

24

25
```

```
 1                    CERTIFICATE OF WITNESS

 2

 3           I, AMIT FORLIT, witness herein, do

 4   hereby certify and declare the within and

 5   foregoing transcription to be my examination

 6   under oath in said action taken on July 20,

 7   2022, with the exception of the changes

 8   listed on the errata sheet, if any;

 9           That I have read, corrected, and

10   do hereby affix my signature under penalty

11   of perjury to said examination under oath.

12

13

14

15

16   _____   _____

17           AMIT FORLIT, Witness                Date

18

19

20

21

22

23

24

25
```

```
 1                      ERRATA SHEET

 2   Case:      FARHAD AZIMA vs. INSIGHT ANALYSIS AND

 3              RESEARCH LLC AND SDC-GADOT LLC

 4   Date:      JULY 20, 2022

 5   Witness:  AMIT FORLIT

 6

 7   Page _____ Line _____ Change _____

 8   Reason _____

 9   Page _____ Line _____ Change _____

10   Reason _____

11   Page _____ Line _____ Change _____

12   Reason _____

13   Page _____ Line _____ Change _____

14   Reason _____

15   Page _____ Line _____ Change _____

16   Reason _____

17   Page _____ Line _____ Change _____

18   Reason _____

19   Page _____ Line _____ Change _____

20   Reason _____

21   Page _____ Line _____ Change _____

22   Reason _____

23

24   _____   _____
               AMIT FORLIT, Witness              Date

25
```