Exhibit A-6

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF FLORIDA

3                       MIAMI DIVISION

4    _____
                                           )
5    FARHAD AZIMA,                         )
                                           )
6                       Petitioner,        )
                                           )
7    vs.                                   )  Case No.:
                                           )  1:22-MC-20707
8    INSIGHT ANALYSIS AND RESEARCH LLC     )
     AND SDC-GADOT LLC,                    )
9                                          )
                        Respondents.       )
10   _____)

11

12

13

14           Videotaped 30(b)(6) Deposition of

15           INSIGHT ANALYSIS AND RESEARCH LLC

16       by and through its Corporate Representative

17                       AMIT FORLIT

18                Thursday, July 21, 2022

19           11:07 a.m. Israel Daylight Time

20

21

22

23

24

25   Reported by:  BRENDA MATZOV, CSR NO. 9243

```
 1              Videoconference 30(b)(6) deposition
 2    of INSIGHT ANALYSIS AND RESEARCH LLC, by and
 3    through its Corporate Representative, AMIT
 4    FORLIT, taken in the above-entitled cause
 5    pending in the United States District Court,
 6    for the Southern District of Florida, Miami
 7    Division, before BRENDA MATZOV, CSR NO. 9243,
 8    at the David Intercontinental Hotel, Tel Aviv,
 9    Israel, and simultaneously in the Zoom
10    participants' remote locations, on Thursday,
11    the 21st day of July, 2022, at 11:07 a.m.
12    Israel Daylight Time.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES:

 2   FOR PETITIONER:

 3            BARET LAW GROUP
              By:  ELAN I. BARET, ESQ.
 4            3999 Sheridan Street
              Suite 200
 5            Hollywood, Florida 33021
              (954) 486-9966
 6            elan@baretlawgroup.com

 7

 8   FOR RESPONDENTS:

 9            MILLER & CHEVALIER CHARTERED
              By:  KIRBY D. BEHRE, ESQ.
10                 IAN A. HERBERT, ESQ.
              900 16th Street N.W.
11            Black Lives Matter Plaza
              Washington, D.C. 20006
12            (202) 626-5800
              kbehre@milchev.com
13            iherbert@milchev.com

14
              BURLINGTONS LEGAL, LLP
15            By:  DOMINIC HOLDEN
              5 Stratford Place
16            London, W1C 1AX
              +44 20 7529 5420
17            dominic.holden@burlingtons.legal

18

19

20

21

22

23

24

25
```

```
1   APPEARANCES (Continued):

2   ALSO PRESENT (in Israel):

3           MITCHELL COOPERSMITH, Videographer

4           HAYA SHAVIT-KEDAR, Hebrew Interpreter

5           RUCHIE AVITAL, Hebrew Interpreter

6

7   ALSO PRESENT (remotely via Zoom):

8           LESLEY SEMONES, Miller & Chevalier

9           FREDERICK WILMOT-SMITH, Burlingtons Legal

10          LUKE HACKETT, Burlingtons Legal

11          FARHAD AZIMA

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   WITNESS

 3   Amit Forlit

 4   (Witness Location:  Tel Aviv, Israel)

 5

 6   EXAMINATION                              PAGE

 7   By Mr. Behre                                9

 8   By Mr. Baret                              129

 9

10                    E X H I B I T S

11   NUMBER          DESCRIPTION            MARKED

12   Exhibit 1       Multiple Invoices from
                     SDC-Gadot LLC to Page
13                   Group ME Ltd. and Page
                     Risk Management DMCC,
14                   Multiple Dates
                     (Provided by Amit Forlit)
15                   (No Bates Number)          13

16   Exhibit 2       Multiple Invoices from
                     Insight Analysis and
17                   Research LLC to Page
                     Group ME Ltd., PGME,
18                   and Page Risk Management
                     DMCC, Multiple Dates
19                   (Provided by Amit Forlit)
                     (No Bates Number)          15
20
     Exhibit 3       Document Entitled
21                   "Electronic Articles of
                     Organization for Florida
22                   Limited Liability Company,"
                     for Insight Analysis and
23                   Research LLC, Date Filed
                     October 18, 2017, and
24                   Related Documents
                     (No Bates Number)          52
25
```

```
 1                  E X H I B I T S

 2   NUMBER          DESCRIPTION                  MARKED

 3   Exhibit 4       Document Entitled
                     "Business Resolution or
 4                   Authorization for Opening
                     and Maintaining Banking
 5                   Relationship," Dated
                     October 30, 2017
 6                   (BANA_Azima000284 to 000288)     61

 7   Exhibit 5       Multiple Bank of America
                     Statements for Insight
 8                   Analysis and Research LLC,
                     Multiple Dates
 9                   (BANA_Azima000222 to 000283
                     and BANA_Azima000001 to 000182)   63

10
     Exhibit 6       Document Entitled
11                   "Project Beech - Financial
                     Investigation Report #1,"
12                   Dated March 13, 2016
                     (No Bates Number)                101

13
     Exhibit 7       Multiple Invoices from
14                   Insight Analysis and
                     Research LLC to Page
15                   Group ME Ltd., PGME,
                     and Page Risk Management
16                   DMCC, Multiple Dates
                     (No Bates Number)                120

17

18

19

20         Q U E S T I O N S   I N S T R U C T E D

21              N O T   T O   A N S W E R

22                      (None.)

23

24

25
```

```
 1                THURSDAY, JULY 21, 2022

 2             11:07 A.M. ISRAEL DAYLIGHT TIME

 3

 4           THE VIDEOGRAPHER:  Today's date is

 5  July 21st, 2022.  And the time on the video

 6  monitor is 11:07 a.m.

 7           This is the videotaped deposition

 8  of Amit Forlit, in the matter of Farhad

 9  Azima versus Insight Analysis and Research

10  LLC and SDC-Gadot LLC, being heard in the

11  United States District Court, Southern

12  District of Florida, Case No. 1:22-MC-20707.

13           The videotaped deposition is taking

14  place in Tel Aviv, Israel, as well as parties

15  are attending remotely.

16           Would the counsel present -- present

17  in Tel Aviv please voice-identify themselves

18  and whom they represent.

19           MR. BEHRE:  Kirby Behre, on behalf

20  of Mr. Azima.

21           MR. BARET:  Elan Baret, on behalf

22  of Insight and Gadot SDC.

23           MR. HERBERT:  Ian Herbert, on

24  behalf of Farhad Azima.

25           MR. HOLDEN:  Dominic Holden, on
```

```
 1   behalf of Farhad Azima.
 2           THE VIDEOGRAPHER:  Will the court
 3   reporter please affirm the interpreters and
 4   the witness.
 5
 6                HAYA SHAVIT-KEDAR
 7                      and
 8                  RUCHIE AVITAL,
 9           the interpreters, were duly affirmed
10           to translate from English to Hebrew
11           and from Hebrew to English.
12
13           (The following proceedings were
14           conducted through the interpreters,
15           unless otherwise indicated, and
16           excluding colloquy.)
17
18           THE COURT REPORTER:  I will ask
19   counsel to please stipulate that, in lieu
20   of formally swearing in the witness, the
21   reporter will instead ask the witness to
22   acknowledge that their testimony will be
23   true under the penalties of perjury, that
24   counsel will not object to the admissibility
25   of the transcript based on proceeding in
```

```
 1   this way, and that the witness has verified

 2   that he is Amit Forlit.

 3             Counsel, do you agree?

 4             MR. BEHRE:  Yes.

 5             MR. BARET:  Agreed.

 6             THE COURT REPORTER:  Mr. Forlit,

 7   do you hereby acknowledge that your testimony

 8   will be true under the penalties of perjury

 9   and do you affirm that the testimony you are

10   about to give in this deposition will be the

11   truth, the whole truth, and nothing but the

12   truth?

13             THE WITNESS:  Yes.

14

15                   AMIT FORLIT,

16             called as a witness, was examined

17             and testified under penalty of

18             perjury as hereinafter set forth.

19

20                   EXAMINATION

21   BY MR. BEHRE:

22        Q.   Good morning, Mr. Forlit.

23        A.   Good morning.

24        Q.   Would you please state your full

25   name for the record?
```

1        A.    Amit Forlit.

2        Q.    Have you ever used any other name

3   besides Amit Forlit?

4        A.    In my former years of service in

5   the Israeli secret service, I had a nickname.

6        Q.    And what was that nickname?

7        A.    Omer.

8              THE INTERPRETER:  Omer?

9              THE WITNESS:  (In English.)  Captain

10  Omer.

11             THE INTERPRETER:  "Omer."

12  BY MR. BEHRE:

13       Q.    Could you spell that?

14       A.    (In English.)  O-m-e-r.

15             (Translated.)  O-m-e-r.

16       Q.    And what does that stand for, if

17  anything?

18       A.    It's a nickname.  No, just a nickname.

19       Q.    Other than that nickname, have you

20  ever used any other name, first and/or last?

21       A.    No.

22       Q.    You are here today as the corporate

23  representative for Insight Analysis and

24  Research LLC; correct?

25       A.    Yes.

```
 1        Q.   And that is a Florida corporation;
 2   correct?
 3        A.   Yes.
 4        Q.   Yesterday you testified on behalf
 5   of SDC-Gadot; correct?
 6        A.   Yes.
 7        Q.   (Partially translated.)  And the
 8   "SDC" in that name refers to "safe data
 9   control"; correct?
10             THE INTERPRETER:  Say that again.
11             THE COURT REPORTER:  "Safe -- safe
12   data" --
13             THE WITNESS:  (In English.)  "Safe
14   data" --
15             THE COURT REPORTER:  -- "control."
16             THE WITNESS:  (In English.)
17   -- "control."
18             (Remainder of pending question
19        translated.)
20             THE WITNESS:  Apparently, yes.
21   You just reminded me of it.
22   BY MR. BEHRE:
23        Q.   Now, since your testimony last
24   night, other than with counsel, have you
25   had any discussions about your testimony?
```

```
 1        A.   I spoke with my -- members of

 2   my family about it.

 3        Q.   And by that, do you mean your

 4   wife?

 5        A.   Yes.

 6        Q.   Your son?

 7        A.   Also, yes.

 8        Q.   Anyone else?

 9        A.   Not that I recall.  No.

10        Q.   Did you talk with anyone about

11   SDC-Gadot?

12        A.   I spoke -- I spoke about the process.

13   So I assume we may have mentioned SDC-Gadot.

14   I spoke about my experience.

15        Q.   And other than your family, did you

16   talk to anybody else about SDC-Gadot?

17        A.   Yes.  I also spoke to Omri.  I asked

18   him to prepare for me the invoices.

19        Q.   Okay.  And those -- by "invoices,"

20   you're talking about the SDC-Gadot invoices

21   we discussed yesterday?

22        A.   Yes.

23        Q.   And did you bring those with you

24   today?

25        A.   Yes.
```

```
 1        Q.   And how many invoices were you able
 2   to locate?
 3        A.   I'm counting.  Eight.
 4             MR. BEHRE:  Okay.  And could we mark
 5   this as an exhibit, please.
 6             THE COURT REPORTER:  He's got the
 7   stickers.  I don't know what number you want.
 8             MR. HERBERT:  Start at 1?
 9             MR. BEHRE:  I guess it's 1.  You
10   want to put it on the document, not on the
11   plastic.
12             THE COURT REPORTER:  It's okay.
13   I'll put it --
14             MR. HERBERT:  No, I can --
15             THE COURT REPORTER:  Thanks.
16             Might as well staple it too.
17             MR. BEHRE:  Let me just jot down
18   what the dates are and the invoice number.
19   You need to mark it, the number.
20             MR. HERBERT:  Oh, sorry.
21             (Exhibit 1 marked.)
22   BY MR. BEHRE:
23        Q.   Now I'm showing you what we've
24   marked as Exhibit No. 1.
25             Those are the invoices you brought
```

1    today that you were able to locate overnight

2    regarding SDC-Gadot; correct?

3         A.   (Examining.)   Yes.

4         Q.   And who -- who located these for you?

5         A.   My financial person, Omri.

6         Q.   Omri Gur Lavie?

7         A.   Yes.

8              MR. BEHRE:  Do you want the spelling

9    of that?

10             THE COURT REPORTER:  I think we have

11   it.

12   BY MR. BEHRE:

13        Q.   And are these all the invoices he

14   was able to find?

15        A.   These are all the invoices related

16   to the Beech Project.

17        Q.   For SDC-Gadot?

18        A.   Yes.

19        Q.   And you also, several times yesterday,

20   indicated that you would look for additional

21   documents.

22             Were you able to locate any other

23   documents overnight?

24        A.   What do you mean?

25        Q.   Were you able to locate any other

1  documents overnight?

2      A.   The -- the invoices of Insight

3  LLC [sic] in regards to the Beech Project.

4      Q.   And did you bring those with you

5  today?

6      A.   Yes.

7      Q.   And how many of those are there?

8      A.   I'll count them.  I think -- I

9  believe 19.  But I'll check.  18.

10         MR. BEHRE:  And can we mark that

11  as Exhibit No. 2.

12         (Exhibit 2 marked.)

13  BY MR. BEHRE:

14     Q.   I'm showing you what's been marked

15  as Exhibit No. 2.

16         Are these the invoices you were

17  able to locate overnight regarding Insight?

18     A.   (Examining.)  Yes.

19     Q.   Did you obtain those from Mr. Gur

20  Lavie as well?

21     A.   Yes.

22     Q.   Other than the invoices, what else

23  did you discuss with Mr. Gur Lavie overnight?

24     A.   Only the issue of money transfers

25  and the invoices.

1     Q.   And what did you discuss regarding

2   money transfers?

3     A.   I asked -- I requested him to

4   provide all the invoices that pertain to

5   Project Beech.

6     Q.   Well, you referenced a discussion

7   about money transfers.

8          What did that concern?

9     A.   The invoice is against a transfer

10  of fund [sic].  That was what I meant.

11    Q.   And did Mr. Gur Lavie confirm

12  that, for each invoice, there was, in

13  fact, a payment received?

14    A.   I -- I don't think -- I don't

15  believe that we discussed it that much

16  in-depth.  We discussed the invoices.  And

17  perhaps this former definition of mine of

18  discussing bank transfers was not exactly

19  accurate.

20    Q.   Okay.  Did you talk to Mr. Propis

21  since your deposition yesterday?

