IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| In re: Application Pursuant to<br>28 U.S.C. 1782 of | ) | |
| | ) | |
| | ) | |
| FARHAD AZIMA | ) | Case No.: 1:22-cv-20707-MC-MARTINEZ |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | |
| INSIGHT ANALYSIS AND RESEARCH, | ) | |
| LLC, and SDC-GADOT LLC, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| | ) | |

**AMIT FORLIT'S RESPONSE IN OPPOSITION TO PETITIONER'S AMENDED APPLICATION FOR DISCOVERY (DE # 64), AND MOTION TO DISMISS FOR WANT OF JURISDICTION (AND INCORPORTED MEMORANDUM OF LAW)[1]:**

AMIT FORLIT, by and through the undersigned attorneys (who continue to represent AMIT FORLIT on the basis of the original Notice of <u>Limited</u> Appearance), hereby files this Response in Opposition to Petitioner's Amended Application for Discovery under 28 U.S.C. § 1782 (as found as part of DE # 64), and his Motion to Dismiss for Want of Jurisdiction, upon proffer of the following:

**COMPLETE LACK OF SUBJECT MATTER JURISDICTION**

1. As noted in the response directed to the Petitioner's prior Amended Petition, on April 26, 2022, AMIT FORLIT received an email from the local registered agent of Respondent, SDC-GADOT, LLC. Thereby, and for the first time, AMIT FORLIT, received a copy of a Notice of Deposition and proposed Subpoena for an in-person deposition set to take place on May 4, 2022 at a law office in Miami, Florida, directing AMIT FORLIT to appear in Florida for said deposition.

---

[1] By filing this Response and Motion, which is filed pursuant to Court Order, AMIT FORLIT does not assent to personal jurisdiction or subject matter jurisdiction of this Court, but rather continues to maintain that a want of subject matter jurisdiction and personal jurisdiction require denial of the relief sought by Petitioner as to AMIT FORLIT and dismissal of these proceedings as to AMIT FORLIT.

2.  AMIT FORLIT is not a resident of the State of Florida. See Exhibit "1" attached hereto.

3.  AMIT FORLIT is not a resident of the United States of America.  See Exhibit "1" attached hereto.

4.  AMIT FORLIT is not a United States Citizen.  See Exhibit "1" attached hereto.

5.  AMIT FORLIT has not physically been in the State of Florida since 2017.  See Exhibit "1" attached hereto.

6.  AMIT FORLIT received no communication from the Petitioner or his counsel before April 26, 2022 regarding the aforementioned deposition, and the date was not scheduled or coordinated with input from AMIT FORLIT.

7.  AMIT FORLIT was **never personally served within the State of Florida**, let alone within the territorial jurisdiction of the United States of America or this District Court, with any subpoena directing him to appear for a deposition in Miami, Florida.

8.  AMIT FORLIT was also not personally served with Petitioner's Amended Application pursuant to 28 U.S.C. § 1782 filed as part of DE # 64.

9.  This Response, and Motion to Dismiss, has been filed in order to timely comply with an Order of this Court entered on January 3, 2023.[2]

10. In so filing this Response and Motion, AMIT FORLIT does not waive, and hereby expressly contests, the attempt of the Petitioner to have this Court assert jurisdiction over his person, and AMIT FORLIT contends that this Court lacks subject matter jurisdiction in these proceedings as to him individually.

11. At all times material hereto, Petitioner has not resided in, conducted business in, owned property in, or otherwise been present in, the State of Florida or the territorial jurisdiction of this Court. See composite Exhibit "1" attached hereto.

---

[2] Of note, this Court entered a prior Order on June 8, 2022 granting AMIT FORLIT'S Motion to Quash and for Protective Order, on the same grounds which are asserted herein and which are still wholly being ignored by the Petitioner.

12. As can be seen by the information on file with the Florida Department of State, Division of Corporations for Respondent SDC-GADOT, LLC (which is the information originally utilized by the Petitioner to initially identify AMIT FORLIT), the address for AMIT FORLIT (denoted on annual filings with the Florida Department of State, Division of Corporations, for SDC-GADOT, LLC) is: 5-A Habarzel St., Tel Aviv, IL 69710-02.  See Exhibit "2" attached hereto.

13. Per 28 U.S.C. § 1782(a), "**The district court of the district in which a person resides or is found** may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. **To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure**. A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." See § 1782, 28 U.S.C. (1996) (emphasis added).

14. Petitioner concedes that AMIT FORLIT, who is not a U.S. Citizen, does not possess a green card, and owns no real property in the State of Florida, is not a resident of the State of Florida.  As such, nothing further needs be addressed to the point of "residency" for determining whether subject matter jurisdiction lies in this proceeding.

15. In determining whether or not subject matter jurisdiction lies based upon a potential Respondent being "found in" a given district, the Courts routinely interpret 28 USC 1782 to provide for what is referred to as "tag" jurisdiction. Thereunder, a person who is physically served with process and/or a subpoena in the United States is located in the jurisdiction in which he is served for purposes of determining if he or she is "found in" a given district. *See generally In re Joint Stock Co. Raiffeisenbank*, 2017 U.S. Dist. LEXIS 130721 (S.D. Fla. 2017) (Section 1782 authorizes district courts to grant an application for judicial assistance, subject to the requirement that "the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance." In re Clerici, 481 F.3d at 1331-32. To determine whether a person resides in the district of the district court ruling on the application within the meaning of the statute, courts have looked to the applicable state law for guidance. [*6] See, e.g., In re Application of Gazprom Latin Am. Servicios, C.A., No. 4:14-mc-1186, 2016 U.S. Dist. LEXIS 87175, 2016 WL 3654590, * 10 (S.D. Tex. July 6, 2016) (applying Texas law to conclude that Section 1782 respondent did not reside in the district). Under Florida law, residence hinges on the intent "to remain permanently a citizen of the state." Bloomfield v. City of St. Petersburg Beach, 82 So. 2d 364, 369 (Fla. 1955). … For purposes of Section 1782, a person is found in a district if he or she has been personally served with the discovery requests underlying the Section 1782 application. See In re Edelman, 295 F.3d 171, 180 (2d Cir. 2002) (holding that "if a person is served with a subpoena while physically present in the district of the court that issued the discovery order, then for the purposes of § 1782(a), he is 'found' in that district").[1] See also In re Godfrey, 526 F. Supp. 2d 417, 421 (S.D.N.Y. 2007) (interpreting In re Edelman as requiring "personal" service, not "substitute" service under a state's rules of service of process and personal jurisdiction). Here, Raiffeisenbank only attempted to effectuate "substitute" service of the subpoenas by serving Beloussov's mother as his purported "coresident" at the Boca Raton Residence. See Affidavits of Service [D.E. 8, 9].[2] Under the authority of In re Edelman and In re Godfrey, such

purported substitute service is insufficient for Beloussov to be "found" in the Southern District of Florida for purposes of Section 1782.[3]").

16. Here, "tag" jurisdiction does not lie, as AMIT FORLIT has not been physically served with process at any time in these proceedings anywhere in the State of Florida, or in the United States.

17. Acknowledging this, Petitioner seeks to move beyond "tag" jurisdiction to argue that this Court can establish proper subject matter jurisdiction over this proceeding as to AMIT FORLIT based upon a Florida state statute governing long-arm personal jurisdiction, which is applicable to direct civil actions brought by a Plaintiff against a foreign party Defendant[3], and based upon alleged "facts" proffered by the Petitioner supporting his allegations of a) "minimum contacts" with the State of Florida, and b) that the corporate Respondents in this action are AMIT FORLIT'S "alter ego".

18. However, Petitioner <u>cites to no controlling or supporting case authority</u> for Petitioner's position that, where subject matter jurisdiction cannot be established under 28 USC 1782 by "tag" jurisdiction, a Petitioner may establish subject matter jurisdiction under 28 USC 1782 by alternatively arguing that personal jurisdiction may lie pursuant to Florida's long-arm *personal jurisdiction* statute (F.S. 48.193).

19. There is no decisional authority of the Eleventh Circuit which would be binding upon this Court on this subject. And as Petitioner cites to no persuasive authority to support his position, your undersigned would assert that Petitioner's exact argument has actually been expressly made to, and rejected by, a sister district Court (in the Eastern District of Virginia) as recently as January of 2022.

---

[3] This is not such a direct action wherein AMIT FORLIT is a named party Defendant with sufficient alleged "contacts" to the form jurisdiction to establish that due process would allow claims to be prosecuted against him in said jurisdiction. This is a statutorily established (and limited) action for discovery to allegedly assist the prosecution of foreign claims against foreign parties in a foreign jurisdiction.

20. In *In re Eli Lilly & Co. v. Novartis Pharma AG*, 2022 U.S. Dist. LEXIS 8984 (E.D. VA 2022), the
Court performed an exhaustive analysis of the congressional intent of 28 U.S.C. § 1782, its limitations,
and the meaning of the term "found" as used within the statute, therein stating the following:

> A. *The plain meaning of "found" suggests that Congress intended § 1782 to provide for
> discovery from a party only where that party was physically present in the district in which
> discovery was sought.*

> Neither the Supreme Court nor the Fourth Circuit have interpreted the meaning of "found" as
> used in §1782 and the case therefore presents a question of first impression. The analysis
> properly begins, "as always in deciding questions of statutory interpretation, with the text of
> the statute." Othi v. Holder, 734 F.3d 259, 265 (4th Cir. 2013).

