IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| In re: Application Pursuant to | ) | |
| 28 U.S.C. 1782 of | ) | |
| | ) | |
| FARHAD AZIMA | ) | Case No.: 1:22-cv-20707-MC-MARTINEZ |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | |
| INSIGHT ANALYSIS AND RESEARCH, | ) | |
| LLC, and SDC-GADOT LLC, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| _____ | ) | |

**INSIGHT ANALYSIS AND RESEARCH, LLC AND SDC-GADOT, LLC'S RESPONSE IN OPPOSITION TO PETITIONER'S AMENDED APPLICATION FOR DISCOVERY (DE # 64) (AND INCORPORTED MEMORANDUM OF LAW):**

COME NOW INSIGHT ANALYSIS AND RESEARCH, LLC and SDC-GADOT, LLC, by and through the undersigned attorneys, and hereby files this Response in Opposition to Petitioner's Amended Application for Discovery under 28 U.S.C. § 1782 (as found as part of DE # 64), upon proffer of the following:

1. On January 19, 2023, Petitioner filed DE # 64, which is an Amended Petition for Discovery. Though in places it appears that DE # 64 only seeks relief in the form of the ability to seek discovery from non-party and proposed Respondent AMIT FORLIT, other portions of DE # 64 appear to seek leave of court to conduct additional discovery directed to INSIGHT and GADOT.

2. As this Court is aware, Petitioner was originally granted leave of Court to serve subpoenas for document production upon these Respondents. Petitioner obtained this leave of Court by spinning a patently false narrative accusing these Respondents of "hacking" the Petitioner, and being involved in a "cover up conspiracy" thereafter designed to obfuscate the true identity of the parties who gained access to the Petitioner's data.

3.  In so doing, Petitioner did exactly what he did when appearing before the Court in the United Kingdom: he spun a story based upon false evidence, fabrications, and lies.

4.  Of particular import, Petitioner relied almost exclusively on the "testimony" of Stuart Page and Majdi Halabi, two parties who testified as witnesses before the High Court of Justice in the United Kingdom in 2020. Absent from the Petitioner's presentation is the fact that both parties were found to have provided "unreliable", "not credible", and "false" testimony to the UK Court.

5.  As to Stuart Page, the High Court in the "UK Proceedings" referenced and found him to be wholly lacking in credibility (even before he recanted his trial testimony). Specifically, in the final judgment entered by the High Court of Justice on May 22, 2020, the Court found:

> Stuart Page, also a former policeman and now the Chairman and majority shareholder of a business providing security and surveillance services, dealt in his witness statement with his engagement in RAK to assist with the investigations into Dr Massaad and the discovery of the hacked material. Counsel for Mr Azima submitted that Mr Page was a dishonest witness who lied about a number of matters. **I consider that Mr Page was an unsatisfactory and unreliable witness.** As set out in greater detail in the context of the hacking claim, **his witness statement was misleading in relation to two significant matters. First, his witness statement implied that he did not produce written reports for the Ruler on his investigations whereas in fact he did so on a regular basis. Second, his witness statement said that he first came across the name of Mr Azima in early 2016 whereas in it was in fact a year earlier**. **His evidence in connection with the discovery of the hacked material was both internally inconsistent and at odds with the contemporary documents. I have concluded that it would be unsafe to rely on any evidence from Mr Page that was not corroborated by some other source**.

> See Exhibit "1" attached hereto, which is an excerpt of the High Court's of Justice's May 22, 2022 Judgment in the case of *Ras Al Khaimah Investment Authority v. Farhad Azima*.

6.  As to Majdi Halabi, the other "witness" whose testimony is relied upon by the Petitioner, he too was found to be of dubious credibility by the High Court of Justice. See Exhibit "1", wherein the Court stated: "*Majdi Halabi gave evidence in relation to the discovery of the hacked material. As set out later in this judgment, I came to the conclusion that his evidence was inherently implausible and not credible.*"

7.   Moreover, **as to the Petitioner himself**, Farhad Azima was found by the High Court of Justice to also have committed the presentation of false testimony, as well as fabricated and back-dated documents. Specifically, in its judgment the Court found:

> Mr Azima is a businessman with more than forty years' experience in all aspects of aviation, the airline industry and logistics. He has served as chairman of various airlines in different parts of the world. I am told that he has never before faced an allegation of fraud. RAKIA submitted that Mr Azima and Mr Adams were dishonest witnesses. **After hearing evidence from Mr Azima and Mr Adams, I reached the conclusion that their evidence in opposition to RAKIA's claims was frequently inconsistent with the contemporaneous documents and inherently implausible.** One example was their evidence concerning the retrospective drafting of the Joint Venture Agreement, which I deal with at paragraphs 123 to 128 below. **I consider that Mr Azima and Mr Adams, in giving evidence, were more concerned to support Mr Azima's case than to assist the court with an honest recollection of the true facts.**
>
> ...
>
> I consider that the explanations given by Mr Azima and Mr Adams of these communications made no sense and were untruthful. If Mr Azima had simply asked Mr Adams to send him "all" previous drafts of the agreement in his possession (as Mr Adams claimed), which is inherently unlikely, they would not have been sent over a period of nearly two months in an evolving sequence. Moreover if the drafts were really prepared in 2007 one would also expect to see them and emails exchanging them in 2007 in Mr Azima's disclosure. None of these documents were disclosed other than as attachments to emails in 2013.
>
> I agree with RAKIA's submission that the overwhelming inference from the documentary evidence is that Mr Azima and Mr Adams retrospectively drafted the Joint Venture Agreement in the summer of 2013. Mr Azima and Dr Massaad (who by then had no authority to enter agreements on behalf of RAKIA) then signed that retrospectively drafted and backdated document on board Mr Azima's yacht on 25 August 2013 and thereafter misrepresented to RAKIA that this document was the original document that had been signed on 12 April 2007.
>
> See Exhibit "1".

8.   Additionally, Petitioner has yet to advise the Court as to the content of any of the materials or "data" which Petitioner claims were taken from him, and he has not addressed the content of any "hacking reports" he alleges were created using such data. This is likely due to the fact that providing the Court

with this information would likely affect the Court's weighing of the Petitioner's credibility, and would jeopardize his request for assistance from this Court[1].

9.  This is the hidden backdrop behind the webbed narrative presented by the Petitioner to this Court, which has only been unraveled as the months have progressed and as the Respondents have uncovered more and more pertinent information which Petitioner decided, in an *ex-parte* proceeding, not to provide to this Court.

10. Against this backdrop, Petitioner served document production subpoenas upon these Respondents, as well as Subpoenas for Deposition pursuant to Rule 30(b)(6), doing so without any authorization by this Court.