22    A.   No.

23    Q.   What about Mr. Goldberger?

24    A.   No.

25    Q.   What about Stuart Page?

```
1       A.   No.

2       Q.   And what about Neil Gerard?

3       A.   No.

4       Q.   What about David Hughes?

5       A.   No.

6       Q.   Anyone else that I haven't covered

7  yet?

8       A.   And I -- neither did I speak with

9  the boss.

10      Q.   In addition to the two sets of

11 invoices, are there any other documents

12 that you've located that you'd like to

13 provide to us today?

14      A.   At your request, I have located

15 the dates of my visit to London in the

16 beginning of 2020.  Unfortunately, I don't

17 have the dates of the trial in London.  So

18 I cannot confirm if I was there at the time

19 of the trial.

20      Q.   And did you bring those records

21 with you?

22      A.   I made myself a note.

23           Would you like me to give you the

24 dates?

25      Q.   Yes, please.
```

```
 1        A.   Between the 27th and the 30th of
 2   January and between the 17th of February
 3   to the 20th of February.
 4        Q.   And those are dates you were in
 5   London?
 6        A.   Yes.
 7        Q.   And were you with Stuart Page
 8   when you were in London on those two trips?
 9        A.   I do not remember clearly and
10   specifically if we met.  But I assume that
11   we met.  Because, generally, when I would
12   come to London and he would be in London,
13   we would meet.
14        Q.   And do you recall if you met with
15   anybody else regarding Project Beech during
16   those two trips?
17        A.   I don't remember.
18        Q.   You're aware that a subpoena for
19   documents was served on Insight, the Florida
20   entity; correct?
21        A.   I found out quite belatedly.  But
22   yes, I did find out eventually.
23        Q.   And are you aware that no documents
24   to date have been provided by you or your
25   counsel regarding this company?
```

1      A.   I am aware that we opposed some

2   of your requests in this regard.  And we

3   are still awaiting the final judgment

4   regarding this issue.

5      Q.   And did Insight -- did or does

6   Insight file tax returns with the U.S.

7   Government or a State Government?

8      A.   Insight, just like SDC-Gadot,

9   regularly and duly reports to the authorities.

10      Q.   Which authorities?

11      A.   We're employing an accountant who

12   takes care of that.  I assume that he's

13   reporting to the authorities of Florida.

14   But I don't know it for a fact.

15      Q.   And what's the name of that

16   accountant?

17      A.   It's the -- the CPA firm Aminach.

18          THE INTERPRETER:  Aminach.

19   BY MR. BEHRE:

20      Q.   Could you spell that, please?

21      A.   I can spell it in Hebrew.

22          THE INTERPRETER:  A-m-i-n-a-c-h.

23   Aminach.

24          THE WITNESS:  It's one of the

25   larger companies here in Israel -- firms.

1  BY MR. BEHRE:

2      Q.   And do they have an office in

3  Florida?

4      A.   No.  They have a license to --

5  to perform accounting work in America.

6  They have a department especially designed

7  for that.

8      Q.   Did Insight file tax returns

9  at any point with U.S. State or Federal

10  Government?

11      A.   I don't know.

12      Q.   Can you tell us what you've done

13  to prepare for today's deposition as the

14  corporate representative of Insight?

15      A.   I reviewed all the payments that

16  we received in regard to the Beech Project.

17      Q.   And how were you able to determine

18  and review all the payments that you received

19  regarding Project Beech?

20      A.   The preparation for the testimony

21  on Insight was the same as I did for SDC-Gadot.

22  I did not prepare anything special for today.

23  And since our bank account with the Bank of

24  America was closed, I assume that all these

25  invoices were paid.  And that is the source

1    of my information about all these payments.

2        Q.   Have you reviewed bank records

3    from the Bank of America regarding Insight?

4        A.   No.  Because, as I said, since our

5    account has been closed, we have no access

6    to the bank records.

7        Q.   And you said "our account."

8             Are you referring to you and

9    Mr. Gur Lavie as the account holders?

10       A.   Mr. Gur Lavie is merely a financial

11   officer.  So when I say "we," I refer to

12   the company, Insight as a company, exclusively

13   to myself.

14       Q.   Did you speak with Mr. Gur Lavie

15   in preparation for your testimony here

16   today?

17       A.   I -- I had spoken to him before

18   my -- yesterday's testimony about Gadot.

19   I spoke to him yesterday merely to ask

20   him to prepare those invoices that I had

21   promised you.

22       Q.   Did you talk to him about Insight

23   specifically since that's why you're here

24   today to testify?

25       A.   I see Omri almost on a daily basis.

```
 1   Until the day before yesterday, we discussed
 2   quite a lot.  We discussed these issues quite
 3   a lot.  I discuss it with him also as a friend.
 4   But since yesterday, we -- basically we discussed
 5   only the -- the invoices that I requested from
 6   him.  I have no recollection of any other
 7   discussions.
 8        Q.   Regardless of whether it was yesterday
 9   or the day before yesterday or even before
10   that, did you talk to Mr. Gur Lavie to prepare
11   for your testimony today?
12        A.   I assume yes.
13        Q.   And do you recall what you discussed
14   with him to prepare for your testimony today?
15        A.   Mainly I requested him to -- to
16   re-produce the -- the invoices, if he could
17   re-produce the invoices.
18        Q.   Anything else other than about the
19   invoice reproduction?
20        A.   No.
21        Q.   Did or does Insight conduct business
22   in the United States?
23        A.   No.
24        Q.   And you -- I've asked you this.  I
25   wasn't sure of the answer.
```

1            Did or does Insight file tax returns

2    in the U.S.?

3        A.   Yes.

4        Q.   And you say that Insight doesn't

5    conduct business in the United States.

6            What is the purpose of forming

7    Insight, if not to conduct business in the

8    U.S.?

9        A.   The purpose of setting up Insight

10   was a conduit or a pipeline to transfer

11   funds in a more convenient manner, in view

12   of the difficulties that we've had with

13   money transfers prior to the setting up

14   of the two companies SDC-Gadot and Insight.

15           When -- when I mentioned that it

16   was not conducting any business in the United

17   States, I meant that it does not perform any

18   work, any operations, any -- anything that

19   could be termed as business other than merely

20   money transfers.

21       Q.   And are those -- yesterday, during

22   your deposition for SDC-Gadot, you indicated

23   that that company was set up primarily so

24   that Stuart Page could pay you for Project

25   Beech.

```
 1                Is that the same purpose that
 2   Insight was set up as well?
 3       A.   Yes.  But not only as pertaining
 4   to the Beech Project or as pertaining Stuart
 5   Page.
 6       Q.   And what else besides pertaining
 7   to the Beech Project or Stuart Page was --
 8   were these companies set up for?
 9                Sorry.
10       A.   Stuart Page had other projects
11   in addition to the project that we are
12   calling Project Beech.  And there were
13   also other clients.
14       Q.   Okay.  Is Insight affiliated
15   with Insight GSIA, a BVI company?
16       A.   No.
17       Q.   And you're involved in Insight
18   GSIA; correct?
19       A.   No.
20       Q.   Do you own that company?  Or have
21   you ever owned it?
22       A.   No.
23       Q.   Who owns it?
24       A.   A guy named Effi Lavie.
25       Q.   And who is Effi Lavie?
```

```
 1        A.   Another investigator who, to the
 2   best of my knowledge, has worked with Stuart
 3   Page.
 4        Q.   And, in fact, Effi Lavie was your
 5   business partner in Gadot EA going back to
 6   the 1990s; correct?
 7             MR. BARET:  Excuse me.  I would
 8   ask counsel to stick to the purpose of the
 9   deposition.  This is not a deposition of
10   Mr. Amit Forlit.  And --
11             MR. BEHRE:  Oh, we're getting
12   there.
13             MR. BARET:  -- I'm trying -- no.
14             MR. BEHRE:  We're getting there.
15             MR. BARET:  Okay.
16             MR. BEHRE:  I'll tie it up.
17             MR. BARET:  I'm trying -- I'm
18   trying to not interfere.
19             MR. BEHRE:  Okay.
20             MR. BARET:  But --
21             MR. BEHRE:  I'll get there.  It'll
22   tie directly.
23             MR. BARET:  Yeah, but you -- you --
24   you are deposing Amit Forlit as Amit Forlit,
25   not Insight.
```

```
 1              MR. BEHRE:  No, I'm not.

 2              MR. BARET:  You're asking him about --

 3              MR. BEHRE:  No.  Just wait.

 4              MR. BARET:  -- companies --

 5              MR. BEHRE:  Just -- just wait and

 6    see.

 7              Did he finish his answer?

 8              THE WITNESS:  Effi Lavie has no

 9    connection whatsoever to Insight LLC.  [sic]

10    BY MR. BEHRE:

11         Q.   Isn't it a fact that Effi Lavie

12    was the financial controller of Insight?

13         A.   Which Insight?

14         Q.   In -- I don't know which Insight.

15    You tell me.

16         A.   Effi Lavie has no connection

17    whatsoever to Insight LLC in the U.S.

18         Q.   Does he have any involvement

19    with any entity called Insight?

20         A.   I assume yes, to the Insight

21    registered in BVI.

22         Q.   But not the one in the U.S.?

23         A.   Correct.

24         Q.   And you're sure of that?

25         A.   Yes.
```

1        Q.   Now, you're aware that Insight

2   LLC was discussed at Mr. Azima's trial;

3   correct?

4        A.   I don't know.

5        Q.   Did -- have you read Stuart

6   Page's testimony at the trial of --

7   involving Farhad Azima?

8        A.   I did not read the testimony.

9   I heard about it from him.

10       Q.   And did you hear that he testified

11   that Insight was responsible for preparing

12   written reports regarding Project Beech?

13       A.   I don't recall that.

14       Q.   Did Insight have a role in preparing

15   invoices for the Project Beech project?

16       A.   Insight U.S. had a role in preparing

17   the invoices.  And we charged through Insight

18   U.S.

19       Q.   And charged who for those reports?

20       A.   We charged Stuart Page's company

21   for work that we did on Project Beech.

22       Q.   And when you say "we did on Project

23   Beech," who is "we"?

24       A.   My firm.

25       Q.   And which firm is that?

1        A.    Gadot Information Services.

2        Q.    And why is Gadot Information Services

3   billing through a company known as Insight?

4        A.    Because it was convenient for us

5   to charge via a number of U.S. companies.

6   And we split up the charge.

7        Q.    And, in your view, is it a good

8   business practice for one company to bill

9   for the work of another company with a

10   totally different named formed in a

11   totally different country?

12        A.    At the time it was.

13        Q.    And why -- why was that a good

14   business practice?

15        A.    It was ultimately -- because,

16   with Insight, when the bank did not have

17   limitations on the transfer amounts,

18   ultimately Insight was more active than

19   Gadot LLC [sic].

20             In other words, the reason why

21   we opened up two companies turned out to

22   be the right thing to do.

23        Q.    Why did you create --

24        A.    Or at least convenient to do.

25        Q.    Why did you create, at the exact

1  same time, two U.S. entities when you only

2  needed one?

3      A.   Ultimately, we tried to open

4  another bank account in Chase Manhattan.

5  And that didn't go well.  But what happened

6  was we worked with Insight.  And it was --

7  turned out to be more active than the other

8  company.

9      Q.   So if I understand your testimony,

10  the project updates were prepared by Gadot,

11  the Israeli company.  But that work was

12  billed through a company called Insight

13  that was created in the United States?

14      A.   (Translated.)  Insight and

15  Gadot LL -- SDC.

16          (In English.)  SDC.

17      Q.   And payment was made into the

18  U.S. via wire for that work; correct?

19      A.   In the United States.  Yes.

20          Yes, the money transferred to the

21  U.S. company and, from there, transferred

22  to Israel, to the Israeli company rather.

23      Q.   And can you give us some explanation

24  for why, upon receipt of the money in the

25  U.S., it was then transferred, sometimes

1   immediately, over to Israel and the Gadot

2   company in Israel?

3       A.   The money was transferred based

4   on financial considerations having to

5   do with the -- with the case and other

6   considerations.

7       Q.   During your meetings in Cyprus,

8   was Insight ever discussed?

9       A.   Not that I can recall.

10      Q.   And during those meetings, Stuart

11  Page's testimony was rehearsed; correct?

12      A.   In Cyprus?  No.

13      Q.   What about in Switzerland, was

14  Stuart Page's testimony rehearsed there?

15      A.   I don't know.  Because, in most

16  of the discussions that related to the

17  trial, I wasn't present.

18      Q.   (Partially translated.)  Was

19  a woman by the name of Liat Czerwonagora

20  involved in preparation of the reports

21  that were billed through Insight in the

22  United States?

23          THE INTERPRETER:  Did I get

24  that right?  Czergora [sic]?  Could you

25  spell it?

```
 1              MR. BEHRE:  C-z -- oh, it's on

 2    the screen.

 3              THE INTERPRETER:  Kind of.  Yeah.

 4    C-z-e-r-w-o-n-a-g-o-r-a.

 5              (Pending question fully translated.)

 6              THE WITNESS:  No.  I don't think

 7    so.

 8    BY MR. BEHRE:

 9       Q.   (Partially translated.)  Well,

10    she -- she helped manage a hostel in London

11    called Hayarkon 48 Hostel; is that correct?

12              THE INTERPRETER:  Could you repeat

13    the name?

14              THE WITNESS:  (Comment in Hebrew.)

15              (Remainder of pending question

16         translated.)

17              THE WITNESS:  No.  It's not correct.

18    BY MR. BEHRE:

19       Q.   Well, isn't it true that that hostel,

20    Hayarkon 48 Hostel, was owned by Omri Gur Lavie?

21       A.   Yes.

22       Q.   And you made payments to that hostel

23    several times from your accounts in the United

24    States?

25       A.   Correct.  But that hostel is located
```

1   in Israel, not London.

2       Q.   Okay.  The payments were made to

3   that hostel; correct?

4       A.   "Kin."

5            The company Hayarkon 48 is owned

6   by Omri Gur Lavie.

7       Q.   And those payments were, at least

8   in part, payments for the role that Liat

9   played in the preparation of the reports;

10  correct?

11      A.   No.

12      Q.   Do you know Jean Goldi Horta?

13      A.   Yes, I do.

14      Q.   She was involved in the preparation

15  of the reports that were paid through the

16  U.S. entities; correct?

17      A.   No.

18      Q.   Didn't she hold a position with

19  one of the U.S. entities as a risk analyst

20  and data scientist?

21      A.   To the best of my knowledge, no.

22      Q.   Was she ever employed by Insight

23  or Gadot?

24      A.   No.

25      Q.   Was she a freelance consultant

1   to any of those entities?

2        A.   No.

3        Q.   So it's your testimony she did

4   no work for any of your entities?

5        A.   None of the American companies.

6   I think she worked for Dinka.

7        Q.   And what is Dinka?

8        A.   Dinka is a company owned by Rafi

9   Pridan.

10        Q.   And Dinka was paid through one

11   or both of your U.S. entities; correct?

12        A.   I don't recall.  I'd have to

13   review.

14        Q.   Okay.  We can do that.

15             And she worked with Rafi Pridan;

16   correct?