> Absent a definition provided by the statute, a reviewing court is required to "give statutory
> terms their ordinary, contemporary, common meaning." Othi, 734 F.3d at 265 (citing United
> States v. Powell, 680 F.3d 350, 355 (4th Cir. 2012)). Courts engaging in statutory interpretation
> customarily rely on dictionary definitions to ascertain the ordinary, common meanings of
> statutory terms. See, e.g., In re Constr. Supervision Servs., Inc., 753 F.3d 124, 128 (4th Cir.
> 2014) (explaining that when a term is not defined in a statute, courts may consult dictionaries
> to ascertain that terms plain, ordinary meaning). Novartis argues that dictionary definitions of
> the word "found" suggests that § 1782 requires physical presence in this District. Indeed,
> dictionary definitions point uniformly to the conclusion that "found" requires physical
> presence. For example, Novartis points to the Merriam-Webster Dictionary, which defines
> "find" as "to perceive (oneself) to be in a certain place" and clearly suggests that to be "found"
> in a place is to be physically present there. Find, MERRIAM-WEBSTER.COM (last visited
> Jan. 5, 2022), https://www.merriamwebster.com/dictionary/find. [*8] Other dictionaries
> confirm that to be found in a judicial district requires physical presence in that district. See,

e.g., Find, OXFORD ENGLISH DICTIONARY (last visited Jan. 5, 2022), https://www.oed.com/view/entry/70348 (defining "find" as "to exist; to occur; to be located at a specific site"); Find, CAMBRIDGE DICTIONARY (last visited Jan. 5, 2022) (defining "find" as "to discover, especially where a thing or person is"). Eli Lilly did not cite or offer a single dictionary definition in support of a contrary definition, nor was any contrary dictionary definition found. Moreover, Eli Lilly offers no argument whatsoever that the plain, ordinary meaning of "found" does not refer to physical presence.

Accordingly, ***it is appropriate to conclude that Congress knew the ordinary, common meaning of "found" and therefore intended § 1782 to apply only to parties who are physically present in the district in which discovery is sought***. As the Supreme Court has instructed, "if the intent of Congress is clear and unambiguously expressed by the statutory language at issue," that marks the end of the statutory interpretation analysis. Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 93, 127 S. Ct. 1534, 167 L. Ed. 2d 449 (2007). The plain and ordinary meaning of "found" finds support in the statute's [*9] legislative history. Novartis convincingly argues that the legislative history of § 1782 also supports this conclusion. As the Supreme Court has instructed, the "statutory history sheds further light on the text" and can clarify a statute's meaning. United States v. Quality Stores, Inc., 572 U.S. 141, 148, 134 S. Ct. 1395, 188 L. Ed. 2d 413 (2014). The legislative history of § 1782 suggests that Congress intended for the statute to apply only to parties physically present in the district in which the § 1782 subpoena is requested. Section 1782 was initially passed in 1948, and the text of that original statute applied only to parties "residing" in a given judicial district. Act of June 25, 1948, Pub. L. No. 80-773, § 1782, 62 Stat. 869, 949. The following year Congress amended the statute, expanding the scope of § 1728 to include a district where the subpoenaed party "resides or is found." Act of May 24, 1949, Pub. L. No. 81-72, § 93, 63 Stat. 89, 103.

This change suggests that Congress intended to include not only parties with a permanent residence in a judicial district, but also those parties who were physically present in the district, even if only temporarily. Indeed, a House Report accompanying the 1949 amendment explained that the change was intended to "correct[ ] restrictive language in section 1782 ... and permit depositions in any judicial proceeding without regard to whether the deponent is 'residing' [*10] in the district or only sojourning there." H.R .Rep. No. 81-352, at 40 (1949), reprinted in 1949 U.S.C.C.A.N. 1254, 1270. Thus, § 1782's legislative history confirms that Congress intended § 1782 to apply in any judicial district in which a party is physically present and can therefore be "found," either as a resident or as a sojourner.

*See Id* (emphasis added).

21. The foregoing authority, while not binding, is persuasive and establishes that Petitioner's "alter ego" theory is not a sufficient basis to supplant the "tag" jurisdiction which congress intended by the express language of 28 U.S.C. § 1782.

22. In addition to being legally inapplicable, the Petitioner's "alter ego" theory is fundamentally flawed in that it seeks to attribute to AMIT FORLIT, individually, all alleged[4] activities of a foreign

---

[4] It is important to remember that while Petitioner makes blanket allegations of alleged illegal activity, Petitioner **provides no proof**. Petitioner and his counsel have falsely asserted that "Mr. Forlit testified that he and others, such as Mr. Page, fabricated invoices and other written evidence to "pacify" banks concerned about the fund transfers to Insight and Gadot. (Ex. A-5 at Tr. 98:24-99:4.) Thus, Insight and Gadot were merely puppets used by Mr. Forlit to commit fraud and launder illicitly gained proceeds." See Memorandum at Page 13. However, **this is patently false, and not the actual testimony provided by Mr. Forlit on behalf of SDC-GADOT**. Rather, Mr. Forlit's actual testimony was:

"Occasionally, when we had problems with funds transferring with Hong Kong we would make some arrangements that would pacify the banks. But to the best of my recollection, there was no organized orderly retainer agreement with him."

Of important note, this testimony related to activities of Gadot Israel and Stuart Page's entity that **pre-dated** the formation of either Respondent. Specifically, Mr. Forlit testified: "And in order to transfer the money to us, he had to transfer it first to Hong Kong and then to transfer it to Israel. *In the early years, we experienced very serious problems in the transfer of the money. And, consequently, Stuart asked or -- either Stuart or his person in charge of finance to simplify and streamline it by opening companies in the United States.*" See DE # X at

corporation (i.e., Gadot Israel a/k/a Gadot Information Services) which pertained to the investigation of Khater Massaad. Petitioner seeks to do this even though AMIT FORLIT was not individually hired to conduct any such investigation, but rather the separate Israeli entity (duly organized and operating in Israel) was hired to conduct the investigation. During the Rule 30(b)(6) depositions conducted in July of 2022 in Tel Aviv, Israel, AMIT FORLIT (appearing by agreement of the Petitioner and the corporate Respondents as the designated representative of SDC-GADOT, LLC and INSIGHT ANALYSIS AND RESEARCH, LLC) specifically testified to this, as follows:

Q.      And when do you think you first heard the name Farhad Azima?

A.      <u>So at the start of the investigation of Gadot Israel, which is also known as Gadot Information Services, we learned that the subject of the investigation was a man named Dr. Khater Massaad.</u> Khater Massaad was referred to your firm by your client Farhad Azima

…

Q. <u>What's the business of SDC-Gadot LLC?</u>

A. **In Gadot SDC, as well as in Insight, there's no business activity other than to serve as a conduit to transfer money to <u>Gadot Israel.</u>**

…

THE WITNESS: And in order to transfer the money to us, he had to transfer it first to Hong Kong and then to transfer it to Israel. In the early years, we experienced very serious problems in the transfer of the money. And, consequently, <u>Stuart asked or -- either Stuart or his person in charge of finance to simplify and streamline it by opening companies in the United States.</u>

BY MR. BEHRE:

Q. <u>And what was or is the business of Gadot here in Israel</u>?

A. Are you referring to the Israeli company Gadot Israel or the Florida company?

---

Page 17, Paragraph 6-15.

This is yet another example of the Petitioner and his counsel's willingness to twist the truth around in order to fit the Petitioner's intended narrative.

Q. <u>The Israeli company, which I understand you're now saying was using the U.S. entity to transmit funds.</u>

A. Gadot Israel is a firm for crisis management that uses the collection of data, data analysis, and recommendations for actions to be taken by their customers.

Q. And in your role with Gadot, has Gadot ever had in its possession stolen data, including stolen e-mails?

A. The answer to that question is a little bit problematic. Because the analysts of Gadot sometimes use information that has been leaked to various websites such as WikiLeaks. Sometimes e-mails that were stolen have been published. So to say that we don't use stolen e-mails in our data collection or as part of our data collection, that would not be accurate. But I can say -- **but I can say that Gadot Israel does not steal data and does not do anything criminal in its activities involving -- in its work here in Israel.**

Q. <u>When you mentioned analysts at Gadot, what specifically is the role that analysts play in the company</u>?

A. In many cases, we get from customers too and from open sources -- also from collecting from open sources and from investigations. For example, by participating in chat rooms and investigations of pretext and -- pretext and monitoring, all this data that is collected is analyzed by analysts.

Q. And by "pretext," do you mean misrepresentations by individuals about who they are to get information? Correct?

A. So every -- so as far as I'm concerned, pretext -- every -- every case should be judged separately. But it could involve hanging out in a bar and overhearing a conversation or talking to someone. Anything -- I consider anything where you don't introduce yourself and say I am so-and-so and I am investigating is what I would consider pretext.

Q. And you also used the term "monitoring." What is it you're monitoring?

A. (Comment in Hebrew.)

THE INTERPRETER: "Surveillance"?

THE WITNESS: "Surveillance."

THE INTERPRETER: Okay.

THE WITNESS: (Comment in Hebrew.)

THE INTERPRETER: The word should have been "surveillance."

BY MR. BEHRE: Q. And "surveillance," you mean human –

THE INTERPRETER: Physical surveillance -- I'm sorry -- he -- he -- he explained. He said: "Physical surveillance."

MR. BEHRE: Okay. Thank you. THE INTERPRETER: Actually surveilling someone.

BY MR. BEHRE:

Q. Following someone without them knowing it, is that an example of surveillance?

A. Yes. That's an example.

Q. Okay. And you said that the customer dictated the policy of not preserving documents; correct?

A. That's what Stuart Page told me. I never met the boss.

Q. And, again, by "boss," you mean the ruler; right?

A. Yes.

Q. And what were the documents that were created but were not retained?

A. Approximately every month, but not always, and based on the findings of the investigation, we would produce a report. The report had an executive summary at the beginning. And this was followed by a breakdown of the findings of the investigation. And we would send these reports using the method that Stuart described quite accurately in his affidavit to Stuart. Stuart always asked, from the beginning, that we leave the report in an open format for two reasons. The first one was that he said that our English was beneath contempt. And he would also add sections to the report involving investigations that he did that had nothing to do with us.

Q. Did you draft or write any portion of those reports?

A. The report was prepared by the staff of analysts. I would review the report before it was sent out, sometimes make corrections or changes.