11. Despite back and forth motion practice, counsel for the parties eventually agreed to produce non-party AMIT FORLIT as the corporate representative for INSIGHT and GADOT for Rule 30(b)(6)

---

[1] During July 2022 Rule 30(b)(6) depositions already completed in this proceeding, Petitioner's counsel produced multiple "reports" which identify Petitioner and members of his family, financial information relating to the Petitioner, business information relating to the Petitioner, and potential criminal activities perpetrated by the Petitioner. These reports have not been filed with the Court due to the sensitive nature of the information contained therein (though they were made exhibits to the subject Rule 30(b)(6) depositions), however one such "report" (titled "Project Beech Report – Farhad Azima") states the following regarding the Petitioner:

"The main effort is placed in order to assist the client in taking the Generator out of the dispute between KM and the client. To do so, one of the main objectives is to point out any potential criminal activity by FA in order to present it to US law enforcement authorities. Without getting into legal analysis, it seems that FA's actions are potentially in violation of the US sanctions against Iran, FCPA laws, Money Laundering laws, the Patriot Act etc. The following are the main findings on FA: a) FA was involved in the bribery of an Azeri tax officer regarding an entity he partially owns in Azerbaijan. B) FA maintains tied business relationship with three Iranians, designated on the US OFAC SDN list together with eight related entities. Since 2011 they have conducted several financial deals and transactions together. In 2011 FA was the mastermind behind supplying them with new St. Kitts passports. C) FA is having financial relationship with Mohammad Hossein Mahallati, an Iranian – US businessman suspected to be an agent of the Iranian regime. D) According to our sources, FA is still in touch with Shahab Izadpanah. E) FA is promoting an ISR project in order to export intelligence and surveillance technologies to the Middle East and Ukraine, allegedly against the Patriot Act."

depositions to be conducted in Tel Aviv, Israel, and those depositions were completed on July 20, 2022 and July 21, 2022.

12. Despite having initially agreed upon the scope of the depositions (see Exhibit "2" attached hereto), Petitioner's counsel went wildly afield of the agreed upon areas of inquiry, and began inquiry into matters pertaining to the work performed by a separate company (Gadot Israel a/k/a Gadot Information Services), as well as unrelated financial transactions addressing work done by Gadot Israel for other clients (i.e., clients who were not Stuart Page).

13. For purposes of example, the following questions (and responses) were provided during the two (2) days of depositions which had no relation whatsoever to the agreed upon areas of inquiry:

   Q.   And for example where did the CitiBank records get mailed to?

   A.   As far as CitiBank is concerned mostly they would send a debit card but the rest of the documents were usually sent via the application the app.

   Q.   **And did they send those did they send the debit cards to New York or to Miami?**

   A.   **No they sent it to Israel I had a fraud event with my card so I canceled the card and they sent me a new card which they sent to Israel.**

   Q.   **And the fraud on the card was for a debit card?**

   A.   **Yes.**

   Q.   Who actually used those debit cards during the life of this account at CitiBank?

   A.   I did.

   Q.   Did anyone else use those cards?

   A.   With the exception of the fraud case.

   Q.   Yes?

   A.   Nobody else.

   Q.   So all the purchases then that would be indicated in the bank statements for Citi that were made on the debit card would have been your personal charges; correct?

A.  These are not personal expenses these are company expenses.

**Q.  And so when you purchased a Porsche in Pennsylvania was that a business expense or a personal expense**?

THE INTERPRETER:  When you acquired a what.

MR. BEHRE:  A Porsche the car.

THE WITNESS:  **I never bought a Porsche in Pennsylvania**.

**Q.   Have you ever resided in the state of Florida?**

**A.   Only as a tourist I never resided there.**

**Q.   Have you ever resided in the United States?**

**A.   No.**

Q.  Have you ever purchased a vacation home in the United States?

A.  No.

Q.  Have you ever attempted to purchase a vacation home in the United States?

A.  No.

Q.  Did you ever form an LLC to purchase a vacation home in the United States?

A.  No.  I bought once a caravan an RV.

**Q.   Did you ever form an LLC with your wife in an effort to buy a vacation home in the United States?**

**A.  I set up an LLC with my wife in order to buy a caravan not not a vacation home an RV.**

**Q.   What was the last part sorry?**

**A.   Recreational vehicle an RV.**

**Q.   And when was that?**

**A.   I believe it was in 2012 and then when we maybe 20 or maybe 2014 he adds and when we divorced in 20 the end of 2017 beginning of 2018 as part of the divorce arrangement I transferred to her the ownership of the RV.**

Q.   And while you owned the RV where was it stored when it was not being used?

A.   It was in use about one month or one month and a half per year and we would store it in the place that we would we would be arriving at.

Q.   And what state was that?

A.   I believe we visited something like 30 states like all over the place.

Q.   Was it ever stored in the state of Florida?

A.   I don't believe so.

Q.   Where?

A.   Because we were more on the west.

Q.   And where from what state were the license plates obtained from?

A.   I don't I honestly don't remember.

Q.   In what state did you purchase the RV?

A.   New Jersey.

**Q.   Now you indicate in the third paragraph of this affidavit dated May 12, 2022, that SDC-Gadot LLC has not conducted business in the state of Florida. Do you see that?**

**A.   Yes.**

**Q.   Is that an accurate statement?**

**A.   I believe it is.**

**Q.   And when you say you it the company has not conducted business in the state of Florida what do you mean?**

**A.   That we did not do any business in the state of Florida.**

**A.   We did not carry out any investigation and we did not conduct any business activity.**

**Q.   Okay.  Now, in paragraph three as well you say the last time you were in the United States was 2019 what were you doing in the U.S. in 2019 (Not translated.)**

**<u>A.   I was on a trip in the Yosemite National Park went up to Canada I was with my partner.</u>**

Q.   You indicate in paragraph six that you are an investigator and you were hired by Stuart Page to quote run intelligence gathering services end quote. Do you see that?

A.  I'm looking -- looking for it.  Yes I see it.

Q.  Are you considered a private investigator?

A.  Among other things yes.

Q.  Are you registered as a private investigator here in Israel?

A.  I'm registered and I have a firm certificate.

Q.  Are you do you have a license to be a private investigator?

A.   There are two levels I'm I have a private investigator's license and I have a license to run an investigating firm I don't actually use them here in Israel but I have those documents from the justice department or Ministry.  I don't think I've even renewed those licenses.

Q.  Has your license ever been suspended or revoked by the government of Israel?

A.  Yes.

A.  Yes I don't even recall why they suspend ed it but then they reinstated.

Q.  And do you recall what year it was suspended?

A.  2005 or six.

Q.   And did it relate to your involvement in smuggling someone out of the State of Israel who was wanted by the Israeli government?

A.  I was accused of that there was a trial I was not found I was not convicted and so my license was restored.

Q.  So that was the reason your license was suspended?

A.  I think so but I don't recall exactly.

…

MR. BARET:  Excuse me how does that relate to SDC-Gadot which is the purpose of this deposition.

MR. BEHRE:  He's claiming he's an investigator and I'm probing about his license.