17        A.   In my opinion, she worked with

18   Rafi Pridan.  But she did not work on

19   Project Beech.

20        Q.   And Pridan introduced Stuart

21   Page to you; is that correct?

22        A.   In 2007 or '8.

23        Q.   And Stuart Page ultimately gave

24   you work on Project Beech for which you

25   were paid through your U.S. entities;

```
 1   correct?

 2        A.   I received payment for Project

 3   Beech through the American companies.

 4        Q.   And you paid Rafi Pridan a

 5   10 percent commission on the work that

 6   Stuart gave you -- Stuart Page gave you;

 7   correct?

 8        A.   I paid him commission.  But I

 9   don't recall the exact percentage.

10        Q.   And those commissions were paid

11   to him, at least in part, through the two

12   U.S. entities; correct?

13        A.   Correct.

14        Q.   And Rafi Pridan has been twice

15   charged for wiretapping offenses in Israel;

16   correct?

17        A.   From general knowledge, I have

18   heard that too.

19        Q.   And, in 1999, he was sentenced

20   to four years imprisonment for that type

21   of conduct involving an Israeli media

22   mogul by the name of Ofer Nimrodi?

23        A.   I didn't know him in 1999.

24        Q.   Did you know him in 2011?

25        A.   Yes.
```

1         Q.   And in that year, he was again

2    sentenced for similar conduct against an

3    individual by the name of Avigdor Lieberman.

4         A.   Okay.

5         Q.   Were you aware of that?

6         A.   I guess I was.

7         Q.   Rafi Pridan is a known hacker,

8    isn't he?

9         A.   Not to the best of my knowledge.

10        Q.   Well, on two occasions, he was

11   prosecuted and convicted and sentenced

12   for hacking; right?

13        A.   You said 1999 was wiretapping.

14        Q.   Well, I'm asking you --

15        A.   And, in 2011, I don't think the

16   charge was hacking.

17        Q.   What was the charge?

18        A.    In 2011, I think it was something --

19   fax collecting or something like that.  I

20   don't know.  Something to do with Lieberman.

21             MR. BEHRE:  Facts, f-a-c-t-s,

22   collecting?

23             THE INTERPRETER:  No.  Fax, f-a-x.

24   Facsimile machine.

25             MR. BEHRE:  Aah.

```
 1              THE INTERPRETER:  Facsimile machine.

 2              MR. BEHRE:  That's very retro.  Okay.

 3   BY MR. BEHRE:

 4        Q.   You know Alan Apelblat; right?

 5        A.   No.

 6        Q.   Wasn't he a senior intelligence

 7   and business analyst for one of your entities?

 8        A.   I don't remember.  I had a lot of

 9   employees.  Alan?  Maybe.

10              Alan didn't work in any of the

11   American companies.

12        Q.   Did he work on the project updates

13   that were paid for through the American

14   companies?

15        A.   No, I'm not familiar with anything

16   called "project update."  And to the best

17   of my knowledge, Alan did not work on

18   Project Beech.

19        Q.   Apologies.

20              When I say "project update," I'm

21   referring to the updates that were prepared

22   by you and your company for Project Beech.

23        A.   They weren't updates.  There were

24   reports of findings in the project known as

25   Beech.
```

```
 1       Q.   Okay.  Are you familiar with
 2   Guerillmo Fremd, F-r-e-m-d.
 3       A.   I think he also worked for one
 4   of my companies, but nothing to do with
 5   Project Beech.
 6       Q.   Didn't he assist in the preparation
 7   of reports for Project Beech for which you
 8   received payment in the United States?
 9       A.   No.
10       Q.   He had a title of senior
11   intelligence and business analyst; correct?
12       A.   I never gave anybody that title.
13       Q.   Now, specifically with regard to
14   Insight and its bank account at Bank of
15   America, did it have a $50,000 wire limit
16   like you had in SDC-Gadot?
17       A.   No.  I think there might have
18   been a limit at 250,000.  But I'm not sure.
19       Q.   And the Insight Bank of America
20   account was opened in 2017; correct?
21       A.   Correct.
22       Q.   And between 2017 and through
23   2020, more than $10 million was deposited
24   into that account; correct?
25       A.   I have to assume that you are
```

1  right, because you have the bank statements

2  and I don't.

3       Q.   Does that sound about right?

4       A.   Yes.  That seems to make sense.

5       Q.   (Partially translated.)  And

6  of that over $10 million, $7,488,310 was

7  received from Stuart Page in those four

8  years.

9            Does that sound correct?

10      A.   No.

11           THE INTERPRETER:  Could you --

12           THE WITNESS:  No.

13           THE INTERPRETER:  Four --

14           THE WITNESS:  Seven --

15           (Pending question partially

16      re-translated.)

17           THE WITNESS:  (In English.)  Ten.

18  It's not of seven.

19           THE INTERPRETER:  Could you repeat

20  the number?

21           MR. BEHRE:  7,488,310.

22           THE WITNESS:  (In English.)  No

23  cents.

24           (Pending question re-translated.)

25           THE WITNESS:  Stuart Page paid for

1   a number of projects besides Project Beech.

2   So yes, that sounds about right.

3   BY MR. BEHRE:

4        Q.   And yesterday we talked about the

5   deposits into the U.S. account for SDC-Gadot.

6   And those records indicated that you received

7   about 2.7 million from Stuart Page into that

8   account.

9             Do you recall that testimony?

10       A.   Yes.

11       Q.   And so combining the two U.S.

12  entities, during those four years -- 2017,

13  2018, 2019, and 2020 -- you received over

14  $10 million from Stuart Page into your

15  U.S. accounts; correct?

16       A.   That is correct.  But only part

17  of it -- and I'm not sure exactly which

18  part -- I'd have to add it up -- came

19  because of payment for Project Beech.

20       Q.   So approximately what percentage

21  would you estimate of that over $10 million

22  was attributable to Project Beech?

23       A.   I estimate about 50 percent.

24       Q.   So over $5 million over four years;

25  correct?

```
 1        A.   Correct.

 2        Q.   And of that $5 million approximately,

 3   how much was paid out to your subcontractors

 4   or vendors that were working on Project

 5   Beech?

 6        A.   Most of the sum, in my opinion,

 7   was paid to Gadot Israel.

 8        Q.   How were your subcontractors or

 9   vendors paid?

10        A.   They were paid by Gadot Israel.

11   And a small number, I guess, I estimate,

12   received payment from the American account.

13        Q.   In addition to subcontractors or

14   vendors, were there any other individuals

15   or entities that worked on Project Beech

16   at your direction for which you paid them?

17        A.   I don't recall.  It's possible.

18        Q.   Has Insight ever had employees?

19        A.   No.

20        Q.   Now, you indicated yesterday

21   that, in addition to subcontractors and

22   vendors, at times you used sources to get

23   information from certain targets that you

24   were investigating.

25             Do you recall that testimony?
```

1      A.   Yes.

2      Q.   And how were those sources paid

3  for the work they did on Project Beech?

4      A.   Through the subcontractors.

5      Q.   And who were those subcontractors?

6      A.   Majdi Halabi was one of them.

7      Q.   Who else?

8      A.   I don't recall.

9      Q.   And how was Halabi paid?  Through

10  what entity?

11      A.   I don't recall.  But I think we

12  probably wired him money from an Israeli

13  bank to his Israeli bank.

14      Q.   So if I understand the money

15  flow, Stuart Page would pay your entities

16  for Project Beech through your two U.S.

17  entities.  And those two U.S. entities

18  would send the money to your Israeli

19  company Gadot, which would then pay

20  Halabi?

21          Do I have that correct?

22      A.   Sounds right.  I think Halabi

23  also received direct payment from the

24  legal firms of the client.

25      Q.   And who were those legal firms?

1   Dechert?

2       A.   You'd have to ask him.  I don't

3   know.

4       Q.   (Not translated.)  Stewarts

5   Law?  Do you recall that name?

6       A.   I remember those two names,

7   Stewarts Law and Dechert.  But I don't

8   know who commissioned his work and who

9   paid him.

10       Q.   You indicated earlier that,

11   from the Insight Bank of America account

12   for the U.S. entity Insight, monies were

13   sent to Gadot Information Services in

14   Israel; correct?

15       A.   Money -- money was transferred

16   from the American company to the Israeli

17   company for work done on Project Beech.

18       Q.   And would it surprise you to

19   learn that the total amount transferred

20   to the bank -- from the Bank of America

21   account to Gadot Information Services

22   during the four years I mentioned, 2017

23   through 2020, was more than $6.5 million?

24       A.   It would not surprise me.

25       Q.   And you indicated that Mr. Halabi

```
 1   found sources who provided information

 2   regarding Project Beech; correct?

 3        A.   Human sources.  Yes.

 4        Q.   How many human sources did

 5   Mr. Halabi oversee regarding Mr. Azima?

 6             MR. BARET:  That's not the

 7   question.

 8             THE INTERPRETER:  (Comment in

 9   Hebrew.)

10             THE WITNESS:  (Comment in Hebrew.)

11             (Pending question partially

12        re-translated.)

13             MR. BARET:  Okay.  Yeah.  That's

14   the question.

15             THE WITNESS:  Not -- not one.

16   BY MR. BEHRE:

17        Q.   Well, there were -- you indicated

18   yesterday there were sources close to

19   Mr. Azima that you and your team relied

20   upon for information; correct?

21        A.   Sources that were close to Khater

22   Massaad.

23        Q.   Well, didn't you prepare reports

24   that were paid for through your U.S. entities

25   that contained information obtained from
```

1   sources who befriended or were close to

2   Mr. Azima?

3        A.   I don't know if the sources were

4   close to or befriended Mr. Azima.  But we --

5   we're talking about sources that were close

6   to Khater Massaad.  I remember that Stuart

7   Page once handled a source that was close

8   to Farhad Azima.

9        Q.   And who was that source?

10       A.   If I remember correctly, it was

11   an attorney from London.

12       Q.   Do you know the attorney's name?

13       A.   I -- I don't -- I don't remember.

14   But I think that he used the source to

15   solve a problem that Farhad Azima had

16   in Saudi Arabia.

17       Q.   Did Mr. Halabi play any role

18   in preparing the reports that were paid

19   for through the U.S. entities?

20       A.   I do not recall if he drafted

21   the report.  But based on information

22   that he brought, some of it was included

23   in the report.  I'm not sure that he wrote

24   or edited the report.

25       Q.   And Mr. Halabi provided to you

1    and your team the information he obtained;

2    correct?

3        A.   Yes.

4        Q.   And you incorporated that

5    information into the reports; correct?

6        A.   Yes.

7        Q.   And those reports were then

8    provided to Mr. Page; correct?

9        A.   They were sent to him.

10       Q.   And you recruited Mr. Halabi

11   to become a witness in the U.K. trial;

12   correct?

13       A.   No.

14       Q.   Who did?  Who picked him to be

15   a witness?

16       A.   I stated yesterday that Mr. Halabi

17   was part of the office and that he had heard

18   about the leakage just like everybody else

19   heard about it.  And when we were requested

20   to say who had reported it to Stuart, somebody

21   proposed -- or he may have proposed it himself,

22   thanks to his name, his background, and the

23   fact that that would prevent embarrassment

24   to the client.  And that is how he was

25   selected, or he selected himself.

1          Q.   What do you mean when you use

2     the term "leakage"?

3          A.   There was a leakage of materials

4     pertaining to Farhad Azima, which was

5     published on -- on the Internet.

6          Q.   And by "leakage," are you talking

7     about the data that was stolen from Farhad

8     Azima?

9          A.   So it seems.

10         Q.   So "leakage" is a polite word for

11    the stolen data from Farhad Azima; right?

12         A.   We're all polite here, aren't we?

13         Q.   Most of the time.

14         A.   One of the best songs by Bob Dylan.

15              MR. BARET:  Can we take, like, a --

16    five, ten minutes?  I need --

17              MR. BEHRE:  Sure.

18              THE VIDEOGRAPHER:  Going off the

19    record at 12:20.

20              (Recess from 12:20 p.m. to 12:39 p.m.

21         Israel Daylight Time.)

22              THE VIDEOGRAPHER:  Back on record

23    at 12:39.

24    BY MR. BEHRE:

25         Q.   (Not translated.)  Mr. Forlit,

1    did you communicate with anybody about

2    your testimony other than your lawyer

3    during the break?

4         A.   (In English.)  No.

5              (Pending question translated.)

6              THE WITNESS:  No.

7    BY MR. BEHRE:

8         Q.   Who worked on the Project Beech

9    reports that you and your team prepared?

10        A.   On behalf of Gadot LLC [sic]

11   and Insight, no one.

12        Q.   Not with regard to those two

13   entities.

14             Anyone who worked on those

15   reports that were paid for through the

16   two U.S. entities.

17        A.   No one was paid through the

18   American entities.

19        Q.   Stuart Page paid you, in part,

20   for the work your -- you and your team

21   did in preparing reports; correct?

22        A.   The reports were prepared by

23   Gadot Israel.

24        Q.   Yes.

25             And they were paid for through

1   your U.S. entities, including, you said,

2   over $5 million from Stuart Page to your

3   Insight U.S. account; right?

4        A.   It -- Insight and Gadot both.

5   And they paid Gadot Israel.  And Gadot

6   Israel paid.

7        Q.   And Gadot -- Gadot Israel paid

8   the individuals who prepared the reports;

9   correct?

10       A.   Correct.  It paid salaries to

11  people.

12       Q.   And what are the names of the

13  people who prepared those reports that

14  were paid for [sic] the monies provided

15  by Stuart Page via the U.S. entities?

16       A.   To the best of my understanding --

17  and I am responding here as the corporate

18  representative of the two companies --

19  Gadot Israel did not --

20       Q.   Sorry.

21       A.   -- Gadot Israel is the one who

22  made the payments.  And Gadot Israel is

23  not being investigated here.

24            MR. BEHRE:  That wasn't my

25  question.

1              Could you read my question

2    back, please?

3              THE COURT REPORTER:  Let me

4    read it, Haya, and then you re-interpret.

5              (Last full question read and

6         re-translated.)

7              THE WITNESS:  Since these people

8    are employed and receive their payment from

9    Gadot Israel, I am not prepared to divulge

10   their names.

11   BY MR. BEHRE:

12        Q.  So you know their names.  You're

13   just not willing to provide them; right?

14        A.  I'm not entirely sure who exactly

15   prepared those reports.  I know the names

16   of employees who worked at the time in the

17   company.  But I cannot be exactly precise

18   about who prepared the reports.

19        Q.  What are the names of those

20   employees?

21        A.  I'm not prepared to tell.

22        Q.  You're not willing to provide

23   those names; right?

24        A.  Yes.  Correct.

25              MR. BEHRE:  Will counsel instruct

1  his client to answer?

2          MR. BARET:  (Not translated.)  If

3  you -- if you -- if you wish, you may answer.

4          THE INTERPRETER:  Sorry?

5          (Comment in Hebrew.)

6          MR. BARET:  If you wish to answer,

7  you can answer.