Q. And when you say the "staff of analysts," who were those people specifically?

A. This was a staff of people who worked for Gadot. And for reasons of privacy, I will not state their names.

Q. And what are the reasons of privacy that you can't disclose the employees of your company?

A. <u>First and foremost, this investigation relates to Gadot U.S.A. and to Insight. And these employees are not employees of Gadot or Insight</u>. And, secondly, some of them have security clearances here in Israel Some of them came from the various security systems, Israeli security systems.

Q. **Well, as I understand your testimony, the payments that were made to SDC-Gadot were payments for the work of Gadot here in Israel; correct?**

**A. Correct.**

…

Q. <u>So my question is: You went through all this trouble to open the SDC-Gadot LLC account with Citibank. And yet you appear to be moving money just about as fast as you get it out to the Israeli entity</u>. Why?

A. **Most of the work was carried out by Gadot Israel**. And as I explained before, these accounts in the United States were opened merely for convenience's sake, which proved itself over time. As I can see now, in July, there's a lot of activity that is not connected to Page at all, to Stuart Page.

…

Q. And what types of materials did Mr. Page provide to you, as you indicated a few moments ago?

MR. BARET: I'm -- I'm sorry. Just for the -- when – when counsel's referring to "you," who are you referring to? Amit Forlit individually?

MR. BEHRE: Yes. As paid by -- for services by SDC-Gadot.

MR. BARET: Right. But –

THE WITNESS: **Amit Forlit did not receive money from SDC-Gadot. Gadot Israel received money from SDC. And I was a representative of SDC-Gadot.**

And Page provided materials. He had his sources. Maybe some of his clients and other sources. I don't know.

BY MR. BEHRE:

Q. What types of materials did Mr. Page provide?

A. A list of companies, a list of contacts of people who were involved, legal -- legal cases that he -- that were taken from various places.

Q. Did he ever provide you with confidential e-mails or financial data belonging to others to which he wasn't entitled to have?

A. I don't think so.

…

Q. So approximately what percentage would you estimate of that over $10 million was attributable to Project Beech?

A. I estimate about 50 percent.

Q. So over $5 million over four years; correct?

A. Correct.

Q. And of that $5 million approximately, how much was paid out to your subcontractors or vendors that were working on Project Beech?

A. Most of the sum, in my opinion, was paid to Gadot Israel.

Q. How were your subcontractors or vendors paid?

A. They were paid by Gadot Israel. And a small number, I guess, I estimate, received payment from the American account.

Q. In addition to subcontractors or vendors, were there any other individuals or entities that worked on Project Beech at your direction for which you paid them?

A. I don't recall. It's possible.

Q. Has Insight ever had employees?

A. No

…

**Q. Stuart Page paid you, in part, for the work your -- you and your team did in preparing reports; correct?**

**A. The reports were prepared by Gadot Israel**.

**Q. Yes. And they were paid for through your U.S. entities, including, you said, over $5 million from Stuart Page to your Insight U.S. account; right?**

**A. It -- Insight and Gadot both. And they paid Gadot Israel. And Gadot Israel paid**.

Q. And Gadot -- Gadot Israel paid the individuals who prepared the reports; correct?

A. Correct. It paid salaries to people.

See DE # 47-1, beginning at Page 14.

23. Corroborating this testimony, Petitioner is in possession of invoices from Gadot Information Services (which is a separate entity from the Respondents in this proceeding) identifying services for a "Beech" project, and which span from April of 2016 to August of 2017[5]. Copies are attached hereto as Exhibit "3". These invoices identify a bank account maintained in Israel by Gadot Information Services, for services which Gadot Israel performed under the name project "Beech" (which AMIT FORLIT, as agent of the Respondents, has testified pertained to Khater Massaad, and did not pertain to the Petitioner).

24. The Petitioner and his counsel openly ignore these invoices, the totality of the foregoing testimony, and the corporate existence of Gadot Israel a/k/a Gadot Information Services[6] as well as the corporate Respondents, when making the blanket (and unsupported) assertion that the Respondents are simply the "alter ego" of Mr. Forlit. Incredibly, Petitioner and his counsel make the patently false assertion that "Mr. Forlit, during the July 2022 depositions, essentially conceded that he is the "alter ego" of Insight and Gadot…"[7]. Nothing could be further from the truth.

---

[5] These invoices also further unravel the Petitioner's web of lies and his continued assertion that AMIT FORLIT and the corporate Respondents "hacked" him, or played a role in his "hacking", where he openly asserts that his information was compromised and accessed in "the fall of 2015", and where a) neither of the corporate Respondents existed at that point in time, and b) Gadot Information Services was performing its investigative work related to Khater Massaad, and only Khater Massaad, during that time.

[6] Attached hereto as Exhibit "4" is a copy of corporate filing information maintained for Gadot Information Services, as organized in Israel in 2002.

[7] This is yet another instance of Petitioner and his counsel twisting and patently misrepresenting testimony and evidence provided during these proceedings. Just like Petitioner continues to falsely label AMIT FORLIT as a "hacker" while simultaneously failing to provide a scintilla of evidence to support the claim (of course, other than the "testimony" of admitted perjurer Stuart Page).

25. It is axiomatic that if AMIT FORLIT was not individually performing work for Mr. Page, but rather Gadot Israel a/k/a Gadot Information Services was providing said services, Gadot Israel was receiving payments for said services (from funds paid by Mr. Page's entities to SDC-GADOT and INSIGHT RESEARCH AND ANALYSIS, LLC), then AMIT FORLIT could not possibly be an "alter ego" of SDC-GADOT and INSIGHT RESEARCH AND ANALYSIS, LLC (or vice-a-versa)[8].

26. In reality, if Petitioner wished to make even a passingly credible "alter ego" argument, Petitioner would need to assert that these Respondents were the "alter ego" of Gadot Israel a/k/a Gadot Information Services. However, they have made no such assertion or argument, as they are fully aware of the unrebutted testimony that the Respondents were only organized to maintain bank accounts to receive payments for a separate corporate entity, Gadot Israel, for services which said entity provided after being hired by Stuart Page.

27. Moreover, the testimony provided by the Corporate Respondents at the July 20, 2022 and July 21, 2022 Rule 30(b)(6) depositions taken in this action establishes that each corporate Respondent was organized **for a lawful purpose**, which was collecting and transmitting payments for services rendered by Gadot Israel a/k/a Gadot Information Services.

28. Finally, the case law cited by AMIT FORLIT in the Motion to Quash Subpoena and Service of Subpoena, and Motion for Protective Order, filed of record and Granted by Order of this Court (see DE 7 and DE 21), holds that subject matter jurisdiction cannot lie as AMIT FORLIT is not physically in the Southern District of Florida, is not found here, has not been personally served here, and cannot be personally served here. *See In re Joint Stock Co. Raiffeisenbank*, 2017 U.S. Dist. LEXIS 130721 (S.D. Fla. 2017) ("For purposes of Section 1782, a person is found in a district if he or she has been personally served with the discovery requests underlying the Section 1782 application. See In re

---

[8] As noted repeatedly during these proceedings, SDC-GADOT, LLC and INSIGHT RESEARCH AND ANALYSIS, LLC were not organized until **October 18, 2017**.

Edelman, 295 F.3d 171, 180 (2d Cir. 2002) (holding that "if a person is served with a subpoena while physically present in the district of the court that issued the discovery order, then for the purposes of § 1782(a), he is 'found' in that district"). See also In re Godfrey, 526 F. Supp. 2d 417, 421 (S.D.N.Y. 2007) (interpreting In re Edelman as requiring "personal" service, not "substitute" service under a state's rules of service of process and personal jurisdiction). Here, Raiffeisenbank only attempted to effectuate "substitute" service of the subpoenas by serving Beloussov's mother as his purported "co-resident" at the Boca Raton Residence. See Affidavits of Service [D.E. 8, 9]. Under the authority of In re Edelman and In re Godfrey, such purported substitute service is insufficient for Beloussov to be "found" in the Southern District of Florida for purposes of Section 1782. Because Beloussov neither resides nor is found in the Southern District of Florida, the Court lacks subject matter jurisdiction over Raiffeisenbank's Application and the Application is subject to dismissal.").

29. Given the foregoing, Petitioner's "alter ego" theory argument lacks both factual credibility and any application at law. Petitioner cites to no authority to support a linkage between his tortured *personal jurisdiction* analysis under F.S. § 48.193 and the requirement of subject matter jurisdiction existing under 28 USC § 1782 based upon its plain language. As such, and even though further inquiry establishes the complete lack of a factual predicate for Petitioner's assertion that the Respondents are "alter egos" of AMIT FORLIT, no further inquiry is necessary as there is a complete lack of subject matter jurisdiction due to the failure of "tag" jurisdiction. As such, the Portion of DE # 67 seeking to request discovery from AMIT FORLIT individually must be dismissed for want of subject matter jurisdiction.

## PETITIONER'S DEFAMATORY ALLEGATIONS, USE OF FALSE AND PERJURIOUS MATERIALS, MISUSE OF 28 U.S.C. § 1782, AND VIOLATION OF OBLIGATION OF CANDOR:

30. Though it does not bear upon the complete absence of subject matter jurisdiction, given the gross amount of defamatory assertions which have been made in the Petitioner's filings AMIT FORLIT wishes to address the overreaching and patently false allegations that have been made against him.

31. First and foremost, AMIT FORLIT is not a hacker.  See Exhibit "1".  He was never hired to investigate or "hack" the Petitioner.  See Exhibit "1".  See also DE # 47-1 and 47-2.

32. AMIT FORLIT is a private investigator. See Exhibit "1".

33. AMIT FORLIT is also not Alon Omri Gurlaive. *See* DE # 47-2, at Page 21, beginning at Paragraph 14.

34. Petitioner's entire request for assistance to this Court is predicated upon the "testimony" of individuals who have knowingly and willingly perjured themselves in prior Court proceedings (including the Petitioner himself).