MR. BARET:  This is not this wasn't for SDC this affidavit was provided to the court as an objection to deposing personally it wasn't.

MR. BEHRE:  It doesn't matter it's the same case.

MR. BARET:  No it's not I mean there is objection to his deposition which the court has not ruled yet we objected for his deposition and since you came from Washington I'm I'm sitting quietly and I'm trying not to interfere but it turns out that you are deposing Amit Forlit as Amit Forlit which we objected to this deposition and the court hasn't ruled yet and we here for the purposes of investigating or taking deposition of a representative of SDC-Gadot Florida.

MR. BEHRE:  Correct.

MR. BARET:  Now it happens to be Amit Forlit but the court has not ruled as to our objection to depose him personally and it turns out that this deposition turns to be taking a deposition in his personal capacity which we are objecting so.

MR. BEHRE:  In the affidavit paragraph five he specifically references SDC-Gadot LLC in paragraph six he says I am an investigator.

MR. BARET:  This is this affidavit was provided in our objection to depose him personally it wasn't we never objected to deposition of SDC-Gadot we're not objecting to SDC-Gadot as a Florida corporation. He happens to be a representative of that corporation and I request that your questioning will be related to SDC-Gadot and not to Amit personally as the court hasn't ruled yet as to your right to depose him personally the court will.

MR. BEHRE:  Okay I hear your objection.

…

**Q.   Did any of the payments that SDC-Gadot received relate to Gadot's use of subcontractors who were located in the United States?**

**A.   Not that I can recall.**

**Q.   Did you have any subcontractors in the United States?**

**A.   Not subcontractors I had vendors that I paid not subcontractors.**

**Q.   And did you have vendors located in the United States?**

**A.   I had vendors in the United States but they are not connected to the case related to Stuart Page.**

…

**Q.   And part of the objective of your work was to prevent those who you thought was harming RAK from doing harm; right?**

**A.   So from the investigation concentrated or focused on the criminal activities carried out by Khater Massaad** both business in business and in politics such as for example assisting Hezbollah or violating the sanctions on Iran and he and his use of various infrastructure structures belonging to RAK the state in order to commit these illegal activities criminal activities among other things we provided protection and our work included protecting creating protocols in order to protect the entire environment the boss was very, very concerned and he he refused to talk on on the telephone because he was so concerned.

**Q.   And SDC-Gadot received payments that were at least in part for the preparation of those reports; correct?**

**A.   So SDC-Gadot received payment for the whole Beech case and that included the security protocols and reports.**

Q.  And it also included payments for the work that was reflected in those reports; right?

A.  Yes.

…

Q.  Okay.  How did you first meet Stuart Page?

A.  I believe it was in 2008 or 2007.

A.  I went to London and I was requested to do some job for him.

Q.  Requested by who?

A.  A mutual acquaintance for whom I was working at the time.

Q.  And who was that mutual acquaintance?

A.  How is this connected to this case.

Q.  It's directly related Stuart Page paid Stuart Page paid you $2.6 million into the U.S. account and I want to know how it is you first came in contact with Stuart Page?

A.  I met him through a mutual acquaintance I believe it was Mr. Rafi Pridan.

…

Q.  Did your investigation involve at all Karam Al Sadaq?  (spelling)

A.   The correct name is Karam Al Sadeq Karam Al Sadeq I also speak Arabic when we launched our investigation Karam was already arrested by the authorities of RAK.

A.   And we did get feedback from concerning him from the investigation he had already been investigated by RAK among other things concerning offshore companies that he had.

Q.   The allegations against Al Sadeq were similar to the allegations against Massaad right they were related?

A.  Not not exactly Massaad.

A.  To the best of my recollection Sadeq assisted in creating the infrastructure for Massaad's activity but the the initiator was Massaad.

Q.  Were you present for any of the interrogations of Al Sadaq.

A.  No and I've never been to Ras Al Khaimah.

…

**Q.   Now you testified earlier that you were involved in private investigation correct?**

**A.  Yes.**

**Q.   And you don't provide IT services do you?**

**A.  I provide security envelope for computers not necessarily IT what you call IT.  We've for example developed a telephone that can't be tapped into and all kinds of technological developments.**

**Q.  But with regard to Project Beech you didn't provide any IT security other than the open-ended e-mail system where you put the reports right (Not translated.)**

**A.   I did provide in Project Beech I actually did provide consults services regarding communication security.**

**Q.  But that was a very small part of what you did for Project Beech; right?**

**A.  It was part I can't define it as big or small.**

…

**Q.   And if you look on on the same page that's page 52, on February 6 and February 13 just about a week apart there were two transfers one for 49,000 and one for 50,000 to Fusion GPS. Do you see that?**

**A.   Yes.**

Q.   (Not translated.)

**Q.   And Fusion GPS is an investigative firm; is that correct?**

**A.   Yes but there's no connection whatsoever to Stuart Page or Project Beech.**

**Q.   And Fusion GPS was a subcontractor to SDC-Gadot; correct?**

**A.   No they did not do any work for SDC-Gadot but they it was payment for something else**.

**Q.   And did the payments to Fusion GPS relate to anything you were doing for Stuart Page?**

**A.   Under no circumstances not at all.**

…


**Q.   There's a $47,000 payment on February 22 a wire to an Olam hamachshavim who is that (Spelling)?**

THE INTERPRETER:  Are did I get that right Olam machshavim (Spelling).

**THE WITNESS:  It's a vendor who supplied me with equipment again it has nothing to do with Stuart Page.**

BY MR. BEHRE:

**Q.   So it's your testimony that Olam sold you equipment?**

**A.   Yeah it's a computer store Olam HA machshavim**.

THE INTERPRETER:  That means computer world in Hebrew so yes I guess it must have been for equipment.

…

**Q.   Directing your attention go to 54 that's the SDC-Gadot statement for March 2018 there is a there's a wire on March first for $30,000 to Aviram Hawk which is Aviram Azari's company**

**A.   Yes that's correct.**

**Q.   And Mr. Azari recently pled guilty in Federal Court in New York to hacking didn't he?**

**A.   Yes he confessed to seven separate incidents of computer hacking in New York.**

**Q.   And the document in which he pled guilty references an Israeli company but they don't name that company was that company yours?**

**A.   No.**

**Q.   How do you know that?**

**A.   Because I've never commissioned hacking have never paid for hacking.**

Q.   You're aware that Mr. Azari is cooperating with federal law enforcement officials in the U.S.; correct?

A.   I wish him all the best.

Q.   Have you been contacted by those prosecutors about this case?

…

**Q.   What work did Azari do for you if it wasn't hacking?**

**A.   For me he never did any work.**

**Q.   Yet he was paid $55,000 on March first and March 12, 2018?**

**A.   He did work for Gadot and that work included economic investigations financial investigations.**

**Q.   And by financial investigations does that mean obtaining confidential banking and financial records about individuals who were being investigated?**

**A.   The investigations that Azari did for me had nothing to do with Project Beech or anything to do with Stuart at all.   And I asked him that any investigations he did to me for me be done in accordance with the law.**

**Q.   Why did you find it necessary to tell him to act lawfully?**

A.  <u>I say that to every one of my subcontractors.</u>

…

Q.  If you look on the same page **that's page 54 there are two entries on March 15th 2018 were where you received wires and one of them the first one is from Florida a p telecom Inc. Do you see that?**  It's a $1,000 that came in from a Florida entity; correct?