8          THE WITNESS:  I don't want to.

9  BY MR. BEHRE:

10     Q.   Why is it -- why is it such a

11  secret, the names of the individuals who

12  prepared these reports?

13     A.   With some of them, I have NDA

14  agreements.  And others have a security

15  clearance in their work in the reserve

16  duty in the IDF.

17     Q.   And part of the reason you're

18  unwilling to provide those names is because

19  the reports they worked on contain stolen

20  data; correct?

21     A.   This is not correct.  In the --

22  the reports to Mr. Page did not contain

23  any stolen information to the best of our

24  knowledge.  Whatever Mr. Page added and

25  transferred to the client, I don't know.

1    I did not see the reports sent by Mr. Stuart.

2         Q.   So you seem to be suggesting that

3    the -- if any report contains stolen data,

4    it was put in there by Stuart Page and not

5    you or your team.

6              Is that what you're alleging?

7         A.   I -- I -- what I claim is that

8    I do not know.  I did not see the reports

9    that he transferred.  So I cannot refer

10   to whatever was in those reports.

11        Q.   What subcontractors worked on

12   the Project Beech reports?

13        A.   I don't remember.

14        Q.   You don't remember or you're not

15   willing to name them?

16        A.   I don't remember.

17        Q.   Were any of the subcontractors

18   based in India?

19        A.   Definitely not.

20        Q.   Were any of the employees who

21   worked on the reports based in India?

22        A.   Definitely not.

23        Q.   (Not translated.)  Have you

24   ever worked with a company named CyberRoot?

25              THE INTERPRETER:  Cyber?

1              MR. BEHRE:  Root.

2              (Pending question translated.)

3              THE WITNESS:  Never.

4    BY MR. BEHRE:

5         Q.   Some of the project reports you

6    prepared use the term "electronic sources."

7              What does that mean?

8         A.   Many -- many investigations

9    within or on the web include chat rooms,

10   collecting information from the dark

11   net, contacts with some obscure sources

12   that promise information.  Overall, this

13   is called an Internet investigation.

14        Q.   Your reports use the term

15   "electronic sources."

16             What does that specific term

17   mean?

18        A.   I haven't seen a report of mine

19   that is using that term of "electronic

20   sources."

21        Q.   Okay.

22             (Exhibit 3 marked.)

23   BY MR. BEHRE:

24        Q.   I'm showing you what's been

25   marked as deposition Exhibit No. 3.

```
 1              It's a series of corporate

 2   records regarding Insight Analysis and

 3   Research LLC including the Articles of

 4   Organization for the State of Florida

 5   and annual reports for the company for

 6   2018, 2019, 2020, 2021, and 2022.

 7              Could you look at that exhibit

 8   and see if you can identify it?

 9        A.   (Examining.)  Yes.  I identify

10   the documents.

11        Q.   And were these documents filed

12   at your direction?

13        A.   I assume they were.

14        Q.   And in the Article [sic] of

15   Organization, which is the first two

16   pages of the exhibit, it lists in

17   Article IV an address for Alon Omri

18   Gur Lavie.

19        A.   "Kin."

20        Q.   Do you see that?

21        A.   (In English.)  Yes.

22             "Kin."

23        Q.   And the address is 5 HaBarzel

24   Street in Tel Aviv.

25             Do you see that?
```

1  A. Yes.

2  Q. And that's the same address that

3 was used for you in the corporate records

4 for SDC-Gadot; correct?

5  A. Yes. Correct.

6  Q. Who lives at that address?

7  A. These -- these were the corporate

8 offices of Gadot in the past.

9  Q. Are they currently the corporate

10 offices of Gadot?

11  A. Yes.

12  Q. And is that an office building?

13  A. Yes.

14  Q. How much office space do you have

15 there?

16  A. About 140 square meters.

17  Q. How many individual offices are

18 included in the office suite?

19  A. Four.

20  THE INTERPRETER: "Four."

21  THE WITNESS: Four and a

22 conference room.

23 BY MR. BEHRE:

24  Q. Who occupies the four offices?

25  A. No one today. This serves as

1    a storage for my own belongings.

2         Q.   If you look at the first annual

3    report --

4              (Brief technical interruption

5         in the proceedings.)

6              THE WITNESS:  (Comment in Hebrew.)

7              MR. BARET:  Strike that.

8    BY MR. BEHRE:

9         Q.   -- for 2018 -- so that's the third

10   page of the exhibit -- it lists Mr. Gur Lavie

11   on the signature line as being the CEO of

12   Insight Analysis and Research LLC.

13             Do you see that?

14        A.   (Translated.)  On page 3?

15             (In English.)  Gur Lavie.  Gur

16   Lavie.  "Signature."  "Date."

17        Q.   It's the annual report for April --

18   filed on April 29th, 2018.

19        A.   (Comment in Hebrew.)

20             (Translated.)  Aah, yes.

21        Q.   Is that accurate?

22             Was Mr. Gur Lavie the CEO?

23        A.   Since these companies were not

24   serving basically any other purpose than

25   being a conduit for transfer of funds, we

1   were not very particular about the choice

2   of -- the choice of titles.  But for all

3   intents and purposes, it was me who was

4   running the company.

5        Q.   So then this particular annual

6   report is not accurate; correct?

7             Mr. Gur Lavie is not the CEO?

8        A.   It could be that he was a

9   co-managing director.

10       Q.   But not --

11            THE INTERPRETER:  Or "co" --

12   BY MR. BEHRE:

13       Q.   -- CEO?

14            THE INTERPRETER:  -- "CEO."

15   "Co-CEO."

16   BY MR. BEHRE:

17       Q.   Co-CEO with who else?

18       A.   With me.

19       Q.   How were the revenues and

20   profits of Insight Analysis and Research

21   LLC shared between you and Mr. Gur Lavie?

22       A.   To the best of my recollection,

23   there were no revenues or profits as such

24   in -- that we left in -- in the company.

25   So Mr. Gur Lavie was receiving a salary,

```
 1   which was paid to him sometimes directly

 2   from Insight to companies belonging to

 3   him and sometimes in other -- other avenues

 4   or other ways.  But I don't remember the

 5   details.

 6            MR. BEHRE:  Can I see that?

 7            THE COURT REPORTER:  Yeah, I

 8   was just writing to Adi about that.

 9            (Brief construction interruption

10      in the proceedings.)

11            MR. BEHRE:  It's getting closer

12   and closer.

13            THE COURT REPORTER:  I wrote to

14   her.

15            MR. BEHRE:  It's like a horror

16   flick.

17            MR. BARET:  Hopefully they're

18   not going to fall through like in --

19            THE INTERPRETER:  Chainsaw --

20            THE COURT REPORTER:  You want

21   to --

22            MR. BEHRE:  I know.

23            THE COURT REPORTER:  You want to

24   go off for --

25            THE INTERPRETER:  Chainsaw massacre.
```

```
 1              THE COURT REPORTER:  Ruchie, we're
 2    on the video.
 3              Go off for a second.
 4              MR. BEHRE:  Why don't we take
 5    a --
 6              THE VIDEOGRAPHER:  Going off --
 7              MR. BEHRE:  -- brief break.
 8              THE VIDEOGRAPHER:  -- record at --
 9    12:59.
10              (Recess from 12:59 p.m. to 1:04 p.m.
11         Israel Daylight Time.)
12              THE VIDEOGRAPHER:  Back on record
13    at 1:04.
14    BY MR. BEHRE:
15         Q.   (Partially translated.)  You said
16    before the break that Mr. Gur Lavie received
17    a salary and that he was paid either directly
18    from Insight U.S. to him or his companies;
19    correct?
20              THE INTERPRETER:  You said Halavi?
21              MR. BEHRE:  Gur Lavie.
22              THE COURT REPORTER:  Gur Lavie.
23              THE WITNESS:  Gur Lavie.
24              THE INTERPRETER:  Gur Lavie.
25    //
```

```
 1              (Remainder of pending question
 2        translated.)
 3              THE WITNESS:  He received his
 4   salary directly to companies of his, not
 5   to him personally.
 6   BY MR. BEHRE:
 7        Q.   And what were the companies of
 8   his that received his salary?
 9        A.   I believe it was Hayarkon 48
10   and Yessodot.
11              THE INTERPRETER:  Y-e, double
12   s, o-d-o-t.
13   BY MR. BEHRE:
14        Q.   And how much was his salary?
15        A.   His salary was $20,000 a month.
16   I do not recall the exact and precise
17   accounting, you know, which money came
18   from what source.
19        Q.   And what did he do for Insight
20   Analysis and Research in order to receive
21   that level of salary?
22        A.   Omri's role is to manage all the
23   finances of all my companies.  And, once
24   again, I do not remember precisely what
25   came from where.  But he was not working
```

1    only for Insight.  He was working for all

2    of my -- the -- all the companies connected

3    to me.

4         Q.   And how many companies are there

5    connected to you?

6         A.   I believe that, in Israel, there

7    are two of them and the two American companies.

8         Q.   Gadot Information [sic] in Israel.

9              And what's the other Israeli company?

10        A.   I have another company, whose name

11   I don't even remember, that is engaged in

12   real estate, also Gadot with something.

13        Q.   So Mr. Gur Lavie, as it relates

14   to Insight Analysis and Research, was a

15   salaried employee; correct?

16        A.   No.  He received a salary into

17   a company in Israel.  But he ran all the

18   financial affairs that are connected to

19   me.  He did not receive a salary per se

20   from the companies in United States.  He

21   received transfers to companies of his

22   in Israel.

23        Q.   Well, just a few minutes ago

24   you referred to it as a salary.

25              Are you changing your testimony

1    now?

2         A.   Let's be more precise.  What

3    I was talking about is wages.  Perhaps

4    the term "salary" is not exactly accurate.

5    These are wages in the tune of $20,000

6    that he received for the management of

7    all my financial affairs.

8         Q.   So he received wages and he

9    was not an owner, was he?

10        A.   Correct.

11        Q.   And so looking at the annual

12   report that was filed on January 21st

13   2019, that is inaccurate in describing

14   Mr. Gur Lavie as an owner, isn't it?

15        A.   I believe these reports were

16   submitted by an accountant --

17             THE INTERPRETER:  Okay.

18             THE WITNESS:  -- an accountant

19   firm.  And the questions should be asked to

20   them, why did they change their terminology

21   from one annual report to the next.

22             (Exhibit 4 marked.)

23   BY MR. BEHRE:

24        Q.   I'm showing you next what's been

25   marked as Exhibit No. 4 for this deposition.

 1   It's a five-page document that appears to

 2   be opening documents for the Bank of America

 3   account for Insight Analysis and Research.

 4        A.   (Examining.)  Okay.  Go ahead.

 5        Q.   Is that what this is, the bank

 6   opening documents for this account at Bank

 7   of America for Insight Analysis and Research?

 8        A.   It would seem so.

 9        Q.   And there's only one individual

10   who's authorized to transact business in

11   this account; correct?

12        A.   Correct.

13        Q.   And that individual is Mr. Gur

14   Lavie and not you; correct?

15        A.   Correct.

16        Q.   And were you present with

17   Mr. Gur Lavie when he opened this account?

18        A.   Yes.

19        Q.   And was this opened in Florida

20   or New York or somewhere else?

21        A.   In Miami, Florida.

22        Q.   So you were present but you weren't

23   put on the account.

24             Why not?

25        A.   At the same time, we opened the

1   account for the other company at Citibank.

2   And we decided, for convenience purposes,

3   to open two accounts, one for each of the

4   companies and have one of us in each one

5   of them.

6       Q.   Were those two bank accounts,

7   the one at Citi for Gadot and the one

8   at Bank of America for Insight, opened

9   on the same day?

10      A.   To the best of my recollection,

11  yes.  Or the next day.

12      Q.   And is there some reason why one

13  of the accounts is in your name and one of

14  the accounts is in his name?

15      A.   No.

16           (Exhibit 5 marked.)

17  BY MR. BEHRE:

18      Q.   I'm showing you next what we'll

19  mark as Exhibit No. 5 in this deposition.

20           These are Bank of America bank

21  statements for Insight Analysis and Research.

22  And they bear Bates numbers, so numbers at

23  the bottom of the pages.  They start at

24  000222 and they run through 000 -- no, I

25  take that back.  They're not subsequently

```
 1   numbered, at least my copy isn't.

 2           So what I'll tell you is that

 3   these are bank records that move -- that

 4   are from October 30th, 2017, through the

 5   bank statement for October 1st, 2021.

 6           And the bank -- bank statements,

 7   starting with the December 1st, 2018,

 8   statement is numbered five zeros, 1 --

 9   is it six zeros? -- 000001.  And they

10   run through 000283 [sic].  They're just

11   not in order because they were produced

12   on two separate occasions by the Bank of

13   America.

14       A.   (Examining.)

15       Q.   Have you had a chance to look

16   at those bank records?

17       A.   No.  Because I didn't have an

18   opportunity -- I didn't have access to

19   the --

20       Q.   Okay.

21       A.   -- bank --

22       Q.   Well --

23       A.   -- account.

24       Q.   -- take a minute to make --

25       A.   But I --
```

1      Q.   -- yourself --

2      A.   -- thank you.

3      Q.   -- familiar with them.

4      A.   It's about 500 pages, isn't it?

5           I think you'll probably refer

6   me to a specific page?

7      Q.   I want to first see if you can

8   identify what these are.

9      A.   Yes, these look like the bank

10  statements.

11     Q.   (Not translated.)  Directing

12  your attention to the bank statement for

13  the month of December 2017, could you

14  look at that?  It's just a few pages in,

15  six, seven pages in.

16     A.   (Comment in Hebrew.)

17          THE INTERPRETER:  (Comment in

18  Hebrew.)

19          THE WITNESS:  Okay.

20  BY MR. BEHRE:

21     Q.   And if you look at Bates page

22  230 --

23     A.   Yes.

24     Q.   -- you'll see that the bank

25  statement is addressed to Insight Analysis

1    and Research in Miami, Florida; correct?

2        A.   Correct.

3        Q.   And on the first page, it indicates

4    that there were deposits in the amount of

5    $459,950.

6             Do you see that?

7        A.   Yes.

8        Q.   And there were withdrawals of

9    $430,092.70?

10       A.   Yes.

11       Q.   And looking at page 232, you'll --

12   you will see that Page Group deposited

13   $280,000 minus the wire transfer fee of

14   apparently $50.

15           Do you see that?

16       A.   Yes.  And I -- I believe that,

17   if it was -- this was for part of Project

18   Beech, then he also received the invoice.

19       Q.   Directing your attention to the

20   time entry -- or the transaction entry on

21   December 26, 2017, it indicates that there

22   was a $200,000 wire payment made from this

23   account to Global Impact Services.