35. As to Stuart Page, the High Court in the "UK Proceedings" referenced and found him to be wholly lacking in credibility (even before he recanted his trial testimony). Specifically, in the final judgment entered by the High Court of Justice on May 22, 2020, the Court found:

> Stuart Page, also a former policeman and now the Chairman and majority shareholder of a business providing security and surveillance services, dealt in his witness statement with his engagement in RAK to assist with the investigations into Dr Massaad and the discovery of the hacked material. Counsel for Mr Azima submitted that Mr Page was a dishonest witness who lied about a number of matters. **I consider that Mr Page was an unsatisfactory and unreliable witness.** As set out in greater detail in the context of the hacking claim, **his witness statement was misleading in relation to two significant matters. First, his witness statement implied that he did not produce written reports for the Ruler on his investigations whereas in fact he did so on a regular basis. Second, his witness statement said that he first came across the name of Mr Azima in early 2016 whereas in it was in fact a year earlier. His evidence in connection with the discovery of the hacked material was both internally inconsistent and at odds with the contemporary documents. I have concluded that it would be unsafe to rely on any evidence from Mr Page that was not corroborated by some other source.**

See Exhibit "5" attached hereto, which is an excerpt of the High Court's of Justice's May 22, 2022 Judgment in the case of *Ras Al Khaimah Investment Authority v. Farhad Azima*.

36. As to Majdi Halabi, the other "witness" whose testimony is relied upon by the Petitioner, he too was found to be of dubious credibility by the High Court of Justice. See Exhibit "5", wherein the Court stated: "*Majdi Halabi gave evidence in relation to the discovery of the hacked material. As set out*

*later in this judgment, I came to the conclusion that his evidence was inherently implausible and not credible."* See Exhibit "5".

37. As to the Petitioner himself, Farhad Azima was found by the High Court of Justice to also have committed the presentation of false testimony, as well as fabricated and back-dated documents. Specifically, in its judgment the Court found:

> Mr Azima is a businessman with more than forty years' experience in all aspects of aviation, the airline industry and logistics. He has served as chairman of various airlines in different parts of the world. I am told that he has never before faced an allegation of fraud. RAKIA submitted that Mr Azima and Mr Adams were dishonest witnesses. **After hearing evidence from Mr Azima and Mr Adams, I reached the conclusion that their evidence in opposition to RAKIA's claims was frequently inconsistent with the contemporaneous documents and inherently implausible**. One example was their evidence concerning the retrospective drafting of the Joint Venture Agreement, which I deal with at paragraphs 123 to 128 below. **I consider that Mr Azima and Mr Adams, in giving evidence, were more concerned to support Mr Azima's case than to assist the court with an honest recollection of the true facts.**
>
> ...
>
> I consider that the explanations given by Mr Azima and Mr Adams of these communications made no sense and were untruthful. If Mr Azima had simply asked Mr Adams to send him "all" previous drafts of the agreement in his possession (as Mr Adams claimed), which is inherently unlikely, they would not have been sent over a period of nearly two months in an evolving sequence. Moreover if the drafts were really prepared in 2007 one would also expect to see them and emails exchanging them in 2007 in Mr Azima's disclosure. None of these documents were disclosed other than as attachments to emails in 2013.
>
> I agree with RAKIA's submission that the overwhelming inference from the documentary evidence is that Mr Azima and Mr Adams retrospectively drafted the Joint Venture Agreement in the summer of 2013. Mr Azima and Dr Massaad (who by then had no authority to enter agreements on behalf of RAKIA) then signed that retrospectively drafted and backdated document on board Mr Azima's yacht on 25 August 2013 and thereafter misrepresented to RAKIA that this document was the original document that had been signed on 12 April 2007.
>
> See Exhibit "5".

38. Of note, Petitioner failed to advise the Court as to the High Court's findings as to the credibility of these "witnesses" relied upon in this matter, as well as the Petitioner's own willingness to knowingly provide false testimony and documentary evidence to the High Court in order to advance his interests.

39. The foregoing should be given heavy consideration by this Court, given the discretionary nature of 28 U.S.C. § 1782 discovery proceedings, and the Petitioner's lack of candor about the foregoing from the outset.

40. Despite Petitioner's reliance upon Mr. Page[9] to identify AMIT FORLIT as a "hacker", as noted above the corporate respondents, SDC-GADOT and INSIGHT RESEARCH AND ANALYSIS, LLC produced AMIT FORLIT as their Rule 30(b)(6) representative for depositions conducted on July 20, 2022 and July 21, 2022 in Tel Aviv, Israel[10], and during that deposition AMIT FORLIT completely refuted the Petitioner's contention that he, and the corporate Respondents, were "hackers". He furthermore testified, repeatedly, that neither he, nor the corporate Respondents, nor Gadot Israel a/k/a Gadot Information Services, ever conducted an investigation into the Petitioner.

41. Across two (2) full days of questioning, AMIT FORLIT responded to the questions posed by Petitioner's counsel, even where the questioning went grossly afield of the agreed upon areas on inquiry pursuant to the Petitioner's own Rule 30(b)(6) Notices[11]. In so doing, the corporate Respondents, and AMIT FORLIT as their designated representative, provided significant additional

---

[9] Petitioner continues to rely upon Stuart Page's fabricated new "testimony" despite knowing that a) Mr. Page previously communicated directly with AMIT FORLIT about how Petitioner's threats of litigation drove him (Page) to the point of a mental breakdown and attempted suicide, and b) where Mr. Page has openly stated that he will do what is necessary, including implicating others, in order to extricate himself from the fight between the Petitioner and RAK.  See Exhibit "6".

[10] These depositions were conducted in Israel by agreement of the parties, as Petitioner and his counsel acknowledged that AMIT FORLIT did not reside in the geographic area of this Court's jurisdiction, but instead resided in Tel Aviv.

[11] By agreement of counsel for the parties, a corporate representative was to be produced to testify regarding the two (2) areas of inquiry identified in Petitioner's first issued Notices of Deposition. However, during the depositions questioning went far afield of those areas of inquiry.

information to the Petitioner and his counsel, going well beyond the scope of what the corporate Respondents were advised would be the subject of inquiry.

42. For purposes of example, the following questions (and responses) were provided during the two (2) days of depositions which had no relation whatsoever to the agreed upon areas of inquiry:

Q.   And for example where did the CitiBank records get mailed to?

A.   As far as CitiBank is concerned mostly they would send a debit card but the rest of the documents were usually sent via the application the app.

Q.   **And did they send those did they send the debit cards to New York or to Miami?**

A.   **No they sent it to Israel I had a fraud event with my card so I canceled the card and they sent me a new card which they sent to Israel.**

Q.   **And the fraud on the card was for a debit card?**

A.   **Yes.**

Q.   Who actually used those debit cards during the life of this account at CitiBank?

A.   I did.

Q.   Did anyone else use those cards?

A.   With the exception of the fraud case.

Q.   Yes?

A.   Nobody else.

Q.   So all the purchases then that would be indicated in the bank statements for Citi that were made on the debit card would have been your personal charges; correct?

A.   These are not personal expenses these are company expenses.

Q.   **And so when you purchased a Porsche in Pennsylvania was that a business expense or a personal expense**?

THE INTERPRETER:  When you acquired a what.

MR. BEHRE:  A Porsche the car.

THE WITNESS:  **I never bought a Porsche in Pennsylvania**.

**Q.   Have you ever resided in the state of Florida?**

**A.   Only as a tourist I never resided there.**

**Q.   Have you ever resided in the United States?**

**A.   No.**

Q.  Have you ever purchased a vacation home in the United States?

A.  No.

Q.  Have you ever attempted to purchase a vacation home in the United States?

A.  No.

Q.  Did you ever form an LLC to purchase a vacation home in the United States?

A.  No.  I bought once a caravan an RV.

Q**.   Did you ever form an LLC with your wife in an effort to buy a vacation home in the United States?**

**A.  I set up an LLC with my wife in order to buy a caravan not not a vacation home an RV.**

**Q.   What was the last part sorry?**

**A.   Recreational vehicle an RV.**

**Q.   And when was that?**

**A.   I believe it was in 2012 and then when we maybe 20 or maybe 2014 he adds and when we divorced in 20 the end of 2017 beginning of 2018 as part of the divorce arrangement I transferred to her the ownership of the RV.**

Q.  And while you owned the RV where was it stored when it was not being used?

A.  It was in use about one month or one month and a half per year and we would store it in the place that we would we would be arriving at.

 Q.   And what state was that?

 A.   I believe we visited something like 30 states like all over the place.

Q.  Was it ever stored in the state of Florida?

A.  I don't believe so.

Q.  Where?

A.  Because we were more on the west.

Q.  And where from what state were the license plates obtained from?

A.  I don't I honestly don't remember.

Q.  In what state did you purchase the RV?

A.  New Jersey.

**Q.   Now you indicate in the third paragraph of this affidavit dated May 12, 2022, that SDC-Gadot LLC has not conducted business in the state of Florida. Do you see that?**

**A.   Yes.**

**Q.   Is that an accurate statement?**

**A.   I believe it is.**

**Q.   And when you say you it the company has not conducted business in the state of Florida what do you mean?**

**A.   That we did not do any business in the state of Florida.**

**A.   We did not carry out any investigation and we did not conduct any business activity.**

**Q.   Okay.  Now, in paragraph three as well you say the last time you were in the United States was 2019 what were you doing in the U.S. in 2019 (Not translated.)**

**A.   I was on a trip in the Yosemite National Park went up to Canada I was with my partner.**

Q.   You indicate in paragraph six that you are an investigator and you were hired by Stuart Page to quote run intelligence gathering services end quote. Do you see that?

A.  I'm looking -- looking for it.  Yes I see it.

Q.  Are you considered a private investigator?

A.   Among other things yes.

Q.   Are you registered as a private investigator here in Israel?

A.   I'm registered and I have a firm certificate.

Q.   Are you do you have a license to be a private investigator?

A.   There are two levels I'm I have a private investigator's license and I have a license to run an investigating firm I don't actually use them here in Israel but I have those documents from the justice department or Ministry.  I don't think I've even renewed those licenses.

Q.   Has your license ever been suspended or revoked by the government of Israel?

A.   Yes.

A.   Yes I don't even recall why they suspend ed it but then they reinstated.

Q.   And do you recall what year it was suspended?

A.   2005 or six.

Q.   And did it relate to your involvement in smuggling someone out of the State of Israel who was wanted by the Israeli government?