A.  **This is -- this is a different customer it has nothing to do with page or any of this case and I can add that the investigation in this particular instance was in South America and has nothing to do with what's going on.**

Q.  **In your affidavit that you submitted in this case in Florida, you indicated that you didn't transact business in Florida and yet we have a transaction where you received $100,000 from a Florida company what business did you transact with this Florida company?**

A.  <u>**I did not transact any business in Florida as I said earlier and this payment is for work that was done in South America**</u>.

…

Q.  **Well, if you look on March 23 on page 55 you received $350,000 from overseas consulting limited LLP; correct?**

A.  **There's no connection whatsoever between these wires and Stuart Page and I I can't answer beyond saying that this has nothing to do with Project Beech Farhad Azima or Stuart Page.**

Q.  **So in the month of March 2018 you received $650,000 from Florida companies; correct?**

A.  <u>**This work was not executed in Florida the customer is not a U.S. citizen**</u>. And apparently part of the payment for this work was transferred through an American through American companies.

Q.  **So my question is you went to all of this trouble to open the SDC-Gadot LLC account with CitiBank and yet you appear to be moving money just about as fast as you get it out to the Israeli entity. Why?**

A.  <u>**Most of the work was carried out by Gadot Israel.  And as I explained before these accounts in the United States were opened merely for convenience's sake which had proved itself over time.**</u>  **As I can see now in July there's a lot of activity that is not connected to page at all to Stuart Page.**

…

**Q.  Okay.  What about Ezekiel Golan Intellectual Pro there are several wires to that entity on December 12th and 13th totaling $65,000. Ezekiel Golan intellectual pro?**

**A.  It is not connected connected in any way whatsoever to Stuart Page or to the Beech Project.**

Q.   What services did @Ezekiel Golan intellectual provide?

A.    I am prevented from answering that this is not connected and it is under privilege.

Q.   Under privilege because you were acting at the direction of a lawyer (Not translated.)

A.   No because of my agreement with Ezekiel Golan that commands a privilege.

Q.   Well, I don't knowing that's a valid basis not to answer?

…

Q.   And then in July 2019 there's a trip to Vegas you stayed at the?

A.   (In English.)  July.

Q.   July 2019 you went to the practiced a store and spent $535 the Montclaire store and spent 2175?

A.   I want a belt.

Q.   You won a?

A.   I can bring it tomorrow.

Q.   Okay.  I'll try it on.

Q.   And you saw the Beetles on Broadway and you ate at Joel Robishon?

A.   Joel Robishon.

Q.   Right?

A.   Kin.

…

See DE 47-1 and 47-2, which respectively are the transcripts for the Rule 30(b)(6) depositions of GADOT and INSIGHT which were conducted on July 20, 2022 and July 21, 2022.

14. Through the use of subterfuge, Petitioner and his counsel obtained more than 15 hours of deposition testimony from AMIT FORLIT as representative of GADOT and INSIGHT, and obtained significant information which was well beyond the scope of the agreed upon Rule 30(b)(6) designations.

15. But during those depositions Petitioner also obtained **<u>unequivocal testimony establishing that neither GADOT, INSIGHT, nor Amit Forlit himself, ever investigated the Petitioner. The testimony provided also established that AMIT FORLIT, GADOT, and INSIGHT, never "hacked" or participated in any "hacking" of the Petitioner</u>. Finally, the testimony established that AMIT FORLIT and these Respondents were not involved in any "cover up" story to be presented to the Courts in the U.K**.:

> Q.   So in the in the document subpoena that you have in front of you Exhibit No. One it asks in on page nine of 39 so the numbering is in the upper right-hand corner under 1A the asks for all reports. Do you see that?
>
> A.   Yes.
>
> Q.   And are those the reports you referenced as having not been retained?
>
> A.   **<u>No we have no reports on Azima because we didn't do any reports on Azima</u>**.
>
> Q.   So it was your testimony that there was no report that mentioned Farhad Azima?
>
> A.   **No.  In my opinion there were reports that mentioned Azima Farhad Azima not as the subject of an investigation but as someone whose name came up in the investigation.  And as I said earlier no reports were preserved so everything that I'm saying now is from memory.**
>
> Q.   So is it your testimony that the reports that mentioned Azima didn't reflect any investigation by your company of Azima?
>
> A.   **<u>My company did not investigate Farhad Azima so my company investigated Dr. Khater Massaad. In some of the transactions that Khater Massaad was involved in, other people were involved like members of the republican guard in -- revolutionary guard in Iran.  Like other people that</u>**

**were involved in these transactions and their names were mentioned.  And Farhad Azima's name came up in some of the transactions.**

…

Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?

A.   **I was working only Khater Massaad as the subject of my investigation** and it went only under Project Beech.

…

**Q. And when do you think you first heard the name Farhad Azima?**

**A. So at the start of the investigation of Gadot Israel, which is also known as Gadot Information Services, we learned that the subject of the investigation was a man named Dr. Khater Massaad. Khater Massaad was referred to your firm by your client Farhad Azima.**

Q. **And do you recall what year you learned that name -- the name of Farhad Azima**?

A. Because I reviewed some of the material in preparation for today, I **-- I would say it was in March 2015, early 2015.**

**Q. And in conjunction with your investigation of Farhad Azima, was the name Project Beech used?**

MR. BARET: Objection. Form.

THE WITNESS: **I have never investigated Farhad Azima. The investigation was of Dr. Khater Massaad.**

Q. Okay. So in preparation for your testimony today, you said that you reviewed some documents; is that correct?

A. Yes.

Q. And what have you reviewed to prepare for your testimony here today?

A. Affidavits given by Stuart Page.

Q. Okay. Anything else?

A. Bank accounts. Invoices for -- for Stuart Page.

Q. And when you say "bank accounts," what are you referring to specifically?

A. I wanted to see when we first charged for the work concerning Khater Massaad.

Q. And when you say "the work regarding Khater Massaad," did that include anything having to do with Farhad Azima?

A. The name of Farhad Azima came up throughout all the years the investigation was being carried out, in a number of transactions which were suspected of being illegal that we investigated. **But the client or the representatives of the client, especially at the beginning of the investigation, said that Farhad Azima served as a mediator or a go-between between them and Khater Massaad. And that's why neither we nor the client were asked to investigate Farhad Azima – were asked not to investigate Farhad Azima.**

…

Q.   Were you involved in writing this report?

A.   No.

Q.   A few minutes ago you said you weren't sure one way or the other why are you now sure you weren't?

A.   **<u>Because I see that this is a report of an investigation on Farhad Azima and we never investigated Farhad Azima</u>.**

…

Q.   **<u>Amit were you ever asked to investigate Farhad Azima</u>?**

A.   **<u>No</u>.**

Q.   **<u>Did you ever author or somebody under you author any reports regarding Farhad Azima</u>?**

A.   **<u>No</u>.**

Q.   **After you provided the report to Stuart did you have any control over what was added to the report?**

A.   **No**.

Q.   **Before Stuart provided a report or forwarded it to the client did he ever share with you the final version of the report that was produced to the client?**

A.   **No.**

MR. BARET:  No further questions.