24           Do you see that?

25       A.   Yes.

```
 1        Q.   And Global Impact Services is

 2   owned by Eitan Arusy; is that correct?

 3        A.   Correct.

 4        Q.   And could you spell that for us?

 5        A.   In Hebrew?

 6        Q.   Yes.

 7             MR. BEHRE:  And then you can

 8   translate it.

 9             THE WITNESS:  I think he spells

10   Eitan, E-i-t-a -- E-i-t-a -- t-h-a-n?

11   T-h-a-n.

12             THE INTERPRETER:  Arusy?

13             MR. BARET:  Very similar to

14   English spelling; right?

15             THE WITNESS:  (In English.)

16   A-r-u-s-i.

17             (Translated.)  A-r-u-s-i,

18   question mark.

19   BY MR. BEHRE:

20        Q.   And Mr. Arusy is your business

21   partner; correct?

22        A.   He's not a business partner.  We

23   collaborate on certain jobs.

24        Q.   And you have or had an agreement

25   with him that, for each payment you received
```

1  from Stuart Page, he received a percentage

2  of that payment; right?

3       A.   I don't recall.  But he was paid

4  for work that he did, that he supplied.

5       Q.   What work did he do?

6       A.   He did a variety of different

7  works, including analysis and investigations,

8  in-depth investigations.

9       Q.   What do you mean by "analysis"?

10      A.   Eitan is a very gifted person.  And

11 he once worked for the Manhattan prosecutor.

12 And he's -- has analytic skills.

13      Q.   And at one point, he was working

14 on investigating individuals and entities

15 that were violating sanctions against doing

16 business with Iran; correct?

17      A.   Eitan doesn't work only with me.

18 And he had some large U.S. companies as his

19 clients that were involved in investigating

20 sanctions -- or violations, rather, of the

21 sanctions.  And I think he had a large case

22 that he worked on for the D.A. in Manhattan.

23      Q.   And the company Global Impact

24 Services is a company established in the

25 United States; correct?

1      A.   I think so.

2      Q.   And Mr. Arusy is currently or

3   was affiliated in some capacity with a

4   U.S. law firm; right?

5      A.   I don't know.  I know that he

6   worked for the D.A.  He was hired by the

7   D.A. in Manhattan.

8      Q.   And Mr. Arusy attended some of

9   the Project Beech meetings, didn't he?

10     A.   I think so.  Yes.

11     Q.   And he attended at least one

12  meeting in Cyprus; correct?

13     A.   I don't recall.

14     Q.   Did he ever attend any meetings

15  with you?

16     A.   It did happen.  Yes.

17     Q.   Do you recall where those meetings

18  occurred?

19     A.   I assume in London.  But I don't

20  recall exactly.

21     Q.   Did he attend at your invitation

22  or the invitation of someone else?

23     A.   I -- I honestly don't remember.

24     Q.   Did you ever attend a meeting in

25  New York with him regarding Project Beech?

1        A.   I don't recall a meeting of that

2   nature.  But I do recall a meeting I had

3   alone in New York about Project Beech.

4        Q.   And who was that meeting with?

5        A.   With Jamie Buchanan.

6        Q.   Do you remember when that was?

7        A.   I think late 2018.

8        Q.   And who else attended besides you

9   and Mr. Buchanan?

10       A.   At that specific meeting, just

11  the two of us.

12       Q.   And what was the purpose of the

13  meeting?

14       A.   So Stuart Page got a request from

15  two people.  One of them was a very close

16  friend of his.  His name was Alex Ibragimov.

17  And the second person's name was Dmitry.

18  But, once again, this is what I heard

19  from Stuart.

20            The meeting was held in London.

21  And Stuart told me that, at that meeting,

22  he was threatened and told to implicate or

23  frame Neil and Gerard in improper actions

24  in managing the file.

25            He was so disturbed by the meeting

1   that he asked me to meet with Jaime urgently

2   and tell him about the content of the meeting.

3   I spoke to Jaime.  We had arranged to meet

4   in his room -- I believe it was the -- the

5   Park Hyatt in Manhattan.  And I told him

6   what Stuart had requested.

7            To the best of my recollection,

8   this is one of the very few meetings in

9   which I had met Jaime without Stuart.

10           Later on, at the request of Jaime

11  and Neil, we met all four of us in London.

12  And then Jaime and Neil asked Stuart to

13  report this meeting to the FBI.

14       Q.   Jamie Buchanan lives in London;

15  right?

16       A.   To the best of my recollection,

17  at the time, he was distributing his time

18  between Dubai, London, and Canada.

19       Q.   What year was this?

20       A.   I believe this was at the end

21  of 2018.

22       Q.   And at the time, you lived in

23  Israel; right?

24       A.   Correct.

25       Q.   So why does somebody who lives

1   at least part time in London and somebody

2   who lives in Israel fly all the way to

3   New York to meet?

4       A.   Jaime was on the move constantly.

5   And Stuart was so disturbed by the -- by

6   the meeting that he had asked me to meet

7   Jaime as fast as possible, at the earliest.

8   And at that time, Jaime was in New York.

9   So I took a flight to New York to meet

10  him.

11      Q.   And then, later on, there was

12  a meeting in London.

13           What happened at that meeting

14  where, if I understand it, you, Jaime,

15  Neil, and Stuart met?

16      A.   I believe that the meeting took

17  place in a club called George that Jaime

18  was a member of.  Here too, at the request

19  of Stuart, we performed a security check

20  to make sure that none was being followed.

21           And I remember, at the meeting,

22  that Stuart told Jaime and Neil how the

23  conversation with Dmitry and Alex had gone.

24  I think that, by the time the meeting was

25  held, Alex spoke once again with Stuart

1    or with his son perhaps.  And what was

2    discussed at that meeting was whether

3    or not Stuart would agree to report his

4    meeting to the authorities.

5            And in my opinion, his trip to

6    the United States to meet FBI agents --

7    and I wasn't there, I had nothing to do

8    with that -- was for that purpose.

9        Q.   (Partially translated.)  And

10   when you say his trip to meet the FBI,

11   who is -- who is "his"?

12       A.   Stuart Page.

13       Q.   And so when you met with Jamie

14   Buchanan in New York and you met with the

15   three others in London, in both instances

16   you were paid for that work; right?

17       A.   This is funny.  Stuart promised

18   that he would take care of the costs, in

19   the context of special expenses, that were

20   beyond the scope of my work.  And I know

21   that he got more than he was budgeted to

22   get.  But he never paid me for it.  So

23   one could say that this trip was voluntary.

24       Q.   Or at least unpaid?

25            MR. BARET:  Pro bono.

```
 1              THE COURT REPORTER:  What?

 2              MR. BARET:  Pro bono.  Not --

 3   not volunteer.

 4              THE WITNESS:  (In English.)

 5   Pro bono.

 6              MR. BARET:  Just not -- not --

 7   not paid.

 8              THE INTERPRETER:  Pro bono.

 9   BY MR. BEHRE:

10       Q.   Do you own any part of Global

11   Impact Services?

12       A.   No.

13       Q.   With regard to Eitan Arusy, did

14   he work with Stuart Page?

15       A.   It's possible.

16       Q.   Did he ever meet with Stuart Page

17   to the best of your knowledge?

18       A.   Yes.

19       Q.   Was that always on Project Beech

20   or some other project?

21       A.   Not just Project Beech.

22       Q.   Okay.  To the best of your knowledge,

23   did Eitan Arusy ever meet with Neil Gerard?

24       A.   Yes.

25       Q.   About how many times?
```

```
 1         A.   I can estimate five to ten times.
 2    But I don't have that information.
 3         Q.   And it appeared, didn't it, that
 4    Gerard believed that Arusy was an intelligent
 5    person?
 6         A.   I don't know what he believed or
 7    didn't believe.
 8         Q.   Well, Gerard asked, on occasion,
 9    Arusy his opinion on certain aspects of
10    the investigation; correct?
11         A.   Correct.
12         Q.   And Arusy advised Gerard on the
13    investigation; correct?
14         A.   (Translated.)  When we had staff
15    meetings, everybody, including me, would
16    raise ideas.  And various subjects were
17    discussed.  That was the nature of the
18    meetings.  Eitan was not the chief consultant
19    to Neil about Project Beech.  I don't think
20    that Neil ever met with Stuart --
21              (In English.)  -- ever met with --
22              MR. BARET:  Eitan.
23              THE WITNESS:  (In English.)
24    -- either Eitan or --
25              (Translated.)  -- either Eitan --
```

```
 1              (In English.)  -- or me without
 2    Stuart.
 3              (Translated.)  -- or me without
 4    Stuart.
 5    BY MR. BEHRE:
 6         Q.   When you say "staff meetings,"
 7    what do you mean?
 8         A.   There was Jaime.  There was
 9    Stuart.  Sometimes Eitan.  Me.  And Neil.
10         Q.   Did Amir Handjani ever attend
11    any of those meetings?
12         A.   I personally never met Amir
13    Handjani.  If he was at meetings that
14    I didn't attend, I don't know.
15         Q.   Do you have any knowledge of
16    what role Mr. Handjani played in Project
17    Beech?
18         A.   I only know that, towards the
19    end of the project, that certain people
20    threatened Stuart on behalf of the client.
21    Not exactly threatened.  They cautioned
22    him to stop trying to make contact with
23    the boss.  So he turned, among others,
24    to Amir Handjani.  And I know that he
25    was always considered a close consultant
```

1    of the boss.

2         Q.   So the boss turned to Handjani

3    to threaten Page not to do what towards

4    the end of the project?

5         A.   Towards the end of the project,

6    Stuart tried to get a meeting with the

7    boss.  And he went through all kinds of

8    acquaintances of his to get to the boss.

9    One of those acquaintances was Amir.

10            And I know that at one time

11   he even got a letter from RAK's attorneys.

12   And that's the first time I encountered

13   that term "cease and desist."  And they

14   simply said to him:  Stop trying to make

15   contact.

16        Q.   Why was Stuart trying to make

17   contact with the boss, that is, the ruler?

18        A.   To the best of my understanding --

19   and this is based completely on hearsay --

20   he thought he had a bonus coming to him

21   at the end of this case.

22        Q.   And how much of a bonus did he

23   think he had coming to him?

24        A.   Something about $2 million.

25        Q.   And was any of that bonus

1   supposed to go to you?

2       A.   The oral agreement we had was

3   that, for all the work that we did, he

4   would -- 70 percent of what he charged

5   for our work, which wasn't the entire

6   amount, 30 percent would be his commission.

7   We were also supposed to get part of the

8   bonus.

9           Today I know that, in his dismissal

10  letter, he did receive a certain sum.  I

11  don't know how much to this day.  And he

12  denies -- up to the point that I last spoke

13  to him, he denied ever receiving that.  And

14  I was supposed to receive part of that amount

15  too.  But I didn't.

16      Q.   Who wrote the cease and desist

17  letter to Stuart Page, if you know?

18      A.   I think the attorneys that are

19  representing Rakia in England.

20      Q.   Stewarts Law?

21      A.   I don't know.  I think they

22  switched attorneys at some point.  But

23  I don't know.  There was an attorney, I

24  think, named Louise.  But I'm not sure.

25      Q.   And you mentioned a dismissal

1   letter.

2           What -- did you ever see that?

3       A.   I don't remember if he just told

4   me about it or actually sent me a copy of

5   it.

6           And I -- I remember he was very

7   offended.  And it was presented as if this

8   was a termination of his employment and

9   that he would be paid a compensation of

10  one and a half million dirham, which is

11  about $400,000.

12          And he talked to me, asked my

13  advice about how -- how to respond to that.

14  And he responded by saying that he had --

15  he had never had a contract with the --

16  but rather an oral agreement with the

17  boss.  And he asked for four and a half

18  million dirham.

19          THE INTERPRETER:  I'd like to

20  correct something I said earlier.  I said --

21  I said "termination of employment."  It

22  should have been "termination of a contract."

23  BY MR. BEHRE:

24      Q.   And what year and month was this

25  occurring in, if you recall?

1       A.   I think about two or three months

2  after he testified at the trial.

3       Q.   And the bonus was because the

4  Rakia case had gone well in Rakia's view;

5  right?

6       A.   I can't say.  I can't say.  That's --

7  Stuart thought it went well.  And he wanted

8  the bonus.  And I think he -- he asks for

9  a bonus from every -- his clients when he

10  stops working with them.

11       Q.   And one last thing, and we'll

12  take a break.

13            You indicated a few moments ago

14  that there was a 70/30 split.  And I want

15  to make sure I understand it correctly.

16            That every payment Stuart Page

17  received, you got 70 percent of it and he

18  kept 30?

19       A.   No.  Stuart Page presented that,

20  for our work on the case, he would charge

21  an amount of money that varied over time.

22  Besides our work, he charged for other jobs

23  large amounts of money, which I don't know

24  how much.  I even know that he once charged

25  $2 million for a job and he had to give it

1   back because he was unable to perform it.

2              And from the amounts that he

3   claimed to have charged, where the division

4   was 70/30, but I never knew if what he was

5   saying was actually true.

6        Q.   So who got the 70 percent and who

7   got the 30 percent?

8        A.   My companies were supposed to get

9   70.  And he was supposed to get 30.

10       Q.   And that's because you were doing

11   most of the work; right?

12       A.   I'm -- I'm relating to the work

13   I did.  He didn't do anything.  For what

14   he did, he charged different sums.

15       Q.   So you -- you did all the work,

16   but he got 30 percent of the money?

17       A.   I was one of the contractors

18   who worked on the case.  If he paid me

19   about $5 million, as we had arranged on

20   this case, in my opinion, he charged more

21   than double.

22       Q.   Uh-huh.  Okay.

23              MR. BEHRE:  Why don't we take

24   our break.

25              THE VIDEOGRAPHER:  Going off

1   the record at 1:52.

2              (Recess from 1:52 p.m. to 3:08 p.m.

3        Israel Daylight Time.)

4              THE VIDEOGRAPHER:  Going back on

5   record at 3:08.

6   BY MR. BEHRE:

7        Q.   Before the lunch break, we were

8   looking at Exhibit No. 5, which are the

9   bank records from the Bank of America for

10  Insight Analysis and Research.

11             Could you pull up that exhibit

12  again?

13       A.   I have it.

14       Q.   I'm going to ask you questions

15  about names that appear in these bank

16  records.  And I can give you a page number

17  or not.  But let's just kind of go one at

18  a time and see if you recognize the name.

19             Who -- who is Gordon Glaze?

20       A.   (In English.)  Gordon Glaze "ve"

21  Ezekiel Golan are the same people.  The same --

22  it's the same guy.

23             (Translated.)  Gordon Glaze "ve"

24  Ezekiel Golan are one and the same person.

25             THE COURT REPORTER:  What was the

1   name?