A.   I was accused of that there was a trial I was not found I was not convicted and so my license was restored.

Q.   So that was the reason your license was suspended?

A.   I think so but I don't recall exactly.

…

MR. BARET:  Excuse me how does that relate to SDC-Gadot which is the purpose of this deposition.

MR. BEHRE:  He's claiming he's an investigator and I'm probing about his license.

MR. BARET:  This is not this wasn't for SDC this affidavit was provided to the court as an objection to deposing personally it wasn't.

MR. BEHRE:  It doesn't matter it's the same case.

MR. BARET:  No it's not I mean there is objection to his deposition which the court has not ruled yet we objected for his deposition and since you came from Washington I'm I'm sitting quietly and I'm trying not to interfere but it turns out

that you are deposing Amit Forlit as Amit Forlit which we objected to this deposition and the court hasn't ruled yet and we here for the purposes of investigating or taking deposition of a representative of SDC-Gadot Florida.

MR. BEHRE:  Correct.

MR. BARET:  Now it happens to be Amit Forlit but the court has not ruled as to our objection to depose him personally and it turns out that this deposition turns to be taking a deposition in his personal capacity which we are objecting so.

MR. BEHRE:  In the affidavit paragraph five he specifically references SDC-Gadot LLC in paragraph six he says I am an investigator.

MR. BARET:  This is this affidavit was provided in our objection to depose him personally it wasn't we never objected to deposition of SDC-Gadot we're not objecting to SDC-Gadot as a Florida corporation. He happens to be a representative of that corporation and I request that your questioning will be related to SDC-Gadot and not to Amit personally as the court hasn't ruled yet as to your right to depose him personally the court will.

MR. BEHRE:  Okay I hear your objection.

…

**Q.   Did any of the payments that SDC-Gadot received relate to Gadot's use of subcontractors who were located in the United States?**

**A.   Not that I can recall.**

**Q.   Did you have any subcontractors in the United States?**

**A.   Not subcontractors I had vendors that I paid not subcontractors.**

**Q.   And did you have vendors located in the United States?**

**A.   I had vendors in the United States but they are not connected to the case related to Stuart Page.**

…

**Q.   And part of the objective of your work was to prevent those who you thought was harming RAK from doing harm; right?**

**A.   So from the investigation concentrated or focused on the criminal activities carried out by Khater Massaad** both business in business and in politics such as for example assisting Hezbollah or violating the sanctions on Iran and he and his use of various infrastructure structures belonging to RAK the state in order to commit these illegal activities criminal activities among other things we

provided protection and our work included protecting creating protocols in order to protect the entire environment the boss was very, very concerned and he he refused to talk on on the telephone because he was so concerned.

**Q.   And SDC-Gadot received payments that were at least in part for the preparation of those reports; correct?**

**A.   So SDC-Gadot received payment for the whole Beech case and that included the security protocols and reports**.

Q.   And it also included payments for the work that was reflected in those reports; right?

A.   Yes.

…

Q.   Okay.  How did you first meet Stuart Page?

A.   I believe it was in 2008 or 2007.

A.   I went to London and I was requested to do some job for him.

Q.   Requested by who?

A.   A mutual acquaintance for whom I was working at the time.

Q.   And who was that mutual acquaintance?

A.   How is this connected to this case.

Q.   It's directly related Stuart Page paid Stuart Page paid you $2.6 million into the U.S. account and I want to know how it is you first came in contact with Stuart Page?

A.   I met him through a mutual acquaintance I believe it was Mr. Rafi Pridan.

…

Q.   Did your investigation involve at all Karam Al Sadaq?  (spelling)

A.   The correct name is Karam Al Sadeq Karam Al Sadeq I also speak Arabic when we launched our investigation Karam was already arrested by the authorities of RAK.

A.   And we did get feedback from concerning him from the investigation he had already been investigated by RAK among other things concerning offshore companies that he had.

Q.   The allegations against Al Sadeq were similar to the allegations against Massaad right they were related?

A.   Not not exactly Massaad.

A.   To the best of my recollection Sadeq assisted in creating the infrastructure for Massaad's activity but the the initiator was Massaad.

Q.   Were you present for any of the interrogations of Al Sadaq.

A.   No and I've never been to Ras Al Khaimah.

…

**Q.   Now you testified earlier that you were involved in private investigation correct?**

**A.   Yes.**

**Q.   And you don't provide IT services do you?**

**A.   I provide security envelope for computers not necessarily IT what you call IT.  We've for example developed a telephone that can't be tapped into and all kinds of technological developments.**

**Q.   But with regard to Project Beech you didn't provide any IT security other than the open-ended e-mail system where you put the reports right (Not translated.)**

**A.   I did provide in Project Beech I actually did provide consults services regarding communication security.**

**Q.   But that was a very small part of what you did for Project Beech; right?**

**A.   It was part I can't define it as big or small.**
…

**Q.   And if you look on on the same page that's page 52, on February 6 and February 13 just about a week apart there were two transfers one for 49,000 and one for 50,000 to Fusion GPS. Do you see that?**

**A.   Yes.**

Q.   (Not translated.)

**Q.   And Fusion GPS is an investigative firm; is that correct?**

**A.  Yes but there's no connection whatsoever to Stuart Page or Project Beech.**

**Q.   And Fusion GPS was a subcontractor to SDC-Gadot; correct?**

**A.   No they did not do any work for SDC-Gadot but they it was payment for something else**.

**Q.   And did the payments to Fusion GPS relate to anything you were doing for Stuart Page?**

**A.   Under no circumstances not at all.**

…

**Q.   There's a $47,000 payment on February 22 a wire to an Olam hamachshavim who is that (Spelling)?**

THE INTERPRETER:  Are did I get that right Olam machshavim (Spelling).

**THE WITNESS:  It's a vendor who supplied me with equipment again it has nothing to do with Stuart Page.**

BY MR. BEHRE:

**Q.  So it's your testimony that Olam sold you equipment?**

**A.  Yeah it's a computer store Olam HA machshavim**.

THE INTERPRETER:  That means computer world in Hebrew so yes I guess it must have been for equipment.

…

**Q.   Directing your attention go to 54 that's the SDC-Gadot statement for March 2018 there is a there's a wire on March first for $30,000 to Aviram Hawk which is Aviram Azari's company**

**A.  Yes that's correct.**

**Q.   And Mr. Azari recently pled guilty in Federal Court in New York to hacking didn't he?**

**A.   Yes he confessed to seven separate incidents of computer hacking in New York.**

**Q.   And the document in which he pled guilty references an Israeli company but they don't name that company was that company yours?**

**A.   No.**

**Q.   How do you know that?**

**A.   Because I've never commissioned hacking have never paid for hacking.**

Q.   You're aware that Mr. Azari is cooperating with federal law enforcement officials in the U.S.; correct?

A.   I wish him all the best.

Q.   Have you been contacted by those prosecutors about this case?

…

**Q.   What work did Azari do for you if it wasn't hacking?**

**A.   For me he never did any work.**

**Q.   Yet he was paid $55,000 on March first and March 12, 2018?**

**A.   He did work for Gadot and that work included economic investigations financial investigations.**

**Q.   And by financial investigations does that mean obtaining confidential banking and financial records about individuals who were being investigated?**

**A.   The investigations that Azari did for me had nothing to do with Project Beech or anything to do with Stuart at all.   And I asked him that any investigations he did to me for me be done in accordance with the law.**

**Q.   Why did you find it necessary to tell him to act lawfully?**

**A.   I say that to every one of my subcontractors.**

…

Q.   If you look on the same page **that's page 54 there are two entries on March 15th 2018 were where you received wires and one of them the first one is from Florida a p telecom Inc. Do you see that?**   It's a $1,000 that came in from a Florida entity; correct?

**A.   This is -- this is a different customer it has nothing to do with page or any of this case and I can add that the investigation in this particular instance was in South America and has nothing to do with what's going on.**

**Q.   In your affidavit that you submitted in this case in Florida, you indicated that you didn't transact business in Florida and yet we have a transaction where you received $100,000 from a Florida company what business did you transact with this Florida company?**

**A.   <u>I did not transact any business in Florida as I said earlier and this payment is for work that was done in South America</u>.**

…

**Q.   Well, if you look on March 23 on page 55 you received $350,000 from overseas consulting limited LLP; correct?**

**A.   There's no connection whatsoever between these wires and Stuart Page and I I can't answer beyond saying that this has nothing to do with Project Beech Farhad Azima or Stuart Page.**

**Q.   So in the month of March 2018 you received $650,000 from Florida companies; correct?**

<u>A.   This work was not executed in Florida the customer is not a U.S. citizen</u>. And apparently part of the payment for this work was transferred through an American through American companies.

**Q.   So my question is you went to all of this trouble to open the SDC-Gadot LLC account with CitiBank and yet you appear to be moving money just about as fast as you get it out to the Israeli entity. Why?**

**A.   <u>Most of the work was carried out by Gadot Israel.  And as I explained before these accounts in the United States were opened merely for convenience's sake which had proved itself over time.</u>  As I can see now in July there's a lot of activity that is not connected to page at all to Stuart Page.**

…

**Q.   Okay.  What about Ezekiel Golan Intellectual Pro there are several wires to that entity on December 12th and 13th totaling $65,000. Ezekiel Golan intellectual pro?**

**A.   It is not connected connected in any way whatsoever to Stuart Page or to the Beech Project.**

Q.   What services did @Ezekiel Golan intellectual provide?

A.   I am prevented from answering that this is not connected and it is under privilege.

Q.   Under privilege because you were acting at the direction of a lawyer (Not translated.)

A.   No because of my agreement with Ezekiel Golan that commands a privilege.

Q.   Well, I don't knowing that's a valid basis not to answer?

…

Q.   And then in July 2019 there's a trip to Vegas you stayed at the?

A.   (In English.)  July.

Q.   July 2019 you went to the practiced a store and spent $535 the Montclaire store and spent 2175?

A.   I want a belt.

Q.   You won a?

A.   I can bring it tomorrow.

Q.   Okay.  I'll try it on.

Q.   And you saw the Beetles on Broadway and you ate at Joel Robishon?

A.   Joel Robishon.

Q.   Right?

A.   Kin.

…

43. The transcripts for the Rule 30(b)(6) deposition testimony filed at DE 47-1 and 47-2 shows the extent of testimony already provided, and that any inquiry Petitioner might have wanted to individually make of AMIT FORLIT was already completed based upon Petitioner's counsel's prior subterfuge.