…

Q.   Directing your attention go to 54 that's the SDC-Gadot statement for March 2018 there is a there's a wire on March first for $30,000 to Aviram Hawk which is Aviram Azari's company

A.   Yes that's correct.

Q.   And Mr. Azari recently pled guilty in Federal Court in New York to hacking didn't he?

A.   Yes he confessed to seven separate incidents of computer hacking in New York.

Q.   And the document in which he pled guilty references an Israeli company but they don't name that company was that company yours?

A.   No.

Q.   How do you know that?

**A.   Because I've never commissioned hacking have never paid for hacking.**

**Q.   When were you first hired for Project Beech?**

**A.   I believe it was 2015**.

Q.   So you worked with Stuart Page for approximately seven years before this project; right?

A.   Not consistently but between 2008 and 2015 on and off.

**Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?**

**A.   <u>I was working only Khater Massaad as the subject of my investigation</u> <u>and it went only under Project Beech.</u>**

Q.   Was there ever a time when that investigation was also called Project Oak?

A.   No Project Oak is something else.

Q.   Okay.  You testified earlier that you did not have a retainer agreement with Stuart Page; is that correct?

A.   To the best of my recollection there was no retainer agreement occasionally when we had problems with funds transferring with Hong Kong we would make some arrangements that would pacify the banks but to the best of my recollection there was no organized orderly retainer agreement with him.

Q.   What was the purpose for which you were hired?

A.   You mean on the Beech Project?

Q.   Yes.

A.   As I specified earlier there were concerns and suspicions on the part of the boss that Khater Massaad was stealing was causing damage to the state including assistance given to political opponents including felonies that would embarrass the boss very seriously vis-a-vis the United States in terms of the violations of the sanctions against Iran.

Q.   Did your investigation involve at all Karam Al Sadaq?  (spelling)

A.   The correct name is Karam Al Sadeq Karam Al Sadeq I also speak Arabic when we launched our investigation Karam was already arrested by the authorities of RAK.

A.   And we did get feedback from concerning him from the investigation he had already been investigated by RAK among other things concerning offshore companies that he had.

Q.   When were you first hired for Project Beech?

A.   I believe it was 2015.

Q.    So you worked with Stuart Page for approximately seven years before this project; right?

A.   Not consistently but between 2008 and 2015 on and off.

Q.   And did your work for Stuart Page relating to Khater Massaad and the others such as Farhad Azima did they go by any other name than Project Beech?

A.   I was working only Khater Massaad as the subject of my investigation and it went only under Project Beech.

Q.   Was there ever a time when that investigation was also called Project Oak?

A.   No Project Oak is something else.

Q.   Okay.  You testified earlier that you did not have a retainer agreement with Stuart Page; is that correct?

A.   To the best of my recollection there was no retainer agreement occasionally when we had problems with funds transferring with Hong Kong we would make some arrangements that would pacify the banks but to the best of my recollection there was no organized orderly retainer agreement with him.

**Q.   What was the purpose for which you were hired?**

**A.   You mean on the Beech Project?**

**Q.   Yes.**

**A.   As I specified earlier there were concerns and suspicions on the part of the boss that Khater Massaad was stealing was causing damage to the state including assistance given to political opponents including felonies that would embarrass the boss very seriously vis-a-vis the United States in terms of the violations of the sanctions against Iran.**

See DE 47-1.

16. In addition to this deposition testimony, INSIGHT and GADOT have compiled documents responsive to the original subpoenas served by Petitioner (pursuant to this Court's Order at DE # 62), and are in the process of transmitting them to Petitioner's counsel via a secure download link.

17. So, despite initiating this proceeding using false information, and using these proceedings for a false purpose which Petitioner concealed from this Court[2], Petitioner has obtained all discovery that he has requested to date.

---

[2] Petitioner initially concealed that he had been litigating with the parties he believed were responsible for his "hacking" since 2020 in a pending proceeding in the Middle District of North Carolina. *See Azima v. Del Rosso et al.*, 1-20-cv-00954-WO-JLW (M.D.NC). Then, on October 13, 2022, Petitioner initiated an action in the Southern District of New York against these Respondents and eight (8) other named Defendants. Therein, Petitioner asserted two (2) claims under RICO seeking money damages and other relief. Of note, in footnote two (2) of the Complaint, Petitioner openly and brazenly asserted that the UK Proceedings sought damages for the "2016 hack" of the Petitioner, and the RICO claim sought relief for all activities occurring thereafter. This assertion flies in the face of the Petitioner's continued mantra asserted before this Court that he "needs discovery about the cover up for the UK Proceedings", and revealed the true purpose of these proceedings, which was to conduct pre-suit discovery to assist the Petitioner in framing his domestic pleadings filed against these Respondents and others.

18. To the extent Petitioner seeks any additional discovery from these Respondents, his request must be denied.

19. Discovery permitted under 28 USC § 1782 lies in the sound discretion of the Court, and it is not mandatory. The Court may exercise its discretion to disallow discovery, or more narrowly tailored (or "trim") the Petitioner's discovery requests. And at a bare minimum, it is incumbent upon the Court not to allow a Petitioner to harass and bury a Respondent under discovery requests which are lodged purely for oppressive purposes. "The district court's discretion to allow discovery if all § 1782 requirements are met *is not boundless*. Rather, district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." Intel Corp., 542 U.S. at 252 (quoting Advanced Micro Devices, Inc. v. Intel Corp., 292 F.3d 664, 669 (9th Cir. 2002)). The Supreme Court has identified four discretionary factors that also "bear consideration" in arriving at a decision. Id. at 264. The first factor to consider is whether the person from whom discovery is sought is a party to the foreign proceeding, in which case "the need for § 1782(a) aid generally is not as apparent" because a "foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." Id. The second factor, at issue here, was adopted from a Senate Report explaining that a court "may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." Id. (citing S. Rep. No. 88-1580, at 7 (1964), as reprinted in 1964 U.S.C.C.A.N. 3782, 3788 (hereinafter "Senate Report")). The third factor to consider is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." Id. at 265. *Finally, the fourth factor addresses whether the request is "unduly intrusive or burdensome" to the extent that it should either be "trimmed" or rejected outright*. Id. In sum, a district court must

first determine whether the statutory requirements are met. If they are, the district court should then consider the four discretionary factors before arriving at a decision." See *Schlich v. Broad Inst.*, Inc. (In re Schlich), 893 F.3d 40, 46-47 (1st Cir. 2018).