2           MR. BEHRE:  Ezekiel.

3           THE INTERPRETER:  Golan Glaze [sic]

4   and Ezekiel Golan, one --

5           THE WITNESS:  (In English.)  No.

6           THE INTERPRETER:  -- and the same.

7           THE WITNESS:  Gordon Glaze and

8   Ezekiel Golan.

9           THE INTERPRETER:  "Gordon Glaze

10  and Ezekiel Golan."

11          THE WITNESS:  We mentioned him

12  yesterday.

13  BY MR. BEHRE:

14      Q.  They're both companies [sic]

15  owned by whom?

16      A.  It's one and the same person.

17  He holds both a Canadian passport and an

18  Israeli passport.

19      Q.  Those are two names for the same

20  person?

21      A.  Yes.

22      Q.  And is there any particular reason

23  he has two names?

24      A.  I don't know.

25      Q.  What kind of work did he perform?

```
 1        A.   Work that is not connected neither
 2   to Stuart nor to Beech.
 3        Q.   What kind of work did he perform?
 4        A.   Something in the medical field.
 5        Q.   Florida IP Telecom made numerous
 6   payments into this Bank of America account.
 7             What is Florida IP Telecom?
 8        A.   It is a client from South America.
 9   And the work was performed in South America.
10        Q.   And it's a U.S. company located
11   in Florida?
12        A.   Apparently the payment came from
13   an American company.  The work was performed
14   in South America for a South America customer.
15        Q.   Did this work relate to Elliott
16   Management in Argentina?
17        A.   No.
18        Q.   Mona Tours Ltd.
19             What is Mona Tours?
20        A.   Mona Tours.  It's a travel agency.
21        Q.   And there's significant payments
22   to Mona Tours.
23             What was that for?
24        A.   For flights.
25             MR. BEHRE:  Say it again.
```

```
 1              THE INTERPRETER:  "For flights."
 2    BY MR. BEHRE:
 3         Q.   Okay.  Overseas Consulting.
 4         A.   Where is it?
 5         Q.   (Partially translated.)  If you
 6    go to page 244, you'll see it.
 7              Overseas Consulting Limited made
 8    a payment to you of $300,000 on March 23rd,
 9    2018.
10              THE INTERPRETER:  Two hundred
11    or three hundred?
12              MR. BEHRE:  300,000.
13              (Remainder of pending question
14         translated.)
15              THE WITNESS:  I don't remember.
16    But this is not connected neither to Stuart
17    nor to Beech.
18    BY MR. BEHRE:
19         Q.   Well, if you don't remember, how
20    do you know it wasn't connected to Project
21    Beech?
22         A.   Because, in the Project Beech,
23    I received money only from Stuart.
24         Q.   And then, on page 248, Aviram
25    Hawk Consultant, there's a payment you
```

1    made to him on April 26, 2018.

2            And as we talked about yesterday,

3    that's the account for Mr. Azari; right?

4       A.   Correct.  An account of Mr. Azari.

5       Q.   I'm directing your attention to

6    page 258, a $6,000 payment on June the 6th,

7    2018, to Tey, T-e-y, Global Strategic.

8            Do you know what that is for?

9       A.   No.  I don't remember.

10      Q.   Were they a subcontractor on

11   Project Beech?

12      A.   I don't recognize it.  I would

13   have to go over the invoices.  But I don't

14   recognize it.

15      Q.   (Not translated.)  And then also

16   on June the 6th, 2018, there's a $8,050

17   payment to Bitachon Eintegrativi.

18           Do you see that?

19      A.   (Comment in Hebrew.)

20           (In English.)  Which page?

21           (Pending question translated.)

22           THE WITNESS:  I don't remember.

23   BY MR. BEHRE:

24      Q.   (Partially translated.)  And

25   then, on page 268, there's another payment

1   for $352,740 to Primum Viridi Navitas.

2        A.   (In English.)  No.

3             THE INTERPRETER:  Say the number

4   again.  Sorry.

5             THE WITNESS:  (In English.)  No.

6             (Comment in Hebrew.)

7             THE INTERPRETER:  3,052?

8             MR. BEHRE:  352,740.

9             THE INTERPRETER:  352,740.

10            (Remainder of pending question

11       translated.)

12            THE WITNESS:  "Kin."

13            (Comment in Hebrew.)

14            THE COURT REPORTER:  I don't

15  have the name.

16            THE WITNESS:  (In English.)

17  Primum --

18            THE INTERPRETER:  "Kin."

19            Navitas.

20            THE WITNESS:  (In English.)

21  -- Viridi --

22            THE INTERPRETER:  (Comment in

23  Hebrew.)

24            MR. BEHRE:  I'll read it.

25            P-r-i-m-u-m, space, V-i-r-i-d-i,

```
 1   space, Navitas, N-a-v-i-t-a-s.

 2               THE WITNESS:  (In English.)  I'm

 3   trying to Google it.  Maybe --

 4               THE INTERPRETER:  Primum Viridi

 5   Navitas.

 6   BY MR. BEHRE:

 7        Q.   Trying to Google it.

 8        A.   I don't remember what it is.

 9             It's maybe a company in Cyprus.

10   But I have to check.

11        Q.   Who is Brian Tulloch?

12        A.   I have no clue.

13        Q.   If you look at the -- at page

14   25, which is the bank statement for May

15   2019, you'll see there's two wires to him,

16   one on May 6 for 64,000, one on May 14th

17   for 75,000, and then a third on May 22nd

18   for 42,000.  It's Brian --

19        A.   (Comment in Hebrew.)

20             (In English.)  Brian Tulloch.

21               THE INTERPRETER:  "Brian Tulloch,"

22   he says.

23               THE WITNESS:  I don't remember.

24   BY MR. BEHRE:

25        Q.   Before the lunch break, we talked
```

1    about Global Impact Services and its owner,

2    Eitan Arusy; correct?

3        A.   Correct.

4        Q.   And we talked about the fact

5    that you were making payments to him.

6             Do you remember that?

7        A.   Yes.

8        Q.   Did there come a time when he

9    actually started making payments to you

10   into this account?

11       A.   It is possible.  The -- the

12   accounting between us was on a global

13   level.  So probably there were times

14   when he had to make payments to me.

15       Q.   For what reason would he be

16   making payments to you?

17       A.   I'd -- I have to go back to

18   the documents to check.  But sometimes

19   I would make payments to him.  Sometimes

20   he would make payments to me.  I would

21   have to check that.

22       Q.   And was that because you were

23   doing work for him?

24       A.   Sometimes we did jobs together.

25   Some of the projects we carried out

1  together.

2      Q.   If you look at page 109 and

3  the entries on September 8th, 2020,

4  and September 24th, 2020, you'll see

5  two payments that he -- that that entity

6  made to Insight's U.S. bank account.  One

7  entry is for $65,000.  The other one's

8  for 75,000.

9      A.   As I've said before, sometimes

10  Eitan would bring a client and I would

11  provide services.  And sometimes it was

12  the other way around.  Sometimes the

13  payment would come from the client to

14  me and then from me to Eitan.  And

15  sometimes the other way around.

16          As far as these two specific

17  entries are concerned, I do not recall.

18      Q.   Okay.  And I note that, in

19  that month of September 2020, the only

20  deposits into this account were from

21  Global Impact Services; right?

22      A.   Correct.

23      Q.   And if you go to the next

24  month, October 2020, page 117, you'll

25  see the same thing, that the only deposit

1   made into the account for Insight in the

2   U.S. was one for $70,000 sent by Global

3   Impact Services.

4           Do you see that?

5       A.   Yes.  I do see it.

6       Q.   And if you go to page 123 in

7   November 2020, you'll see yet another

8   payment from Global Impact Services,

9   this one for 71,000.

10          Do you see that on November

11  9th, 2020?

12      A.   Yes, I see.

13          At that time I believe that

14  the Beech Project had already been

15  completed.  It was completed, I believe,

16  on the -- in the beginning of 2020.  And,

17  hence, I do not see the connection between

18  that and our investigation.

19      Q.   Well, there's a deposit on

20  November 2nd, 2020, that says it's

21  coming from SDC-Gadot in your name;

22  right?

23          Do you see that, the -- the

24  entry above that?

25      A.   Of the 24 [sic]?

1       Q.   No.  November 2nd, 2020.

2       A.   Yes.

3       Q.   And why is there money moving

4    from the Gadot bank account in the United

5    States and you're the person initiating

6    the wire?  Why is there movement going

7    between the two U.S. entities when you

8    said they both played the same role?

9       A.   I imagine that the finance

10   person -- the -- the person in charge

11   of finances decided that funds should

12   be concentrated in this particular account.

13   I do not know a specific reason.  But I

14   imagine that we could find the opposite

15   as well.

16      Q.   When did you stop working with

17   Stuart Page on the project?

18      A.   When did you stop, you say?

19      Q.   Stop.  Yeah.

20           When did your relationship --

21   when did your relationship with Stuart

22   Page end?

23      A.   In this specific project, I

24   believe that -- about May 2020.  But we

25   remained in contact until at least the

1    middle or the end of 19 -- '21.

2         Q.   And why did your relationship

3    with Stuart Page end regarding Project

4    Beech in May 2020?

5         A.   When his job was interrupted

6    or terminated, then so was mine.  It's

7    not -- the relationship did not stop.

8    The work stopped.

9         Q.   Uh-huh.

10             And once your relationship

11   with Page ended, did Global Impact

12   Services take over the role that Page

13   played?

14        A.   It's a bit of a confused question --

15   confusing.

16             (Comment in Hebrew.)

17             MR. BARET:  That's not the question

18   he asked.  Answer his question.

19             THE WITNESS:  (Comment in Hebrew.)

20             MR. BEHRE:  Can you translate

21   that first, please?

22             THE INTERPRETER:  He said that:

23   "The reason that the relations between

24   Stuart and me stopped was because he

25   insisted that I participate in his

1    legal fee -- legal -- legal expenses."

2              THE WITNESS:  Whether or not

3    Global pursued the relations with him,

4    I don't know.

5    BY MR. BEHRE:

6         Q.   Stuart Page asked you to help

7    pay his legal bills?

8         A.   Yes.

9         Q.   What did he have legal bills for?

10        A.   He said that he was being sued

11   in many aspects, that it's very distressing

12   to him.  He said -- he said that he had

13   tried twice to commit suicide.  He said

14   that he had had himself hospitalized once

15   for a week and then for another week in

16   home hospitalization and that his legal

17   fees are killing him.

18        Q.   And did he give you any reason

19   why he thought that you should be helping

20   pay his legal bills?

21        A.   He said that he believed that

22   I had made a lot of money from him and

23   that, as a friend, I should be helping

24   him.

25        Q.   And did you -- how did you

1  respond to that request?

2       A.   I told him that he was cheeky,

3  impudent.

4            MR. BARET:  You know what is

5  chutzpah?  You know what's chutzpah?

6            (Comment in Hebrew.)

7            It's chutzpah.

8  BY MR. BEHRE:

9       Q.   Did Global Impact Services play

10  a role similar to the role that Stuart

11  Page played in Project Beech?

12      A.   No.

13      Q.   Did it play any role with regard

14  to Project Beech?

15      A.   They did -- they did play a role.

16  Global was working vis-a-vis Stuart.  But

17  only Stuart was in contact with the client.

18      Q.   (Not translated.)  With the "client"

19  being who?

20      A.   (In English.)  The boss.

21           (Translated.)  The boss.

22      Q.   Yesterday you indicated that you

23  thought the ruler was worried about being

24  overthrown.

25           Is that right?

1        A.   Correct.

2        Q.   And how do you know that?

3        A.    In some of Stuart's briefings

4    to us, Stuart -- Stuart said that the

5    ruler was suspecting that Khater Massaad

6    was collaborating with one of his siblings,

7    the siblings of the boss.  And he feared

8    that this was in the context of trying

9    to topple him.

10       Q.   And did you hear about this

11   concern about being overthrown from Neil

12   Gerard as well?

13       A.   I do not recall.  But I seem

14   to remember I did hear that from Jaime.

15       Q.   And are you aware that some of

16   the individuals that the ruler wanted to

17   target had been trying to bring to light

18   human rights violations by the ruler and

19   those working for him?

20       A.   I don't remember such a thing.

21       Q.   Now, you've testified over the

22   last two days that Stuart Page hired you,

23   in effect, to work on Project Beech; right?

24       A.   Correct.

25       Q.   Who hired Stuart Page to become

1   involved in Project Beech?

2           Was it Neil Gerard?

3       A.   According -- according to Stuart

4   Page, the ruler himself had hired him.  And

5   in the first few months, he was reporting

6   only to the ruler.

7       Q.   And what -- what happened after

8   the first few months in terms of who he

9   reported to?

10      A.   After a few months, I remember

11  Jaime and Neil joining in the meetings.

12          And to the instructions given to

13  Stuart, in the beginning, he was reporting

14  only to the ruler of RAK.  He was traveling

15  there and reporting to him.  And after that,

16  he was also reporting to Jaime and Neil.

17      Q.   Okay.  And who -- who paid Page

18  for his work?

19      A.   In the early years, he told us

20  that he had received money directly from

21  the palace, from the private accounts of

22  the ruler.  He said he had to -- he had

23  to submit an invoice each time anew to the

24  PA of the ruler and it only went through

25  them.  In the very last months, I remember

1    that the person who would authorize the

2    invoices was Jaime.

3         Q.   And who or what entity paid Page

4    for the payments that -- that Buchanan

5    authorized?

6         A.   I don't know.

7         Q.   Are you aware of any corporate

8    entities that Jamie Buchanan had that

9    he ran?

10        A.   Do you mean companies that

11   belonged to Jaime or companies that he

12   managed for RAK?

13        Q.   Both.

14        A.   I think he was the -- Jaime was

15   the CEO of Rakia.  And I think he also --

16   he said he also invoiced for his services.

17   He was -- that he was a subcontractor, he

18   told me.

19        Q.   (Not translated.)  Did Jaime have

20   a company that was involved in balloon sales?

21             THE INTERPRETER:  Balloons like

22   birthday party balloons or hot air balloons?

23   Which one?

24             MR. BEHRE:  The first.

25             THE INTERPRETER:  The first.

```
 1                  (Pending question translated.)

 2                  THE WITNESS:  Not that I know of.

 3    BY MR. BEHRE:

 4        Q.   Yesterday you made some serious

 5    allegations about Nicholas Del Rosso.

 6                  Do you recall that?

 7        A.   Everything I know about Nicholas

 8    Del Rosso comes from the legal proceedings

 9    that I think you are carrying out against

10    him.

11        Q.   What have you seen in those legal

12    proceedings?

13        A.   That he paid a sum of $1 million

14    to an Indian company that was known for

15    being a hacking company on the date of

16    the hacking and that he -- and that he

17    received money from Dechert.

18        Q.   Do you know if those allegations

19    are true to the best of your knowledge?

20        A.   In retrospect, it seems to be

21    right.

22        Q.   And why do you say, in retrospect,

23    it seems to be right?

24        A.   Because at the time the leak

25    suddenly occurred, we didn't understand
```

1    where it had come from or why.  And from

2    my familiarity with the charges against

3    my friend Aviram, who was in jail in New

4    York, it appears -- appears to be -- it

5    seems to be a similar -- a similar M.O.