44. Moreover, and as noted above, during the July 20, 2022 and July 21, 2021 Rule 30(b)(6) depositions AMIT FORLIT **unequivocally testified that neither corporate Respondent, nor Amit Forlit himself, ever investigated the Petitioner, nor were they ever hired to investigate or "hack" the**

**Petitioner**.  The Deponent also testified that he was not involved in any "cover up" story to be presented to the Courts in the U.K.:

> Q.   So in the in the document subpoena that you have in front of you Exhibit No. One it asks in on page nine of 39 so the numbering is in the upper right-hand corner under 1A the asks for all reports. Do you see that?
>
> A.   Yes.
>
> Q.   And are those the reports you referenced as having not been retained?
>
> A.   **No we have no reports on Azima because we didn't do any reports on Azima.**
>
> Q.   So it was your testimony that there was no report that mentioned Farhad Azima?
>
> A.   **No.  In my opinion there were reports that mentioned Azima Farhad Azima not as the subject of an investigation but as someone whose name came up in the investigation.  And as I said earlier no reports were preserved so everything that I'm saying now is from memory.**
>
> Q.   So is it your testimony that the reports that mentioned Azima didn't reflect any investigation by your company of Azima?
>
> A.   **My company did not investigate Farhad Azima so my company investigated Dr. Khater Massaad. In some of the transactions that Khater Massaad was involved in, other people were involved like members of the republican guard in -- revolutionary guard in Iran.  Like other people that were involved in these transactions and their names were mentioned.  And Farhad Azima's name came up in some of the transactions.**
>
> …
>
> Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?
>
> A.   **I was working only Khater Massaad as the subject of my investigation** and it went only under Project Beech.
>
> …
>
> **Q. And when do you think you first heard the name Farhad Azima?**
>
> **A. So at the start of the investigation of Gadot Israel, which is also known as Gadot Information Services, we learned that the subject of the investigation**

**was a man named Dr. Khater Massaad. Khater Massaad was referred to your firm by your client Farhad Azima.**

Q. **And do you recall what year you learned that name -- the name of Farhad Azima**?

A. Because I reviewed some of the material in preparation for today, I **-- I would say it was in March 2015, early 2015.**

**Q. And in conjunction with your investigation of Farhad Azima, was the name Project Beech used?**

MR. BARET: Objection. Form.

THE WITNESS: **I have never investigated Farhad Azima. The investigation was of Dr. Khater Massaad.**

Q. Okay. So in preparation for your testimony today, you said that you reviewed some documents; is that correct?

A. Yes.

Q. And what have you reviewed to prepare for your testimony here today?

A. Affidavits given by Stuart Page.

Q. Okay. Anything else?

A. Bank accounts. Invoices for -- for Stuart Page.

Q. And when you say "bank accounts," what are you referring to specifically?

A. I wanted to see when we first charged for the work concerning Khater Massaad.

Q. And when you say "the work regarding Khater Massaad," did that include anything having to do with Farhad Azima?

A. The name of Farhad Azima came up throughout all the years the investigation was being carried out, in a number of transactions which were suspected of being illegal that we investigated. **But the client or the representatives of the client, especially at the beginning of the investigation, said that Farhad Azima served as a mediator or a go-between between them and Khater Massaad. And that's why neither we nor the client were asked to investigate Farhad Azima – were asked not to investigate Farhad Azima.**

…

Q.   Were you involved in writing this report?

A.  No.

Q.  A few minutes ago you said you weren't sure one way or the other why are you now sure you weren't?

A.  **Because I see that this is a report of an investigation on Farhad Azima and we never investigated Farhad Azima.**

…

Q.  **Amit were you ever asked to investigate Farhad Azima?**

A.  **No.**

Q.  **Did you ever author or somebody under you author any reports regarding Farhad Azima?**

A.  **No.**

Q.   **After you provided the report to Stuart did you have any control over what was added to the report?**

A.  **No**.

Q.   **Before Stuart provided a report or forwarded it to the client did he ever share with you the final version of the report that was produced to the client?**

A.  **No.**

MR. BARET:  No further questions.

…

Q.   Directing your attention go to 54 that's the SDC-Gadot statement for March 2018 there is a there's a wire on March first for $30,000 to Aviram Hawk which is Aviram Azari's company

A.  Yes that's correct.

Q.  And Mr. Azari recently pled guilty in Federal Court in New York to hacking didn't he?

A.   Yes he confessed to seven separate incidents of computer hacking in New York.

Q.   And the document in which he pled guilty references an Israeli company but they don't name that company was that company yours?

A.  No.

Q.  How do you know that?

**A.  Because I've never commissioned hacking have never paid for hacking.**

**Q.  When were you first hired for Project Beech?**

**A.  I believe it was 2015**.

Q.  So you worked with Stuart Page for approximately seven years before this project; right?

A.  Not consistently but between 2008 and 2015 on and off.

**Q.  And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?**

**A.  I was working only Khater Massaad as the subject of my investigation and it went only under Project Beech.**

Q.  Was there ever a time when that investigation was also called Project Oak?

A.  No Project Oak is something else.

Q.  Okay.  You testified earlier that you did not have a retainer agreement with Stuart Page; is that correct?

A.  To the best of my recollection there was no retainer agreement occasionally when we had problems with funds transferring with Hong Kong we would make some arrangements that would pacify the banks but to the best of my recollection there was no organized orderly retainer agreement with him.

**Q.  What was the purpose for which you were hired?**

**A.  You mean on the Beech Project?**

**Q.  Yes.**

**A.  As I specified earlier there were concerns and suspicions on the part of the boss that Khater Massaad was stealing was causing damage to the state including assistance given to political opponents including felonies that would embarrass the boss very seriously vis-a-vis the United States in terms of the violations of the sanctions against Iran.**

Q.  Did your investigation involve at all Karam Al Sadaq?  (spelling)

A.   The correct name is Karam Al Sadeq Karam Al Sadeq I also speak Arabic when we launched our investigation Karam was already arrested by the authorities of RAK.

A.   And we did get feedback from concerning him from the investigation he had already been investigated by RAK among other things concerning offshore companies that he had.

**Q.   When were you first hired for Project Beech?**

**A.   I believe it was 2015.**

Q.   So you worked with Stuart Page for approximately seven years before this project; right?

A.   Not consistently but between 2008 and 2015 on and off.

**Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?**

A.   <u>I was working only Khater Massaad as the subject of my investigation</u> <u>and it went only under Project Beech.</u>

Q.   Was there ever a time when that investigation was also called Project Oak?

A.   No Project Oak is something else.

Q.   Okay.  You testified earlier that you did not have a retainer agreement with Stuart Page; is that correct?

A.   To the best of my recollection there was no retainer agreement occasionally when we had problems with funds transferring with Hong Kong we would make some arrangements that would pacify the banks but to the best of my recollection there was no organized orderly retainer agreement with him.

**Q.   What was the purpose for which you were hired?**

**A.   You mean on the Beech Project?**

**Q.   Yes.**

**A.   As I specified earlier there were concerns and suspicions on the part of the boss that Khater Massaad was stealing was causing damage to the state including assistance given to political opponents including felonies that would embarrass the boss very seriously vis-a-vis the United States in terms of the violations of the sanctions against Iran.**

See DE 47-1.

45. In total, the foregoing shows that AMIT FORLIT appeared as representative of SDC-GADOT, LLC and INSIGHT RESEARCH AND ANALYSIS, LLC where he resides in Tel Aviv, Israel, and provided the Petitioner with **more than fifteen (15) hours of testimony given over two (2) days**.

46. The discovery now sought by DE # 67 from AMIT FORLIT is moot, as the Petitioner has already completed the discovery depositions which Petitioner initially sought, and Petitioner has already received the sworn answers that Petitioner sought to obtain. Unequivocally, AMIT FORLIT has testified that neither he, nor the Respondents, ever investigated Farhad Azima, they were not retained to investigate Fahrad Azima, they did not "hack" or retain anyone to "hack" Fahrad Azima, and they were not involved in any "coverup" conspiracy to mask the origination of the information that was utilized in the UK trial involving Fahrad Azima.

47. Discovery permitted under 28 USC § 1782 lies in the sound discretion of the Court, and it is not mandatory.  The Court may exercise its discretion to disallow discovery, or more narrowly tailored (or "trim") the Petitioner's discovery requests.  And at a bare minimum, it is incumbent upon the Court not to allow a Petitioner to harass and bury a Respondent under discovery requests which are lodged purely for oppressive purposes. "The district court's discretion to allow discovery if all § 1782 requirements are met *is not boundless*. Rather, district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." Intel Corp., 542 U.S. at 252 (quoting Advanced Micro Devices, Inc. v. Intel Corp., 292 F.3d 664, 669 (9th Cir. 2002)). The Supreme Court has identified four discretionary factors that also "bear consideration" in arriving at a decision. Id. at 264. The first factor to consider is whether the person from whom discovery is sought is a party to the foreign proceeding, in which case "the need for § 1782(a) aid generally is not as apparent" because a "foreign tribunal has jurisdiction over those

appearing before it, and can itself order them to produce evidence." Id. The second factor, at issue here, was adopted from a Senate Report explaining that a court "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." Id. (citing S. Rep. No. 88-1580, at 7 (1964), as reprinted in 1964 U.S.C.C.A.N. 3782, 3788 (hereinafter "Senate Report")). The third factor to consider is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." Id. at 265. ***Finally, the fourth factor addresses whether the request is "unduly intrusive or burdensome" to the extent that it should either be "trimmed" or rejected outright***. Id. In sum, a district court must first determine whether the statutory requirements are met. If they are, the district court should then consider the four discretionary factors before arriving at a decision." See *Schlich v. Broad Inst.*, Inc. (In re Schlich), 893 F.3d 40, 46-47 (1st Cir. 2018).