20. The Petitioner has already conducted a broad fishing expedition through this action, and the conduct of the Petitioner and his counsel show how the Petitioner has been conducting a "bait and switch" game with this Court, in that though arguing that the "purpose" for these proceedings is to gather testimony and evidence for use in the UK proceedings, in reality Petitioner's counsel is probing around in order to complete his investigation to look for support for the causes of action the Petitioner recently asserted in Case No.: 1:22-cv-08728 filed in the Southern District of New York.

21. 28 USC 1782 does not authorize *carte blanche* unlimited discovery directed to non-parties merely because the requesting party comes before a Court and states that they believe the proposed Respondent may possess information useful to an ongoing foreign action, or may be a witness at a later time in the ongoing foreign action.

22. Here, the Petitioner and his counsel have grossly abused the discretion of this Court[3], and 28 USC § 1782, and as such this Court should DENY the Amended Petition seeking any further discovery from INSIGHT or GADOT.

**OTHER FACTORS WHICH MANDATE THE DENIAL OF THE RELIEF SOUGHT**:

23. Per Rule 30(d)(1) of the Federal Rules of Civil Procedure, "(1) Duration. Unless otherwise stipulated or ordered by the court, a deposition is limited to **one day of 7 hours**. The court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination."   As noted above,

---

[3] Particularly where, as noted above, the Petitioner, and his counsel, have already identified the individual and entities responsible for his "hacking", and are pursuing direct relief against those entities in another District Court in the United States. *See Azima v. Del Rosso et al.*, 1-20-cv-00954-WO-JLW (M.D.NC), wherein Petitioner has been bringing direct claims against the person and parties he asserts is responsible for his "hacking", with those claims having been asserted first in **2020**.

Petitioner's counsel went grossly afield of the two (2) areas of inquiry designated in the Rule 30(b)(6) notices which were the subject of the Rule 30(b)(6) depositions conducted on July 20, 2022 and July 21, 2022, and Petitioner's counsel asked what appears to amount to in excess of seven (7) hours of questions to Mr. Forlit which were wholly outside the scope of the Rule 30(b)(6) notices. Petitioner has not identified any basis for another deposition of either INSIGHT or GADOT, and as such no further deposition(s) should be allowed.

24. Furthermore, in an attempt to convince this Court that the discretionary *Intel*[4] factors weighed in favor of granting Petitioner's request, he falsely represented to this Court that he was left with no alternative but to seek discovery from this Court for use in the UK Proceedings.

25. In the initial Petition filed by the Petitioner, he stated: "Mr. Azima's application does not seek to avoid any proof-gathering requirements of the UK Court and is a good-faith attempt to seek discovery that would assist him in presenting his case at the UK Court, namely by obtaining additional evidence regarding the hacking perpetrated by the UK Defendants and subsequent cover-up. ***The fact that the UK Court has no jurisdiction over Respondents makes it necessary for Mr. Azima to pursue discovery from Respondents through this Court***. Mr. Azima is pursuing this discovery at the first available opportunity because in the first trial, RAKIA did not disclose the Respondents' involvement in the investigation of Mr. Azima or in the scheme to defraud the UK Court."

26. Now, Petitioner states: "Petitioner's initial and amended applications do not seek to avoid any proof-gathering requirements of the UK Court. Rather, the Petitioner has, under good faith, attempted to seek discovery that can assist him in presenting his case in the UK. ***The fact that the UK Court has***

---

[4] As identified by the honorable Beth Bloom in *In re Kurbatova*, 2019 U.S. Dist. LEXIS 84030 (S.D. Fla. 2019), "The Intel factors include: 1) whether the respondents are parties in a foreign proceeding; 2) the nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign tribunal to assistance from a U.S. federal court,  3) whether the discovery application conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States, and 4) whether the request is intrusive or burdensome."  See *Id*.

*no jurisdiction over the Respondents have made it necessary for Petitioner to pursue discovery from them through this court.*"

27. To the direct contrary, the fact that these Respondents are corporate entities organized in Florida is not an impediment to the Petitioner's ability to procure discovery from these Respondents in the UK Proceedings, and the Petitioner has wholly failed to advise this Court that discovery procedures are directly available to the Petitioner in the UK Proceedings. Specifically, pre-trial depositions, and document production, **<u>are available</u>** pursuant to Court Order under the applicable civil rules of procedure employed by the High Court overseeing the UK Proceedings. CPR[5] 34 provides for access to discovery depositions and document production by subpoena, and the issuance of letters of request to obtain depositions of persons residing outside of the High Court's geographical jurisdiction. See https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part34. CPR 34.13 specifically provides for protocols to allow depositions of foreign parties, and CPR 34A contains provisions addressing the procedures applicable to depositions of foreign parties.

28. In both of his filed Petitions, Petitioner has wholly failed to address the fact that he possesses discovery vehicles which are readily available to him under the governing provisions of the CPR. This is yet another instance of Petitioner actively misleading this Court, as Petitioner failed to address what steps, if any, Petitioner sought to employ under Rule 34 to obtain document production, or discovery depositions, directly from these Respondents.

29. Moreover, under Rule 34.7 a proposed witness is entitled to compensation for travel time and loss of work time, which a requesting party must offer at the inception of the request for deposition. "At the time of service of a witness summons the witness must be offered or paid – (a) a sum reasonably sufficient to cover his expenses in travelling to and from the court; and (b) such sum by way of compensation for loss of time as may be specified in Practice Direction 34A."

---

[5] CPR is an abbreviation for "Civil Procedure Rules".

30. Petitioner has actively sought to deprive these Respondents of the right to have their authorized

representative, Mr. Forlit, be compensated for his appearance at any deposition for his expenses

travelling to or from court to testify, or to be compensated for loss of time as specified in PD 34A,

which states:

> **3.1** When a witness is served with a witness summons he must be offered a sum to
> cover his travelling expenses to and from the court and compensation for his loss of
> time[5].
>
> **3.2** If the witness summons is to be served by the court, the party issuing the summons
> must deposit with the court:
> (1) a sum sufficient to pay for the witness's expenses in travelling to the court and in
> returning to his home or place of work, and
> (2) a sum in respect of the period during which earnings or benefit are lost, or such
> lesser sum as it may be proved that the witness will lose as a result of his attendance at
> court in answer to the witness summons.
>
> **3.3** The sum referred to in 3.2(2) is to be based on the sums payable to witnesses
> attending the Crown Court[6].
>
> **3.4** Where the party issuing the witness summons wishes to serve it himself[7], he must:
> (1) notify the court in writing that he wishes to do so, and
> (2) at the time of service offer the witness the sums mentioned in paragraph 3.2 above.