6         Q.   And what's that M.O.?

7         A.   That this company Beltox (phonetic)

8    or some other Indian company is hired.  They

9    do the hacking.  And they're paid for it.

10        Q.   Now, Del Rosso had a company;

11   right?  It's called Vital Management?

12        A.   I -- I don't know.  I guess,

13   if you say so.

14        Q.   Did -- did Del Rosso write his

15   own reports regarding Project Beech?

16        A.   I don't know him.  I don't know

17   what he did.  And I don't know what he

18   wrote.

19        Q.   Did you ever receive any reports

20   that you thought were written by Del Rosso

21   or his company?

22        A.   I don't know.  Possibly Stuart

23   sent reports of that nature.  But I don't

24   recall.

25        Q.   And if there were such reports,

1  Stuart would send them to you, and you'd

2  consider them for inclusion in your own

3  report; correct?

4        A.   No.  Stuart would send information

5  sometimes and ask to have that information

6  included in the report.  And sometimes he

7  would re-write the reports himself and add

8  his own information.  And I don't know what

9  his sources were, if it was Del Rosso or

10 somebody else.

11             (Exhibit 6 marked.)

12 BY MR. BEHRE:

13       Q.   I'm showing you next what's been

14 marked as Exhibit No. 6 in this deposition.

15 It's entitled:

16             "Project Beech - Financial

17 Investigation Report #1."

18             MR. BARET:  Which one is it?

19             MR. BEHRE:  No. 6.

20             MR. BARET:  Do you have a copy

21 for me?

22             MR. BEHRE:  He will when he gets

23 back.  I believe he went to make a copy.

24             MR. BARET:  Okay.

25             THE WITNESS:  (Examining.)

1   BY MR. BEHRE:

2        Q.   (Not translated.)  Have you had

3   a chance to look at that report?

4        A.   (In English.)  Yes.

5        Q.   (Not translated.)  I direct your

6   attention to the first paragraph.  And it

7   says, quote:

8            "The following report focuses

9   on the findings regarding KM's bank

10  accounts as appeared in 'Vital Management

11  Services' (hereinafter:  'VMS') report

12  dated 12.11.2014."

13           Do you see that?

14       A.   "Kin."

15           (In English.)  Yes.

16       Q.   And that would suggest that

17  there was a report prepared by Del

18  Rosso and his company, Vital Management,

19  concerning financial issues; right?

20       A.   Based on what I'm reading

21  here, yes.

22       Q.   Were you involved in the

23  preparation of this report?

24       A.   No.

25       Q.   You're certain you weren't

1    involved in preparing this report at

2    all?

3         A.   Since I didn't keep any of

4    the documents related to this case, I

5    don't know.  I can't find out if this

6    report is based on a report I wrote

7    or whether Stuart wrote it or whether

8    Stuart amended it.

9         Q.   So you don't recall one way

10   or the other whether you were involved

11   in preparing this report?

12        A.   I do not remember.

13        Q.   You would agree, wouldn't you,

14   that it appears to contain confidential

15   financial information to which the author

16   would not have a right to; correct?

17        A.   I'm not sure.  It could be human

18   intelligence sources that provided this

19   information.  I don't know.  It could be

20   fake.

21        Q.   If you look at page 8, it contains

22   very specific financial information about

23   Khater Massaad, doesn't it?

24        A.   Yes.

25        Q.   And those -- the precision

1  of those numbers suggest it's highly

2  unlikely that a human source would be

3  able to provide those numbers without

4  the aid of a bank record; right?

5      A.  Unless this human source was

6  privy to the bank records.

7      Q.  Yesterday you said that Nick

8  Del Rosso was working on Project Beech

9  but he was working in parallel to you

10  but on different issues.

11          Do you recall that testimony?

12      A.  Yes, I recall.  I -- I think

13  he -- he might have worked for the same

14  client.  But I'm not sure it should be

15  called Project Beech.  Project Beech

16  was a name that Stuart made up.

17      Q.  Putting aside what the name

18  of the project was, you indicated that

19  you thought Nick Del Rosso was working

20  in parallel but on different issues.

21          What did you mean by that?

22      A.  At first, we knew that Nick

23  was involved.  But I don't know if --

24  how Stuart knew, if he knew it from the

25  boss or other sources.  And there were

1   certain aspects in the case where we were

2   told:  You don't have to investigate this.

3   It's being taken care of.

4        Q.   And what were those other aspects

5   that were being taken care of by others?

6        A.   One was Farhad Azima.  And there

7   was another family I recall named Rothman.

8             THE INTERPRETER:  Rothman?

9             THE WITNESS:  Rothman.

10             THE INTERPRETER:  Rothman.

11             THE WITNESS:  (Comment in Hebrew.)

12             THE INTERPRETER:  Rothman.

13             R-o-t-m-a-n or R-o-t-h-m-a-n.

14   BY MR. BEHRE:

15        Q.   And what about Farhad Azima was

16   being taken care of by others?

17        A.   They didn't tell us Farhad Azima

18   was being taken care of by somebody else.

19             At first -- they didn't tell us:

20   You don't have to investigate Farhad Azima.

21             But, at first, they told us that

22   he was serving as some kind of mediator

23   between RAK and Khater Massaad.  And then

24   the trial started with this mutual accusations

25   and it wasn't necessary.

 1      Q.   And who was this individual Rothman

 2  that you mentioned?

 3      A.   During the investigation, a suspicion

 4  came up regarding some kind of arms deal that

 5  involved the Rothman family, some kind of --

 6  they were accused of some kind of fictitious

 7  deal.  And as part of the findings of the

 8  investigation, this is something I recall.

 9  We were told not to touch it.

10      Q.   And is that because somebody else

11  was going to touch it or just to stay out

12  of it entirely?

13      A.   The initial question was:  What

14  do I think Nick Del Rosso did?

15           At that time, I did not think there

16  was anybody else doing any investigating.

17           Based on the findings in the court,

18  today I do believe that Nick Del Rosso was

19  investigating.

20      Q.   Was investigating what?

21      A.   I think he was investigating all

22  the matters dealing with Farhad Azima.

23      Q.   Why was Stuart Page so upset that

24  Nick Del Rosso was brought in to provide

25  assistance with regard to the -- what you

1  called Project Beech?

2      A.   I think Stuart Page has a big

3  ego.  And if to base myself on what you

4  said yesterday, he was mad that he was

5  taking away business from him.

6      Q.   Do you know who worked with

7  Nick Del Rosso?

8      A.   No.

9      Q.   Do you know if he had any

10  employees?

11      A.   No.  I don't know him.  I've --

12  I've never seen him.  I don't know him

13  at all.

14      Q.   Did there come a time, to the

15  best of your knowledge, that Nick Del

16  Rosso's work for the boss either was

17  suspended or ended?

18      A.   I think -- I think that, at

19  the time that our work was terminated,

20  Stuart said that that work was also

21  terminated.  But I -- I don't really

22  know.

23      Q.   How would you describe the

24  role of Neil Gerard in Project Beech?

25      A.   "Rega."

```
 1              (In English.)  Wait.  It cut

 2    off.

 3              (Brief technical interruption

 4         in the proceedings.)

 5    BY MR. BEHRE:

 6         Q.   (Not translated.)  You can go

 7    ahead.  Yeah.

 8         A.   I think he was like the quarterback.

 9    He was a very close advisor to the boss.  I

10    think his decisions were very impactful.

11         Q.   And who reported to him regarding

12    Project Beech issues?

13         A.   Based on what Stuart told me and

14    what I remember, there were subjects that

15    Jaime and Stuart said to consult with Neil.

16              THE INTERPRETER:  With Neil?

17              THE WITNESS:  (Comment in Hebrew.)

18              THE INTERPRETER:  (Comment in

19    Hebrew.)

20    BY MR. BEHRE:

21         Q.   What was David Hughes' role in

22    Project Beech?

23         A.   In my -- in my recollection, I --

24    I saw David Hughes twice.  And my feeling

25    is that he was some kind of assistant for
```

1    Neil.

2          Q.   Did it appear to you that he was

3    subservient to Neil Gerard?

4          A.   I wouldn't call it subservient.

5    Subordinate.  He was a subordinate of --

6    of him, like you and you.  (Indicating.)

7                MR. BARET:  He's actually the

8    boss.  He's just --

9                MR. BEHRE:  Yeah.  You just --

10               MR. BARET:  -- mentoring --

11               MR. BEHRE:  -- didn't know it.

12               MR. BARET:  -- his work.  He's --

13   just make sure --

14               THE INTERPRETER:  The ruler.

15               MR. BARET:  -- he's doing his

16   job right.  That's it.

17   BY MR. BEHRE:

18         Q.   What about Andrew Frank, what was

19   his role in Project Beech?

20         A.   I never met and never knew Andrew

21   Frank.  I heard that he was responsible for

22   the PR.

23         Q.   And what PR are you talking about?

24         A.   There was somebody in charge of PR.

25   He was in charge of PR.  I -- I did my part

1    of the project.  I don't know what the other

2    people did.

3              MR. BEHRE:  Could you just try

4    and unmute that or maybe you could help

5    him?

6              THE VIDEOGRAPHER:  Off the record

7    at 4:06.

8              (Recess from 4:06 p.m. to 4:07 p.m.

9         Israel Daylight Time.)

10             THE VIDEOGRAPHER:  Back on the

11   record at 4:07.

12   BY MR. BEHRE:

13        Q.   Okay.  We're talking about the

14   PR effort that Andrew Frank was apparently

15   making.

16        A.   Is there a question?

17        Q.   No.  I'm just trying to start

18   back up where we were.

19             Did that PR include some of the

20   negative press that came out about Farhad

21   Azima?

22        A.   I don't know.  I never had a

23   meeting or was present at a meeting with

24   Andrew Frank.

25        Q.   (Not translated.)  And what about

1    Amir Handjani, who worked with Andrew Frank

2    at Karv, what was his role in Project Beech,

3    if you know?

4             THE INTERPRETER:  I'm sorry.  I

5    didn't catch --

6             MR. BEHRE:  "If you know."

7             THE INTERPRETER:  "If you know."

8             (Pending question translated.)

9             THE WITNESS:  I never met Andrew --

10   Amir Handjani either.  And towards the end

11   of our engagement, Stuart presented him

12   as a close associate or close -- somebody

13   close to the boss, consultant -- close

14   advisor of the boss.

15   BY MR. BEHRE:

16        Q.   Have you ever heard the name

17   Brandon Neuman before?

18        A.   No.

19        Q.   (Partially translated.)  Have

20   you ever heard the name Chris Swecker

21   before?

22        A.   No.

23        Q.   (Partially translated.)  Have

24   you ever heard the name Linda Goldstein

25   before?

1      A.   No.

2      Q.   Yesterday you said that there

3  were approximately ten meetings that you

4  attended with Neil Gerard.

5           And you said that one or two of

6  them were at the Dechert offices in London,

7  one or two of them were at the Metropolitan

8  Hotel where you were staying at the time,

9  and there were another ten times or so

10  when you met with him.

11           Do you recall that testimony?

12      A.   (Translated.)  I recall that

13  I said that we had a total of about ten

14  meetings.

15           Yes, we met at Dechert once

16  or twice, in Cyprus, in Switzerland with

17  Stuart, at the Metropolitan --

18           (In English.)  To Stuart's office.

19           (Translated.)  -- at that club --

20           THE INTERPRETER:  Sorry?

21           THE WITNESS:  (Translated.)

22  -- at Stuart's --

23           (In English.)  Office.

24           (Translated.)  -- office, at

25  the Metropolitan, at that club with Jaime.

1    Might have been a little more than ten.

2    BY MR. BEHRE:

3        Q.   And you mentioned meetings or

4    a meeting at Page's offices.

5             Where were they located?

6        A.   (Comment in Hebrew.)

7             THE INTERPRETER:  You asked about?

8             MR. BARET:  Stuart's office.

9             THE WITNESS:  (In English.)  Stuart

10   office.

11            THE INTERPRETER:  Page's office.

12   I'm sorry.

13            THE WITNESS:  (In English.)  Page

14   office.

15            THE INTERPRETER:  Yeah.

16            THE WITNESS:  I think -- I think

17   it was somewhere near the -- near Buckingham

18   Palace, near the Taj Hotel.  That's where

19   I was staying.  That's where the -- the

20   offices were at that time.

21            He used to switch offices every

22   year.  Each time he tried to find something

23   cheaper.  In the end, he ended up near some

24   church somewhere, some corner.

25            THE INTERPRETER:  "In some church."

1    BY MR. BEHRE:

2        Q.   (Partially translated.)  Did there

3    come a time in 2019 when there was a great

4    deal of interest by the boss in Neil Gerard

5    and others about who was funding both the

6    Azima litigation and the torture litigation

7    brought by victims of torture at the hands

8    of RAK?

9            THE COURT REPORTER:  Say the end.

10   I'm sorry.  Torture litigation?

11           THE INTERPRETER:  "Tort" or "torture"?

12           MR. BEHRE:  Involving those tortured --

13           THE INTERPRETER:  "Torture."

14           MR. BEHRE:  -- at the hands of RAK.

15           (Pending question fully translated.)

16           THE WITNESS:  Since the meeting

17   with Alex Ibragimov and Dimitri, who

18   represented himself as -- as representing

19   Alpha but really represented -- he worked

20   in a place called Alpha Group.  But he was

21   actually running or managing the entire

22   strategic file of ENRC.

23           And since that, it was -- the

24   prevalent opinion among us was that it

25   was ENRC that was behind the funding of

1    all that litigation that you mentioned.

2              Regarding the torture litigation,

3    I don't know anything at all about that.

4    BY MR. BEHRE:

5         Q.   So the comments you just made

6    concern the Azima litigation; right?

7         A.   Yes.  The Azima case.

8              I imagine that you're relating

9    to the torture that came up as a subject

10   in the trial of Karam Sadaq?

11        Q.   Yes.

12        A.   So on that litigation, we learned

13   from the meeting held by Stuart with Paul

14   Robinson.

15        Q.   Is it true that Neil Gerard became

16   very interested, as -- as did the boss, in

17   finding out who was funding this litigation?

18   And, therefore, he asked Stuart Page to

19   find out who was funding it?

20        A.   My -- my feeling is that Stuart

21   was deeply offended that he was not entrusted

22   with that investigation and he had heard

23   about it because he was a personal friend

24   of Paul Robinson's father.