48. The Petitioner already conducted a broad fishing expedition through this action, and the conduct of the Petitioner and his counsel show how the Petitioner has been conducting a "bait and switch" game with this Court, in that though arguing that the "purpose" for these proceedings is to gather testimony and evidence for use in the UK proceedings, in reality Petitioner's counsel is probing around in order to complete his investigation to look for support for the causes of action the Petitioner recently asserted in Case No.: 1:22-cv-08728 filed in the Southern District of New York.

49. Specifically, on October 13, 2022, Petitioner filed a two (2) Count Complaint against AMIT FORLIT, corporate Respondents SDC-GADOT, LLC and INSIGHT RESEARCH AND ANALYSIS, LLC, and seven (7) other named Defendants.  See Exhibit "7" attached hereto.

50. At footnote two (2), found on page two (2) of the Complaint, Petitioner openly admits the following: "The UK case seeks damages for the 2016 hacking of Azima. This Complaint seeks damages for conduct that postdates the 2016 hacking. In effect, the UK case focuses on crimes that occurred in or

about 2016, while this Complaint focuses on efforts to cover-up those crimes. In addition, the parties in the two cases are not identical, and this Complaint includes defendants Handjani, Frank, KARV, Insight, SDC-Gadot, and Forlit, who are US persons and entities, and along with Defendant Hughes are not defendants in the UK case. UK law does not have a comparable statute to RICO."

51. In his recently filed RICO Complaint, Petitioner has openly and brazenly admitted the true purpose for his initiation of this 28 U.S.C. § 1782 proceeding, which was not to obtain discovery for use in foreign proceedings, but rather to obtain pre-suit discovery prior to filing his claims in the Southern District of New York.

52. Petitioner's actions have forced the Respondents to incur tens of thousands of dollars of expenses participating in these proceedings, and AMIT FORLIT has been forced to incur significant expense as well in order, to address the improper methods used to try and drag him into these proceedings, where Petitioner has never possessed any intention to use these proceedings for their statutorily authorized purpose.

53. 28 USC 1782 does not authorize *carte blanche* unlimited discovery directed to non-parties merely because the requesting party comes before a Court and states that they believe the proposed Respondent may possess information useful to an ongoing foreign action, or may be a witness at a later time in the ongoing foreign action.

54. Here, the Petitioner and his counsel have grossly abused the discretion of this Court[12], and 28 USC § 1782, and as such this Court should DENY the Amended Petition seeking to compel further discovery from AMIT FORLIT. Furthermore, the relief sought by the Amended Petition is moot, as Amit Forlit has already answered questions on July 20, 2022 and July 21, 2022 which the Petitioner's counsel

---

[12] Particularly where the Petitioner, and his counsel, have already identified the individual and entities responsible for his "hacking", and are pursuing direct relief against those entities in another District Court in the United States. *See Azima v. Del Rosso et al.*, 1-20-cv-00954-WO-JLW (M.D.NC), wherein Petitioner has been bringing direct claims against the person and parties he asserts is responsible for his "hacking", with those claims having been asserted first in **2020**.

would ask him in an individual deposition if this Court were to determine that ordering such a deposition were somehow proper under 28 USC 1782.

## OTHER FACTORS WHICH MANDATE THE DENIAL OF THE RELIEF SOUGHT:

### 1. FOREIGN LOCATION OF ALL ALLEGED CONDUCT:

55. Beyond the clear and facial invalidity of the "facts" identified by Petitioner in support of his request for relief, one key factor that the Petitioner and his supporting affiants routinely and openly overlook is that all allegations or attestations made relating to AMIT FORLIT pertain to alleged activity falling wholly outside of the geographic boundaries and jurisdiction of the United States of America. Of note, nowhere in the volumes of materials provided by the Petitioner does the Petitioner identify any conduct of AMIT FORLIT aimed at "misleading" or "defrauding" the Courts of the UK which allegedly occurred in the territorial jurisdiction of the United States of America. Moreover, no allegation or attestation has been made that AMIT FORLIT conducted any "hacking" of the Petitioner from a location within the territorial jurisdiction of the United States.

56. This is likely due to the fact that a) the Petitioner knows that the defamatory accusations made against AMIT FORLIT are false, b) the Petitioner is relying upon coerced false statements of affiants to prop up this false narrative, and c) the Petitioner is currently actively pursuing claims against the actual "hackers" he believes perpetrated the interception and covert acquisition of his data. See Exhibit "8", wherein the Petitioner is suing the party Defendants he openly alleges are responsible for his "hacking".

57. In a recent decision of this Court, *In re Kurbatova*, 2019 U.S. Dist. LEXIS 84030 (S.D. Fla. 2019), the honorable Beth Bloom quashed subpoenas for discovery directed to a foreign party, stating the following in support thereof:

> Once the district court determines that the statutory requirements of § 1782 have been met, it
>
> must then also determine whether the requested discovery complies with the Federal Rules.

"For example, if the subpoena at issue is directed to a party that resides or is found in the district, same must comply with Fed. R. Civ. P. 45." In re Chevron Corp., 2012 U.S. Dist. LEXIS 123315, 2012 WL 3636925, at *6 (S.D. Fla. June 12, 2012) (citing In re Application of Inversiones v. Gasolinera Petroleos Vanezuela, S. De R.L., 2011 U.S. Pursuant to Rule 45(d)(3), *the Court must quash or modify a subpoena that requires a "person to comply beyond the geographical limits specified in Rule 45(c)." Federal Rule of Civil Procedure 45(c) states that a subpoena may only command a person to attend a trial, hearing or deposition or command the production of documents "within 100 miles of where the person resides, is employed, or regularly transacts business." Fed. R. Civ. Pro. 45(c)(1); Fed. R. Civ. Pro. 45(c)(2).* In the Motion, Credit Suisse argues that the Subpoena must be quashed because Credit Suisse has no office in Florida and thus has no employees within the 100-mile radius to engage in the act of production. ECF No. [22], at 10-12. Kurbatova responds that "Section 1782's reach is extraterritorial." ECF No. [29], at 19. However, she concedes that there is a "geographical limitation on Section 1782 discovery concern[ing] 'the location for [*7] the act of production.'" Id. *In support of its Motion, Credit Suisse has provided an affidavit from its Director of Cross-Border Litigation and Investigations, which provides sworn testimony affirming that it has no employees within the State of Florida. ECF No. [22-1], at 2. Thus, because there is no Credit Suisse employee within a 100-mile radius of the place of production, the Court agrees with Credit Suisse and finds that the Subpoena must be quashed.*

*See Id.* (emphasis added).

58. Given the foregoing, even if subject matter jurisdiction did lie (which it does not), the fact that AMIT FORLIT is a foreign national who resides in Israel, does not conduct business in the State of Florida, and has not been in the State of Florida since 2017, coupled with the fact that all "conduct" alleged

by the Petitioner is alleged to have taken place entirely outside of the United States of America, the Court would be required to quash the Petitioner's proposed deposition and document production subpoenas and dismiss the Petitioner's Amended Petition, as Petitioner seeks to obtain discovery from AMIT FORLIT at a physical location in the Southern District well beyond 100 miles from where he is located[13].

**2.   *INTEL* FACTORS**:

59. As a final point, and again assuming arguendo that subject matter jurisdiction did lie under 28 USC § 1782, and this Court was not concerned with the blatant misrepresentations and omissions made by Petitioner and his counsel, consideration of the *Intel* factors should lead this Court to deny the relief requested by the Petitioner.

60. As identified by the honorable Beth Bloom in *In re Kurbatova*, 2019 U.S. Dist. LEXIS 84030 (S.D. Fla. 2019), "The Intel factors include: 1) whether the respondents are parties in a foreign proceeding; 2) the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign tribunal to assistance from a U.S. federal court,  3) whether the discovery application conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States, and 4) whether the request is intrusive or burdensome."  See *Id*.

61. As to the second and third *Intel* factors, Petitioner has wholly failed to advise this Court that discovery procedures are directly available to the Petitioner in the UK Proceedings, and AMIT FORLIT's status as a resident of Israel is not an impediment to seeking his deposition directly in the UK Proceedings. Specifically, pre-trial depositions, and document production, **are available** pursuant to Court Order under the applicable civil rules of procedure employed by the High Court overseeing the UK

---

[13] As an aside, Petitioner does not argue, and seems to concede, that AMIT FORLIT is not currently employed, and does not routinely conduct business at this time, in the State of Florida.  AMIT FORLIT has also attested to those points in Exhibit "2" attached hereto.

Proceedings. Specifically, CPR[14] 34 provides for access to discovery depositions and document production by subpoena, and the issuance of letters of request to obtain depositions of persons residing outside of the High Court's geographical jurisdiction. See https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part34. CPR 34.13 specifically provides for protocols to allow depositions of foreign parties, and CPR 34A contains provisions addressing the procedures applicable to depositions of foreign parties.

62. Despite this, Petitioner and his counsel have informed this Court that no avenue to obtain such discovery exists in the UK Proceedings.  In the initial Petition filed by the Petitioner, he stated: "Mr. Azima's application does not seek to avoid any proof-gathering requirements of the UK Court and is a good-faith attempt to seek discovery that would assist him in presenting his case at the UK Court, namely by obtaining additional evidence regarding the hacking perpetrated by the UK Defendants and subsequent cover-up. The fact that the UK Court has no jurisdiction over Respondents makes it necessary for Mr. Azima to pursue discovery from Respondents through this Court. Mr. Azima is pursuing this discovery at the first available opportunity because in the first trial, RAKIA did not disclose the Respondents' involvement in the investigation of Mr. Azima or in the scheme to defraud the UK Court."