31. The foregoing weighs against the Petitioner's request for discovery under 28 U.S.C. § 1782 and the

third *Intel* factor, as Petitioner has the right to seek discovery deposition(s), and production of

documents, directly in the UK Proceedings under the UK Court's applicable Civil Procedure Rules.

The fact that the foregoing was concealed from the Court by the Petitioner should also weigh heavily

against the Petitioner's current request.

32. As to the fourth *Intel* factor, the gross overbreadth of discovery sought by the Petitioner should also

give the Court immediate pause.

33. Petitioner's newest proposed Subpoena seeks the following:

> 1. All documents and communications relating to or reflecting any work performed
>    by you, Mr. Amit Forlit, and/or Mr. Stuart Page relating directly or indirectly to
>    Mr. Farhad Azima or Azima's Associates, <u>including but not limited to</u>:
>
>    a. All reports prepared about or involving Mr. Azima and/or Azima's

Associates;

b. All documents of Mr. Azima or others obtained for the Project, including all hacked data from Mr. Azima or Azima's Associates, whether or not it was included in a report;

c. All engagement letters relating to Mr. Azima or the Project;

d. All invoices for the Project, including but not limited to invoices sent to Page Group ME Ltd and any other Page Group entity;

e. All communications regarding Mr. Azima or Azima's Associates;

f. All communications about any websites, torrents, or WeTransfer links relating to Mr. Azima;

g. All documents and communications instructions to "go after" or "target" Mr. Azima;

h. All documents related to bank accounts and transactions used to send and receive money related to Azima or Azima's associates;

i. All documents and communication related to Mr. Azima's trial; and

j. All documents and communications related to meetings with Mr. Gerrard, Mr.

2. All documents and communications relating to any individuals who were involved in preparing reports regarding the Project, including all employees, subcontractors, and vendors.

3. All documents and communications with Mr. Stuart Page, Mr. Neil Gerrard, Mr. Jamie Buchanan, Eitan Arusy, Majdi Halabi, or any individual associated with the law firm Dechert LLP (including Mr. David Hughes), including all WhatsApp, email, and messaging application exchanges.

34. In connection with these production categories, Petitioner has come up with his own defined term "Azima's Associates", which "includes but is not limited to" five (5) more people: Khater Massaad; Ray Adams; Afsaneh Azadeh; Kirby Behre; Chris Cooper.

35. Petitioner has not addressed the clear overlap between the discovery sough there and the claims at issue in the newly filed New York litigation (in which these Respondents are named Defendants), nor has the Petitioner sought to identify in any way, shape, or form, what these "Azima's Associates"

have to do with the UK Proceedings, why the identified categories of documents pertaining to these individuals is relevant to the UK Proceedings, or even if the materials relating to these individuals is admissible in the UK Proceedings. Moreover, Petitioner again seeks to use "including but not limited to" in a defined term, leaving any person or entity served with such a discovery request to guess at what persons Petitioner might consider to be his "Associate". As the Court is well aware, Petitioner previously attempted to "have his cake and eat it too" in connection with his first round of subpoenas, seeking to assert at the same time that the requests were narrowly tailored to pass scrutiny under the fourth Intel factor but at the same tome open and broad based upon the use of "including but not limited to" language which required these Respondents to guess at the mindset of the Petitioner as to what might, in his mind, be responsive.

36. It is clear that the Petitioner's new proposed subpoena seeks grossly overbroad document production and, is a request by the Petitioner designed only to harass and annoy the Respondents. Moreover, it is clear that Petitioner's actions are solely designed to require the Respondents to incur additional costs and expenses in this proceeding where Petitioner has already filed another proceeding in the Southern District of New York where the full breadth of discovery afforded under the Rules of Civil Procedure is available in a bi-lateral format to all named parties.

37. Finally, these Respondents' deposition responses also established that these Respondents did nothing more than maintain bank accounts to collect and remit funds for non-party Gadot Israel a/k/a Gadot Information Services.

> Q. And what was or is the business of Gadot here in Israel?
>
> A. Are you referring to the Israeli company Gadot Israel or the Florida company?
>
> Q. The Israeli company, which I understand you're now saying was using the U.S. entity to transmit funds.
>
> A. **Gadot Israel is a firm for crisis management that uses the collection of data, data analysis, and recommendations for actions to be taken by their customers**.

Q. And in your role with Gadot, has Gadot ever had in its possession stolen data, including stolen e-mails?

A. The answer to that question is a little bit problematic. Because the analysts of Gadot sometimes use information that has been leaked to various websites such as WikiLeaks. Sometimes e-mails that were stolen have been published. So to say that we don't use stolen e-mails in our data collection or as part of our data collection, that would not be accurate. But I can say -- **but I can say that Gadot Israel does not steal data and does not do anything criminal in its activities involving -- in its work here in Israel.**

Q. When you mentioned analysts at Gadot, what specifically is the role that analysts play in the company?

A. In many cases, we get from customers too and from open sources -- also from collecting from open sources and from investigations. For example, by participating in chat rooms and investigations of pretext and -- pretext and monitoring, all this data that is collected is analyzed by analysts.

Q. And by "pretext," do you mean misrepresentations by individuals about who they are to get information? Correct?

A. So every -- so as far as I'm concerned, pretext -- every -- every case should be judged separately. But it could involve hanging out in a bar and overhearing a conversation or talking to someone. Anything -- I consider anything where you don't introduce yourself and say I am so-and-so and I am investigating is what I would consider pretext.

Q. And you also used the term "monitoring." What is it you're monitoring?

A. (Comment in Hebrew.)

THE INTERPRETER: "Surveillance"?

THE WITNESS: "Surveillance."

THE INTERPRETER: Okay.

THE WITNESS: (Comment in Hebrew.)

THE INTERPRETER: The word should have been "surveillance."

BY MR. BEHRE: Q. And "surveillance," you mean human –

THE INTERPRETER: Physical surveillance -- I'm sorry -- he -- he -- he explained. He said: "Physical surveillance."

MR. BEHRE: Okay. Thank you. THE INTERPRETER: Actually surveilling someone.

BY MR. BEHRE:

Q. Following someone without them knowing it, is that an example of surveillance?

A. Yes. That's an example.

Q. Okay. And you said that the customer dictated the policy of not preserving documents; correct?

A. That's what Stuart Page told me. I never met the boss.

Q. And, again, by "boss," you mean the ruler; right?

A. Yes.

Q. <u>And what were the documents that were created but were not retained</u>?

A. <u>Approximately every month, but not always, and based on the findings of the investigation, we would produce a report. The report had an executive summary at the beginning. And this was followed by a breakdown of the findings of the investigation. And we would send these reports using the method that Stuart described quite accurately in his affidavit to Stuart. Stuart always asked, from the beginning, that we leave the report in an open format for two reasons. The first one was that he said that our English was beneath contempt. And he would also add sections to the report involving investigations that he did that had nothing to do with us</u>.