25              And I believe he was extremely

1  angry at Neil for not entrusting him with

2  that investigation.  I don't think he ever

3  investigated it.  And at this stage, they

4  had asked -- by that time, they had asked

5  Stuart to stop contacting them.

6       Q.   Are you aware that Stuart Page

7  met with Neil Gerard and Amir Handjani

8  at the Royal Automotive Club in London

9  about this very issue, who was funding

10 the litigation?

11      A.   No.

12           When was it?

13      Q.   During the Azima litigation.

14      A.   No, I did not know that this

15 subject was debated.

16      Q.   Did you prepare any report

17 regarding who was funding that litigation?

18      A.   Not that I recall.

19      Q.   Did you perform any surveillance

20 in Dubai on behalf of anyone for Project

21 Beech?

22      A.   No.

23      Q.   Have you ever been to RAK?

24      A.   No.

25           The first time I flew to Dubai

1   was after the project had ended.

2       Q.   (Not translated.)  Were you

3   involved in surveillance that was conducted

4   on the Stokoe legal team in the U.K.?

5       A.   (Comment in Hebrew.)

6            THE INTERPRETER:  Stoke legal

7   team?

8            MR. BEHRE:  S-t-o-k-o-e.  Stokoe.

9            THE INTERPRETER:  Okay.

10           (Pending question translated.)

11           THE WITNESS:  No.

12  BY MR. BEHRE:

13      Q.   Do you know who Radha Stirling

14  is?

15      A.   No.

16           (Comment in Hebrew.)

17           THE INTERPRETER:  "What is the

18  name again," he asked.

19  BY MR. BEHRE:

20      Q.   Radha Stirling.

21      A.   No.

22      Q.   Earlier we talked about an entity

23  called Insight GSIA Limited, which is a BVI

24  corporation.

25           Do you remember that discussion?

1    A.   Yes.

2    Q.   And at that time -- maybe I got

3    it wrong -- you indicated you -- you didn't

4    know anything about this entity; is that

5    right?

6    A.   No.  I did not say that.

7    Q.   I'm sorry.

8         Are you familiar with that entity?

9    A.   Yes.  I did say that this was a

10   company owned by Effi Lavie.

11   Q.   And you had no interest in it?

12   A.   No.

13   Q.   And are you aware that Insight

14   GSIA Limited provided Project Beech

15   assistance to Stuart Page?

16   A.   It's possible, yes.

17   Q.   Are you familiar with a company

18   called Sublime Solutions Innovations and

19   Trade?

20   A.   Not that I recall.  No.

21   Q.   Would it surprise you that they

22   provided Project Beech services to Stuart

23   Page?

24   A.   As I've said before, Stuart Page

25   utilized numerous subcontractors and also

1    provided services that do not relate to

2    my work.

3        Q.   Did your Insight entity ever

4    have a website?

5        A.   I don't think so.

6        Q.   Did anybody make efforts to

7    scrub any mention of Insight from the

8    Internet?

9        A.   I have no clue.

10       Q.   Have you ever attempted to

11   reduce the profile of any entity you're

12   involved in by attempting to manipulate

13   the Internet so that searches for those

14   companies would not be so fruitful?

15       A.   No.

16            But I don't possess a website

17   for my companies.  So there's nothing

18   to reduce or remove.

19            MR. BEHRE:  I think Ian has

20   gone out to get copies of the records

21   that you brought.  So we'll just need

22   to take a couple-minute break until he

23   comes back.  We're getting close to done.

24   So ...

25            THE VIDEOGRAPHER:  Going off the

1    record at 4:25.

2              (Recess from 4:25 p.m. to 4:40 p.m.

3         Israel Daylight Time.)

4              THE VIDEOGRAPHER:  Going on record

5    at 4:40.

6              (Exhibit 7 marked.)

7    BY MR. BEHRE:

8         Q.   I'd like to next show you

9    Exhibit 2, which is the set of Insight

10   Analysis and Research LLC invoices you

11   brought to your deposition today.  And

12   I'd also like to give you another exhibit

13   we're marking as Exhibit 7, which is a --

14   another packet of Insight Analysis and

15   Research LLC invoices as well.

16             And I want to direct your

17   attention to Invoice 1036 in both packets.

18   Okay?  So just get 1036 in the version

19   you brought and 1036 in the version of

20   the other exhibit.

21             Do you have both of those

22   exhibits opened to Invoice 1036?

23        A.   (Examining.)  Yes.

24        Q.   And while they're both labeled

25   Invoice 1036, they appear to be different

1    in that they -- each one has a different

2    logo.  So they're not identical copies.

3            Do you see that?

4    A.   Yes.

5    Q.   Can you explain why that is?

6    A.   No.

7    Q.   Was there ever a case where

8    invoices were re-written or edited after

9    they were issued?

10   A.   There were cases where Stuart

11   delayed payment or he asked us to re-send

12   an invoice and we may have used a different

13   software.  But I see that the amount is the

14   same in both of them.  So I don't see that

15   there's any problem in this.

16   Q.   Okay.  Would you do the same thing

17   with Invoice No. 1038.

18           Do you have that in front of you,

19   1038?

20   A.   (In English.)  Yes.

21           (Translated.)  Yes.

22   Q.   Now, it appears that there's a --

23   in the set you brought today, there's an

24   additional invoice labeled 1038.  And then,

25   in handwriting, an "A" is placed after it

1  and it's for a different amount than 1038.

2      Do you see that?

3      A.   That's right.  1038A is for the

4  same amount.  And 1038 is for a different

5  amount.

6      Q.   Correct.

7      And can you explain why there's

8  a one oh -- 1038 and a 1038A?

9      A.   I'm trying to look at the deposit

10  of the money.  I think I must have given

11  them another invoice that Stuart didn't

12  issue, wherever they got it from.  Because

13  I see a payment of $250,000 for the invoice.

14  I think mine is more precise because there's

15  a deposit of 250,000 and a deposit of 300,000 --

16      Q.   So --

17      A.   -- one in August and one in July.

18      Q.   So both were paid?

19      A.   Based on what I see here in the

20  Bank of America, yes.

21      Q.   (Partially translated.)  Okay.

22  Yesterday you said you were going to obtain

23  and give us a copy of your travel records

24  that you got from the Israeli agency that

25  provides that.

1              Did you do that?

2              THE INTERPRETER:  From the --

3              THE WITNESS:  (Comment in Hebrew.)

4              THE INTERPRETER:  -- Israeli agency.

5              (Comment in Hebrew.)

6              THE WITNESS:  (Comment in Hebrew.)

7              THE INTERPRETER:  You mean the

8    Ministry?

9              MR. BEHRE:  Yes.

10             (Remainder of pending question

11        translated.)

12             THE WITNESS:  I put in a request.

13   And as soon as it comes, I will send it

14   to you.

15   BY MR. BEHRE:

16        Q.   Okay.  And you also said you'd

17   look at your WhatsApp for more communications

18   with Stuart Page; right?

19        A.   I scanned through my phone.  I

20   couldn't find any.  But I may have it on

21   other phones.  So I'll look.

22        Q.   How many phones do you have?

23        A.   I have one phone.  But I replace

24   it every year.  And when you replace it,

25   I -- when I replace it, I don't back up

1    the WhatsApps.

2        Q.   How did you communicate with

3    Neil Gerard?

4        A.   Via Stuart.

5        Q.   Did you ever text him or e-mail

6    him?

7        A.   No.

8        Q.   Did you ever use WhatsApp or

9    a -- or a method like that to communicate

10   with him?

11       A.   No.

12       Q.   What about Jamie Buchanan, how

13   did you communicate with him?

14       A.   With Signal.  It's an application

15   called Signal.

16       Q.   Any other way?

17       A.   Not with Jaime.  I don't think

18   so.

19       Q.   Did you use Signal for other

20   communications involving Project Beech?

21       A.   I -- I would assume that I did.

22       Q.   With who?

23       A.   With Stuart.  With employees

24   from my firm sometimes.

25       Q.   What other apps do you use to

1   communicate?

2        A.   We once used Silent Circle and

3   Wire.  Today we use a phone that we have

4   developed for ourselves.

5        Q.   And would you also please look

6   at your Signal communications with Jamie

7   Buchanan and, if they concern Project

8   Beech, provide them to us?

9        A.   There's nothing there.  It's

10  programmed to disappear after one week.

11       Q.   Let me ask you to take out

12  Exhibit No. 6 again.  It's the project

13  update we looked at previously.

14       A.   "Kin."

15       Q.   I know that you said you didn't

16  recognize that report.

17            But is that in the format that

18  your reports were done regarding Project

19  Beech?  So in other words, the -- the

20  pagination or the font or the lettering,

21  that type of thing, does it look like

22  it's in a similar style as the reports

23  you did create?

24       A.   Yes.

25       Q.   And what is it that's -- that

1    looks familiar?

2         A.   The way the report is set up.

3         Q.   Who besides Stuart Page received

4    your reports?

5         A.   To the best of my knowledge,

6    Stuart Page.  Maybe other people in his

7    firm got it, that helped him.

8         Q.   Do you know who he distributed

9    the reports to?

10        A.   No.

11        Q.   Did you ever discuss that with

12   him?

13        A.   He sometimes mentioned that he

14   passed it on to Neil or to Jaime.  But

15   it never was a subject that was discussed.

16        Q.   Okay.  Did you ever get any

17   feedback from Jamie Buchanan or Neil

18   Gerard that made you think they'd

19   actually read your reports?

20        A.   At the meetings that I was

21   present together with them, I -- I could

22   understand that they had read the reports.

23        Q.   Because the reports contained

24   information that became the basis for

25   discussion at the meetings; right?

```
 1      A.   Yes.  But they're also subjects

 2  that they raised.

 3      Q.   Did you ever attend any meetings

 4  in the U.S. about Project Beech?

 5      A.   Other than the meeting with Jaime

 6  that I described earlier, I don't recall

 7  any others.

 8           MR. BEHRE:  We need a two-minute

 9  break.  Sorry.

10           THE VIDEOGRAPHER:  Going off the

11  record at 4:56.

12           (Recess from 4:56 p.m. to 5:00 p.m.

13      Israel Daylight Time.)

14           THE VIDEOGRAPHER:  Back on record

15  at 5:00 o'clock.

16  BY MR. BEHRE:

17      Q.   Mr. Forlit, were you involved

18  in any investigation of Karam Al Sadeq?

19      A.   No.

20      Q.   Dima Al Sadeq?

21           THE COURT REPORTER:  "Dima"

22  or "Dena"?

23           MR. BEHRE:  Dima.

24           THE INTERPRETER:  Dima.

25           THE WITNESS:  No.
```

1    BY MR. BEHRE:

2         Q.   Jihad Quzmar?

3         A.   No.

4         Q.   Did you do, prior to 2015, any

5    other work regarding any other RAK-related

6    matters besides Project Beech?

7         A.   In 2008, I worked for Rafi, who

8    was working for Stuart concerning some

9    aspects related to the case.

10        Q.   Did that involve Sheikh Khaled?

11        A.   "Kin."

12             THE INTERPRETER:  "Khaled"?

13             THE WITNESS:  "Khaled."

14             MR. BEHRE:  "Khaled."

15             THE INTERPRETER:  "Yes."

16   BY MR. BEHRE:

17        Q.   What about Sheikh Faisal?

18        A.   I don't recall.

19             THE INTERPRETER:  "I don't

20   remember that."

21             Sorry.

22   BY MR. BEHRE:

23        Q.   And did that involve the -- the

24   potential overthrow of the Sheikh, of the --

25   of the ruler?

```
1          A.   No.   There was -- there was no
2     potential overthrow at that time.   There
3     were two princes fighting over who was
4     going to be the king.   There wasn't any
5     overthrow.
6               MR. BEHRE:   Okay.   I have no
7     further questions.   Thank you.
8               THE VIDEOGRAPHER:   That concludes
9     the deposition of Amit Forlit at 5:03.
10              (Brief pause in the proceedings.)
11              THE VIDEOGRAPHER:   Back on record
12    at 5:03.
13
14                    EXAMINATION
15    BY MR. BARET:
16         Q.   Amit, were you ever asked to
17    investigate Farhad Azima?
18         A.   No.
19         Q.   Did you ever author or somebody
20    under you author any reports regarding
21    Farhad Azima?
22         A.   No.
23         Q.   After you provided the report
24    to Stuart, did you have any control over
25    what was added to the report?
```

```
 1       A.   No.

 2       Q.   Before Stuart provided a report

 3  or -- or forwarded it to the client, did

 4  he ever share with you the final version

 5  of the report that was produced to the

 6  client?

 7       A.   No.

 8            MR. BARET:  No further questions.

 9            THE VIDEOGRAPHER:  That concludes

10  the deposition of Amit Forlit at 5:05.

11            (The deposition concluded at 5:05 p.m.

12  Israel Daylight Time.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                CERTIFICATE OF REPORTER

 2

 3          I, BRENDA MATZOV, CSR NO. 9243, do

 4    hereby certify:

 5          That, prior to being examined, the

 6    witness named in the foregoing deposition was

 7    asked to acknowledge that their testimony will

 8    be true under the penalties of perjury and will

 9    be the truth, the whole truth, and nothing but

10    the truth.

11          That the foregoing deposition was taken

12    before me, at which time the aforesaid proceedings

13    were stenographically recorded by me and thereafter

14    transcribed by me;

15          That the foregoing transcript, as typed,

16    is a true record of the said proceedings;

17          And I further certify that I am not

18    interested in the action.

19

20          Dated this 30th day of July, 2022.

21

22    _____
      BRENDA MATZOV, CSR NO. 9243
23

24

25
```

```
 1                CERTIFICATE OF WITNESS

 2

 3          I, AMIT FORLIT, witness herein, do

 4  hereby certify and declare the within and

 5  foregoing transcription to be my examination

 6  under oath in said action taken on July 21,

 7  2022, with the exception of the changes

 8  listed on the errata sheet, if any;

 9          That I have read, corrected, and

10  do hereby affix my signature under penalty

11  of perjury to said examination under oath.

12

13

14

15

16  _____   _____

17        AMIT FORLIT, Witness                Date

18

19

20

21

22

23

24

25
```

```
 1                      ERRATA SHEET

 2   Case:      FARHAD AZIMA vs. INSIGHT ANALYSIS AND

 3              RESEARCH LLC AND SDC-GADOT LLC

 4   Date:      JULY 21, 2022

 5   Witness:   AMIT FORLIT

 6

 7   Page _____ Line _____ Change _____

 8   Reason _____

 9   Page _____ Line _____ Change _____

10   Reason _____

11   Page _____ Line _____ Change _____

12   Reason _____

13   Page _____ Line _____ Change _____

14   Reason _____

15   Page _____ Line _____ Change _____

16   Reason _____

17   Page _____ Line _____ Change _____

18   Reason _____

19   Page _____ Line _____ Change _____

20   Reason _____

21   Page _____ Line _____ Change _____

22   Reason _____

23

24   _____  _____
               AMIT FORLIT, Witness            Date

25
```