63. Now, Petitioner states: "Petitioner's initial and amended applications do not seek to avoid any proof-gathering requirements of the UK Court. Rather, the Petitioner has, under good faith, attempted to seek discovery that can assist him in presenting his case in the UK. The fact that the UK Court has no jurisdiction over the Respondents have made it necessary for Petitioner to pursue discovery from them through this court."

64. In both Petitions, Petitioner has wholly failed to address that he possesses discovery vehicles which are readily available to him under the governing provisions of the CPR. This is yet another instance

---

[14] CPR is an abbreviation for "Civil Procedure Rules".

of Petitioner actively misleading this Court, as Petitioner failed to address what steps, if any, Petitioner sought to employ under Rule 34 to obtain document production, or discovery depositions, directly from AMIT FORLIT.

65. Moreover, under Rule 34.7 a proposed witness is entitled to compensation for travel time and loss of work time, which a requesting party must offer at the inception of the request for deposition. "At the time of service of a witness summons the witness must be offered or paid – (a) a sum reasonably sufficient to cover his expenses in travelling to and from the court; and (b) such sum by way of compensation for loss of time as may be specified in Practice Direction 34A."

66. Petitioner has actively sought to deprive AMIT FORLIT of the right to be compensated for his appearance at any deposition for his expenses travelling to or from court to testify, or to be compensated for loss of time as specified in PD 34A, which states:

> **3.1** When a witness is served with a witness summons he must be offered a sum to cover his travelling expenses to and from the court and compensation for his loss of time[5].
>
> **3.2** If the witness summons is to be served by the court, the party issuing the summons must deposit with the court:
> (1) a sum sufficient to pay for the witness's expenses in travelling to the court and in returning to his home or place of work, and
> (2) a sum in respect of the period during which earnings or benefit are lost, or such lesser sum as it may be proved that the witness will lose as a result of his attendance at court in answer to the witness summons.
>
> **3.3** The sum referred to in 3.2(2) is to be based on the sums payable to witnesses attending the Crown Court[6].
>
> **3.4** Where the party issuing the witness summons wishes to serve it himself[7], he must:
> (1) notify the court in writing that he wishes to do so, and
> (2) at the time of service offer the witness the sums mentioned in paragraph 3.2 above.

67. The foregoing weighs against the Petitioner's request for discovery under 28 U.S.C. § 1782, as Petitioner has the right to seek discovery deposition(s), and production of documents, directly in the UK Proceedings under the UK Court's applicable Civil Procedure Rules. The fact that the foregoing

was concealed from the Court by the Petitioner should also weigh heavily against the Petitioner's current request.

68. As to the fourth Intel factor, the gross overbreadth of discovery sought by the Petitioner should also give the Court immediate pause.

69. Petitioner seeks to require AMIT FORLIT to travel to the Southern District from Tel Aviv, Israel, even though AMIT FORLIT is not a United States Citizen or resident, and he possesses no green card. Petitioner seeks an unlimited scope deposition of AMIT FORLIT in the Southern District, despite already having more than two (2) days to ask questions of AMIT FORLIT previously when he appeared in Tel Aviv, Israel, as representative of the Respondents for Rule 30(b)(6) depositions in July of 2022.

70. Per Rule 30(d)(1) of the Federal Rules of Civil Procedure, "(1) Duration. Unless otherwise stipulated or ordered by the court, a deposition is limited to one day of 7 hours. The court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." As noted above, Petitioner's counsel went grossly afield of the two (2) areas of inquiry designated in the Rule 30(b)(6) notices which were the subject of the Rule 30(b)(6) depositions conducted on July 20, 2022 and July 21, 2022, and Petitioner's counsel asked what appears to amount to in excess of seven (7) hours of questions to Mr. Forlit which were wholly outside the scope of the Rule 30(b)(6) notices. Petitioner has not identified any basis for another deposition of seven (7) hours for AMIT FORLIT individually, or what additional information could be adduced which would exceed that already produced on July 20, 2022 and July 21, 2022.

71. Moreover, DE 47-1 and 47-2, and Exhibit "7" attached hereto, show how Petitioner and Petitioner's counsel's true goal is to conduct discovery relating to the claims Petitioner has asserted in the Southern District of New York in pending Case No.: 1:22-cv-08728-PGG.

72. Despite openly asserting in the RICO Complaint filed in 1:22-cv-08728-PGG that the UK case "seeks damages for the 2016 hacking of Azima" and "This Complaint seeks damages for conduct that postdates the 2016 hacking", Petitioner's proposed production subpoena directed to AMIT FORLIT seeks:

> *1.* All documents and communications relating to or reflecting any work performed by you, Mr. Amit Forlit, and/or Mr. Stuart Page relating directly or indirectly to Mr. Farhad Azima or Azima's Associates, <u>including but not limited to</u>:
>
>> a. All reports prepared about or involving Mr. Azima and/or Azima's Associates;
>>
>> b. All documents of Mr. Azima or others obtained for the Project, including all hacked data from Mr. Azima or Azima's Associates, whether or not it was included in a report;
>>
>> c. All engagement letters relating to Mr. Azima or the Project;
>>
>> d. All invoices for the Project, including but not limited to invoices sent to Page Group ME Ltd and any other Page Group entity;
>>
>> e. All communications regarding Mr. Azima or Azima's Associates;
>>
>> f. All communications about any websites, torrents, or WeTransfer links relating to Mr. Azima;
>>
>> g. All documents and communications instructions to "go after" or "target" Mr. Azima;
>>
>> h. All documents related to bank accounts and transactions used to send and receive money related to Azima or Azima's associates;
>>
>> i. All documents and communication related to Mr. Azima's trial; and
>>
>> j. All documents and communications related to meetings with Mr. Gerrard, Mr.
>
> 2. All documents and communications relating to any individuals who were involved in preparing reports regarding the Project, including all employees, subcontractors, and vendors.
>
> 3. All documents and communications with Mr. Stuart Page, Mr. Neil Gerrard, Mr. Jamie Buchanan, Eitan Arusy, Majdi Halabi, or any individual associated with the law firm Dechert LLP (including Mr. David Hughes), including all WhatsApp, email, and messaging application exchanges.

73. In connection with these production categories, Petitioner has come up with his own defined term "Azima's Associates", which "includes but is not limited to" five (5) more people: Khater Massaad; Ray Adams; Afsaneh Azadeh; Kirby Behre; Chris Cooper.

74. Petitioner has not addressed the clear overlap between the discovery sough there and the claims at issue in the newly filed New York litigation, nor has the Petitioner sought to identify in any way, shape, or form, what these "Azima's Associates" have to do with the UK Proceedings, why the identified categories of documents pertaining to these individuals is relevant to the UK Proceedings, or even if the materials relating to these individuals is admissible in the UK Proceedings. Moreover, Petitioner again seeks to use "including but not limited to" in a defined term, leaving any person or entity served with such a discovery request to guess at what persons Petitioner might consider to be his "Associate".

75. It is clear that seeking grossly overbroad document production from AMIT FORLIT, as well as another 7 hours of deposition with no limitation in scope whatsoever, is a request by the Petitioner designed only to harass and annoy AMIT FORLIT, and an attempt to require him to incur additional costs and expenses in this proceeding where Petitioner has already filed another proceeding in the Southern District of New York (in which he is seeking to serve AMIT FORLIT) where the full breadth of discovery afforded under the Rules of Civil Procedure is available in a bi-lateral format to all named parties.

76. As a final point of consideration for the fourth Intel factor, across the past 20 years, AMIT FORLIT has worked (through Gadot Israel) for a number of clients, **none of which ever hired him to investigate the Petitioner, or to "hack" the Petitioner.** AMIT FORLIT should not be subjected to limitless discovery about his activities as a private investigator, Gadot Israel's business or activities which do not involve the Petitioner, the identify of Gadot Israel's clients and the services provided to them, the when, where, how, and what clients paid for Gadot Israel's services, or the scope of his

services, or anything else that is not directly related (and limited) to a) the Petitioner, or b) the testimony provided in the subject UK proceedings and which is the subject matter or the "re-re-amended counter-claim". At a bare minimum, the grossly overbroad and limitless deposition subpoena should be denied, and the request (if the Court somehow looks beyond all of the foregoing and determines that jurisdiction exists and the sought discovery is appropriate) must be trimmed and tailored so as to match the actual alleged "issues" and "need" for the desired discovery deposition.

## CONCLUSION:

Based upon the foregoing, subject matter jurisdiction does not lie in this proceeding as to AMIT FORLIT, and as such the Petitioner's Amended Petition must be denied, the intended discovery disallowed, and these proceedings dismissed as to AMIT FORLIT. AMIT FORLIT furthermore should be awarded a recovery of reasonable attorney's fees and court costs incurred in being forced to respond to the Petitioner's filings and actions in this proceeding.

WHEREFORE AMIT FORLIT requests that this Court DENY all relief requested by the Petitioner, and grant relief to AMIT FORLIT as set forth hereinabove.

## GOOD FAITH CERTIFICATION:

The undersigned counsel hereby certifies that: (A) that counsel for the undersigned has conferred with all parties or non-parties who may be affected by the relief sought in the foregoing in a good faith effort to resolve the issues raised in the foregoing and has been unable to do so.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25th day of January, 2023, that a true and correct copy of the foregoing has been filed through the Court's CM/ECF-filing portal and that a true copy has been served through the portal upon all counsel of record in this action.

Respectfully submitted,

By: */s/ Christopher S. Salivar, Esq.*
    Christopher S. Salivar, Esquire
    Florida Bar No.: 57031
    6576 Whispering Wind Way

Delray Beach, FL 33484
Tel: (561) 628-8908
Email: cssalivarattorney@gmail.com

By: */s/ Elan I. Baret, Esq.*
     Elan I. Baret, Esquire
     Florida Bar No.: 20676
     3999 Sheridan Street, 2nd Floor
     Hollywood, Florida 33021
     Tel: (954) 486-9966
     Facsimile: (954) 585-9196
     Email: elan@baretlawgroup.com