Q. Did you draft or write any portion of those reports?

A. The report was prepared by the staff of analysts. I would review the report before it was sent out, sometimes make corrections or changes.

Q. And when you say the "staff of analysts," who were those people specifically?

A. This was a staff of people who worked for Gadot. And for reasons of privacy, I will not state their names.

Q. And what are the reasons of privacy that you can't disclose the employees of your company?

A. <u>First and foremost, this investigation relates to Gadot U.S.A. and to Insight. And these employees are not employees of Gadot or Insight</u>. And, secondly, some of them have security clearances here in Israel Some of them came from the various security systems, Israeli security systems.

**Q. Well, as I understand your testimony, the payments that were made to SDC-Gadot were payments for the work of Gadot here in Israel; correct?**

**A. Correct.**

…

Q. So my question is: You went through all this trouble to open the SDC-Gadot LLC account with Citibank. And yet you appear to be moving money just about as fast as you get it out to the Israeli entity. Why?

A. **Most of the work was carried out by Gadot Israel**. **And as I explained before, these accounts in the United States were opened merely for convenience's sake, which proved itself over time.** As I can see now, in July, there's a lot of activity that is not connected to Page at all, to Stuart Page.

…

Q. And what types of materials did Mr. Page provide to you, as you indicated a few moments ago?

MR. BARET: I'm -- I'm sorry. Just for the -- when – when counsel's referring to "you," who are you referring to? Amit Forlit individually?

MR. BEHRE: Yes. As paid by -- for services by SDC-Gadot.

MR. BARET: Right. But –

THE WITNESS: **Amit Forlit did not receive money from SDC-Gadot. Gadot Israel received money from SDC. And I was a representative of SDC-Gadot.**

And Page provided materials. He had his sources. Maybe some of his clients and other sources. I don't know.

BY MR. BEHRE:

Q. What types of materials did Mr. Page provide?

A. A list of companies, a list of contacts of people who were involved, legal -- legal cases that he -- that were taken from various places.

Q. Did he ever provide you with confidential e-mails or financial data belonging to others to which he wasn't entitled to have?

A. I don't think so.

…

Q. So approximately what percentage would you estimate of that over $10 million was attributable to Project Beech?

A. I estimate about 50 percent.

Q. So over $5 million over four years; correct?

A. Correct.

Q. And of that $5 million approximately, how much was paid out to your subcontractors or vendors that were working on Project Beech?

A. Most of the sum, in my opinion, was paid to Gadot Israel.

Q. How were your subcontractors or vendors paid?

A. They were paid by Gadot Israel. And a small number, I guess, I estimate, received payment from the American account.

Q. In addition to subcontractors or vendors, were there any other individuals or entities that worked on Project Beech at your direction for which you paid them?

A. I don't recall. It's possible.

Q. Has Insight ever had employees?

A. No

…

**Q. Stuart Page paid you, in part, for the work your -- you and your team did in preparing reports; correct?**

**A. The reports were prepared by Gadot Israel.**

**Q. Yes. And they were paid for through your U.S. entities, including, you said, over $5 million from Stuart Page to your Insight U.S. account; right?**

**A. It -- Insight and Gadot both. And they paid Gadot Israel. And Gadot Israel paid.**

Q. And Gadot -- Gadot Israel paid the individuals who prepared the reports; correct?

A. Correct. It paid salaries to people.

See DE # 47-1, beginning at Page 14.

38. Corroborating this testimony, Petitioner is in possession of invoices from Gadot Information Services (which is a separate entity from the Respondents in this proceeding) identifying services for a "Beech" project, and which span from April of 2016 to August of 2017. Copies are attached hereto as Exhibit "3". These invoices identify a bank account maintained in Israel by Gadot Information Services, for services which Gadot Israel performed under the name project "Beech" (which AMIT FORLIT, as agent of the Respondents, has testified pertained to Khater Massaad, and <u>did not pertain to the Petitioner</u>).

39. In order to advance the Petitioner's false narrative he and his counsel openly ignore these invoices, the totality of the foregoing testimony, and the corporate existence of Gadot Israel a/k/a Gadot Information Services[6] as well as the corporate Respondents, when making the blanket (and unsupported) assertion that the Respondents are simply the "alter ego" of Mr. Forlit. It is axiomatic that if AMIT FORLIT was not individually performing work for Mr. Page, but rather Gadot Israel a/k/a Gadot Information Services was providing said services, Gadot Israel was receiving payments for said services (from funds paid by Mr. Page's entities to GADOT and INSIGHT), then AMIT FORLIT could not possibly be an "alter ego" of GADOT and INSIGHT (or vice-a-versa)[7].

40. In reality the testimony provided by these Respondents at the July 20, 2022 and July 21, 2022 Rule 30(b)(6) depositions taken in this action establishes that each corporate Respondent was organized for a lawful purpose, which was collecting and transmitting payments for services rendered by Gadot Israel a/k/a Gadot Information Services.

## **<u>CONCLUSION</u>**:

---

[6] Attached hereto as Exhibit "4" is a copy of corporate filing information maintained for Gadot Information Services, as organized in Israel in 2002.

[7] As noted repeatedly during these proceedings, SDC-GADOT, LLC and INSIGHT RESEARCH AND ANALYSIS, LLC were not organized until **<u>October 18, 2017</u>**.

Based upon the foregoing, the Petitioner's Amended Petition must be denied to the extent it seeks any additional discovery from these Respondents.

WHEREFORE SDC-GADOT, LLC and INSIGHT ANALYSIS AND RESEARCH, LLC, request that this Court DENY all relief requested by the Petitioner, and grant relief to the Respondents as set forth herein.

## **GOOD FAITH CERTIFICATION**:

The undersigned counsel hereby certifies that: (A) that counsel for the undersigned has conferred with all parties or non-parties who may be affected by the relief sought in the foregoing in a good faith effort to resolve the issues raised in the foregoing and has been unable to do so.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 25th day of January, 2023, that a true and correct copy of the foregoing has been filed through the Court's CM/ECF-filing portal and that a true copy has been served through the portal upon all counsel of record in this action.

Respectfully submitted,

By: */s/ Christopher S. Salivar, Esq.*
    Christopher S. Salivar, Esquire
    Florida Bar No.: 57031
    6576 Whispering Wind Way
    Delray Beach, FL 33484
    Tel: (561) 628-8908
    Email: cssalivarattorney@gmail.com

By: */s/ Elan I. Baret, Esq.*
    Elan I. Baret, Esquire
    Florida Bar No.: 20676
    3999 Sheridan Street, 2nd Floor
    Hollywood, Florida 33021
    Tel: (954) 486-9966
    Facsimile: (954) 585-9196
    Email: elan@baretlawgroup.com